# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  18-218 (TSC)** |
| **v.** | : | |
| | : | |
| | : | |
| **MARIIA BUTINA, also known as** | : | |
| **MARIA BUTINA,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT
## OF PRETRIAL DETENTION

### Introduction

The United States of America, by and through the U.S. Attorney for the District of Columbia, submits this memorandum in support of the defendant's pretrial detention.  As explained below, and as the government will demonstrate at any hearing on this matter, Mariia Butina ("Butina" or defendant) poses a serious risk of flight based on the nature of the charges, her history of deceptive conduct, the potential sentence she faces, the strong evidence of guilt, her extensive foreign connections, and her lack of any meaningful ties to the United States.

The defendant, a Russian citizen, stands charged with violations of 18 U.S.C. §§ 371 and 951(a), for her role in a covert Russian influence operation in the United States.  The charges in this case implicate not only Butina, but also the activities of a senior Russian Federation official, the individual identified as the Russian Official in the Indictment, who is now a specially designated national.  Given these circumstances, Butina presents an extreme risk of flight.

The defendant's legal status in the United States is predicated on deception.  She not only has deep ties to her country (with which the United States has no extradition treaty) but actually works on behalf of the Russian government.  FBI surveillance over the past week has confirmed that Butina has access to funds and an intention to move money outside of the United States.  Butina's closest tie to the United States is the individual identified as U.S. Person 1 in the Indictment, but she appears to treat that relationship as simply a necessary aspect of her activities.  Her last tie to the District of Columbia—her apartment lease—ends on July 31, 2018, and there were boxes packed in her apartment consistent with a move at the time of her arrest on July 15, 2018.   All of Butina's known personal ties, save for those U.S. persons she attempted to exploit and influence, reside in the Russian Federation.

Because Butina has been exposed as an illegal agent of Russia, there is the grave risk that she will appeal to those within that government with whom she conspired to aid her escape from the United States.  In sum, the Court should grant the government's motion to detain Butina pending trial.

### Principles Governing Requests for Detention

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure the defendant's appearance at trial and pre-trial proceedings:  the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).

At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015). When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

## Factual Proffer of the Evidence Supporting the Charges

The conduct charged in the Indictment arises from the defendant's acting as an agent of the Government of the Russian Federation. The United States proffers the factual allegations as set out in the affidavit in support of a criminal complaint, which is attached hereto as Exhibit A and incorporated herein.

In sum, the defendant engaged in a years-long conspiracy to work covertly in the United States as an undeclared agent of the Russian Federation in order to advance the interests of her home country. The plan was calculated, patient, and directed by the Russian Official. The defendant's covert influence campaign involved substantial planning, international coordination, and preparation. The plan for Butina also required, and she demonstrated, a willingness to use deceit in a visa application to move to the United States and bring the plan to fruition.

## Additional Information Supporting Detention

### 1. Butina Appears to Have Ties to the Russian Intelligence Services

The FBI has uncovered evidence during the course of executing several search warrants that, during the course of her deployment to the United States, Butina was in contact with officials believed to be Russian intelligence operatives. First, the defendant maintained contact information for individuals identified as employees of the Russian FSB, the *Federal'naya sluzhba bezopasnosti*

*Rossiyskoy Federatsii*, the main successor agency to the USSR's Committee of State Security, the KGB.  For example, in the defendant's electronic contact list, there was an email account listed at an FSB-associated domain.  Another document uncovered during the execution of a search warrant contained a hand-written note, entitled "Maria's 'Russian Patriots In-Waiting' Organization," and asking "How to respond to FSB offer of employment?"  Based on this and other evidence, the FBI believes that the defendant was likely in contact with the FSB throughout her stay in the United States.  Additionally, FBI surveillance observed Butina in the company of a Russian diplomat in the weeks leading up to that official's departure from the United States in March 2018.  That Russian diplomat, with whom Butina was sharing a private meal, was suspected by the United States Government of being a Russian intelligence officer.  The concern that Butina poses a risk of flight is only heightened due to her connection to suspected Russian intelligence operatives.

Moreover, like any sovereign nation, the Russian Federation has the ability to remove, or exfiltrate, its citizens from foreign countries.  And due to international law and treaty restrictions, law enforcement would be prevented from stopping Butina from entering the Russian Embassy.  Under these circumstances, a passport would not be necessary for Butina to depart the jurisdiction of the United States.  Accordingly, even with a full combination of the most restrictive measures, for example, (i) house arrest, (ii) electronic monitoring, (iii) high-intensity monitoring, (iv) any monetary bond or agreement to forfeit property, (v) retained passport, and (vi) third party custodian, the defendant need only seek refuge in a diplomatic facility, well before Pretrial Services would ever be alerted, let alone be able to respond.   Simply put, neither the Court nor law enforcement could stop her or has any recourse or remedy, in the event Butina decided to seek safe harbor in a diplomatic facility.

