# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT MARIA BUTINA'S MOTION FOR BOND REVIEW

Pursuant to 18 U.S.C. § 3145(b), Maria Butina moves this Court to review and modify the current pretrial order of detention to allow for her release pending trial into the Pretrial Services Agency High Intensity Supervision Program (HISP) on a home detention basis with electronic monitoring. As grounds for this motion, for which a hearing is requested, counsel directs the Court to the memorandum in support filed herewith.

WHEREFORE, for the foregoing reasons and those that the defense may present during a hearing on this matter, Defendant Maria Butina respectfully requests that her motion be granted and that the Court allow for her release pending trial on a home detention basis with electronic monitoring.

Dated: August 24, 2018

Respectfully submitted,

/s/Robert N. Driscoll
Robert N. Driscoll (DC Bar No. 486451)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 403-3870
rdriscoll@mcglinchey.com

/s/Alfred D. Carry
Alfred D. Carry (DC Bar No. 1011877)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 330-5897
acarry@mcglinchey.com

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT MARIA BUTINA'S MOTION FOR BOND REVIEW**

Defendant Maria Butina submits this memorandum in support of her motion for bond review, stating as follows:

**I. Background**

Maria Butina was indicted for acting in the United States as an agent of a foreign government without prior notification to the Attorney General (in violation of 18 U.S.C. § 951) and conspiracy to do the same (in violation of 18 U.S.C. § 371).

Since her arrest on July 15, 2018, Ms. Butina has been held without bond. At the preliminary detention hearing on July 18, 2018, Magistrate Judge Deborah Robinson denied Ms. Butina's request for release based on the government's fear of flight from prosecution. (Mem. of Findings of Fact and Statement of Reasons in Support of Order of Detention, Jul. 24, 2018 [Doc. 15] (Robinson, M.J.)) According to the government's proffer and a single witness from the State Department's Diplomatic Security Service, who had no personal knowledge about Ms. Butina's specific flight risk, the government contended that no combination of conditions could reasonably assure her future appearance in court. After interviewing Ms. Butina and assessing her flight risk, the Pretrial Services Agency (PSA) recommended that the Court release Ms. Butina under general

supervision and a few conditions.[1] Her counsel echoed the PSA's recommendations, asking the Court to release Ms. Butina with conditions. The magistrate denied that request.

In deciding to detain Ms. Butina without bond, Magistrate Judge Robinson rejected the PSA's independent findings and accepted the government's proffer as true, principally because "a grand jury has found probable cause" (Doc. 15 at 3) and Ms. Butina "is a national of the Russian Federation, with which the United States has no extradition treaty" (*id.* at 6). Magistrate Judge Robinson also noted that defense counsel "did not cross examine the witness called by the government." (*Id.* at 7, n.3.)

## II. <u>Standard of Review</u>

A person awaiting trial on a federal offense may be released on personal recognizance or bond, conditionally released, or detained. 18 U.S.C. § 3142(a); *see United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). "Our system of criminal justice embraces a strong presumption against detention. 'In our society, liberty is the norm and detention prior to trial or without trial is the carefully limited exception.'" *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (2009) (quoting *United States v. Salerno,* 481 U.S. 739, 755 (1987)).

The Bail Reform Act of 1984 (Act), 18 U.S.C. § 3141 *et seq.*, enumerates the limited circumstances when a defendant may be detained before trial. If a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community, such judicial officer shall order the detention of the defendant before trial." 18 U.S.C. § 3142(e). Alternatively, a finding that no condition or combination of conditions will reasonably assure the appearance of the defendant must be

---

[1] Those conditions were that Ms. Butina report to the PSA weekly by phone, verify her address, not apply for or possess a passport, stay within the Washington, DC area, and surrender all passports to the PSA. (Doc. 5 at 2.)

supported by a preponderance of the evidence. *Id.*; *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). The "preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can reasonably assure that the defendant will appear for trial." *United States v. Xulam,* 84 F.3d 441, 442 (D.C. Cir. 1996).

A magistrate judge's bail determination is reviewed de novo, and a court is free to use any evidence or rationale different from what the magistrate relied upon. *United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001) (Kennedy, J.); *United States v. Bess*, 678 F. Supp. 929, 934 n.3 (D.D.C. 1988). Further, both the government and the defendant may present evidence by proffer at a detention hearing, rather than by presenting live testimony. *Hanson*, 613 F. Supp. 2d at 88.

### III. <u>Argument</u>

The government sought to detain Ms. Butina under section 3142(f)(2)(A), which permits a court to order pretrial detention "in a case that involves . . . a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A).[2] However, the government's claim that no release conditions will reasonably assure her future appearance in court is an exaggeration. Indeed, many of the government's assertions find no support among the facts. Instead, the government relies on innuendo and undefined phrases, soundbites and alarmist buzzwords.

The assertion that she was arrested for an alleged "role in a covert Russian influence operation in the United States" (Doc. 8 at 2) is a war drum based on pure fiction. Nothing about

---

[2] The government did not argue that Ms. Butina should be detained because she would pose a danger to the public if released. And going to dinners among intellectuals and foreign policy wonks to discuss U.S.-Russia relations, attending two National Prayer Breakfasts, and booking hotel rooms at the Washington Hilton, if true, is anything but an "obvious" danger to the public. (Doc. at 7.)

her activities in the United States were covert or clandestine. Quite the opposite, Ms. Butina came to the United States for graduate school. She spoke genuinely about peace and positive relations between her home country and the United States. Her personal statement for graduate school addressed the same, and her supposed "handler" Aleksandr Porfiryevich Torshin, who is actually just a friend, wrote her letters of recommendation (attached as Exhibit 1).

Maria actually applied to seven universities in the United States (Yale, Columbia, Harvard, Stanford, Georgetown, American, and Tufts). She even considered going to law school in Russia prior to resolving to matriculate at American University. No person from the Russian government instructed her to go to American. Moreover, once there, she considered transferring to Harvard to enroll in their Russia, Eastern Europe, and Central Asia (REECA) Master's Degree program (*see* Exhibit 2). These are not the actions of a Russian agent looking to hide among students "as part of the operation" while leaving enough time to collect information, as the government claims. (Doc. 8 at 7.) To the contrary, her academic pursuits were sincere. She sought scholastic rigor, not a "cover occupation." (*Id.* at 8.)

### A. <u>The Nature and Circumstances of the Offense</u>

To be sure, the counts alleged in the indictment (acting as a foreign agent without registration and conspiracy) are serious charges that carry ten and five year maximum sentences, respectively. However, they are not offenses that carry a rebuttable presumption that no condition of release or combination of conditions would reasonably assure a defendant's appearance. *See* 18 U.S.C. § 3142(e)(3). Furthermore, despite the patina of espionage with which the government tries to color this case, the allegations do not involve spying, tradecraft, classified information, or any other hallmarks of an espionage case.

Rather, Ms. Butina is alleged to have acted publicly, documenting her activities on blog posts and social media. She traveled openly in the United States with her purported "handler" every time he visited, and she had a "special assistant" business card that she asked him to provide, so she could help with his travel arrangements while not being mistaken for a paid escort. She is accused of arranging dinners to promote better relations between Russia and the United States although the very dinner that is listed as a predicate act for her alleged crimes was written about in Time Magazine and the American Conservative—hardly covert activity—and, in actuality, was initiated, organized, and directed by an American citizen, not the Russian government.[3]

The gravamen of the government's case is that Ms. Butina was essentially lobbying on behalf of Russia for better relations with the United States. However for reasons only it is aware, the government has charged Ms. Butina under 18 U.S.C. § 951 rather than the Foreign Agent Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, which generally carries civil penalties and much less severe criminal penalties (for circumstances far more egregious than the facts alleged here). Much like a FARA case, the government does not allege that Ms. Butina undertook any independently illegal activities in the United States. The only thing that made her alleged conduct illegal, if true, is that she did not notify the Attorney General prior to undertaking it. Additionally, the government does not allege that Ms. Butina is a member of any Russian intelligence service. Instead, the government relies on a series of isolated Twitter direct messages (that she voluntarily supplied to the U.S. Senate Select Committee on Intelligence in their entirety) to establish that she was somehow operating under the direction or control of a Russian official, even though the

---

[3] Alex Altman and Elizabeth Dias, *Moscow Cozies Up to the Right*, TIME MAGAZINE, Mar. 10, 2017, http://time.com/4696424/moscow-right-kremlin-republicans/. George D. O'Neill Jr., *Why Do We Want a Cooperative Relationship With Russia?*, AMERICAN CONSERVATIVE, Apr. 24, 2017, https://www.theamericanconservative.com/articles/why-do-we-want-a-cooperative-relationship-with-russia/.

