**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT MARIA BUTINA'S MOTION FOR BOND REVIEW**

Defendant Maria Butina submits this memorandum in support of her motion for bond review, stating as follows:

**I. Background**

Maria Butina was indicted for acting in the United States as an agent of a foreign government without prior notification to the Attorney General (in violation of 18 U.S.C. § 951) and conspiracy to do the same (in violation of 18 U.S.C. § 371).

Since her arrest on July 15, 2018, Ms. Butina has been held without bond. At the preliminary detention hearing on July 18, 2018, Magistrate Judge Deborah Robinson denied Ms. Butina's request for release based on the government's fear of flight from prosecution. (Mem. of Findings of Fact and Statement of Reasons in Support of Order of Detention, Jul. 24, 2018 [Doc. 15] (Robinson, M.J.)) According to the government's proffer and a single witness from the State Department's Diplomatic Security Service, who had no personal knowledge about Ms. Butina's specific flight risk, the government contended that no combination of conditions could reasonably assure her future appearance in court. After interviewing Ms. Butina and assessing her flight risk, the Pretrial Services Agency (PSA) recommended that the Court release Ms. Butina under general

1

supervision and a few conditions.[1] Her counsel echoed the PSA's recommendations, asking the Court to release Ms. Butina with conditions. The magistrate denied that request.

In deciding to detain Ms. Butina without bond, Magistrate Judge Robinson rejected the PSA's independent findings and accepted the government's proffer as true, principally because "a grand jury has found probable cause" (Doc. 15 at 3) and Ms. Butina "is a national of the Russian Federation, with which the United States has no extradition treaty" (*id.* at 6). Magistrate Judge Robinson also noted that defense counsel "did not cross examine the witness called by the government." (*Id.* at 7, n.3.)

## II. <u>Standard of Review</u>

A person awaiting trial on a federal offense may be released on personal recognizance or bond, conditionally released, or detained. 18 U.S.C. § 3142(a); *see United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). "Our system of criminal justice embraces a strong presumption against detention. 'In our society, liberty is the norm and detention prior to trial or without trial is the carefully limited exception.'" *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (2009) (quoting *United States v. Salerno,* 481 U.S. 739, 755 (1987)).

The Bail Reform Act of 1984 (Act), 18 U.S.C. § 3141 *et seq.*, enumerates the limited circumstances when a defendant may be detained before trial. If a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community, such judicial officer shall order the detention of the defendant before trial." 18 U.S.C. § 3142(e). Alternatively, a finding that no condition or combination of conditions will reasonably assure the appearance of the defendant must be

---

[1] Those conditions were that Ms. Butina report to the PSA weekly by phone, verify her address, not apply for or possess a passport, stay within the Washington, DC area, and surrender all passports to the PSA. (Doc. 5 at 2.)

supported by a preponderance of the evidence. *Id.*; *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). The "preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful—can reasonably assure that the defendant will appear for trial." *United States v. Xulam,* 84 F.3d 441, 442 (D.C. Cir. 1996).

A magistrate judge's bail determination is reviewed de novo, and a court is free to use any evidence or rationale different from what the magistrate relied upon. *United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001) (Kennedy, J.); *United States v. Bess*, 678 F. Supp. 929, 934 n.3 (D.D.C. 1988). Further, both the government and the defendant may present evidence by proffer at a detention hearing, rather than by presenting live testimony. *Hanson*, 613 F. Supp. 2d at 88.

### III. <u>Argument</u>

The government sought to detain Ms. Butina under section 3142(f)(2)(A), which permits a court to order pretrial detention "in a case that involves . . . a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A).[2] However, the government's claim that no release conditions will reasonably assure her future appearance in court is an exaggeration. Indeed, many of the government's assertions find no support among the facts. Instead, the government relies on innuendo and undefined phrases, soundbites and alarmist buzzwords.

