# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  18-218 (TSC)** |
| **v.** | : | |
| | : | |
| | : | |
| **MARIIA BUTINA, also known as** | : | |
| **MARIA BUTINA,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR BOND REVIEW

### I.    Introduction

The United States of America, by and through the U.S. Attorney for the District of Columbia and the Assistant Attorney General for the National Security Division of the U.S. Department of Justice, respectfully submits this opposition to the defendant's Motion for Bond Review (ECF No. 23; the "Bond Motion"), and supporting memorandum and attachments thereto (the "Response in Opposition").  For the reasons stated below, and any additional reasons as may be proffered at any hearing, the defendant's motion should be denied.

### *The Defendant Presents a Serious Flight Risk.*

The defendant is charged with acting in the United States as an agent of a foreign government, the Russian Federation, without prior notification to the Attorney General, in violation of 18 U.S.C. § 951, and with conspiracy, in violation of 18 U.S.C. § 371.  The defendant is a citizen of the Russian Federation with ties to senior Russian government officials and oligarchs.  By contrast, the defendant has no meaningful ties to the United States.

### *The Evidence is Powerful.*

As outlined in more detail below, the weight of the evidence against the defendant is substantial.  The essence of the charges against the defendant is that she acted on U.S. soil as an agent of the Russian Federation, at the direction of a senior Russian government official ("the "Russian Official"), without first having notified the Attorney General, thereby denying the U.S. government the opportunity to decide whether to allow her access to the United States in light of her activities.  Beginning as early as 2015, the defendant wrote a proposal intended for Russian officials laying out her plan to serve as an unofficial agent or representative to promote the political interests of the Russian Federation vis-à-vis the United States.  In the early stages of this plan, the defendant tried to identify and establish connections with the persons she believed most likely to win the Presidential nomination of a major U.S. political party ("Political Party 1").  The defendant and the Russian Official to whom she reported also believed that it was necessary to develop close connections with a U.S. gun rights organization ("Gun Rights Organization") in order to provide them with the best access to and influence over Political Party 1.

As part of her plan, and subject to the direction and approval of the Russian Official, the defendant organized and managed, with the assistance of certain U.S. persons, a series of events referred to as "U.S.-Russia Friendship Dinners" in Washington, D.C., that included among their purposes establishing an informal line of communication between the Russian Federation and the next U.S. Presidential Administration.  In 2015 and the first part of 2016, the defendant traveled to the United States multiple times.  In 2016, the defendant applied for and was granted an F1 student visa to study at American University in Washington, D.C.  On her application, she identified her current employer as "Antares LLC" and described the Russian Official as a previous employer.  Nonetheless, once resident in the United States, the defendant continued her efforts at

the direction of the Russian Official to establish connections with U.S. Political Party 1 and other U.S. officials and political operatives.  In addition, the defendant and the Russian Official took actions throughout 2016 and into 2017 to use their U.S. political contacts to establish an informal line of communication with U.S. government officials at the 2017 National Prayer Breakfast in Washington, D.C.

### *The History and Characteristics of the Defendant Support Continued Detention.*

The defendant's history and characteristics also support detention.  The defendant is a citizen of the Russian Federation who was born and raised in Russia and lived in that country until approximately two years ago.  Although the defense contends that the defendant is in a committed relationship with U.S. Person 1, she recently offered to provide information to the government about his illegal activities.  Moreover, as set forth in the government's charging papers and below, U.S. Person 1 has aided the defendant's charged criminal activity for years and, as such, should not be viewed as a positive tie to the community.  Accordingly, the defendant has little or no incentive to stay in the United States and face a potential criminal conviction and sentence — including up to fifteen years of incarceration — and every motivation to flee to her home country, where she would be protected from extradition.  Whatever countervailing weight might be attributed to the fact that the defendant remained in the United States after some of her actions were publicized in the media, or attracted the attention of a Senate Committee, or once search warrants were executed, is dwarfed by the very real threat of incarceration she faces now that she has been arrested and indicted.

## II.    <u>Legal Principles</u>

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure the defendant's appearance

at trial and pre-trial proceedings: the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).[1]

At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015). When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). A magistrate judge's determination regarding bail is reviewed *de novo*. *See*, *e.g.*, *United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001).

