UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT MARIA BUTINA'S REPLY TO THE
GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR BOND REVIEW**

Defendant Maria Butina submits this reply to the government's opposition (Doc. 26) to her motion for bond review, stating the following.

The government's opposition (Doc. 26) is an extraordinary document that reeks of desperation. On page 19 of a 22-page brief filed near midnight, the government shamelessly admits it had no factual basis for a proffer made in court that Maria Butina "offered . . . sex" in exchange for a position with a public interest organization.[1] This concession, made even more remarkable because of the government's request to gag defense counsel from pointing out this falsity to the media (Docs. 22 and 24), is paired with another unashamed admission of a fictitious proffer the government championed overtly but now buries in a footnote on page 19. At the detention hearing, the government previously stated that Ms. Butina applied for a tourist visa after graduation to

---

[1] Furthermore, none of the so-called "other communications and materials" provided to the defense (Doc. 26 at 19) bear any relevance to the initial claim that Maria offered to trade sex for access and power. Rather, it appears the government simply trolled five-years worth of a 20-something year-old's conversations and are now, based on AUSA Erik Kenerson's latest email of September 9, 2018 (which the defense can make available to the Court on request), threatening to disclose those documents "if the Court inquires further regarding your client's relationship with US Person 1"—a veiled threat if her lawyers dare to raise the issue again. The government's documents do nothing to discredit the sincerity of her relationship with Paul Erickson, and its craze with her sex life has gone too far and transformed into an irrelevant obsession.

1

imply she was not planning to work in the United States but instead "travel to and from the United States." (Doc. 8 at 8.) In truth, she applied for and received OPT status—a work authorization for student graduates to join the American workforce for one year and get practical training that complements their education—a fact that carries a very different implication about her future plans in the United States and undermines the government's fear of her bolting to Russia.

Both of these fabrications made in open court are either the product of a stunning disinterest in reading the documents already in the government's possession or a craven willingness to mislead the court—and the public—in an attempt to detain a woman convicted of no crime. Whatever the reason, it is nothing short of cowardice to make false proffers to much fanfare only to deny them later in a mere sentence or footnote.

In a desperate attempt to conjure up facts to replace its now-conceded false ones, the government now makes assertions that are frankly shocking coming from an agency of the United States. Apparently oblivious to the terms of the Vienna Convention, international law, or our U.S. State Department practices, the government contends that Maria Butina is likely to flee because she received "six consular visits" to inquire about her health and wellness, and because the Russian Foreign Ministry "twice" expressed concern about her arrest and condition, as well as changed its Twitter account avatar. (Doc. 26 at 5.) Momentarily setting aside the fact that "[o]ne of the highest priorities of the Department of State and U.S. embassies and consulates abroad is to provide assistance to U.S. citizens incarcerated abroad,"[2] Maria is confined in a small cell, in isolation, without fresh air, in a foreign country, for 22-hours a day. She is relieved from her cell to shower and call her parents once at 1:00am and again at 11:00am. Americans detained abroad, who receive

---

[2] U.S. Department of State—Bureau of Consular Affairs, Arrest or Detention of a U.S. Citizen Abroad, *available at* https://travel.state.gov/content/travel/en/international-travel/emergencies/arrest-detention.html (last visited Sep. 9, 2018).

regular consular visits from U.S. Foreign Service Officers and have State Department inquiries made on their behalves, would be aghast to learn that their own government is taking the position that consular visits from home and for comfort is proof of flight or some sort of intelligence connection.

Having run roughshod over international legal norms, the government turns its attention to bulldozing domestic ones. It argues that Ms. Butina's relationship with her boyfriend Paul Erickson is insincere because she agreed to a proffer session with FBI agents in an investigation related to him. (Doc. 26 at 3.) By extension, the U.S. Attorney's Office for the District of Columbia suggests that true love means never cooperating with federal investigations and that only a "duplicitous" partner would offer an interview with government agents or provide truthful evidence. The government's attempt to punish Maria for choosing to cooperate with a federal investigation—like a gang member would punish a witness for snitching—is jaw dropping. The Court should deny the government's invitation to endorse its "snitches get stiches" argument as unlawful and a wrongful contention that providing evidence or testimony to the government is disloyal rather than upstanding. Moreover, as the FBI is aware from conversations with counsel, Maria has little to no information about that matter, and her proffer would have been immaterial to the investigation.