**2.   Butina Was Considered a Covert Russian Agent by the Russian Official**

FBI agents have also discovered messages between Butina and the Russian Official in which the Russian Official likened Butina to one member of a ring of Russian covert agents who were arrested in 2010.  Specifically, in March 2017, after a series of media articles were published about Butina, the following conversation ensued:

> Russian Official: Good morning! How are you faring there in the rays of the new fame?[] Are your admirers asking for your autographs yet? You have upstaged Anna Chapman.  She poses with toy pistols, while you are being published with real ones.  There are a hell of a lot of rumors circulating here about me too! Very funny!
>
> Butina: It is curious that only our liberal media published the translation of the article.  Yesterday I was pressing for an interview to Komsomolka but they are silent.  It was probably our [people] that stood up for me.
>
> Russian Official: I only saw it in the Echo [of Moscow] Blog and on the InoSMI site.  What do you expect from the liberals anyway?!
>
> Butina: It's the other thing that is important: evidently, there is an Order not to touch us.  I believe it is a good sign.
>
> Russian Official: For now – yes, but should things shift, then we are guaranteed a spot on the list of 'agents of influence." . . .
>
> Butina: It's better to keep a low profile now.  For some time.  You probably got in trouble because of that nasty leak? Sorry. . . .
>
> (Translated from Russian.)

The FBI believes that in this communication, the Russian Official was referring to Anna Vasilyevna Chapman, a Russian intelligence agent who gained notoriety after being arrested in the United States  in 2010.   At the time of her arrest, Chapman was accused of acting on behalf of the Russian Federation's external intelligence agency, the *Sluzhba vneshney razvedki* (SVR).  Chapman pleaded guilty to a charge of conspiracy to act as an agent of a foreign

government and she and the other Russians were deported to Russia on July 8, 2010, as part of a Russia – U.S. prisoner swap.

The Twitter direct messages between Butina and the Russian Official also contain multiple references to Butina acting covertly, such as the following exchange, from October 5, 2016, after the Russian Official asked about the status of the "Russia-USA friendship society":

> BUTINA: It's not alive. We are currently "underground" both here and there. Now, private clubs and quite [sic] influence on people making decisions is the trend. No publicity.

> BUTINA: Advisor – is the profession of the current day. Even a secret advisor. Right now the Administration here is flexible – and there is the idea, so that the right thoughts would dominate.

The following exchange occurred just a week later, on October 12, 2016:

> BUTINA: Don't do that! Take it easy on yourself. Important things are ahead of us!

> RUSSIAN OFFICIAL: In this sense, you probably shouldn't be going as an observer from Russia. The risk of provocation is too high and the "media hype" which comes after it.

> BUTINA: I agree! I did not even plan on it without you!  Only incognito! Right now everything has to be quiet and careful.

> (Translated from Russian.)

On January 20, 2017, in response to a photo Butina sent to the Russian Official of her near the U.S. Capitol on Inauguration Day, the Russian Official responded, "You're a daredevil girl! What can I say![]"  Butina responded, "Good teachers![]"

Based on the Russian Official's comments, the Court should conclude the defendant is considered to be on par with other covert Russian agents.  Her risk of flight under these circumstances increases immeasurably.

### 3.  Butina Has Ties to the Russian Oligarchy

In addition to her ties to the Russian government, there is evidence that Butina is well-connected to wealthy businessmen in the Russian oligarchy.  Her Twitter messages, chat logs, and emails refer to a known Russian businessman with deep ties to the Russian Presidential Administration.  This person often travels to the United States and has also been referred to as her "funder" throughout her correspondence; he was listed in Forbes as having a real-time net worth of $1.2 billion as of 2018.  Immediately prior to her first trip to the United States in late 2014, Butina engaged in a series of text messages with a different wealthy Russian businessman regarding budgets for her trip to the United States and meetings with the aforementioned "funder." Individuals such as these wealthy businessmen could, through their wealth and influence, be in a position to offer a safe harbor for Butina.

### 4.  Butina Proposed Applying for a U.S. Student Visa as Part of the Operation

The FBI has uncovered electronic communications revealing Butina's involvement in the planning of the covert influence operation with U.S. Person 1.  This series of communications included a discussion about how Butina could best enter and remain in the United States.  Butina chose a student visa from a range of options for her ultimate application, but not before a lengthy discussion of the risks associated with traveling to the United States repeatedly on a tourist visa. The FBI has discovered text messages and emails between U.S. Person 1 and Butina in which Butina would routinely ask U.S. Person 1 to help complete her academic assignments, by editing papers and answering exam questions.  In other words, although she attended classes and completed coursework with outside help, attending American University was Butina's cover while she continued to work on behalf of the Russian Official.

It is not uncommon for agents of a foreign government to assume cover occupations, including posing as students, while operating on behalf of the foreign power.   It is notable that Butina stated, under penalty of perjury, that she was no longer employed by the Russian Official at the time she applied for her student visa.   Butina likely only admitted her affiliation with the Russian Official at all because she had been previously publicly linked with that Russian Official in media reports.  Her false attestation on the visa application was premediated and consistent with her actions being part of a Russian operation.

## 5.  Butina's "Tie" to the United States is a Duplicitous Relationship

During the course of this investigation, the FBI has determined that Butina gained access through U.S. Person 1 to an extensive network of U.S. persons in positions to influence political activities in the United States.  Butina, age 29, and U.S. Person 1, age 56, are believed to have cohabitated and been involved in a personal relationship during the course of Butina's activities in the United States.  But this relationship does not represent a strong tie to the United States because Butina appears to treat it as simply a necessary aspect of her activities.  For example, on at least one occasion, Butina offered an individual other than U.S. Person 1 sex in exchange for a position within a special interest organization.  Further, in papers seized by the FBI, Butina complained about living with U.S. Person 1 and expressed disdain for continuing to cohabitate with U.S. Person 1.