Russian Federation did not pay for her travel to the United States, her tuition, her living expenses, or make any payments to her at all.

At bottom, the government's case appears to be a novel attempt to stretch 18 U.S.C. § 951 to cover the activities of a foreign national student under the theory that her communications (about non-classified public source material) with contacts in her home country made her an "agent" of that country. The serious charges against her should be viewed in that context, which makes this case distinctly different from a typical section 951, "espionage-like or clandestine behavior" case.[4]

## B. <u>Weight of the Evidence</u>

With regard to the weight of the evidence, the government claims that its case is "substantial." (Doc. 8 at 10.) However, behind the curtain of its fanciful assertions that she acted as a Kremlin-agent of influence "to penetrate the U.S. national decision-making apparatus" (Doc. 1-1 at 4 ¶ 14) is no allegation that the Russian Federation actually gave Ms. Butina an order, let alone direction to do anything. She stole no national secrets. She engaged in no confidential information gathering or stealthy procurement-type activities. She never worked for an intelligence operation of the Russian Federation. At most, she networked for her own entrepreneurial gain, took pictures with political celebrities as keepsakes, and shared her memorable events and enthusiasm for American culture and politics with family and friends back home, like hundreds of other foreign students and typical Washingtonian mid-twenty-somethings do.

To distract from the frailty of its charges, the government reprises that Ms. Butina is charged under section 951 and not FARA. However, that charging decision alone contradicts the

---

[4] According to the United States Department of Justice, National Security Division, 18 U.S.C. § 951 targets "espionage-like or clandestine behavior." U.S. DOJ, Office of the Inspector General, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at 9 (Sep. 2016), *available at* https://oig.justice.gov/reports/2016/a1624.pdf (last visited Aug. 24, 2018)

Justice Department's own policies, and perhaps was made as an attempt to aggrandize her conduct and mischaracterize her innocent political interest as nefarious.

That is, the Department of Justice ("DOJ") Criminal Resource Manual makes a distinction between section 951 and a FARA violation. It describes FARA under section 611 *et seq.* as requiring an agent of a foreign principal engaged in political activities to register. *See* U.S. Dep't of Justice, United States Attorneys' Manual 9-90.700 and 9-90.701; and *see* Criminal Resource Manual at 2062. It also discusses other federal statutes like section 951, which is "aimed at persons loosely called foreign agents" but specifically exempts section 951 from applying to "foreign agents engaged in political activities." *Id.* In plain English, DOJ further notes among frequently asked questions that section 951 is only "aimed at foreign government controlled agents engaged in *non-political* activities."[5]

The government's April, 2018 search warrant sought evidence of a potential violation under FARA. The indictment irrefutably characterizes her actions (Doc. 7 at 3, ¶ 8) as political. The purpose of her so-called conspiracy, the government claims, was to "exploit personal connections with U.S. persons having influence in American politics" and to "establish unofficial lines of communications with U.S. politicians and political organizations." (*Id.*) The affidavit in support of the criminal complaint similarly focuses on political activities. (Doc. 1-1.) However, although such allegations are unfounded and untrue, and although the government's searches revealed no hidden transmitters, wads of cash, counterfeit passports, and plane tickets back to Moscow, the government still decided to paper a case against Ms. Butina under section 951. This

---

[5] *See* DOJ Comments regarding FARA Related Statutes, *available at* https://www.justice.gov/nsd-fara/fara-related-statutes (last visited Aug. 24, 2018) (emphasis added); *see also* DOJ Answers to Frequently Asked Questions, *available at* https://www.justice.gov/nsd-fara/general-fara-frequently-asked-questions (last visited Aug. 24, 2018).

decision shows that the government desired to overcharge and inflate her conduct for tactical advantages versus act with restraint or, at a minimum, be consistent with the DOJ and National Security Division's own publicized understanding of appropriate charges.

It follows that the government states "facts" that distort the truth or are wholly false. For example, the government has deleted sentences, misquoting her messages; truncated conversations, taking them out of context; replaced emoticons with brackets, twisting tone; and mistranslated Russian communications, altering their meaning. The government has also sworn in its affidavit—likely presenting the same false information to a grand jury under oath—that Ms. Butina took certain actions in the United States when immigration records confirm that she was, in fact, overseas.

### C. <u>History and Character of the Person</u>

Ms. Butina is not a criminal. She is not on probation, parole, or on other release pending trial, sentencing, or appeal. *See* 18 U.S.C. § 3142(g)(3)(B). She has never been arrested or charged with a crime before. *Id.* Rather, she is a young woman of good character and with genuine ties to the United States through her five-year relationship with Paul Erickson, her academic work, and her desire to pursue a career in the United States. *See* 18 U.S.C. § 3142(g)(3)(A).

The government gratuitously and falsely smeared her character and reputation in its written memorandum and oral proffer made in open court. The government argued that Ms. Butina's relationship with Mr. Erickson is a "duplicitous relationship" because she "appears to treat it as simply a necessary part of her activities." (Govt's Mem. in Support of Detention, Doc. 8 at 8). In particular, AUSA Kenerson alleged that:

> For example, on at least one occasion, Butina offered an individual other than [Mr. Erickson] sex in exchange for a position within a special interest organization.

(*Id.*) The impact of this inflammatory allegation, which painted Ms. Butina as some type of Kremlin-trained seductress, or spy-novel honeypot character, trading sex for access and power, cannot be overstated. The assertion that she *used sex* to develop her relationships in the United States appeared on the front pages of the New York Times, the Washington Post, CNN's website, and more. Worse, it also appeared on the television of her parent's family room TV.

- "Maria Butina, Suspected Secret Agent, Used Sex in Covert Plan, Prosecutors Say," the New York Times wrote.[6]

- "The Russian accused of using sex, lies and guns to infiltrate US politics," CNN reported. [7]

- "How Russia's Mariia Butina Allegedly Used Sex to "Infiltrate" the Republican Party and NRA," said Slate.[8]

- "Who is Maria Butina? Accused Russian spy allegedly offered sex for power," USA Today wrote.[9]

- "Russian spy offered sex for role in 'special interest' group: feds," said the New York Post.[10]

- "Maria Butina, 29, . . . offered sex . . . "in exchange for a position within a special interest organization," the Washington Post wrote.[11]

---

[6] New York Times, *available at* https://www.nytimes.com/2018/07/18/us/politics/maria-butina-russia-espionage.html (last visited Aug. 24, 2018).

[7] CNN, *available at* https://www.cnn.com/2018/07/19/politics/maria-butina-paul-erickson-russian-sex-lies-guns/index.html (last visited Aug. 24, 2018).

[8] Slate, *available at* https://slate.com/news-and-politics/2018/07/mariia-butina-nra-republican-party-russian-used-sex-to-manipulate-filings-say.html (last visited Aug. 24, 2018).

[9] USA Today, *available at* https://www.usatoday.com/story/news/nation-now/2018/07/19/maria-butina-accused-russian-spy-who-allegedly-offered-sex-power/799333002/ (last visited Aug. 24, 2018).

[10] New York Post, *available at* https://nypost.com/2018/07/18/russian-spy-offered-sex-for-role-in-special-interest-group-feds/ (last visited Aug. 24, 2018).

[11] Washington Post, *available at* https://www.washingtonpost.com/local/public-safety/alleged-russian-agent-maria-butina-had-ties-to-russian-intelligence-agency-prosecutors-say/2018/07/18/a1a4042c-8a01-11e8-a345-a1bf7847b375_story.html?utm_term=.de39df8bb778 (last visited Aug. 24, 2018).

Defense counsel asked the government for the evidence supporting this proffer the day after it was made. In response, the government stalled for weeks, insisting on the entry of a protective order to safeguard the so-called integrity of ongoing investigations. But the evidence eventually produced shows why the government delayed. The *only* evidence the government relied on for its explosive claim was an excerpt from an innocuous three-year-old text exchange (attached as Exhibit 3) sent in Russia between Ms. Butina and DK, her longtime friend, assistant, and public relations man for *The Right to Bear Arms* gun rights group that she founded.

DK, who often drove Ms. Butina's car and thus was listed on the insurance, took the car for its annual government-required inspection and insurance renewal, and upon completion, texted (according to government translators), "I don't know what you owe me for this insurance they put me through the wringer." Ms. Butina jokingly replied, "Sex. Thank you so much. I have nothing else at all. Not a nickel to my name." DK responded: "Ugh . . . ( "—that is, with a sad face emoticon.