The assertion that she was arrested for an alleged "role in a covert Russian influence operation in the United States" (Doc. 8 at 2) is a war drum based on pure fiction. Nothing about

---

[2] The government did not argue that Ms. Butina should be detained because she would pose a danger to the public if released. And going to dinners among intellectuals and foreign policy wonks to discuss U.S.-Russia relations, attending two National Prayer Breakfasts, and booking hotel rooms at the Washington Hilton, if true, is anything but an "obvious" danger to the public. (Doc. at 7.)

her activities in the United States were covert or clandestine. Quite the opposite, Ms. Butina came to the United States for graduate school. She spoke genuinely about peace and positive relations between her home country and the United States. Her personal statement for graduate school addressed the same, and her supposed "handler" Aleksandr Porfiryevich Torshin, who is actually just a friend, wrote her letters of recommendation (attached as Exhibit 1).

Maria actually applied to seven universities in the United States (Yale, Columbia, Harvard, Stanford, Georgetown, American, and Tufts). She even considered going to law school in Russia prior to resolving to matriculate at American University. No person from the Russian government instructed her to go to American. Moreover, once there, she considered transferring to Harvard to enroll in their Russia, Eastern Europe, and Central Asia (REECA) Master's Degree program (*see* Exhibit 2). These are not the actions of a Russian agent looking to hide among students "as part of the operation" while leaving enough time to collect information, as the government claims. (Doc. 8 at 7.) To the contrary, her academic pursuits were sincere. She sought scholastic rigor, not a "cover occupation." (*Id.* at 8.)

### A. The Nature and Circumstances of the Offense

To be sure, the counts alleged in the indictment (acting as a foreign agent without registration and conspiracy) are serious charges that carry ten and five year maximum sentences, respectively. However, they are not offenses that carry a rebuttable presumption that no condition of release or combination of conditions would reasonably assure a defendant's appearance. *See* 18 U.S.C. § 3142(e)(3). Furthermore, despite the patina of espionage with which the government tries to color this case, the allegations do not involve spying, tradecraft, classified information, or any other hallmarks of an espionage case.

Rather, Ms. Butina is alleged to have acted publicly, documenting her activities on blog posts and social media. She traveled openly in the United States with her purported "handler" every time he visited, and she had a "special assistant" business card that she asked him to provide, so she could help with his travel arrangements while not being mistaken for a paid escort. She is accused of arranging dinners to promote better relations between Russia and the United States although the very dinner that is listed as a predicate act for her alleged crimes was written about in Time Magazine and the American Conservative—hardly covert activity—and, in actuality, was initiated, organized, and directed by an American citizen, not the Russian government.[3]

The gravamen of the government's case is that Ms. Butina was essentially lobbying on behalf of Russia for better relations with the United States. However for reasons only it is aware, the government has charged Ms. Butina under 18 U.S.C. § 951 rather than the Foreign Agent Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, which generally carries civil penalties and much less severe criminal penalties (for circumstances far more egregious than the facts alleged here). Much like a FARA case, the government does not allege that Ms. Butina undertook any independently illegal activities in the United States. The only thing that made her alleged conduct illegal, if true, is that she did not notify the Attorney General prior to undertaking it. Additionally, the government does not allege that Ms. Butina is a member of any Russian intelligence service. Instead, the government relies on a series of isolated Twitter direct messages (that she voluntarily supplied to the U.S. Senate Select Committee on Intelligence in their entirety) to establish that she was somehow operating under the direction or control of a Russian official, even though the

---

[3] Alex Altman and Elizabeth Dias, *Moscow Cozies Up to the Right*, TIME MAGAZINE, Mar. 10, 2017, http://time.com/4696424/moscow-right-kremlin-republicans/. George D. O'Neill Jr., *Why Do We Want a Cooperative Relationship With Russia?*, AMERICAN CONSERVATIVE, Apr. 24, 2017, https://www.theamericanconservative.com/articles/why-do-we-want-a-cooperative-relationship-with-russia/.

Russian Federation did not pay for her travel to the United States, her tuition, her living expenses, or make any payments to her at all.