### III.  The Defendant Should Be Detained Pending Trial.

#### A.  The Nature and Circumstances of the Offenses Charged Support Detention.

As set forth in the Criminal Complaint, ECF No. 1-1, the Indictment, ECF No. 7, and the government's Memorandum in Support of Detention, ECF No. 8, all of which are incorporated by reference, the nature and circumstances of the offenses charged in this case overwhelmingly support detention. This case involves charges against a foreign national whose demonstrated allegiance is to Russia. The defendant operated in the United States as an agent of the Russian

---

[1]   The government seeks detention based on the first three factors set forth under 18 U.S.C. § 3142(g).

Federation, at the direction of the Russian Official, while outwardly portraying herself to be a private individual living in this country as a foreign student.

Since the detention hearing in this case, the actions of the Russian Federation and its officials toward the defendant have confirmed her relationship with, and value to, her own government.   To date, the Russian government has conducted six consular visits with the defendant.  It also has passed four diplomatic notes to the U.S. Department of State.[2]  According to the Russian Ministry of Foreign Affairs, Russian Foreign Minister Sergey Lavrov has spoken to the U.S. Secretary of State twice to complain about this prosecution.[3]  The official Kremlin Twitter account changed its avatar to the defendant's face and started a #FreeMariaButina hashtag. *RT*, a Russian television network funded by the Russian government, has published numerous articles on its website criticizing this prosecution and the defendant's detention.[4]  Russia has issued more diplomatic notes on the defendant's behalf in the past month than for any other Russian

---

[2]     Diplomatic notes are used for official correspondence between the U.S. Government and a foreign government.   The Department of State serves as the official channel for diplomatic communications between the U.S. government and a foreign government.

[3]     Press release on Foreign Minister Sergey Lavrov's telephone conversation with US Secretary of State Mike Pompeo, July 21, 2018 available at http://www.mid.ru/en/web/guest/foreign_policy/news/-/asset_publisher/cKNonkJE02Bw/ content/id/3302434 (last accessed Sept. 7, 2018); Press Release on Foreign Minister Sergey Lavrov's telephone conversation with US Secretary of State Mike Pompeo, August 23, 2018, available at http://www.mid.ru/en/web/guest/foreign_policy/news/-/asset_publisher/ cKNonkJE02Bw/content/id/3323966 (last accessed September 7, 2018).

[4]     *See*, *e.g.*, "Accused 'Russian Agent' Butina moved to another jail, now in 'borderline torture' conditions," *RT*, August 19, 2018, available at https://www.rt.com/usa/436301-butina-moved-torture-prison/ (last accessed Sept. 2, 2018); "'A real witch hunt': Moscow says student Butina is being held as 'political prisoner' by US," *RT*, July 26, 2018, available at https://www.rt.com/usa/434385-butina-political-prisoner-visit/ (last accessed Sept. 2, 2018).

citizen imprisoned in the United States in the past year.  Put simply, the Russian government has given this case much more attention than other cases.

The risk of flight under these circumstances is not hypothetical.  In a number of recent cases, Russian defendants sought by the United States have fled from third countries while on bail, even in circumstances in which a passport had been surrendered.[5]  Examples include a Russian national who allegedly was associated with 10 Russian illegal operatives arrested in the United States in June 2010.  After being arrested in Cyprus, he posted bail and then disappeared.[6]  In a second case, a Russian national charged by the United States with cyber offenses was arrested in Sri Lanka in 2017 on a provisional arrest request by the United States, but was granted bail, and then fled back to Russia, despite having surrendered his passport.[7]  Last, a Russian hacker was arrested in Greece on U.S. charges.[8]  The significance of defendant Butina to the government of the Russian Federation is evident in light of the Russian government's actions since her arrest; so too, does it underscore her risk of flight.

---

[5]     The United States does not assign blame to these foreign countries.

[6]     *See*, *e.g.*, "Russian spy suspect jumps bail in Cyprus," *Reuters*, June 30, 2010, available at https://www.reuters.com/article/us-usa-russia-spying-cyprus-idUSTRE65T4OO20100630    (last accessed August 29, 2018).

[7]     *See*, *e.g.*, "Superpowers fight it out over Russian hacker in Colombo," *The Sunday Times*, December 24, 2014, available at http://www.sundaytimes.lk/171224/news/superpowers-fight-it-out-over-russian-hacker-in-colombo-274497.html (last accessed Aug. 29, 2018).