The government nonetheless argues that Maria should be held pretrial because *other persons* in *other cases* evaded prosecution by absconding from Cyprus, Sri Lanka, and Greece. However, these events are of no significance because they have nothing to do with Maria Butina's individualized risk of flight, and the Court should ignore this argument as an irrelevant parade of horrors.

Despite all of its proven falsehoods and overblown claims discussed above, the government *still* urges the Court to rely on its proffers of cherry-picked messages and often impermissibly suggestive translations as accurate. The Court should not give credence to such proffers.

In response to a few of its claims, the government makes much of individual instances where Ms. Butina states she is 'awaiting orders' without acknowledging that it is a common idiom in her conversation to convey polite manners and respect. According to government translators, Maria also sought "orders" from Aleksandr Torshin for souvenirs and gifts. For example, on June 24, 2015:

> MB:   Should I buy things for the little kids this time?
>
> AT:   I don't know yet.
>
> MB:   I'm awaiting orders. Always ready, if something's needed.

With regard to whom the government has ominously referred to as "Political Candidate 1" (at 8), Maria attended his announcement to run for president at the invitation of an American. No one from the Russian Federation directed or instructed her to go. Like hundreds of others, she listened to the candidate's speech, shook his hand, and had her picture taken with him. Energized by the excitement of witnessing history and charmed by American culture and politics, she retold the event to her family and friends, including Aleksandr Torshin, who humored her with a request to 'tell me about it.' There was no sinister subversion of American politics. Just an innocent intellectual curiosity. As for the email contact found on her phone from "an FSB-associated domain," the single correspondence was a reply to Maria Butina as the founder of her gun rights group, *The Right to Bear Arms*. Her organization had made submissions to numerous Kremlin departments and state agencies, including the FSB, to lobby for better gun laws and rights in Russia. The FSB provided a standard reply, noting it would take the matter under advisement.

Finally, the government fills the remaining pages of its brief in support of detention by revealing its troubling theory of prosecution and its belief that it does not need to prove Maria Butina was an intelligence agent, she did anything covert, she acquired any classified or nonpublic material, or did any other underlying illegal activity. The government's case triggers constitutional issues for which a motion to dismiss is forthcoming. However, setting aside these issues, the case is a reach for the government because it is essentially trying to prove that this graduate student— who (a) is not and has never been paid or employed by the Russian Federation; (b) genuinely believes and desires peace and better U.S.-Russia relations; (c) dreams of a future career in international relations; (d) attends publicized dinners about better U.S.-Russia relations at the request and organization of American citizens; (e) attends public events at the invitation of other American citizens; (f) networks for her own self-interests like other Washingtonians in the District; (g) takes pictures for keepsakes to be posted on social media like thousands of other millennials; (h) keeps a diary adorned by colorful stickers where she records her daily events and hopes and dreams for the future; and (i) shares her excitement about American culture and happenings with her friend and mentor in Russia, who happens to also have an interest in gun rights, peace and better relations, and takes personal time off from his government job to travel to the United States (alone and without an embassy vehicle, embassy support staff, embassy escort, interpreter, or any other typical amenity for a "senior" official (Doc. 26 at 1)) to attend civil society groups with members of similar beliefs—can be convicted of 18 U.S.C. §§ 371 and 951.

The bottom line is that the government has a legally and factually weak case based upon an esoteric theory brought against young woman, who is trying to start a life in America, not an intelligence agent, and has demonstrated that she is not a flight risk. She should be released pending trial.

Our "system of criminal justice embraces a strong presumption against detention." Liberty is the norm, not detention prior to trial. *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (2009) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)); *see also* 18 U.S.C. §§ 3142(b) and 3142(c)(1)(B) (a defendant "shall" be released on personal recognizance or upon the "least restrictive further condition or combination of conditions" that will reasonably assure her appearance). The central question before this Court is whether there are any conditions that the "judge might find useful" to "reasonably assure that the defendant will appear for trial." *United States v. Xulam,* 84 F.3d 441, 442 (D.C. Cir. 1996). The answer to that question is yes.

Dated: September 9, 2018                    Respectfully submitted,

/s/Robert N. Driscoll
Robert N. Driscoll (DC Bar No. 486451)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 403-3870
rdriscoll@mcglinchey.com

/s/Alfred D. Carry
Alfred D. Carry (DC Bar No. 1011877)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 330-5897
acarry@mcglinchey.com

*Counsel for Defendant*