## 6.  Butina Was Taking Steps to Leave the Washington, D.C., Area

Finally, in the days leading up to her arrest, Butina was observed by the FBI taking steps consistent with a plan to leave the Washington, D.C., area and possibly the United States.  First, Butina applied for a B1/B2 visa, which would allow her to travel to and from the United States. On July 14, 2018, Butina and U.S. Person 1 were followed to a U-Haul truck rental facility where

they inquired about renting a moving truck and purchased moving boxes.  When agents executed

a warrant at their Washington, D.C., apartment on July 15, 2018, the defendant's belongings were

packed and a letter was discovered notifying the landlord that the lease was to be terminated on

July 31, 2018.

In addition, on July 12, 2018, Butina and U.S. Person 1 were observed entering a bank in

Washington, D.C., and sending an international wire transfer in the amount of $3,500 to an account

in Russia.  Although the government does not proffer that it knows the purpose of that transfer at

this point, the amount shows her access to funds, and the location of the recipient underscores her

ties to Russia.

Even if Butina were only trying to leave the immediate Washington, D.C., area, her sole

real tie to the United States at all is U.S. Person 1, who, as the affidavit in support of the complaint

demonstrates, was instrumental in aiding her covert influence operation, despite knowing its

connections to the Russian Official.

### No Condition or Combination of Conditions Will Reasonably Assure the Defendant's Appearance in Court

### 1. Nature and Circumstances of the Offense(s) Charged

The circumstances of the offenses charged in this case overwhelmingly support detention.

By its very nature, this case involves charges against a foreign national whose demonstrated

allegiance is to Russia.  Her strong incentive is to retreat to Russia where she will never be required

to submit to the jurisdiction or orders of a United States court.

The charges in the Indictment are properly characterized as serious due to the possible

statutory penalties; the duration and complexity of the criminal conduct; and the fact that the

charges include multiple layers of deceit, including misleading statements to the U.S. State

Department.  *See United States v. Anderson*, 384 F. Supp. 2d 32, 39 (D.D.C. 2005) (defendant's

"historical unwillingness to be forthright in his dealings with government officials" relevant to flight risk).

The possible maximum terms of imprisonment that the defendant faces upon conviction provide an incentive to flee. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). The defendant faces ten years of imprisonment on the charge of a violation of 18 U.S.C. § 951 and five years of imprisonment for violating 18 U.S.C. § 371. Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes "a substantial incentive to flee the United States." *See Hong Vo*, 978 F. Supp. 2d at 43 (finding detention appropriate for defendant facing stiff penalties for bribery and visa fraud). Simply put, Butina has no incentive to appear before this Court and submit to the jurisdiction of the United States.

### 2. The Weight of Evidence Against the Defendant

Courts also consider the weight of the evidence in assessing the risk of light. 18 U.S.C. § 3142(g)(2). The weight of the evidence against the defendant is substantial. The FBI has acquired email and other electronic evidence documenting Butina's work on behalf of Russia, including taskings, reporting, and attempts to be "incognito." The evidence establishes that Butina's purpose for coming to the United States was to work on behalf of the Russian Federation. Further, numerous witnesses will testify about the influence activities described in the complaint.

### 3. The History and Characteristics of the Defendant

The defendant's history and characteristics likewise support pretrial detention. Butina is a Russian citizen with no meaningful ties to the United States; she has every reason to flee this prosecution. Butina entered the United States with the express purpose of working as part of a covert Russian influence campaign and did not disclose that fact—not on her visa application and

not to the Attorney General.  The Court should have no confidence that she would abide by any conditions of release, and the Court has no recourse to assure her appearance.

For obvious reasons, courts routinely find a serious risk of flight where, as here, a foreign-national defendant has few or no ties to the United States.  *See, e.g.*, *United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017); *United States v. Frater*, 356 F. App'x 133, 135 (10th Cir. 2009); *United States v. Hussain*, 6 F. App'x 50, 51-52 (1st Cir. 2001); *United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990).

## Conclusion

The defendant is a foreign agent who loyally acted on behalf of the Russian government. Based on the nature of the charges and the weight of the proffered evidence against the defendant, no condition or combination of conditions will reasonably assure the appearance of the defendant at trial.  Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by a preponderance of the evidence that the defendant is a flight risk.

For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845


By: _____/s/_____
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar Number 82960
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION FOR CRIMINAL COMPLAINT FOR MARIIA BUTINA, ALSO KNOWN AS MARIA BUTINA | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Kevin Helson, being first duly sworn, hereby depose and state that I am a Special Agent

with the Federal Bureau of Investigation (FBI) and charge as follows:

### THE FBI INVESTIGATION

1.     The bases of my knowledge for the facts alleged herein are as follows.  I have been a

Special Agent with the FBI for 15 years.  Currently, I am assigned to the Counterintelligence

Division within the Washington Field Office of the FBI.  The focus of my counter intelligence

efforts has been the investigation of the foreign intelligence activities of the Russian Federation.  I

have learned the facts contained in this affidavit from, among other sources, my personal

participation in this investigation, my discussions with other law enforcement agents, searches that

have been conducted, surveillance that has been conducted, and reviews of documents, electronic

items, and other evidentiary materials.