Aside from the fact that Maria is friends with DK's wife and child and treats DK like a brother, the reference to sex is clearly a joke, as he goes on to state that the car "is at the house, the insurance and documents are on the table at your house, winter tires are in the trunk of your car"—hardly the expected response to a serious offer of sex from a coworker. Maria continued her thanks, "[DK], thank you so much!!!!! Ask for anything . . . . . . you want." (ellipses in original). "That they hire you?" she taunted as a good-humored reminder that he already works for her gun rights organization, as well as advertising agency, *Antares*.  And DK volleyed back, "Think of something!! Sex with you does not interest me. Think!"

There is no indication that the two ever had sex, as the exchange was nothing more than a long-running joke between old friends. Indeed, DK would apparently tease Maria repeatedly about

the fact that he would never sleep with a redhead, and Mr. Erickson knew of this jovial banter and their ongoing friendship.

However, more important is the fact that even under a strained reading of an obvious joke, nowhere does Ms. Butina offer anyone sex in exchange for a job (or any other advantage) for herself (or anyone else). This 2015 exchange does nothing to support the government's claim that, in 2018, her relationship with Mr. Erickson is "duplicitous" because she was apparently willing to use sex to get a "position with a special interest organization." (Doc. 8 at 8.) The government's proffer is a sexist smear, using a three-year-old offhand joking reference to suggest that Ms. Butina is some kind of James Bond spy character, promiscuously using sex to advance her career. The government's allegation should be withdrawn or stricken and certainly should not weigh in favor of detention.

Even worse, the government piled on its disparaging campaign by adding that, "in papers seized by the FBI, Butina complained about living with [Mr. Erickson] and expressed disdain for continuing to cohabitate with him." (Doc. 8 at 8.) The evidence the government relies on for support, also a text exchange from 2015 (attached as Exhibit 4), is with IS, a girlfriend of Maria's. It is nothing more than two twenty-something girlfriends chatting about their American boyfriends, exchanging cute cat photos, and figuring out when they will next socialize. It is in this context, in response to her girlfriend's own complaints about her boyfriend's failure to call in three weeks (accompanied by an angry face emoji) that Maria responds that her own boyfriend (Mr. Erickson) has been "bugging the sh*t out of me with his mom" and that she has "a feeling that I am residing in a nursing home." "Send a link to the dating app[,]" Maria encouraged her friend.

| Maria Butina: | And a photo of your cat |
| --- | --- |
| IS: | In AppStore |

| IS: | [Image of a cat] |
| Maria Butina: | Oh my, what a cutie |
| Maria Butina: | What's his name? |
| IS: | [Photo of a cat] |
| IS: | Elizar. Meet him ) |
| Maria Butina: | [image] |
| Maria Butina: | Is that it? |
| IS: | Yeeeees |

Given that Mr. Erickson's mother died in 2017 (Maria flew to the funeral) and this type of casual chitchat between friends is never intended to be public, it was particularly cruel for the government to claim it as the basis for an attack on Ms. Butina's character or commitment to Mr. Erickson. Three-year old, offhand complaints about one's romantic partner being too close to their mother should be out of bounds, and certainly not asserted to be proof of a "duplicitous" relationship.

Ms. Butina is an attractive young woman who has been in the media spotlight for some time, and, unfortunately, sexist stereotypes about her have proliferated– suggesting without evidence that her connections with certain Americans were made through sex, rather than through her intellect demonstrated by the fact that she, before the age of 30, obtained three Master's Degrees, founded a significant civil society organization in Russia, and achieved almost a 4.0 in her Master's Program at American University. There may not be anything that can be done about the media and popular culture's sexist assumptions about this young woman, but AUSA Kenerson, the United States Attorney's Office, and the National Security Division should be held to a higher

standard and not fuel the sexist and misogynistic flames surrounding this case with baseless slurs and indignities.

Indeed, after dismissing the government's false and unsubstantiated claims, Maria's good character and ties to the United States come into sharp focus. She applied for a lottery green card, meaning she intended to stay in the United States. She formed a new limited liability company, meaning she intended to deepen her roots here. She also applied for and received OPT status (essentially work authorization), not a B1/B2 visa as proffered by the government, meaning she intended to work in the United States for at least the next twelve months and not travel back and forth to Russia, as the government "mistake[nly]" claimed.[12] She applied to add herself to the lease for Mr. Erickson's apartment in South Dakota, and thus had a permanent address. Moreover, her U-Haul rental was one way to South Dakota, with theme park tickets purchased for a park along the route (attached as Exhibits 5 and 6). In short, Ms. Butina was simply like many recent graduates, leaving her student apartment in a U-Haul, degree in hand, for her next residence, where she would seek opportunities to work in the United States.

### IV. Proposed Conditions of Release

Unconditional release is presumed. A defendant "shall" be released "on personal recognizance, or upon execution of an unsecured appearance bond . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or

---

[12] Despite learning of this "mistake" earlier, the government sat on this information, cavalierly calling it a "clerical error," and did not disclose it to defense counsel until nearly a month later— unsurprisingly, three days after the protective order. (*See* Email from AUSA Kenerson to Defense (Aug. 13, 2018), attached as Exhibit 7.) This was not a clerical error. Unlike a B1/B2 visa, the mere grant of OPT status did not permit Ms. Butina to travel freely between the United States and Russia, as the government portrayed. And the fact that the government has also failed to provide any evidence to support its claim that Maria affirmatively lied on her application for a student visa should give this Court pause. (Doc. 8 at 8.)

will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). However, if more is required than personal recognizance or an unsecured appearance bond, the Court must impose the "least restrictive further condition, or combination of conditions" that will reasonably assure appearance or safety. 18 U.S.C. § 3142(c)(1)(B).

The government rests its fear of flight primarily on Ms. Butina's Russian citizenship and the lack of extradition. However, if such factors alone were determinative, release would never be possible in a criminal case against a foreign national from a country with no extradition, and the statutory scheme that Congress established would be nullified completely. "In evaluating the likelihood of flight, the potential penalty has relevance," but the stability of community ties and an extensive record may also establish reliability in meeting court obligations. The absence of flight, when flight is possible, "is an important indicator of whether a defendant is likely to appear once again." *Wood v. United States*, 391 F.2d 981, 984 (D.C. Cir. 1968); *Stack v. Boyle*, 342 U.S. 1 (1951) ("each accused is entitled to any benefits due to his good record.").

Here, Ms. Butina has an unbroken record of *not* fleeing when, were the government's allegations against her true (that she is some kind of Russian agent), she clearly would have fled:

First, in February, 2017, the Daily Beast published an article about Maria, her connection to Aleksandr Torshin, her love of guns, and her activities in the United States, essentially alleging that her purpose in the United States might be to "infiltrate" American conservative political groups.[13] If the government's fanciful theory were correct, almost 18 month ago, Maria Butina was exposed, her handler identified, and her purpose in the United States published on the internet. She did not flee, visit the Russian Embassy, or make any effort to change her status as a student.

---

[13] Tim Mak, *The Kremlin and GOP Have a New Friend—and Boy, Does She Love Guns*, THE DAILY BEAST (Feb. 23, 2017), *available at* https://www.thedailybeast.com/the-kremlin-and-gop-have-a-new-friendand-boy-does-she-love-guns.

Second, in the fall of 2017, various congressional committees or their members, sent letters, based on media reports, seeking her testimony and even, in at least one instance, threatening a subpoena. She did not flee or discontinue her studies, but rather retained counsel, and eventually testified voluntarily before the Senate Select Committee on Intelligence, producing over 8,000 pages of documents and testifying for 8 hours.