At bottom, the government's case appears to be a novel attempt to stretch 18 U.S.C. § 951 to cover the activities of a foreign national student under the theory that her communications (about non-classified public source material) with contacts in her home country made her an "agent" of that country. The serious charges against her should be viewed in that context, which makes this case distinctly different from a typical section 951, "espionage-like or clandestine behavior" case.[4]

## B. Weight of the Evidence

With regard to the weight of the evidence, the government claims that its case is "substantial." (Doc. 8 at 10.) However, behind the curtain of its fanciful assertions that she acted as a Kremlin-agent of influence "to penetrate the U.S. national decision-making apparatus" (Doc. 1-1 at 4 ¶ 14) is no allegation that the Russian Federation actually gave Ms. Butina an order, let alone direction to do anything. She stole no national secrets. She engaged in no confidential information gathering or stealthy procurement-type activities. She never worked for an intelligence operation of the Russian Federation. At most, she networked for her own entrepreneurial gain, took pictures with political celebrities as keepsakes, and shared her memorable events and enthusiasm for American culture and politics with family and friends back home, like hundreds of other foreign students and typical Washingtonian mid-twenty-somethings do.

To distract from the frailty of its charges, the government reprises that Ms. Butina is charged under section 951 and not FARA. However, that charging decision alone contradicts the

---

[4] According to the United States Department of Justice, National Security Division, 18 U.S.C. § 951 targets "espionage-like or clandestine behavior." U.S. DOJ, Office of the Inspector General, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at 9 (Sep. 2016), *available at* https://oig.justice.gov/reports/2016/a1624.pdf (last visited Aug. 24, 2018)

Justice Department's own policies, and perhaps was made as an attempt to aggrandize her conduct and mischaracterize her innocent political interest as nefarious.

That is, the Department of Justice ("DOJ") Criminal Resource Manual makes a distinction between section 951 and a FARA violation. It describes FARA under section 611 *et seq.* as requiring an agent of a foreign principal engaged in political activities to register. *See* U.S. Dep't of Justice, United States Attorneys' Manual 9-90.700 and 9-90.701; and *see* Criminal Resource Manual at 2062. It also discusses other federal statutes like section 951, which is "aimed at persons loosely called foreign agents" but specifically exempts section 951 from applying to "foreign agents engaged in political activities." *Id.* In plain English, DOJ further notes among frequently asked questions that section 951 is only "aimed at foreign government controlled agents engaged in *non-political* activities."[5]

The government's April, 2018 search warrant sought evidence of a potential violation under FARA. The indictment irrefutably characterizes her actions (Doc. 7 at 3, ¶ 8) as political. The purpose of her so-called conspiracy, the government claims, was to "exploit personal connections with U.S. persons having influence in American politics" and to "establish unofficial lines of communications with U.S. politicians and political organizations." (*Id.*) The affidavit in support of the criminal complaint similarly focuses on political activities. (Doc. 1-1.) However, although such allegations are unfounded and untrue, and although the government's searches revealed no hidden transmitters, wads of cash, counterfeit passports, and plane tickets back to Moscow, the government still decided to paper a case against Ms. Butina under section 951. This

---

[5] *See* DOJ Comments regarding FARA Related Statutes, *available at* https://www.justice.gov/nsd-fara/fara-related-statutes (last visited Aug. 24, 2018) (emphasis added); *see also* DOJ Answers to Frequently Asked Questions, *available at* https://www.justice.gov/nsd-fara/general-fara-frequently-asked-questions (last visited Aug. 24, 2018).

decision shows that the government desired to overcharge and inflate her conduct for tactical advantages versus act with restraint or, at a minimum, be consistent with the DOJ and National Security Division's own publicized understanding of appropriate charges.