[8]     *See*, *e.g.* "Russian Hacker who Fled from Greek Justice in 2013, Charged in the US," *Greek USA Reporter*, August 25, 2017, available at https://usa.greekreporter.com/2017/08/25/russian-hacker-who-fled-from-greek-justice-in-2013-charged-in-the-us/ (last accessed Sept. 6, 2018).

**B.  The Weight of the Evidence is Substantial.**

The elements of a violation of 18 U.S.C. § 951 are that (1) the defendant acted in the United States as an agent of a foreign government; (2) that the defendant failed to notify the Attorney General of the United States that she would be acting in the United States as an agent of a foreign government prior to so acting; and (3) that the defendant acted knowingly, and knew that she had not notified the attorney general. *See, e.g., United States v. Dumeisi*, 2004 WL 5370253 (jury instructions given in N.D. Ill. January 12, 2004).

The essential facts in support of these elements are set out in the affidavit in support of the Complaint and the Indictment. The magistrate judge found the weight of this evidence to be "compelling," ECF No. 15 at 4, in that it "includes email and other electronic communications, as well as surveillance, reflecting Defendant's alleged activities as an agent of the Russian Federation," *Id.* The magistrate judge noted that the defendant "did not directly address the government's proffer regarding the weight of the evidence," but rather "disputed the proffered evidence, and offered innocuous explanations for the proffered evidence." *Id.* The magistrate judge then found that the defense explanations "do not serve to alter the reality that the government has significant evidence against the Defendant." *Id.* at 5. That remains the case.

**1.  The Defendant Received Direction from, and Reported to, a Russian Government Official.**

The defense argues, "[t]here is no allegation that the Russian Federation actually gave Ms. Butina an order, let alone direction to do anything." ECF No. 23-1 at 6. The affidavit in support of the Complaint sets out clear evidence that the defendant was acting on taskings from the Russian Official, including the defendant's note to that Official that "By your recommendation, I am setting up the groundwork here but I am really in need of mentoring. Or the energy might [g]o towards the wrong direction." ECF No. 1-1 at ¶ 32. As another example, on November 9, 2016, the

defendant stated that she was "ready for further orders," and the Russian Official responded with ideas for how to proceed. *Id.* at ¶ 36.

The government has developed other evidence over the course of the conspiracy that establishes taskings by the Russian Official (whom U.S. Person 1 has referred to as "Putin's emissary") and actions within the United States in response to those taskings by the defendant.

In 2015, the defendant created a document entitled "Description of the Diplomacy Project," in March 2015, which included a proposal to cultivate political contacts in the United States.  At some point, she identified a particular candidate ("Political Candidate 1"), whom she believed to have the best chance of becoming Political Party 1's nominee for President.  On July 14, 2015, the Russian Official requested that the defendant send him a report about Political Candidate 1's announcement of his candidacy for the Presidency.  She did so the next morning.  After recounting Political Candidate 1's speech, the defendant reported that she had a "short personal contact" with Political Candidate 1, with whom she had had previous personal contact, as well as one of his three advisors in matters of international politics.  The day prior, the defendant had written to the Russian Official, "Judging from American polls – our bet on [Political Candidate 1] is correct."  She continued,  "What do they think in the RF about this? How are things with you?"  The Russian Official responded, "In the RF no one is even looking in that direction.  You will be the creator of something sensational, God willing!"

The defendant also wrote a report summarizing the first U.S.-Russia Friendship Dinner and her meetings leading up to it with U.S. Person 2.[9] It stated in part, regarding a meeting that took place in February 2016 (translated from Russian):

> Ms. Butina visited [U.S. Person 2's residence].   In the course of the conversation, the sides established even more trusting relationship; they also discussed first steps towards establishing an informal communication channel.  [U.S. Person 2] offered to organize events in Washington and New York on May 23-25, 2016 with the purpose of gathering American pro-Russian politicians, scientists and business people and discussing how, by holding such meetings regularly in the US and Russia, they might establish the informal communication channel.  [U.S. Person 2] also stated that he is willing to finance these events.   It is important to note that [U.S. Person 2] enjoys proximity to the formation of the future White House administration (regardless of which side wins), and because of this, he thinks that the events mentioned above should help the White House experts form the correct outlook towards Russia.