2.     In the course of this investigation, the FBI has employed a variety of lawful

investigative methods, including the acquisition of Rule 41 search warrants of two premises, which

included authorization to search electronic devices.  One of those searches included a laptop

computer belonging to MARIIA BUTINA, a/k/a "Maria Butina" ("BUTINA"), (hereinafter

"BUTINA's Laptop") and an iPhone belonging to BUTINA (hereinafter "BUTINA's iPhone").

Because this affidavit is being submitted for the limited purpose of establishing probable cause, it

does not include every fact that I have learned during the course of this investigation.  Further, any

statements related herein are related in substance and in part only.  Finally, certain items related herein were translated by FBI linguists from Russian to English.

## BACKGROUND

### Title 18, U.S. Code, sections 371 (Conspiracy) and 951 (Agents of Foreign Governments)

3.  Title 18 of the United States Code, section 371 (Conspiracy to Commit Offense or to Defraud United States), makes it a criminal offense for any person(s) to conspire together with one or more others either to commit an offense against the United States or to defraud the United States, or any agency thereof, in any manner or for any purpose.

4.  Title 18 of the United States Code, section 951 (Agents of Foreign Governments), makes it a criminal offense for any person, other than a diplomatic or consular official or attaché, to act in the United States as an agent of a foreign government without prior notification to the Attorney General, as required by law.  For purposes of this law, the term "agent of a foreign government" includes an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official.

### Relevant Persons and Definitions

5.  Defendant BUTINA is a Russian citizen who entered the United States in August 2016 on an F-1 Student Visa.  Before and after her arrival in the United States, BUTINA served as Special Assistant to the RUSSIAN OFFICIAL.  Conspiring together, BUTINA and the RUSSIAN OFFICIAL took various overt acts in furtherance of the conspiracy and to effect the illegal purpose thereof.

6.  The RUSSIAN OFFICIAL is a Russian citizen and a high-level official in the Russian government.  The RUSSIAN OFFICIAL was previously a member of the legislature of the Russian Federation and later became a top official at the Russian Central Bank.  The RUSSIAN OFFICIAL directed BUTINA's activities in furtherance of the conspiracy.

2

7.    U.S. Person 1 is a United States citizen and an American political operative. BUTINA established contact with U.S. Person 1 in Moscow in or around 2013. U.S. Person 1 worked with BUTINA to jointly arrange introductions to U.S. persons having influence in American politics, including an organization promoting gun rights (hereinafter "GUN RIGHTS ORGANIZATION"), for the purpose of advancing the agenda of the Russian Federation.

8.    U.S. Person 2 is a United States citizen who was included among the participants in a series of email communications in 2016 and 2017 that reveal BUTINA's efforts to arrange a series of dinners in the District of Columbia and New York City involving Russian nationals and U.S. persons having influence in American politics (hereinafter "friendship and dialogue dinners"). BUTINA told U.S. Person 2 that the RUSSIAN OFFICIAL was "very much impressed by you" and that "the Russians will support the efforts from our side."

9.    The Ministry of Foreign Affairs of the Russian Federation (MFA) is the Russian government agency with primary responsibility for the Russian Federation's foreign relations and foreign policy.

### Actions of the Russian Federation

10.    The Russian Federation, or Russia, is one of the leading state intelligence threats to U.S. interests, based on its capabilities, intent, and broad operational scope. Penetrating the U.S. national decision-making apparatus and the Intelligence Community are primary objectives for numerous foreign intelligence entities, including Russia. The objective of the Russian Federation leadership is to expand its sphere of influence and strength, and it targets the United States and U.S. allies to further that goal.

11.    Russian influence operations are a threat to U.S. interests as they are low-cost, relatively low-risk, and deniable ways to shape foreign perceptions and to influence populations. Moscow seeks to create wedges that reduce trust and confidence in democratic processes, degrade

3

democratization efforts, weaken U.S. partnerships with European allies, undermine Western sanctions, encourage anti-U.S. political views, and counter efforts to bring Ukraine and other former Soviet states into European institutions.

12.   In 2018, pursuant to Executive Order 13661, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC), in consultation with the U.S. Department of State, listed seven Russian oligarchs and 12 companies they own or control, 17 senior Russian government officials, including the RUSSIAN OFFICIAL, and a state-owned Russian weapons trading company and its subsidiary, a Russian bank, as specially designated nationals. OFAC sanctioned the RUSSIAN OFFICIAL for being an Official of the Government of the Russian Federation. In sanctioning these entities, U.S. Treasury Secretary Steven T. Mnuchin announced:

> The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities. Russian oligarchs and elites who profit from this corrupt system will no longer be insulated from the consequences of their government's destabilizing activities.

### THE DEFENDANT'S ACTIVITIES ON BEHALF OF RUSSIA

13.   As detailed below, the FBI's investigation has revealed that BUTINA, the defendant, was working in the United States at the direction of the RUSSIAN OFFICIAL.

14.   The FBI's investigation has further revealed that BUTINA and the RUSSIAN OFFICIAL took steps to develop relationships with American politicians in order to establish private, or as she called them, "back channel" lines of communication. These lines could be used by the Russian Federation to penetrate the U.S. national decision-making apparatus to advance the agenda of the Russian Federation.