Third, on April 25, 2018, over a dozen FBI agents appeared at her door in tactical gear to search her apartment for hours. The search warrant listed 18 U.S.C. §§ 371 and 951 violations as bases for the warrant. Yet she did not flee, did not seek assistance from the Russian Embassy or any Russian contacts, but instead consulted with her American counsel about the matter.[14]

These facts make this case unique in that, typically, a court must predict whether a defendant will flee because their alleged criminal activity has been exposed. Here, there is no need to guess because Maria Butina has already been tested with plenty of reasons (reasons an actual Russian agent would have acted upon) to bolt for Russia, as the government fears she will do now. Maria Butina had every reason to run. She did not, but instead went to class, finished school, applied to join the American workforce, and packed up her apartment to move in with her boyfriend by renting a U-Haul truck for a one-way trip to Sioux Falls, not Moscow. And any suggestion that the government was surprised by the renting of a U-Haul truck and purchase of packing boxes (Doc. 8 at 2) is belied by the fact that defense counsel informed both AUSA Kenerson and FBI Agent Miller of the pending move to South Dakota well in advance of Ms. Butina's arrest. (*See* Email from Attorney Driscoll to AUSA Kenerson (Jun. 29, 2018), attached

---

[14] Finally, the government implies that Ms. Butina has ties to significant means, adding that "FBI surveillance over the past week has confirmed that Butina has access to funds and an intention to move money outside of the United States." (Doc. 8 at 2.) However, this argument merits little attention because the government has neither produced personal bank records nor statements that are attributable to her to substantiate these claims.

as Exhibit 8; and *see* Email from Attorney Driscoll to FBI Agent Miller (Jul. 6, 2018), attached as Exhibit 9.) These facts weigh heavily in favor of her release.

This Court has the discretionary authority to release Ms. Butina pretrial pursuant to 18 U.S.C. § 3141(c) upon the least restrictive combination of conditions necessary to reasonably assure her appearance at court. Under these circumstances, if simple release on personal recognizance and general supervision by the PSA will not satisfy the Court's concerns about Ms. Butina's risk of flight, the High Intensity Supervision Program (HISP) provides structured programming and close supervision for defendants, and is therefore an alternative to preventive detention. Ms. Butina is eligible for HISP, and because of the nature of this case and likely exclusion of time under the Speedy Trial Act, necessitated by the tremendous volume of information, as well as expected length of pretrial delay and pretrial detention that Ms. Butina is expected to endure, she is a great candidate for HISP.

## V. <u>Conclusion</u>

For the foregoing reasons and those that the defense may present during a hearing on this matter, Defendant Maria Butina requests that she be released pending trial into the PSA High Intensity Supervision Program on a home detention basis with electronic monitoring.

Dated: August 24, 2018                    Respectfully submitted,


                                          /s/Robert N. Driscoll
                                          Robert N. Driscoll (DC Bar No. 486451)
                                          McGlinchey Stafford PLLC
                                          1275 Pennsylvania Avenue NW, Suite 420
                                          Washington, DC 20004
                                          Phone: (202) 802-9999
                                          Fax: (202) 403-3870
                                          rdriscoll@mcglinchey.com


                                          /s/Alfred D. Carry
                                          Alfred D. Carry (DC Bar No. 1011877)
                                          McGlinchey Stafford PLLC
                                          1275 Pennsylvania Avenue NW, Suite 420
                                          Washington, DC 20004
                                          Phone: (202) 802-9999
                                          Fax: (202) 330-5897
                                          acarry@mcglinchey.com

                                          *Counsel for Defendant*

**Butina Letter of Recommendation**
**from Bank of Russia Deputy Governor Alexander Torshin**

To the Columbia University Graduate School of Arts & Sciences:

World class universities, by their nature, carry the special responsibility of preparing future world leaders.  I have been privileged in my career to work with many world leaders and I have come to recognize the traits that make each one a success.  Mariia Butina embodies the essential traits of future success    and I am trusting you to further refine her skills so that she may one day offer bold leadership within Mother Russia.

I was Chairman of the Federation Council (the equivalent of being president of the American U.S. Senate) when I first met Ms. Butina in 2012.  I have met few if any other young leaders who were as quick to learn and adapt to wildly different environments and challenges.  She was introduced to me as the Founding Chairman of a (then) small public organization dedicated to "The Right to Bear Arms" for Russian citizens.  I shared her belief on this issue and, together with Hero of the Motherland Gen. Mikhail Kalashnikov, sought ways to support her work.  She was fearless when others were timid.  She was a woman in a world dominated by men.  In four years, she added 10,000 citizen members to her organization, but her legislative dreams have yet to be fully realized.  She is patient when others are rash    she keeps an eye on the horizon.

The Soviet and now Russian educational system drills its students thoroughly and hard.  But it cannot teach aptitude.  During her years as my assistant in the Russian Federation Council, she learned the difference between reading political science and real life political science.  She adapted quickly and was able to learn mountains of process and the special language of government (her third after Russian and English).

When my world radically changed just under a year ago, she taught herself yet another world as Special Assistant to my new position as Deputy Governor of the Bank of Russia.  Central bank finance now became more central than legislation, but she discovered that key political truths transcend government institutions . . . and international borders.  All while maintaining her leadership of her gun rights organization.

She will flourish at Columbia.  She meets and charms world leaders effortlessly and shall greet her fellow students with equal ease.  Thank you for considering her    please teach her and return her home ready for the next chapter in Russian / U.S. relations.

Sincerely,
Alexander Torshin
Deputy Governor, Bank of Russia

**EXHIBIT**
**1**

## <u>Mariia Butina Statement of Purpose</u>

Is it possible to be born in two countries at once?  I was.  But my mission is to help the new conquer the old.

I was born in a small town in Siberia at the sunset of the Soviet era and the sunrise of the new capitalistic Russia.  I had the good fortune to see socialism, the lack of human rights and a dying economy.  I had the good fortune to see the transitional period when my country did not have any rules and laws.  (For a period, Russia was controlled by criminals – I remember when our house was occasionally called by various people threatening to burn my home and kill my family.)  I had the good fortune to see the New Russia, when my fellow citizens took first steps in a market economy, and to share with them the joy of success and the pain of failure.

My generation in Russia is called "the transitionals."  We were taught by teachers nostalgic for the Soviet past.  We were taught new ideas from old textbooks.  On the first page of my first book in elementary school was a huge portrait of Vladimir Lenin with his famous phrase, "Study, study and study again."  Though dated, it was surprisingly crucial for my generation.  We chose to interpret it as a call to be a person free from the pressure of Soviet propaganda – and open to new ideas.

In my life, there were three moments that allowed me to fully realize the importance of new ideas.

The first moment was when I was granted admission to the only special experimental public school in Siberia – with in-depth study of foreign languages.  I was allowed to read English and German books, not just Soviet history books.  Only 15% of Russians know any foreign language.

Sunrise in New Russia was also the dawn of the internet.  My second moment was when my generation decided to live by the Latin aphorism "scientia potentia est" (knowledge is power).  The post-Soviet internet age gave us the most valuable gift for our minds – access to true information.  We could study the world and the laws of capitalism outside official classes.

My final lesson was from my father.  When the Soviet Union collapsed, he was a university professor of mechanical engineering.  That's when he started his first business in what the West calls "retail," which for 70 years the USSR called "speculation" and was a crime punishable by up to 2 years in prison.  Following the example of my father, I studied the basics of supply and demand and opened a small chain of furniture stores (mostly by "trial and error").

But it was the criminal "transition" period that haunted me.  I realized the importance of safety for the prosperity of the nation.  And I realized that average Russians had no way to protect themselves, their homes or their families.

So at the same time that I was attending university and running a retail business, I founded a non-profit public organization to fight for the right of average citizens to bear arms for self-defense.  During my second year at university, the success of "The Right to Bear Arms" led to my election as the youngest member of The Russian Social Chamber of my home state.

EXHIBIT

2

I was ready to devote my whole life to bettering my New Russia by bettering my native Siberia. But then more I learned about Russia, then more I realized that the true hub of power was located far to the west . . . in Moscow. I realized that to be significant, I had to live where one-third of the Russian population (and all political, media and business authorities) lived.

So after graduating with Masters Degrees in political science and teaching, I sold my business and moved to Moscow. I created a new public relations company in Moscow, all while concentrating on expanding "The Right to Bear Arms." This non-profit organization grew to include offices in nearly every Russian state and currently has over 10,000 members.

Being chairman of the public organization, I got to see all of my vast country – its rich and its poor. And much of the world. I have spoken about gun rights in Germany, the Czech Republic, Estonia, Taiwan and the United States.

But despite everything I've learned and the political influence I've gained, I understand that this knowledge is still insufficient to help develop my Motherland. We are still learning economics, democracy, human rights and international relations through "trial and error." The price of each mistake is the broken fate of a citizen of my country. So I believe that it's necessary to obtain knowledge in a Western university, to more rapidly bring true economic and political progress to New Russia.

I believe in the Russian Federation. I believe that Russia can be a country with free and prosperous citizens, who will be able to realize and use their talents and potential. I believe that Russia is an important and powerful player in the global political arena and can play an even bigger role in maintaining peace in the world and countering the threat of global terrorism.