It follows that the government states "facts" that distort the truth or are wholly false. For example, the government has deleted sentences, misquoting her messages; truncated conversations, taking them out of context; replaced emoticons with brackets, twisting tone; and mistranslated Russian communications, altering their meaning. The government has also sworn in its affidavit—likely presenting the same false information to a grand jury under oath—that Ms. Butina took certain actions in the United States when immigration records confirm that she was, in fact, overseas.

### C. History and Character of the Person

Ms. Butina is not a criminal. She is not on probation, parole, or on other release pending trial, sentencing, or appeal. *See* 18 U.S.C. § 3142(g)(3)(B). She has never been arrested or charged with a crime before. *Id.* Rather, she is a young woman of good character and with genuine ties to the United States through her five-year relationship with Paul Erickson, her academic work, and her desire to pursue a career in the United States. *See* 18 U.S.C. § 3142(g)(3)(A).

The government gratuitously and falsely smeared her character and reputation in its written memorandum and oral proffer made in open court. The government argued that Ms. Butina's relationship with Mr. Erickson is a "duplicitous relationship" because she "appears to treat it as simply a necessary part of her activities." (Govt's Mem. in Support of Detention, Doc. 8 at 8). In particular, AUSA Kenerson alleged that:

> For example, on at least one occasion, Butina offered an individual other than [Mr. Erickson] sex in exchange for a position within a special interest organization.

(*Id.*) The impact of this inflammatory allegation, which painted Ms. Butina as some type of Kremlin-trained seductress, or spy-novel honeypot character, trading sex for access and power, cannot be overstated. The assertion that she *used sex* to develop her relationships in the United States appeared on the front pages of the New York Times, the Washington Post, CNN's website, and more. Worse, it also appeared on the television of her parent's family room TV.

- "Maria Butina, Suspected Secret Agent, Used Sex in Covert Plan, Prosecutors Say," the New York Times wrote.[6]

- "The Russian accused of using sex, lies and guns to infiltrate US politics," CNN reported.[7]

- "How Russia's Mariia Butina Allegedly Used Sex to "Infiltrate" the Republican Party and NRA," said Slate.[8]

- "Who is Maria Butina? Accused Russian spy allegedly offered sex for power," USA Today wrote.[9]

- "Russian spy offered sex for role in 'special interest' group: feds," said the New York Post.[10]

- "Maria Butina, 29, . . . offered sex . . . "in exchange for a position within a special interest organization," the Washington Post wrote.[11]

---

[6] New York Times, *available at* https://www.nytimes.com/2018/07/18/us/politics/maria-butina-russia-espionage.html (last visited Aug. 24, 2018).

[7] CNN, *available at* https://www.cnn.com/2018/07/19/politics/maria-butina-paul-erickson-russian-sex-lies-guns/index.html (last visited Aug. 24, 2018).

[8] Slate, *available at* https://slate.com/news-and-politics/2018/07/mariia-butina-nra-republican-party-russian-used-sex-to-manipulate-filings-say.html (last visited Aug. 24, 2018).

[9] USA Today, *available at* https://www.usatoday.com/story/news/nation-now/2018/07/19/maria-butina-accused-russian-spy-who-allegedly-offered-sex-power/799333002/ (last visited Aug. 24, 2018).

[10] New York Post, *available at* https://nypost.com/2018/07/18/russian-spy-offered-sex-for-role-in-special-interest-group-feds/ (last visited Aug. 24, 2018).

[11] Washington Post, *available at* https://www.washingtonpost.com/local/public-safety/alleged-russian-agent-maria-butina-had-ties-to-russian-intelligence-agency-prosecutors-say/2018/07/18/a1a4042c-8a01-11e8-a345-a1bf7847b375_story.html?utm_term=.de39df8bb778 (last visited Aug. 24, 2018).

Defense counsel asked the government for the evidence supporting this proffer the day after it was made. In response, the government stalled for weeks, insisting on the entry of a protective order to safeguard the so-called integrity of ongoing investigations. But the evidence eventually produced shows why the government delayed. The *only* evidence the government relied on for its explosive claim was an excerpt from an innocuous three-year-old text exchange (attached as Exhibit 3) sent in Russia between Ms. Butina and DK, her longtime friend, assistant, and public relations man for *The Right to Bear Arms* gun rights group that she founded.