After her meeting at U.S. Person 2's residence, the defendant reported to the Russian Official that U.S. Person 2 "confirmed everything to me, that he will sponsor the American part of the enterprise in Washington and New York.  He will send the list next week (the people that he recommends).  The final word will be yours."  After receiving such a list from U.S. Persons 1 and 2, the defendant sent an email to U.S. Person 2 on March 14, 2016, noting that a representative of the Russian "Presidential Administration" had expressed approval "for building this communication channel."

In April 2016, the Russian Official tasked the defendant with writing a note about a possible meeting with another political candidate ("Political Candidate 2") and other political candidates at the Gun Rights Organization's annual meeting when that meeting conflicted with his duties at the

---

[9]    The FBI located a copy of this report on a thumb drive located at U.S. Person 1's residence. This report, along with other, similar reports, was located within a sub-folder entitled "Notes to [Russian Official]," which was itself in a folder entitled "Maria Butina's Files."  The metadata associated with this particular report indicates that the defendant created it on May 29, 2016.

Russian Central Bank.[10]  The Russian Official added, "Maybe MID [the Russian acronym for the Russian Federation Ministry of Foreign Affairs, or MFA] will ask to have me sent . . ." (ellipses in original).  The defendant's draft of that note, written in Russian and sent to the Russian Official on April 23, 2016, via Twitter direct message, read in part,

> **Important** in these circumstances **are those contacts with the candidate and his entourage that will help form [Political Candidate 2]'s correct view of Russian-American relations.  Attending the general assembly of the [Gun Rights Organization] in May 2016 fully provides this unique opportunity**.

(emphasis in original).[11]  On April 28, 2016, the defendant and the Russian Official discussed the likelihood of his trip being approved.  The defendant stated, "I hope your female boss [the Russian Official's supervisor at the Central Bank] will understand.  This is an important moment for the future of our country."

Then, on June 21, 2016, less than a month after her student visa was granted, the defendant received a tasking from the Russian Official to create a report on "your perspective on the situation regarding [Political Candidate 2]."  On June 22, 2016, U.S. Person 1 sent an email to the defendant, with subject line "Suggested [Political Candidate 2] Report Language1 [sic]."  In the email to the defendant, U.S. Person 1 suggested the defendant should close her report to the Russian Official

---

[10]    All available evidence indicates that no such meeting occurred with Political Candidate 2.

[11]    This request from the Russian Official—and the defendant's response—contradicts the defense argument from the detention hearing that "The Government takes all of those [Twitter messages] out of context.  The government official's seeking approval.  He's seeking approval to travel to the US for the [Gun Rights Organization] or prayer breakfast, which he's doing on his own time, so he needs approval to get away from the Russian government."  ECF No. 12 at 56:8-12.

by noting that she had worked to make "deep, inside connections to . . . [Political Party 1] . . . in the past year.  . . . As of today, it's more likely than not that [Political Candidate 2] wins the presidency and that my connections can be utilized for the benefits [sic] of both countries."  On July 3, 2016, the defendant reported to the Russian Official as tasked, via Twitter direct message.[12] The report included an election forecast, but not U.S. Person 1's suggested closing.  In response, the Russian Official asked whether he could send the defendant's report to the MFA, and the defendant replied, "That would be a great honor! The authorship completely doesn't matter.  If going to the MFA, glance at the content and language, I can make corrections.  . . ."

After the defendant began attending classes at American University, the defendant and U.S. Person engaged in the following acts in furtherance of the conspiracy, among others:

- On or about November 10, 2016, the defendant, who in reports often refers to herself in the third person, sent a proposal to the Russian Official, which stated, in part (translated from Russian):

  During the last 5 years, [Russian Official] and Butina have constantly worked on establishing unofficial contact, based on common views and a system of conservative values, with a number of key [Political Party 1] organizations in the US, including the executive level of  [Political Party 1], its intellectual establishment and [Political Party 1] organizations.

  The defendant's proposal suggested that the Russian Federation could use the National Prayer Breakfast to expand its network of influence in the United States.

---

[12]     The FBI located a copy of this report on a thumb drive located at U.S. Person 1's residence. This report, along with other, similar reports, was located within a sub-folder entitled "Notes to [Russian Official]," which was itself in a folder entitled "Maria Butina's Files."

- On November 30, 2016, the defendant emailed U.S. Person 1 regarding the planned Russian delegation to that event, "[p]eople in the list are handpicked by [the Russian Official] and me and are VERY influential in Russia.  They are coming to establish a back channel of communication… Let's think if our [U.S. Person 2's first name] would like to meet with them…" (ellipses in original).