15.   The FBI's investigation has also revealed that BUTINA and the RUSSIAN

OFFICIAL planned to advance Moscow's long-term strategic objectives in the United States, in part, by establishing relationships with American political organizations, including the GUN RIGHTS ORGANIZATION.    Based on my training, experience and familiarity with this investigation, I believe that BUTINA and the RUSSIAN OFFICIAL took these steps in order to infiltrate those groups and advance the interests of the Russian Federation.

16.    The Russian influence operation included, among other things, (i) taskings from the RUSSIAN OFFICIAL to BUTINA; (ii) meetings between BUTINA and U.S. politicians and political candidates; (iii) BUTINA's attendance at events sponsored by special interest groups, also attended by U.S. politicians and political candidates; and (iv) BUTINA's reporting back to Moscow through the RUSSIAN OFFICIAL the results of the various encounters with the U.S. politicians and political candidates.

### Laying the Groundwork in Russia

17.    During the course of her work as a covert Russian agent, BUTINA regularly met and communicated with the RUSSIAN OFFICIAL and U.S. Person 1 to plan and develop the contours of the influence operation.

18.    On or about March 24, 2015, BUTINA emailed U.S. Person 1 with the subject line of "The Second Pozner."[1]   The body of this email also contained a project proposal.   BUTINA noted to U.S. Person 1 in the email that she was sending the "Google Translator text.   Maybe I could translate it myself but it would take at least a day because the text is very specific."   She went on to note that she "will be happy to answer to any your questions [sic] and follow your recommendations before a [sic] finally send it."   The first line of the proposal reads, "Project Description 'Diplomacy.'"   It goes on to state that a major U.S. political party [hereinafter

---

[1]    I believe that this statement likely refers to Vladimir Pozner, a propagandist who served in the disinformation department of the Soviet KGB and who often appeared on Western television to explain the views of the Soviet Union during the Cold War.

"POLITICAL PARTY 1"], would likely obtain control over the U.S. government after the 2016 elections; that POLITICAL PARTY 1 is "traditionally associated with negative and aggressive foreign policy, particularly with regards to Russia. However, now with the right to negotiate seems best to build konstruktivnyh [sic] relations;" and that "[c]entral place and influence in the [POLITICAL PARTY 1] plays the [GUN RIGHTS ORGANIZATION]. The [GUN RIGHTS ORGANIZATION] [is] the largest sponsor of the elections to the US congress, as well as a sponsor of The CPAC conference and other events."

19.    The March 24, 2015 email further highlighted BUTINA's relationship with the GUN RIGHTS ORGANIZATION's leadership, including her attendance at events in the United States and BUTINA's and the RUSSIAN OFFICIAL's connections to officials of the GUN RIGHTS ORGANIZATION. BUTINA described recent visits to the United States, including references to instances when she was introduced to POLITICAL PARTY 1 leaders as a "representative of informal diplomacy" of the Russian Federation. BUTINA's project proposal concluded by noting, "[t]he resulting status needs to be strengthened is in the current time interval, before the presidential election in 2016," and requesting a budget of $125,000 for BUTINA to participate in "all upcoming major conferences" of POLITICAL PARTY 1.

20.    In late March 2015, U.S. Person 1 replied to BUTINA via email with the subject "Potential American Contacts":

> Dear Maria,
>
> * * *
>
> Your challenge in your "special project" will be to balance two opposing imperatives: Your desire to communicate that you speak for Russian interests that will be ascendant (still around) in a post-Putin world while simultaneously doing nothing to criticize the President or speed the arrival of his successor.
>
> This restriction is easily understood in private meetings with political and business leaders. It will SEVERELY limit your interactions with media.

6

> Most of the potential "guest appearances" listed under media will only be possible if you're willing to be more candid (honest) than is politically prudent for you.  But ALL of the media personalities listed would be interested in meeting you "off the record" – though your patrons / sponsors may not fully understand the power of such meetings if you do not appear on television, radio, or print as you do in Russia.
>
> *  *  *
>
> [T]here is NO limit as to how many American companies that you can meet—at the highest levels—if you are able to represent that you are a potential line of communication into future Russian Federation governments.

In this email, U.S. Person 1 listed potential media, business, and political contacts, and closed with,

"Everyone on this list understands (to some degree) U.S. / Russian relations under President

Obama and President Putin.  Everyone on this list would like to better understand U.S. / Russian

relations under new presidents for each country.  YOU can provide commentary on both—

if you're willing to take that risk."

21.    Also in late March 2015, U.S. Person 1 emailed BUTINA, with the subject line

"Your Plan Forward."  In this email, U.S. Person 1 told BUTINA that

> If you were to sit down with your special friends and make a list of ALL the most important contacts you could find in America for a time when the political situation between the U.S. and Russia will change, you could NOT do better than the list that I just emailed you.  NO one – certainly not the "official" Russian Federation public relations representative in New York – could build a better list.  And for a variety of current political reasons, the current Russian ambassadors to the United States and United Nations do not even try.
>
> YOU HAVE ALREADY MET ALL OF THE AMERICANS necessary to introduce you to EVERYONE on that list. . . .
>
> If you had NOT spent the last year attending conferences in America, it would take you ANOTHER year to be able to meet the names on that list.  What you have done is prepare all of the groundwork (necessary introductions) in order to be introduced to everyone on that list.  All that is needed is for your friends to provide you with the financial resources to spend the time in America to TAKE ALL OF THESE MEETINGS.  I and your friends in America can't make it any easier for you than that.