And I believe that the Russian Federation and America can be partners (again) on the world stage. The one truly golden age of diplomacy between Russia and America occurred during the rule of Russian Emperor Alexander II and President Abraham Lincoln. These leaders shared a contemporary challenge of abolishing slavery within their nations – with Alexander II ending serfdom in 1861 and Lincoln ending slavery in 1863. At a time of upheaval in both nations, their close correspondence created diplomatic relations that were durable and effective.

My generation has a great responsibility for the management of Russia during this time of upheaval and into the future, and I want to do my best for my Motherland. A Master's degree from Harvard will give me the best chance to see this dream become reality.

**To:** ███████@gmail.com] ███████@gmail.com]
**From:** Harvard Graduate School of Arts and Sciences
**Sent:** Tue 1/3/2017 1:18:05 AM
**Subject:** Harvard GSAS Application Submitted

Case 1:18-mj-00218-TSC   Document 23-3   Filed 08/24/18   Page 3 of 7

Dear Maria Butina,

Your application to Harvard University's Graduate School of Arts and Sciences has been successfully submitted.

Please remember to complete and submit the supplemental data application.

Sincerely,
Admissions Office

**To:** ██████@gmail.com ██████@gmail.com]
**From:** Harvard Graduate School of Arts and Sciences Case 1:18-cr-00218-TSC Document 23-3 Filed 08/24/18 Page 4 of 7
**Sent:** Wed 12/28/2016 11:26:27 AM
**Subject:** Online Recommendation Submitted for Harvard Graduate School Online Application

Dear Maria Butina,

This email is to let you know that an online recommendation has been submitted by Alexander Torshin for your application to Harvard Graduate School of Arts and Scie

Thank you,

Graduate School Admissions Office

**From:** ███████████████

**Sent:** Sat 1/28/2017 10:37:13 AM

**Subject:** Harvard REECA Skype Interview Sign-Up

Greetings!

Thank you for your application to the REECA Master's Program at Harvard.  As part of the application process, our director of studies, ██████████████ , would like to conduct a brief interview with you.  She has set aside the following blocks of time for this purpose (all times listed are Eastern Standard Time):

Monday, January 30:  12 noon – 1pm, 3:30pm – 5pm
Tuesday, January 31:  10:30am – 4:40pm

I realize that this is short notice, but I hope that you will be able to find a time that works for you.  Each slot is just 10 minutes, so the conversation will be brief.

If you have the bandwidth, video is preferred, but we recognize that this may not be possible. To facilitate the interview process, please send a Skype contact request to avacroux well ahead of your appointment.

Please sign up for an individual appointment on the Doodle poll at the link below.

http://doodle.com/poll██████████ .

Note:  by signing up for a slot, you have reserved that appointment.  To edit your response, simply follow the link again, and click on the pencil icon to edit your response.

If you are not available or do not have internet access during the times listed, please let me know.

Thank you!
--
██████████████
Student Programs Officer
Davis Center for Russian and Eurasian Studies
t: ██████████████

| From: | Maria Butina [███████@gmail.com] on behalf of Maria Butina |
|---|---|
| Sent: | Friday, January 27, 2017 7:13 PM |
| To: | Erickson Paul |
| Subject: | Fwd: Harvard REECA Skype Interview Sign-Up |

!!!!!

Best regards,

Maria Butina

████████████(cell)

Начало переадресованного сообщения:

**От:** "████████████" <███████@fas.harvard.edu>
**Дата:** 27 января 2017 г., 19:57:18 GMT-5
**Тема: Harvard REECA Skype Interview Sign-Up**

Greetings!

Thank you for your application to the REECA Master's Program at Harvard.  As part of the application process, our director of studies, ███████████████, would like to conduct a brief interview with you. She has set aside the following blocks of time for this purpose (all times listed are Eastern Standard Time):

Monday, January 30:  12 noon – 1pm, 3:30pm – 5pm
Tuesday, January 31:  10:30am – 4:40pm

I realize that this is short notice, but I hope that you will be able to find a time that works for you.  Each slot is just 10 minutes, so the conversation will be brief.

If you have the bandwidth, video is preferred, but we recognize that this may not be possible. To facilitate the interview process, please send a Skype contact request to avacroux well ahead of your appointment.

Please sign up for an individual appointment on the Doodle poll at the link below.

http://doodle.com/poll/██████████

Note:  by signing up for a slot, you have reserved that appointment.  To edit your response, simply follow the link again, and click on the pencil icon to edit your response.

If you are not available or do not have internet access during the times listed, please let me know.

Thank you!
--
████████████

Student Programs Officer
Davis Center for Russian and Eurasian Studies
t: █████████

UNCLASSIFIED

| +79 ▮ | Local User | 8/26/2015 01:33:27 PM | I don't know what you owe me for this insurance they put me through the wringer. |
|--------|-----------|----------------------|---------|
| Local User | +79 ▮ | 8/26/2015 01:33:46 PM | Sex. |
| Local User | +79 ▮ | 8/26/2015 01:33:51 PM | Thank you so much. |
| Local User | +79 ▮ | 8/26/2015 01:34:04 PM | I have nothing else at all.  Not a nickel to my name. |
| +79 ▮ | Local User | 8/26/2015 01:37:19 PM | Ugh…( |
| +79 ▮ | Local User | 8/26/2015 02:18:52 PM | The "mvshina"[sic, read "car"] is at the house, the insurance and documents are on the table at your house, winter tires are in the truck of the car! |
| Local User | +79 ▮ | 8/26/2015 04:09:37 PM | [DK], thank you so much!!!!! |
| Local User | +79 ▮ | 8/26/2015 04:09:44 PM | Ask for anything… |
| Local User | +79 ▮ | 8/26/2015 04:09:49 PM | …you want. |
| Local User | +79 ▮ | 8/26/2015 04:09:57 PM | That they hire you? |
| +79 ▮ | Local User | 8/26/2015 04:13:39 PM | Think of something!  Sex with you does not interest me.  Think! |

EXHIBIT
2

USAO_Discovery_005770

Conversation (iMessage: +79 ████ Chat)

Participants (3)

| (owner) | Mariya Butina | +79 ████████ |
| | ████████ | +79 ████████ |
| (owner) | Mariya Butina | ████ @gmail.com |

Conversation

Mariya Butina

[IS] let's go have fun with guys!!!
Read: 8/19/2015 7:06:24 AM (UTC+0) | Delivered: 8/19/2015 7:06:06 AM (UTC+0)

8/19/2015 7:06:06 AM (UTC+0)

IS ████████

What kind of proposition is this first thing in the morning? Are you drunk?
Read: 8/19/2015 7:07:17 AM (UTC+0)

8/19/2015 7:07:04 AM (UTC+0)

Mariya Butina

Bored. So there.

Read: 8/19/2015 7:08:16 AM (UTC+0) | Delivered: 8/19/2015 7:07:22 AM (UTC+0)

8/19/2015 7:07:22 AM (UTC+0)

IS ████████

Got you. Come over for lunch, would you like to?
Read: 8/19/2015 7:14:43 AM (UTC+0)

8/19/2015 7:08:35 AM (UTC+0)

Mariya Butina

I can't((. Thursday evening?!
Read: 8/19/2015 7:15:04 AM (UTC+0) | Delivered: 8/19/2015 7:15:57 AM (UTC+0)

8/19/2015 7:14:56 AM (UTC+0)

EXHIBIT
3

USAO_Discovery_005760

Mariya Butina

Oh. Shit. There is a gathering there. Lunchtime on Thursday.
Read: 8/19/2015 7:15:11 AM (UTC+0) | Delivered: 8/19/2015 7:15:11 AM (UTC+0)

8/19/2015 7:15:11 AM (UTC+0)

IS ▮▮▮▮▮▮▮

I am going home on Thursday evening. I will come on Sun. In the meantime, look for guys)
Read: 8/19/2015 7:15:46 AM (UTC+0)

8/19/2015 7:15:46 AM (UTC+0)

Mariya Butina

How is it going with yours!
Read: 8/19/2015 7:17:09 AM (UTC+0) | Delivered: 8/19/2015 7:17:09 AM (UTC+0)

8/19/2015 7:17:09 AM (UTC+0)

Mariya Butina

?
Read: 8/19/2015 7:17:11 AM (UTC+0) | Delivered: 8/19/2015 7:17:11 AM (UTC+0)

8/19/2015 7:17:11 AM (UTC+0)

IS ▮▮▮▮▮▮▮

Nohow. 3 weeks of silence. The hell with him! [angry face emoji]
Read: 8/19/2015 7:18:04 AM (UTC+0)

8/19/2015 7:17:46 AM (UTC+0)

Mariya Butina

It's even worse in my case. He's been bugging the shit out of me with his mom

Read: 8/19/2015 7:18:29 AM (UTC+0) | Delivered: 8/19/2015 7:18:21 AM (UTC+0)

8/19/2015 7:18:20 AM (UTC+0)

Mariya Butina

I have a feeling that I am residing in a nursing home

Read: 8/19/2015 7:18:32 AM (UTC+0) | Delivered: 8/19/2015 7:18:31 AM (UTC+0)

USAO_Discovery_005761

UNCLASSIFIED

8/19/2015 7:18:30 AM (UTC+0)

Mariya Butina

Shit!!!!