DK, who often drove Ms. Butina's car and thus was listed on the insurance, took the car for its annual government-required inspection and insurance renewal, and upon completion, texted (according to government translators), "I don't know what you owe me for this insurance they put me through the wringer." Ms. Butina jokingly replied, "Sex. Thank you so much. I have nothing else at all. Not a nickel to my name." DK responded: "Ugh . . . ( "—that is, with a sad face emoticon.

Aside from the fact that Maria is friends with DK's wife and child and treats DK like a brother, the reference to sex is clearly a joke, as he goes on to state that the car "is at the house, the insurance and documents are on the table at your house, winter tires are in the trunk of your car"—hardly the expected response to a serious offer of sex from a coworker. Maria continued her thanks, "[DK], thank you so much!!!!! Ask for anything . . . . . . you want." (ellipses in original). "That they hire you?" she taunted as a good-humored reminder that he already works for her gun rights organization, as well as advertising agency, *Antares*.  And DK volleyed back, "Think of something!! Sex with you does not interest me. Think!"

There is no indication that the two ever had sex, as the exchange was nothing more than a long-running joke between old friends. Indeed, DK would apparently tease Maria repeatedly about

the fact that he would never sleep with a redhead, and Mr. Erickson knew of this jovial banter and their ongoing friendship.

However, more important is the fact that even under a strained reading of an obvious joke, nowhere does Ms. Butina offer anyone sex in exchange for a job (or any other advantage) for herself (or anyone else). This 2015 exchange does nothing to support the government's claim that, in 2018, her relationship with Mr. Erickson is "duplicitous" because she was apparently willing to use sex to get a "position with a special interest organization." (Doc. 8 at 8.) The government's proffer is a sexist smear, using a three-year-old offhand joking reference to suggest that Ms. Butina is some kind of James Bond spy character, promiscuously using sex to advance her career. The government's allegation should be withdrawn or stricken and certainly should not weigh in favor of detention.

Even worse, the government piled on its disparaging campaign by adding that, "in papers seized by the FBI, Butina complained about living with [Mr. Erickson] and expressed disdain for continuing to cohabitate with him." (Doc. 8 at 8.) The evidence the government relies on for support, also a text exchange from 2015 (attached as Exhibit 4), is with IS, a girlfriend of Maria's. It is nothing more than two twenty-something girlfriends chatting about their American boyfriends, exchanging cute cat photos, and figuring out when they will next socialize. It is in this context, in response to her girlfriend's own complaints about her boyfriend's failure to call in three weeks (accompanied by an angry face emoji) that Maria responds that her own boyfriend (Mr. Erickson) has been "bugging the sh*t out of me with his mom" and that she has "a feeling that I am residing in a nursing home." "Send a link to the dating app[,]" Maria encouraged her friend.

| Maria Butina: | And a photo of your cat |
| IS: | In AppStore |

| IS: | [Image of a cat] |
| Maria Butina: | Oh my, what a cutie |
| Maria Butina: | What's his name? |
| IS: | [Photo of a cat] |
| IS: | Elizar. Meet him ) |
| Maria Butina: | [image] |
| Maria Butina: | Is that it? |
| IS: | Yeeeees |

Given that Mr. Erickson's mother died in 2017 (Maria flew to the funeral) and this type of casual chitchat between friends is never intended to be public, it was particularly cruel for the government to claim it as the basis for an attack on Ms. Butina's character or commitment to Mr. Erickson. Three-year old, offhand complaints about one's romantic partner being too close to their mother should be out of bounds, and certainly not asserted to be proof of a "duplicitous" relationship.