- On January 22, 2017, U.S. Person 1 emailed U.S. Person 2, copied the defendant, and stated "[i]n anticipation of [U.S. Person 2's] U.S./Russian Friendship Dinner . . . January 31."  U.S. Person 1 attached a "summary chart" of the 15-member Russian delegation to the National Prayer Breakfast.  U.S. Person 1 also included two paragraphs, which he invited U.S. Person 2 to use to "pitch the dinner / delegation to Members of Congress or people of importance":

  > The Russian Federation is sending a full contingent to this year's National Prayer Breakfast . . .

  > The delegation is being led by . . . [the Russian Official] . . . .  It is populated by key mayors, university presidents and personal advisors to President Putin.  Reaction to the delegation's presence in America will be relayed DIRECTLY to President Putin and Foreign Minister Sergey Lavrov (who both had to personally approve the delegation's travel to this event).

- On January 26, 2017, U.S. Person 1 asked an acquaintance for National Prayer Breakfast tickets, noting that tickets could "advance the cause of US/Russian reset (on our terms)."  U.S. Person 1 later noted, "I was ahead of this in December, but last weekend Putin decided to up his official delegation – if we can accommodate them, we can empower rational insiders that have been cultivated for three years."

2.  **The Government Need Not Prove that the Defendant Stole National Secrets.**

The defense argues that the government's case is weak because it does not allege that the defendant stole any "national secrets." ECF No. 23-1 at 6. Stealing "national secrets" is not an element of any of the offenses with which the defendant is charged. The defendant's primary goal was to establish an influence operation, not to steal secrets. A series of emails sent from U.S. Person 1 to U.S. Person 2, in an attempt to convince the latter to meet with the defendant and the Russian Official to begin establishing a "back-channel" of communication illustrates this goal:

> [Russian Official] (former President of the Russian Senate -- #3 in Russian leadership – and now the new Deputy Governor of the Russian Central Bank) and his young protégé, Maria Butina (the head of the Russian version of the [Gun Rights Organization] – whose stunning back story is printed below as a postscript). Quietly – VERY quietly – there is a movement alive in Russia that's looking ahead to a post-Putin era. These players are not disloyal to the current president; they are simply realists about the future and the need for Russian/American friendship. . . . [Russian Official] is making a triple bet: That [Members of Political Party 1] are a better match for diplomatic relations with Russia, that a [Member of Political Party 1] will win the 2016 Presidential contest and that the [Gun Rights Organization] is the best back-channel into any [Political Party 1] administration.

On February 2, 2016, U.S. Person 1 sent an email to U.S. Person 2, copying the defendant, to introduce her to U.S. Person 2. U.S. Person 1 stated, "Maria and [Russian Official] are very serious about improving relations between American [sic] and Russia. If you have any ideas on this front, [U.S. Person 2], they have the desire *and authority* to listen" (emphasis added).[13] In March 2016, U.S. Person 1 wrote in an invitation to a U.S.-Russia friendship dinner:

---

[13] The evidence in this quotation and the defendant's reports and communications surrounding U.S. Person 2 as described above contradicts the defendant's theory that any Russian-American friendship dinners organized by the defendant were "initiated, organized, and directed by an American citizen, not the Russian government." ECF No. 23-1 at 5. The government does

> Butina represents factions within the top echelons of Russian power (political and business) that desperately want a new dialogue with the U.S. on behalf of the current regime and that are already (very quietly) imagining a post-Putin era within Russia. . . . Toward that end, our old friend from your . . . campaign, [U.S. Person 2], has offered to host dinners in both Washington, D.C. and New York City in late May that will bring together very small groups of leading American thinkers with an unofficial but sanctioned Russian team consisting of [Russian Official], Butina, and an oligarch that has a foot inside Putin's dacha and the international business community.  The goal is simple and private: To have a candid discussion about shared international security interests and what steps need to be taken to bolster U.S.-Russian relations in the future.

That the defendant is not accused of stealing "national secrets" has no bearing on the weight of the evidence against her.