7

Your potential sponsors either understand this or they don't. The names of all of the people that impress your friends by listing them. All that your friends need to know is that meetings with the names on MY list would not be possible without the unknown names in your "business card" notebook. Keep them focused on who you are NOW able to meet, NOT the people you have ALREADY met.

22. Your affiant has reviewed a number of .pdf documents stored in BUTINA's Laptop containing Twitter direct messages between BUTINA and the RUSSIAN OFFICIAL that reflect direction and coordination of BUTINA's efforts by the RUSSIAN OFFICIAL. The direct messages between BUTINA and the RUSSIAN OFFICIAL in the latter half of 2015 include:

- A conversation between the RUSSIAN OFFICIAL and BUTINA regarding an article published by BUTINA in *The National Interest* on or about June 12, 2015, which argued that certain U.S. politicians and Russians share many common interests. BUTINA asked the RUSSIAN OFFICIAL to look at the article, and the RUSSIAN OFFICIAL said it was very good;

- A request by the RUSSIAN OFFICIAL for BUTINA to "write [him] something brief" about a political event in the United States which she was scheduled to attend. BUTINA provided that write-up the next day, which included descriptions of her speaking to a political candidate on the night of the announcement, as well as BUTINA's previous private meeting with the candidate at the 2015 annual GUN RIGHTS ORGANIZATION members' meeting;

- Discussions about the RUSSIAN OFFICIAL's anticipated attendance at a National Prayer Breakfast (including whether he had received approval to attend from the MFA), and providing the RUSSIAN OFFICIAL with

8

biographies of U.S. politicians and executives of the GUN RIGHTS ORGANIZATION;

- Discussions about the RUSSIAN OFFICIAL's plans to meet with a U.S. Congressman during a Congressional Delegation trip to Moscow in August 2015. In that conversation, BUTINA noted that she has the RUSSIAN OFFICIAL's diplomatic passport and can purchase a plane ticket for him from St. Petersburg to Moscow; and

- A statement from BUTINA to the RUSSIAN OFFICIAL that the latter "has the responsibility of a serious mission – restoration of relations between countries." BUTINA continued by saying that this is a long game and that "maybe, by inviting the [GUN RIGHTS ORGANIZATION] here, you have prevented a conflict between two great nations. [] although, I think, this is the very beginning of the journey."

23.    Based on my training, experience, and familiarity with this investigation, I believe that the above-described email and Twitter conversations represent BUTINA's plan to conduct activities as an illegal agent of the Russian Federation in the United States through a Russian influence operation.

## Acts in the United States

24.    BUTINA's efforts in the United States to promote the political interests of the Russian Federation were diverse and multifaceted, including BUTINA's efforts to organize a series of "friendship and dialogue" dinners, some of which are believed to have taken place in the District of Columbia, as well as BUTINA's attendance at two National Prayer Breakfasts in the District of Columbia.

25.    On or about January 19, 2016, BUTINA and the Russian Representative exchanged

9

Twitter direct messages regarding logistics for the 2016 National Prayer Breakfast. The RUSSIAN OFFICIAL noted that the MFA had given approval for his attendance.

26.   On February 4, 2016, both BUTINA and the RUSSIAN OFFICIAL attended the 2016 National Prayer Breakfast in the District of Columbia.

27.   A series of email communications (also known as "email strings") spanning March 10 and 11, 2016 and involving BUTINA, U.S. Person 1, and U.S. Person 2 reveal BUTINA's efforts to arrange the "friendship and dialogue" dinners in the District of Columbia and New York City near the end of May 2016.   U.S. Person 1 provided a list to BUTINA of American individuals and noted that this list would serve as "a good start for Maria's first briefing for [the RUSSIAN OFFICIAL's] Friday morning in Moscow." BUTINA expressed her gratitude to U.S. Person 1 and noted that she had received the list before her meeting with the RUSSIAN OFFICIAL, and "that [w]e confirm the Dates! [the RUSSIAN OFFICIAL] is working on the best third person from the Russian side now." Additionally, BUTINA told U.S. Person 2 that the RUSSIAN OFFICIAL had expressed to her that he was "very much impressed by you and expresses his great appreciation for what you are doing to restore relations between the two countries. He also wants you to know that Russians will support the efforts from our side. That is all I can tell you for now.  More information next week!"

28.   On March 14, 2016, BUTINA emailed U.S. Person 2 and said that the RUSSIAN OFFICIAL confirmed to her "his desire in our Russian-American project," and that a representative of the Russian Presidential administration had expressed approval "for building this communication channel." BUTINA additionally assured U.S. Person 2 that he should not worry as "all that we needed is <<yes>> from Putin's side. The rest is easier."