Read: 8/19/2015 7:18:35 AM (UTC+0)  |  Delivered: 8/19/2015 7:18:35 AM (UTC+0)

8/19/2015 7:18:35 AM (UTC+0)

UNCLASSIFIED

3

USAO_Discovery_005762

Mariya Butina

Send a link to the dating app

Read: 8/31/2015 1:18:36 PM (UTC+0)  |  Delivered: 8/31/2015 1:18:22 PM (UTC+0)

8/19/2015 1:18:22 PM (UTC+0)

IS

Tinder
Read: 8/31/2015 1:18:48 PM (UTC+0)

8/31/2015 1:18:43 PM (UTC+0)

Mariya Butina

And a photo of your cat

Read: 8/31/2015 1:18:53 PM (UTC+0)  |  Delivered: 8/31/2015 1:18:52 PM (UTC+0)

8/31/2015 1:18:48 PM (UTC+0)

IS

In AppStore

Read: 8/31/2015 1:18:53 PM (UTC+0)

8/31/2015 1:18:52 PM (UTC+0)

IS

[Image of a cat]

8/31/2015 1:19:36 PM (UTC+0)

Mariya Butina

Oh my, what a cutie

Read: 8/31/2015 1:20:44 PM (UTC+0)  |  Delivered: 8/31/2015 1:20:20 PM (UTC+0)

8/31/2015 1:20:05 PM (UTC+0)

Mariya Butina

What's his name?
Read: 8/31/2015 1:20:46 PM (UTC+0)  |  Delivered: 8/31/2015 1:20:45 PM (UTC+0)

USAO_Discovery_005763

UNCLASSIFIED

IS ▮▮▮▮▮

[Photo of a cat]
8/31/2015 1:20:51 PM (UTC+0)

IS ▮▮▮▮▮

Elizar. Meet him )

8/31/2015 1:21:02 PM (UTC+0)

Mariya Butina

[image]
Read: 8/31/2015 1:21:34 PM (UTC+0)  |  Delivered: 8/31/2015 1:21:16 PM (UTC+0)

8/31/2015 1:21:00 PM (UTC+0)

Mariya Butina

Is that it?
Read: 8/31/2015 1:21:34 PM (UTC+0)  |  Delivered: 8/31/2015 1:21:24 PM (UTC+0)

8/31/2015 1:21:02 PM (UTC+0)

IS ▮▮▮▮▮

Yeeeees
Read: 8/31/2015 1:21:53 PM (UTC+0)

8/31/2015 1:21:52 PM (UTC+0)

IS ▮▮▮▮▮

Download.

Read: 8/31/2015 1:21:05 PM (UTC+0)

▮▮▮▮▮

There are lots of foreigners there, and they are the ones most engaged, ours are such slackasses(
Read: 8/31/2015 1:22:57 PM (UTC+0)

8/31/2015 1:22:48 PM (UTC+0)

Mariya Butina

It is asking for Facebook. In other words everyone will know that I am there?

USAO_Discovery_005764

Read: 8/31/2015 1:24:51 PM (UTC+0) | Delivered: 8/31/2015 1:23:57 PM (UTC+0)

8/31/2015 1:23:54 PM (UTC+0)

IS ▮▮▮▮▮▮

No
Read: 8/31/2015 1:24:56 PM (UTC+0)

8/31/2015 1:24:55 PM (UTC+0)

IS ▮▮▮▮▮▮

They will not
Read: 8/31/2015 1:25:06 PM (UTC+0)

8/31/2015 1:24:58 PM (UTC+0)

IS ▮▮▮▮▮▮

It is asking for this for identification purposes, that you in fact exist
Read: 8/31/2015 1:25:22 PM (UTC+0)

8/31/2015 1:25:18 PM (UTC+0)

IS ▮▮▮▮▮▮

It is not going to post anything
Read: 8/31/2015 1:25:47 PM (UTC+0)

8/31/2015 1:25:29 PM (UTC+0)

Mariya Butina

So it is only searching for those within a radius?
Read: 8/31/2015 1:27:42 PM (UTC+0) | Delivered: 8/31/2015 1:27:41 PM (UTC+0)

8/31/2015 1:27:38 PM (UTC+0)

IS ▮▮▮▮▮▮

No, how you give parameters.

Read: 8/31/2015 1:28:12 PM (UTC+0)

8/31/2015 1:28:11 PM (UTC+0)

IS ▮▮▮▮▮▮

USAO_Discovery_005765

Look in settings.

Read: 8/31/2015 1:28:21 PM (UTC+0)

8/31/2015 1:28:18 PM (UTC+0)

USAO_Discovery_005766

2018

U-Haul: Order/Reservation confirmation

Order/Reservation confirmation # - 23316478   Page 1 of 1

Paul Erickson

[New Ind. 7/10 2:00 pm]

Amount paid to date: $0.00

(360)-843-6198 /
(800)-468-4285

Rental equipment confirmation # 23316478

Save time at the counter with Express On-Line Check-in, and experience Moving Made Easier™ on your own personal page at myuhaul.com. This is also the place to go to view your reservation, make changes as needed and learn about other useful features.

**Pick up**

Sunday, July 15, 2018   (2:00 pm)

**U-Haul Moving & Storage of Capitol Hill**
26 K St NE
Washington, DC 20002
(202) 289-5480

(@ 1st Ne)

Note: This location is a preference only.

Includes up to 5 days and 1587 miles

**Drop off**

By: Friday, July 20, 2018

**U-Haul Moving & Storage of Sioux Falls**
923 W 11th St
Sioux Falls, SD 57104
(605) 339-0750

(East of I-29 on 12th Before Minnesota)

Note: This location is a preference only.

| Item | Total |
|------|-------|
| 10' truck | $1,300.00 |
| Safemove® | $112.00 |

**Additional rental items**

| Item | Quantity | Rate | Total |
|------|----------|------|-------|
| Utility Dolly | 1 | $10.00 | $10.00 |
| Total due | | | $10.00 |

Dimensions:   10' x 6'4" x 6'3"   [15' x 7'6" x 7'2", plus cab]

Fuel:   31 gallon tank / 12 mpg

**EXHIBIT 5**

Cedar Point

# VOUCHER - NOT FOR RESALE

## Cedar Point

**Cedar Point**



BUTINA

01419418936697865279

---

**2018 ALL DAY DINING**

---

| | |
|---|---|
| **TYPE:** All-Day Dining | **PURCHASER:** Erickson, Paul |
| **PRICE:** $34.15 | **CONFIRMATION #** 67377458 |
| **TICKET #**01419418936697865279 | **PURCHASE DATE:**07/13/2018 |
| | **PAYMENT METHOD:** Visa |

---

### DESCRIPTION

Add food to your fun all day long! Enjoy an entrée and side as often as every 90 minutes during 1 visit during the 2018 season. Valid at participating locations at Cedar Point and Cedar Point Shores Waterpark. Drinks are not included. Does not include park admission.

### INSTRUCTIONS

Redeem this original Voucher at participating locations throughout Cedar Point and Cedar Point Shores Waterpark for an all-day dining wristband. This Voucher contains a unique barcode valid for UNLIMITED USE FOR ONE MAIN AND ONE SIDE EVERY 90 MINUTES. This Voucher becomes INVALID once scanned and may not be re-used. Unauthorized use or duplication is strictly prohibited and will result in revocation without refund and ejection of the individual attempting to enter. In the event that a duplicate ticket appears, the Park reserves the right to refuse entry to all ticket holders.