Ms. Butina is an attractive young woman who has been in the media spotlight for some time, and, unfortunately, sexist stereotypes about her have proliferated– suggesting without evidence that her connections with certain Americans were made through sex, rather than through her intellect demonstrated by the fact that she, before the age of 30, obtained three Master's Degrees, founded a significant civil society organization in Russia, and achieved almost a 4.0 in her Master's Program at American University. There may not be anything that can be done about the media and popular culture's sexist assumptions about this young woman, but AUSA Kenerson, the United States Attorney's Office, and the National Security Division should be held to a higher

standard and not fuel the sexist and misogynistic flames surrounding this case with baseless slurs and indignities.

Indeed, after dismissing the government's false and unsubstantiated claims, Maria's good character and ties to the United States come into sharp focus. She applied for a lottery green card, meaning she intended to stay in the United States. She formed a new limited liability company, meaning she intended to deepen her roots here. She also applied for and received OPT status (essentially work authorization), not a B1/B2 visa as proffered by the government, meaning she intended to work in the United States for at least the next twelve months and not travel back and forth to Russia, as the government "mistake[nly]" claimed.[12] She applied to add herself to the lease for Mr. Erickson's apartment in South Dakota, and thus had a permanent address. Moreover, her U-Haul rental was one way to South Dakota, with theme park tickets purchased for a park along the route (attached as Exhibits 5 and 6). In short, Ms. Butina was simply like many recent graduates, leaving her student apartment in a U-Haul, degree in hand, for her next residence, where she would seek opportunities to work in the United States.

## IV. Proposed Conditions of Release

Unconditional release is presumed. A defendant "shall" be released "on personal recognizance, or upon execution of an unsecured appearance bond . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or

---

[12] Despite learning of this "mistake" earlier, the government sat on this information, cavalierly calling it a "clerical error," and did not disclose it to defense counsel until nearly a month later—unsurprisingly, three days after the protective order. (*See* Email from AUSA Kenerson to Defense (Aug. 13, 2018), attached as Exhibit 7.) This was not a clerical error. Unlike a B1/B2 visa, the mere grant of OPT status did not permit Ms. Butina to travel freely between the United States and Russia, as the government portrayed. And the fact that the government has also failed to provide any evidence to support its claim that Maria affirmatively lied on her application for a student visa should give this Court pause. (Doc. 8 at 8.)

will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). However, if more is required than personal recognizance or an unsecured appearance bond, the Court must impose the "least restrictive further condition, or combination of conditions" that will reasonably assure appearance or safety. 18 U.S.C. § 3142(c)(1)(B).

The government rests its fear of flight primarily on Ms. Butina's Russian citizenship and the lack of extradition. However, if such factors alone were determinative, release would never be possible in a criminal case against a foreign national from a country with no extradition, and the statutory scheme that Congress established would be nullified completely. "In evaluating the likelihood of flight, the potential penalty has relevance," but the stability of community ties and an extensive record may also establish reliability in meeting court obligations. The absence of flight, when flight is possible, "is an important indicator of whether a defendant is likely to appear once again." *Wood v. United States*, 391 F.2d 981, 984 (D.C. Cir. 1968); *Stack v. Boyle*, 342 U.S. 1 (1951) ("each accused is entitled to any benefits due to his good record.").

Here, Ms. Butina has an unbroken record of *not* fleeing when, were the government's allegations against her true (that she is some kind of Russian agent), she clearly would have fled:

First, in February, 2017, the Daily Beast published an article about Maria, her connection to Aleksandr Torshin, her love of guns, and her activities in the United States, essentially alleging that her purpose in the United States might be to "infiltrate" American conservative political groups.[13] If the government's fanciful theory were correct, almost 18 month ago, Maria Butina was exposed, her handler identified, and her purpose in the United States published on the internet. She did not flee, visit the Russian Embassy, or make any effort to change her status as a student.

---

[13] Tim Mak, *The Kremlin and GOP Have a New Friend—and Boy, Does She Love Guns*, THE DAILY BEAST (Feb. 23, 2017), *available at* https://www.thedailybeast.com/the-kremlin-and-gop-have-a-new-friendand-boy-does-she-love-guns.