### 3.  The Government Need Not Prove that the Defendant Engaged in Covert Activity

The defense also argues that the government's case is weak because the government does not allege that the defendant engaged in confidential information gathering or stealthy procurement-type activities.  ECF No. 23-1 at 6.  As with the previous claim, none of these activities is an element of the offenses charged.  Nonetheless, the evidence shows that the defendant and her co-conspirators *did* attempt to conceal their efforts to establish "back-channel" communications and expressed concern that those efforts would become public.

In July 2016, in a series of revealing communications, the defendant, U.S. Person 1, and the Russian Official expressed concern about how their operation might be affected by news reports that Russia had hacked the emails of the Political Party 2 National Committee.  U.S. Person 1 worried that "it complicates the hell out of nearly a year of quiet back-channel diplomacy in establishing links between reformers inside the Kremlin and a putative [Political Party 1]

---

not discount U.S. Person 2's role in organizing the dinners, but the *defendant*'s role in them was at the direction of the Russian Official.

administration (regardless of nominee or president). . . .  What a colossal waste of lead time."  The defendant told the Russian Official, "Right now I'm sitting here very quietly after the scandal about our FSB hacking into [Political Party 2's] emails.  My all too blunt attempts to befriend politicians right now will probably be misinterpreted, as you yourself can understand."  The Russian Official responded by telling the defendant, she was "doing the right thing."

On October 5, 2016, in a series of Twitter direct communications, the Russian Official asked the defendant about the status of the "Russia-USA friendship society."  The defendant responded, "It's not alive.  We are currently 'underground' both here and there.  Now, private clubs and quite [sic] influence on people making decisions is the trend.  No publicity."  She continued, "Advisor – is the profession of the current day.  Even a secret advisor.  Right now the Administration here is flexible – and there is the idea, so that the right thoughts would dominate."

Then, in early 2017, the reactions of the defendant and the Russian Official to the publication (or threatened publication) of news articles about their activities speak volumes about their intent to keep those efforts covert.  In early 2017, in response to the Russian Official's comment to her that a reporter had contacted him about his relationship to the defendant, President Putin, and U.S. Person 1, among others, the defendant told the Russian Official that she had received inquiries from the same reporter. She told the Russian Official, "under no circumstances should you contact him.  You didn't even see the letter at all."  She continued, "Somebody really threw the three of us under the bus.  Furthermore, this someone is well informed."   Shortly after an article featuring her was published, she told the Russian Official, "It's better to keep a low profile now.  For some time.  You probably got in trouble because of that nasty leak? Sorry. . . ."

Later in 2017, a reporter from a different publication contacted her and asked her about, *inter alia*, her political activities within the United States and her ties to the Gun Rights

Organization.  Before responding to that email, the defendant complained to U.S. Person 1 about one of the reporter's questions, stating, "We have somebody seriously leaking."  She later added, "Bad.  Someone is leaking."

### 4.   The Government Need Not Prove that the Defendant Worked for an "Intelligence Operation."

The defendant also argues that the government's case is weak because it does not allege that the defendant worked for an "intelligence operation of the Russian Federation." ECF No. 23-1 at 6.  It is not an element of any of the charged offenses that the defendant worked for a foreign intelligence operation.  All that the government must prove is that the defendant acted in the United States as an agent of a foreign government without notification to the Attorney General.  18 U.S.C. § 951(a).  "Agent of a foreign government" is defined as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." § 951(d).  Notwithstanding the defense's irrelevant claim, the defendant does, in fact, have known connections to at least one suspected Russian intelligence official, as well as contact information saved in her phone associated with the FSB, as set forth in the government's original Memorandum in Support of Detention.  ECF No. 8 at 3-4.

### 5.   The Case is Properly Charged.

The defendant cites to the U.S. Attorney's Manual (USAM) and the Criminal Resource Manual and argues that the government improperly charged the defendant with violating 18 U.S.C. § 951 instead of a violation of the Foreign Agents Registration Act (FARA).  But neither the USAM nor the Criminal Resource Manual contain any provisions that "specifically exempt[] section 951 from applying to 'foreign agents engaged in political activities.'" ECF No. 23-1 at 7. Setting aside whether the defendant's alleged activities are "purely political"—which the government does not concede—the sections of the USAM and Criminal Resource Manual cited

by the defendant do not specifically exempt political activity undertaken at the behest of a foreign government or foreign government official from prosecution under 18 U.S.C. § 951.  Further, the Inspector General's Report cited by the defendant, *id.* at 6, n.4, quotes National Security Division officials as stating, "unlike FARA . . .  Section 951 can be aimed at political or non-political activities of agents under the control of foreign governments."  U.S. DOJ, Office of the Inspector General, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, at ii (Sep. 2016), *available at* https://oig.justice.gov/reports/2016/a1624.pdf (last visited Aug. 26, 2018).  More importantly, the USAM "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." *United States v. Goodwi*n, 57 F.3d 815, 818 (9th Cir. 1995) (quoting USAM § 1-1.100); *cf. United States v. Caceras*, 440 U.S. 741, 754 (1979) (IRS manual does not confer any substantive rights on taxpayers but is instead only an internal statement of penalty policy and philosophy).[14]