29.   On March 30, 2016, BUTINA sent an email thanking an associate of the organizer

of the 2017 Prayer Breakfast for meeting with her and the RUSSIAN OFFICIAL in Moscow. In this email, BUTINA noted that the RUSSIAN OFFICIAL "suggested to President Putin that he consider coming to the Prayer Breakfast next year, Feb 2017, and Pres. Putin did not say 'no'!" BUTINA observed that she believed that there were a number of conditions that should be met in order for President Putin to attend, including a personal invitation from the President of the United States and the attendance of at least fifteen other world leaders or heads of state. In a later March email, the organizer of the 2017 National Prayer Breakfast promised BUTINA he would provide ten seats at the 2017 event.

30.     On September 16, 2016, BUTINA sent an email to U.S. Person 1 and U.S. Person 2 regarding organizing another Russian-American "friendship and dialogue" dinner in the District of Columbia. BUTINA suggested scheduling the next dinner at the beginning of October 2016, because "we only have 2 month left before the US elections and it's the time for building an advisors team on Russia for a new president. I am seriously worry that the candidates some upcoming day will suddenly realize that 'now' is the time to do something with Russia and will look for advisory among currently popular radically oppositional to Russia crowd of experts. Bad things happen than. I believe we can prevent it." [sic]

31.     On October 4, 2016, U.S. Person 1 sent an email to an acquaintance. The email covered a number of topics. Within the email, U.S. Person 1 stated, "Unrelated to specific presidential campaigns, I've been involved in securing a VERY private line of communication between the Kremlin and key POLITICAL PARTY 1 leaders through, of all conduits, the [GUN RIGHTS ORGANIZATION]."     Based on my training, experience, and familiarity with this investigation, I believe that this email describes U.S. Person 1's involvement in BUTINA's efforts to establish a "back channel" communication for representatives of the Government of Russia.

32.     On October 5, 2016, BUTINA and the RUSSIAN OFFICIAL exchanged the

11

following direct messages on Twitter:

> BUTINA: Time will tell. We made our bet. I am following our game. I will be connecting the people from the prayer breakfast to this group. Most importantly, you get better. Everything else we will win.

> RUSSIAN OFFICIAL: No doubt! Of course we will win, but I (you are right) need to beat the illness first and get out of the hospital (I made an attempt today – it didn't work). And it is not about winning today's fight (although we are striving for it) but to win the entire battle. This is the battle for the future, it cannot be lost! Or everyone will lose.

> BUTINA: True! But don't try to get out right now: the doctors ordered you to stay for a reason. Better finish the treatment. Please do not risk it. You have a key role and you know it. I will not manage without you.

> RUSSIAN OFFICIAL: No! This is a mistake. Your political star has risen in the sky. Now it is important to rise to the zenith and not burn out (fall) prematurely.

> BUTINA: Oh well. I am just starting in this field. I still have to learn and learn from you! These are not just words! Harsh and impetuous moves will ruin everything early.

> RUSSIAN OFFICIAL: This is hard to teach. Patience and cold blood + faith in yourself. And everything will definitely turn out.

> * * *

> BUTINA: By your recommendation, I am setting up the groundwork here but I am really in need of mentoring. Or the energy might to towards the wrong direction. Yesterday's dinner showed that American society is broken in relation to Russia. This is now the dividing line of opinions, the crucial one in the election race. [POLITICAL PARTY 1] are for us, [another major U.S. political party] – against – 50/50. Our move here is very important." [sic]

33.     During the October 5, 2016 Twitter direct communications, BUTINA and the

RUSSIAN OFFICIAL also discussed other potential steps to take in the operation. The RUSSIAN

OFFICIAL asked about how the "Russia-USA friendship society" looked at that time. BUTINA

responded, "It's not alive. We are currently 'underground' both here and there. Now, private

clubs and quite [sic] influence on people making decisions is the trend. No publicity." She

continued, "Advisor – is the profession of the current day. Even a secret advisor. Right now the Administration here is flexible – and there is the idea, so that the right thoughts would dominate."

34.    Following this October 5, 2016 Twitter conversation, BUTINA and the RUSSIAN OFFICIAL discussed whether BUTINA should volunteer to serve as a U.S. election observer from Russia and agreed that the risk was too high.   The RUSSIAN OFFICIAL expressed the opinion that "the risk of provocation is too high and the 'media hype' which comes after it," and  BUTINA agreed by responding, "Only incognito! Right now everything has to be quiet and careful."

35.    In October 2016, BUTINA and the RUSSIAN OFFICIAL intermittently communicated to discuss the topics of the 2017 National Prayer Breakfast invitation and the upcoming elections via Twitter direct message.   On October 17, 2016, BUTINA asked the RUSSIAN OFFICIAL for a list of ten individuals from Russia who would be attending the National Prayer Breakfast. BUTINA further suggested to the RUSSIAN OFFICIAL that it would be a good idea to invite the Russian Ambassador and noted that it "needs to be somebody influential from Russia, it would be better [if it were someone] from the Kremlin or RPC [Russian Orthodox Church] of course."

36.    In a series of November 8 and 9, 2016 Twitter direct messages, the RUSSIAN OFFICIAL and BUTINA discussed the results of the U.S. Presidential election as they were announced.  As part of that same Twitter conversation, BUTINA told the RUSSIAN OFFICIAL, ". . . I'm going to sleep. It's 3 am here. I am ready for further orders." The RUSSIAN OFFICIAL responded, "Think about in which areas of life we could go towards bringing us closer. ISIS – understandably, what else we need to look at the American agenda." After speculating about who might be nominated as Secretary of State, BUTINA suggested a phone call to discuss, and the RUSSIAN OFFICIAL noted that he liked the idea, but was  worried that "all our phones are being listened to!" BUTINA suggested that they talk via WhatsApp.