---

### TERMS OF USE AND REFUNDS

Valid for the entitlement(s) and park(s) specified during the **2018 Season only**. Not valid in conjunction with any other discount offer. Not for resale. Cedar Fair reserves the right to refuse admission and control occupancy. Holder assumes all risk of personal injury and loss of property, agrees to the posted conditions of usage, rider safety guidelines and ride admission policies and grants Cedar Fair permission to use his/her photograph or video image in any advertising and promotion without payment to holder.

No rain checks, refunds, exchanges or replacements if lost or stolen. Not valid for separately ticketed events, special events or park buyouts. Some attractions require an additional charge. Height and physical restrictions may apply on some rides. Please visit the park's website or call the park to confirm operating dates and hours and learn more about park rules, ride admission policies and guest assistance guidelines. Unauthorized resale of this ticket is prohibited.

---

**NOT FOR RESALE**



01419418936697865279



# Cedar Point

**Cedar Point**



0141941893869786527 3

---

## 2018 ALL DAY DINING

| | |
|---|---|
| **TYPE:** All-Day Dining | **PURCHASER:** Erickson, Paul |
| **PRICE:** $34.15 | **CONFIRMATION #** 67377458 |
| **TICKET #**01419418938697865273 | **PURCHASE DATE:**07/13/2018 |
| | **PAYMENT METHOD:** Visa |

### DESCRIPTION

Add food to your fun all day long! Enjoy an entrée and side as often as every 90 minutes during 1 visit during the 2018 season. Valid at participating locations at Cedar Point and Cedar Point Shores Waterpark. Drinks are not included. Does not include park admission.

### INSTRUCTIONS

Redeem this original Voucher at participating locations throughout Cedar Point and Cedar Point Shores Waterpark for an all-day dining wristband. This Voucher contains a unique barcode valid for UNLIMITED USE FOR ONE MAIN AND ONE SIDE EVERY 90 MINUTES. This Voucher becomes INVALID once scanned and may not be re-used. Unauthorized use or duplication is strictly prohibited and will result in revocation without refund and ejection of the individual attempting to enter. In the event that a duplicate ticket appears, the Park reserves the right to refuse entry to all ticket holders.

### TERMS OF USE AND REFUNDS

Valid for the entitlement(s) and park(s) specified during the **2018 Season only**. Not valid in conjunction with any other discount offer. Not for resale. Cedar Fair reserves the right to refuse admission and control occupancy. Holder assumes all risk of personal injury and loss of property, agrees to the posted conditions of usage, rider safety guidelines and ride admission policies and grants Cedar Fair permission to use his/her photograph or video image in any advertising and promotion without payment to holder.

No rain checks, refunds, exchanges or replacements if lost or stolen. Not valid for separately ticketed events, special events or park buyouts. Some attractions require an additional charge. Height and physical restrictions may apply on some rides. Please visit the park's website or call the park to confirm operating dates and hours and learn more about park rules, ride admission policies and guest assistance guidelines. Unauthorized resale of this ticket is prohibited.

---

**NOT FOR RESALE**



01419418938697865273

Cedar Point

**FAST LANE PLUS and ADMISSION COMBO - NOT FOR RESALE**



**Cedar Point**





01419418940697865820

---

**ADMISSION & FAST LANE PLUS COMBO**

Valid Date: Tuesday, 07/17/2018

| | |
|---|---|
| **TYPE:** Admission w/Fast Lane Plus | **PURCHASER:** Erickson, Paul |
| **PRICE:** $150.96 | **CONFIRMATION #** 67377458 |
| **TICKET #**01419418940697865820 | **PURCHASE DATE:** 07/13/2018 |
| | **PAYMENT METHOD:** Visa |

---

## DESCRIPTION

Valid for one admission and one Fast Lane Plus wristband for anyone age 3 or older. Valid on the date chosen. Limited availability.

Enjoy the ultimate Cedar Point experience with Fast Lane Plus! Includes all Fast Lane attractions plus unlimited rides on Steel Vengeance, Valravn, Maverick, Top Thrill Dragster and GateKeeper!

## INSTRUCTIONS

Valid only on the date printed on this ticket. This is your Fast Lane voucher. Present this voucher at any ticket sales window (prior to entering the park) to receive your Fast Lane wristband or at any Fast Lane sales location inside the park. This is also your admission ticket. Present this original E- Ticket at any Cedar Point entrance gate for admission. This E-Ticket becomes INVALID once scanned for admission and Fast Lane wristband and may not be re-used. Unauthorized use or duplication is strictly prohibited and will result in revocation without refund and ejection of the individual attempting to enter. In the event that a duplicate ticket appears, the Park reserves the right to refuse entry to all ticket holders. GET INTO CEDAR POINT AN HOUR EARLY WITH AN OVERNIGHT STAY! Cedar Point Resorts offer the closest accommodations to the amusement park, and resort guests enjoy getting in ONE HOUR EARLY to challenge select rides. Visit cedarpoint.com or call 419-627-2106 for further details.

---

## TERMS OF USE AND REFUNDS

Valid for the entitlement(s) and park(s) specified during the 2018 Season Only. Not valid in conjunction with any other discount offer. Not for resale. Cedar Fair reserves the right to refuse admission and control occupancy. Holder assumes all risk of personal injury and loss of property, agrees to the posted conditions of usage, rider safety guidelines and ride admission policies and grants Cedar Fair permission to use his/her photograph or video image in any advertising and promotion without payment to holder.

No rain checks, refunds, exchanges or replacements if lost or stolen. Not valid for separately ticketed events, special events or park buyouts. Some attractions require an additional charge. Height and physical restrictions may apply on some rides. Please visit the park's website or call the park to confirm operating dates and hours and learn moreparkihng about park rules, ride admission policies and guest assistance guidelines.

UNAUTHORIZED RESALE OF THIS TICKET IS PROHIBITED.

---

**NOT FOR RESALE**



01419418940697865820

## Cedar Point

Cedar Point



PAUL

0141941894269786 5834



### ADMISSION & FAST LANE PLUS COMBO

Valid Date: Tuesday, 07/17/2018

**TYPE:** Admission w/Fast Lane Plus
**PRICE:** $150.96
**TICKET #**0141941894269786 5834

**PURCHASER:** Erickson, Paul
**CONFIRMATION #** 67377458
**PURCHASE DATE:**07/13/2018
**PAYMENT METHOD:** Visa

### DESCRIPTION

Valid for one admission and one Fast Lane Plus wristband for anyone age 3 or older. Valid on the date chosen. Limited availability.

Enjoy the ultimate Cedar Point experience with Fast Lane Plus! Includes all Fast Lane attractions plus unlimited rides on Steel Vengeance, Valravn, Maverick, Top Thrill Dragster and GateKeeper!

### INSTRUCTIONS

Valid only on the date printed on this ticket. This is your Fast Lane voucher. Present this voucher at any ticket sales window (prior to entering the park) to receive your Fast Lane wristband or at any Fast Lane sales location inside the park. This is also your admission ticket. Present this original E- Ticket at any Cedar Point entrance gate for admission. This E-Ticket becomes INVALID once scanned for admission and Fast Lane wristband and may not be re-used. Unauthorized use or duplication is strictly prohibited and will result in revocation without refund and ejection of the individual attempting to enter. In the event that a duplicate ticket appears, the Park reserves the right to refuse entry to all ticket holders. GET INTO CEDAR POINT AN HOUR EARLY WITH AN OVERNIGHT STAY! Cedar Point Resorts offer the closest accommodations to the amusement park, and resort guests enjoy getting in ONE HOUR EARLY to challenge select rides. Visit cedarpoint.com or call 419-627-2106 for further details.

### TERMS OF USE AND REFUNDS

Valid for the entitlement(s) and park(s) specified during the 2018 Season Only. Not valid in conjunction with any other discount offer. Not for resale. Cedar Fair reserves the right to refuse admission and control occupancy. Holder assumes all risk of personal injury and loss of property, agrees to the posted conditions of usage, rider safety guidelines and ride admission policies and grants Cedar Fair permission to use his/her photograph or video image in any advertising and promotion without payment to holder.

No rain checks, refunds, exchanges or replacements if lost or stolen. Not valid for separately ticketed events, special events or park buyouts. Some attractions require an additional charge. Height and physical restrictions may apply on some rides. Please visit the park's website or call the park to confirm operating dates and hours and learn moreparkinng about park rules, ride admission policies and guest assistance guidelines.

UNAUTHORIZED RESALE OF THIS TICKET IS PROHIBITED.