Second, in the fall of 2017, various congressional committees or their members, sent letters, based on media reports, seeking her testimony and even, in at least one instance, threatening a subpoena. She did not flee or discontinue her studies, but rather retained counsel, and eventually testified voluntarily before the Senate Select Committee on Intelligence, producing over 8,000 pages of documents and testifying for 8 hours.

Third, on April 25, 2018, over a dozen FBI agents appeared at her door in tactical gear to search her apartment for hours. The search warrant listed 18 U.S.C. §§ 371 and 951 violations as bases for the warrant. Yet she did not flee, did not seek assistance from the Russian Embassy or any Russian contacts, but instead consulted with her American counsel about the matter.[14]

These facts make this case unique in that, typically, a court must predict whether a defendant will flee because their alleged criminal activity has been exposed. Here, there is no need to guess because Maria Butina has already been tested with plenty of reasons (reasons an actual Russian agent would have acted upon) to bolt for Russia, as the government fears she will do now. Maria Butina had every reason to run. She did not, but instead went to class, finished school, applied to join the American workforce, and packed up her apartment to move in with her boyfriend by renting a U-Haul truck for a one-way trip to Sioux Falls, not Moscow. And any suggestion that the government was surprised by the renting of a U-Haul truck and purchase of packing boxes (Doc. 8 at 2) is belied by the fact that defense counsel informed both AUSA Kenerson and FBI Agent Miller of the pending move to South Dakota well in advance of Ms. Butina's arrest. (*See* Email from Attorney Driscoll to AUSA Kenerson (Jun. 29, 2018), attached

---

[14] Finally, the government implies that Ms. Butina has ties to significant means, adding that "FBI surveillance over the past week has confirmed that Butina has access to funds and an intention to move money outside of the United States." (Doc. 8 at 2.) However, this argument merits little attention because the government has neither produced personal bank records nor statements that are attributable to her to substantiate these claims.

as Exhibit 8; and *see* Email from Attorney Driscoll to FBI Agent Miller (Jul. 6, 2018), attached as Exhibit 9.) These facts weigh heavily in favor of her release.

This Court has the discretionary authority to release Ms. Butina pretrial pursuant to 18 U.S.C. § 3141(c) upon the least restrictive combination of conditions necessary to reasonably assure her appearance at court. Under these circumstances, if simple release on personal recognizance and general supervision by the PSA will not satisfy the Court's concerns about Ms. Butina's risk of flight, the High Intensity Supervision Program (HISP) provides structured programming and close supervision for defendants, and is therefore an alternative to preventive detention. Ms. Butina is eligible for HISP, and because of the nature of this case and likely exclusion of time under the Speedy Trial Act, necessitated by the tremendous volume of information, as well as expected length of pretrial delay and pretrial detention that Ms. Butina is expected to endure, she is a great candidate for HISP.

## V. <u>Conclusion</u>

For the foregoing reasons and those that the defense may present during a hearing on this matter, Defendant Maria Butina requests that she be released pending trial into the PSA High Intensity Supervision Program on a home detention basis with electronic monitoring.

Dated: August 24, 2018                    Respectfully submitted,


                                          /s/Robert N. Driscoll
                                          Robert N. Driscoll (DC Bar No. 486451)
                                          McGlinchey Stafford PLLC
                                          1275 Pennsylvania Avenue NW, Suite 420
                                          Washington, DC 20004
                                          Phone: (202) 802-9999
                                          Fax: (202) 403-3870
                                          rdriscoll@mcglinchey.com


                                          /s/Alfred D. Carry
                                          Alfred D. Carry (DC Bar No. 1011877)
                                          McGlinchey Stafford PLLC
                                          1275 Pennsylvania Avenue NW, Suite 420
                                          Washington, DC 20004
                                          Phone: (202) 802-9999
                                          Fax: (202) 330-5897
                                          acarry@mcglinchey.com

                                          *Counsel for Defendant*