### C.  The History and Characteristics of the Defendant

Likewise, the defendant's history and characteristics strongly support the magistrate judge's finding that pretrial detention is appropriate.  The defendant is a Russian citizen with no meaningful ties to the United States and has every reason to flee this prosecution.  She entered the United States with the purpose of working as part of a Russian influence campaign and did not declare that fact—not on her visa application and not to the Attorney General.  This Court should

---

[14]     The defendant also attempts to rely on the government's search warrant seeking "evidence of a potential violation under FARA."  ECF No. 23-1 at 7.  As the defendant later acknowledges, *id.* at 15, the search warrants the government obtained for the defendant's residence authorized it to search for potential violations of 18 U.S.C. §§ 371 and 951, as well as 22 U.S.C. § 611 *et seq.*

have no confidence that she would abide by any conditions of release and, most importantly, will have no recourse should the defendant abscond from the jurisdiction.

### 1.   The Defendant Acted Under the Direction and Control of the Russian Official.

The defendant failed to declare to the Attorney General, as she was required to do by law, that she was acting in the United States as an agent of the Russian Federation.  To be sure, it is not in dispute that the defendant said publicly that she wanted better relations between the United States and Russia.  What she did not state publicly was that she was working as an undeclared agent on behalf of the Russian Federation to position herself and that official to exert Russian influence over U.S. policies towards Russia after the 2016 Presidential election.  That the defendant was willing to engage in such ad operation within the United States should give this Court significant doubt as to whether she will abide by conditions of release or return to court.

### 2.   Any Tie to U.S. Person 1 is Insufficient to Prevent Defendant's Flight.

The defendant's relationship with U.S. Person 1 is an insufficiently strong tie to prevent her from fleeing the jurisdiction if released.  As noted at the detention hearing before the magistrate judge, there is an ongoing fraud investigation examining the activities of U.S. Person 1.  ECF No. 12 at 37:13-14, 38:1-2.  Moreover, the defendant has offered to provide information to the government, in connection with that case, about "the illegal acts of others," *i.e.*, U.S. Person 1.  *Id.* at 38:3-25; Defense Exh. 1.  In addition, as the government set forth in the affidavit in support of its complaint, as well as its proffer above, U.S. Person 1 for multiple years played an integral role in the defendant's efforts to establish an informal line of communication between the Kremlin and the incoming Presidential Administration, knowing that she was acting at the direction of the Russian Official.  Indeed, the government has also recovered a handwritten document from his residence, entitled "Maria's Patriots in Waiting Organization," that included the question,

"Respond to FSB offer of employment?"  Under these circumstances, U.S. Person 1 is not a tie to the United States on which the Court should rely to ensure the defendant's return to court or compliance with conditions of release.

Following the detention hearing, the defense has disputed the assertion in the government's memorandum in support of pretrial detention that the defendant offered sex in exchange "for a position with a special interest organization."  That statement was based both on a series of text messages between the defendant and another individual, "DK"[15] and other information about the relationship between the defendant and DK gained through a review of additional communications between them.  Even granting that the government's understanding of this particular text conversation was mistaken, other communications and materials in the government's possession (and produced to the defense) call into doubt the defendant's claim that her relationship with U.S. Person 1 is a sufficiently strong tie to ensure her appearance in court to face the charges against her if she is released.

### 3.  The Defendant's Ties to Russian Officials Demonstrate Her Flight Risk.

For obvious reasons, courts routinely find a serious risk of flight where, as here, a foreign-national defendant has few or no ties to the United States.[16]  *See, e.g.*, *United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017); *United States v. Frater*, 356 F. App'x 133, 135 (10th Cir.

---

[15]    *See* ECF No. 23-4.