37.    On November 11, 2016, BUTINA sent the RUSSIAN OFFICIAL a direct message via Twitter, in which she predicted who might be named Secretary of State and asked the RUSSIAN OFFICIAL to find out how "our people" felt about that potential nomination.

38.    Also on November 11, 2016, BUTINA sent the RUSSIAN OFFICIAL a direct message via Twitter which included a screen shot of two "reports" in Russian.  One report proposed ways to establish dialogue with U.S. politicians through a conference. The proposal stated that "[t]he conference must be presented as a private initiative, not a government undertaking."  The proposal also suggested that BUTINA and a number of political officials and U.S. Congressmen should participate.  In this report, BUTINA noted to the RUSSIAN OFFICIAL, under the heading "advantages," that "[t]he event will get wide coverage in the press; it will be the first positive event regarding Russia in Washington (currently, all of them are anti-Russian and anti-Putin).  The event does not pose any risks because no government officials from either country will attend; yet it creates a foundation for further talks on the level of government officials."

39.    In a November 12, 2016 Twitter direct message, the RUSSIAN OFFICIAL acknowledged reading the proposal referenced above and informed BUTINA that "they" won't go for it.  He told BUTINA that he could not reach an MFA contact and noted "[p]eople are waiting for the formed decisions.  I will try to clarify this subject on Monday one more time."   Based on my training, experience, and familiarity with this investigation, I believe these messages are the RUSSIAN OFFICIAL relaying the Russian Federation's instructions to its agent, BUTINA.

40.    On November 30, 2016, BUTINA emailed U.S. Person 1 regarding the Russian delegation to the 2017 National Prayer Breakfast.  BUTINA stated that the "[p]eople in the list are handpicked by [the RUSSIAN OFFICIAL] and me and are VERY influential in Russia. They are coming to establish a back channel of communication... Let's think if our [U.S. Person 2's first name] would like to meet with them..." (ellipses in original)

41.     On December 1, 2016, U.S. Person 1 emailed BUTINA with instructions for "what is required to book the Russian delegation hotel rooms in the Washington Hilton – the actual venue of the National Prayer Breakfast." The email listed rooms and prices, and U.S. Person 1 noted, "To be safe, I'd ask [the RUSSIAN OFFICIAL] to place US $3500 on one of your Russian charge cards in order to pay these deposits."

42.     In a December 26, 2016 email, the RUSSIAN OFFICIAL told BUTINA that the MFA had no objection to his trip to attend the National Prayer Breakfast, but "it does not mean that everything is settled. . . . Officially, only ambassadors will be invited. There will be no state leaders and delegations." BUTINA replied, "The response from the MFA is perfect.[] I am serious."

43.     On January 5, 2017, BUTINA was forwarded a copy of an email between U.S. Person 1 and U.S. Person 2 regarding the 2017 National Prayer Breakfast in which U.S. Person 1 attached a list of Russian visitors, including 12 Russian guests, noting, "In addition to delegation leader [the RUSSIAN OFFICIAL], the list is populated by important political advisors to Russian President Putin, university presidents, mayors, and substantial private businessmen."

44.     On January 26, 2017, BUTINA and the RUSSIAN OFFICIAL communicated via Twitter direct message about the RUSSIAN OFFICIAL delivering a speech the night before the National Prayer Breakfast. BUTINA told the Russian Representative that "[t]he only thing I ask is to somehow mention me. This is very important for me for negotiations with the breakfast committee. They need to see me not as the delegation 'organization committee' but as your partner and colleague." The Russian Representative agreed as to the "need to stress [BUTINA's] status as a key figure."

45.     On February 2, 2017, BUTINA and the RUSSIAN OFFICIAL attended the 2017 National Prayer Breakfast in the District of Columbia.

46.     On February 6, 2017, BUTINA emailed a National Prayer Breakfast organizer to thank him for "the gift of you [sic] precious time during the National Prayer Breakfast week – and for the very private meeting that followed. A new relationship between two countries always begins better when it begins in faith. Once you have a chance to rest after last week's events, I have *important information for you to further* this new relationship. I would appreciate one brief additional meeting with you to explain these new developments. I remain in Washington, D.C. pursuing my Master's Degree at American University. My schedule is your schedule!" (emphasis added)

48.     On February 8, 2017, BUTINA emailed U.S. Person 2 to thank him and noted, "Our delegation cannot stop chatting about your wonderful dinner. My dearest President has received 'the message' about your group initiatives and your constructive and kind attention to the Russians."

49.     At no time did BUTINA notify the Attorney General, whose office in the Department of Justice is located in the District of Columbia, that she would and did act in the United States as an agent of a foreign government.

## CONCLUSION

50.    For the reasons stated above, there is probable cause to believe that BUTINA

conspired with one or more persons to violate 18 U.S.C. § 951, in violation of 18 U.S.C. § 371.

51.    I declare under the penalty of perjury that the information provided above is true

and correct to the best of my knowledge.

Respectfully submitted,

KEVIN HELSON
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on

THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

17