**NOT FOR RESALE**



0141941894269786 5834

| **From:** | Kenerson, Erik (USADC) <Erik.Kenerson@usdoj.gov> |
|---|---|
| **Sent:** | Monday, August 13, 2018 7:55 PM |
| **To:** | Driscoll, Robert; Saunders, Thomas (USADC) |
| **Cc:** | Carry, Alfred; Mackie, Will (NSD) (JMD); Plunkett, Daniel T. |
| **Subject:** | RE: US v. Butina - protective order |

Bob,

As to the hard drive, it is a good news, bad news proposition.  The good news is that the FBI was able to image her electronics from the July search as well, and it can put those on this initial hard drive as well.  The bad news is that this would extend the amount of time it takes – to about two weeks.  I have been explained the technical reasons why it should take so long and can relay them in a call if you want (with the caveat that I'm not technical myself so my knowledge base is limited).  It should be ready by August 24, though the FBI hopes to have it sooner.  The other option is to provide only the April images in this initial tranche, which would get them to you sooner, but then we would need another hard drive for the July tranche.

We know, of course, that you are eager to get the materials.  We should be able to provide within a couple of days a disc containing scanned versions of the physical documents seized from your client's residence, as well as the FBI verbatim translations of her Twitter chats.

With regards to the materials underlying the complaint and detention memo, I will identify those today and ask the agents to begin pulling copies of them so we can provide them to you separately before the hard drive finishes copying.  By the way, your email reminds me of a correction I've been meaning to make since I recently noticed it – the B1/B2 reference from the detention memo is a mistake – she recently applied for an OPT extension (if that's the proper term) of her F1, but the upshot of that—that she can travel to and from under it—remains the same.  Apologies for the clerical error there.

Please let us know if you want to discuss further.

Erik

-----Original Message-----
From: Driscoll, Robert <rdriscoll@mcglinchey.com>
Sent: Monday, August 13, 2018 12:37 PM
To: Kenerson, Erik (USADC) <EKenerson@usa.doj.gov>; Saunders, Thomas (USADC) <TSaunders@usa.doj.gov>
Cc: Carry, Alfred <acarry@mcglinchey.com>; Mackie, Will (NSD) (JMD) <Will.Mackie@usdoj.gov>; Plunkett, Daniel T. <dplunkett@mcglinchey.com>
Subject: RE: US v. Butina - protective order

Erik:

        Please let us know the revised timing on the hard drive – obviously this is important to us.  Also, given that the protective order is in place, could you please send separately all the evidence relied on in your proffer regarding detention, particularly the allegations that (a) Maria offered to trade sex for a position with an organization; (b) that Maria expressed dissatisfaction with living with Paul; and (c) that Maria applied for a tourist visa (B1/B2).  You had previously indicated that you would need a day or two to get this information together, but now that the PO is in place I'd imagine you can go to the file you used to write the motion to identify the documents fairly quickly.   If there are other electronic forms of evidence (e.g., a CD) that would take some time, let us know what there is and how long it might take.

        Given the September 10 status, I would like to review that information quickly to determine if we will seek to revisit Maria's detention, because in order to brief that question in time for the next date, we would have to make that call fairly soon.  Thus the urgency on our end.

EXHIBIT
7

Thanks for doing what you can to expedite that portion of the discovery process.

Best,

Bob

**From:** Driscoll, Robert
**Sent:** Friday, June 29, 2018 10:08 AM
**To:** 'Kenerson, Erik (USADC)'
**Subject:** RE: Butina

Still nothing?


As an FYI, my client may be moving South Dakota later this summer,


Bob


**Robert Neil Driscoll**

| | |
|---|---|
| **direct:** | (202) 802-9950 |
| **fax:** | (202) 403-3870 |
| **email:** | rdriscoll@mcglinchey.com |
| **office:** | 1275 Pennsylvania Avenue NW, Suite 420 | Washington, DC 20004 |

 McGLINCHEY STAFFORD®

bio | vcard | www.mcglinchey.com | www.cafalawblog.com

Alabama  California  Florida  Louisiana  Mississippi  New York  Ohio  Tennessee  Texas  Washington, DC

---

**From:** Kenerson, Erik (USADC) [mailto:Erik.Kenerson@usdoj.gov]
**Sent:** Thursday, June 21, 2018 4:38 PM
**To:** Driscoll, Robert
**Subject:** RE: Butina

Nothing new to report

---

**From:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Sent:** Thursday, June 21, 2018 2:33 PM
**To:** Kenerson, Erik (USADC) <EKenerson@usa.doj.gov>
**Subject:** Re: Butina

Anything shaking with this?

Sent from my iPhone

On May 17, 2018, at 11:46 AM, Driscoll, Robert <rdriscoll@mcglinchey.com> wrote:

> Erik:
>
> Guessing at your email, your vmail is full. Could you call me?  I wanted to talk a little about the Judiciary Minority Report mentioning Maria that came out yesterday.
>
> Bob


EXHIBIT
8

**Robert Neil Driscoll**

| | |
|---|---|
| **direct:** | (202) 802-9950 |
| **fax:** | (202) 403-3870 |
| **email:** | rdriscoll@mcglinchey.com |
| **office:** | 1275 Pennsylvania Avenue NW, Suite 420 \| Washington, DC 20004 |

\<image001.gif\>®

bio | vcard | www.mcglinchey.com | www.cafalawblog.com

Alabama  California  Florida  Louisiana  Mississippi  New York  Ohio  Tennessee  Texas  Washington, DC

www.mcglinchey.com | www.CafaLawBlog.com

McGlinchey Stafford, PLLC in Alabama, Florida, Louisiana, Mississippi, New York, Ohio, Tennessee, Texas, and Washington DC and McGlinchey Stafford, LLP in California.

Confidentiality Statement: This email may contain attorney-client privileged or confidential information. It is for the sole use of the intended recipient(s). If you have received this transmission in error, immediately notify us by telephone at 504-586-1200 and return the original message to us at McGlinchey Stafford, 12th Floor, 601 Poydras Street, New Orleans, LA, 70130 via the United States Postal Service.

We take steps to remove metadata in attachments sent by email, and any remaining metadata should be presumed inadvertent and should not be viewed or used without our express permission. If you receive an attachment containing metadata, please notify the sender immediately and a replacement will be provided.

See McGlinchey Stafford Disclaimer/Privacy Policy https://www.mcglinchey.com/disclaimer/

**From:** Driscoll, Robert
**Sent:** Friday, July 06, 2018 9:42 AM
**To:** 'Miller, Matthew J. (MP) (FBI)'
**Subject:** RE:

Just checking if you saw this – the bottom line is that she is moving.  July  11-14 work best for DC (and generally), as she has not told Paul she is talking to you .  She can do other dates in SD, but I will have to fly out and it will be harder to keep Paul in the dark, which may or may not matter to you at this point (I understand that he rolled in with counsel a few weeks back).

**Robert Neil Driscoll**

| | |
|---|---|
| **direct:** | (202) 802-9950 |
| **fax:** | (202) 403-3870 |
| **email:** | rdriscoll@mcglinchey.com |
| **office:** | 1275 Pennsylvania Avenue NW, Suite 420 \| Washington, DC 20004 |



bio | vcard | www.mcglinchey.com | www.cafalawblog.com

Alabama  California  Florida  Louisiana  Mississippi  New York  Ohio  Tennessee  Texas  Washington, DC

---

**From:** Driscoll, Robert
**Sent:** Thursday, June 28, 2018 5:38 PM
**To:** Miller, Matthew J. (MP) (FBI)
**Subject:** RE:

July 11-14 all work in DC.  I think in August she'll be in SD.  That's suboptimal for me but doable if it comes to it, as easier to have me fly than you and her.   Let me know what its looking like for you.

---

**From:** Miller, Matthew J. (MP) (FBI) <MJMiller@fbi.gov>
**Sent:** Thursday, June 28, 2018 5:28 PM
**To:** Driscoll, Robert <rdriscoll@mcglinchey.com>
**Subject:**

Hey Bob,

Just checking in on Maria. I know she is out of school by now so I was wondering if she was still around for a possible proffer on August 3rd.

Matt

EXHIBIT
9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of Defendant's Motion for Bond Review, the memorandum in support filed therewith, and other evidence before the Court, it is this _____ day of _____, 2018 hereby

**ORDERED** that Defendant Maria Butina be released pending trial into the Pretrial Services Agency High Intensity Supervision Program on a home detention basis with electronic monitoring.

**SO ORDERED**.

_____
Judge Chutkan

Copies to:

All counsel of record

1