[16]    The defense asserts, ECF No. 23-1 at 13 n.12 & ECF No. 23-8, that the government made a misrepresentation regarding the type of visa for which the defendant recently applied and implies that it did so intentionally. The government acknowledges the error in its Memorandum in Support of Detention regarding the label it applied to the visa.  ECF No. 8 at 8.  But the substance of the government's contention—that the defendant could travel to and from the United States per her new visa's terms, but not per the terms of her F-1 visa after her graduation—is true of the Optional and Practical Training visa extension for which the defendant applied.  In other words, the "B1/B2"

2009); *United States v. Hussain*, 6 F. App'x 50, 51-52 (1st Cir. 2001); *United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990).   Moreover, despite the defendant's repeated claim to the contrary, *e.g.,* ECF No. 23-1 at 14, the government does not maintain that her Russian citizenship and the unavailability of extradition from Russia to the United States alone are determinative of detention.   Of course, the Court should consider those facts in assessing the risk that the defendant will flee, *see United States v. Tajideen*, No. 17-00046, 2018 WL 1342475, at *7 (D.D.C. Mar. 15, 2018), but it also should consider the nature and circumstances of the crime.   Here, the defendant is charged specifically with acting as an undisclosed agent of the Russian Federation, and the government's evidence is, as the magistrate judge found, compelling.   The defendant faces significant prison time if convicted.   As Magistrate Judge Robinson noted, when the defendant previously offered to cooperate with the United States Government, she was not charged with any crimes.   ECF No. 15 at 6, n.2.   She now is so charged; she now knows the gravity of those charges; and her government has publicly claimed that the charges are no more than "part of a political put-up job set to it by forces that are whipping up anti-Russia hysteria in the US."[17]   Simply put, if the defendant is released, and she goes to the Russian embassy or consulate, she will be beyond the reach of this Court, and it will have no redress.   *See* ECF No. 8 at 4; ECF No. 12 at 43-52 (testimony of Diplomatic Security Service Special Agent Joseph William Stowell).

   At the detention hearing on July 18, 2018, defense counsel argued, "There's no evidence [the defendant has] been in a diplomatic car.   There's no evidence that she's been to the embassy.

---

label the government used to describe the visa was incorrect, but its underlying its argument was correct.

[17]   Tweet by verified Twitter user "@MFA_Russia," July 18, 2018, available at https://twitter.com/mfa_russia/status/1019587270310055937" (last accessed Aug. 31, 2018).

There's no evidence that she's been in contact with the consulate.  ECF No. 12 at 55:21-25.  But after the government proffered that it had seen photos of the defendant with the former Russian ambassador to the United States, ECF No. 12 at 58:8-18, counsel admitted that he was aware of at least one photograph of the defendant with the former Ambassador at "a movie screening hosted by a Russian cultural group in Washington."  *Id.* at 59:19-21.  The government now proffers that it possesses additional photographs of the defendant and the Russian Official with the former Russian ambassador to the United States; that the defendant's calendar shows a call with the former ambassador in May 2015; and that the defendant's journal reflects her plan to meet with the current Russian ambassador to the United States upon his arrival to the United States.  The government also possesses a photograph of the defendant with the Russian ambassador dated October 2017.

In connection with the detention hearing, the government proffered the defendant's connections to Russia, including intelligence services and the oligarchy.  ECF No. 8.  The defendant does not appear to contest that proffer in its current filing.  In addition to the other factors set forth herein, including the unchallenged fact that monitoring will not prevent her from taking refuge outside the Court's jurisdiction, in a diplomatic facility, the defendant is a serious risk of flight.  *See United States v. Hong Vo*, 978 F. Supp. 41, 46 (D.D.C. 2013) (noting that GPS monitoring does not prevent flight).

## IV.    <u>Conclusion</u>

For the foregoing reasons, as well as any offered by the government at any hearing on this

matter, the government requests that the Court order the pre-trial detention of the defendant.


Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By:_____/s/_____
ERIK M. KENERSON
THOMAS N. SAUNDERS
Assistant United States Attorneys
Ohio Bar Number 82960 (Kenerson)
N.Y. Bar Number 4876975 (Saunders)
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov


_____/s/_____
WILLIAM A. MACKIE
Trial Attorney, National Security Division
N.C. Bar Number 13816
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: 202-233-2122
Email: Will.Mackie@usdoj.gov