**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT MARIA BUTINA'S MOTION
TO DISMISS OR COMPEL ELECTION BETWEEN MULTIPLICITOUS COUNTS**

Defendant Maria Butina submits this memorandum in support of her motion to dismiss the indictment (or one of the counts thereof), or to compel election between the multiplicitous counts, stating the following.

## I. Introduction

On July 17, 2018, a federal grand jury returned a two-count indictment charging Maria Butina with conspiracy to act as an agent of a foreign government, in violation of 18 U.S.C. §§ 371, 951 (Count One), and acting within the United States as an agent of a foreign government, in violation of 18 U.S.C. § 951 (Count Two). The indictment is constitutionally infirm because it is overly broad and functions unconstitutionally as applied to Maria Butina.

Count Two alleges that she violated section 951 by acting as a foreign agent. However, prosecuting Maria under this statute violates the overbreadth doctrine and fair notice requirements of the Constitution, as it imperils a substantial amount of protected conduct and fails to provide her with notice of what conduct is criminal and what conduct is not. For example, the statute does not define the "acts" that are illegal other than its vague reference to "agree[ing] to operate . . . subject to the direction or control of a foreign government or official[.]" 18 U.S.C. § 951(a) and

1

(d). The statute also does not specify which employees of a foreign government are "official" or whether they must be officiating at the time of "direction or control." *Id.* The statute further does not delineate the extent of "direction or control" necessary to trigger culpability. *Id.* In short, section 951 does not establish the "clearly marked" "boundaries" of proscribed conduct. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

The government nonetheless prosecutes Maria under section 951, even though she came to the United States as a student to better her career and make connections all on her own volition. The government does not allege that the Russian Federation employed her as an intelligence officer or foreign agent in any traditional sense. Instead, the government contends Maria is a Kremlin agent because she shared her memorable American happenings and naïve, youthful optimism for better Russian-American relations with others, including an individual claimed to be "Russian Official," who did not employ her, pay her, request her to pursue better relations between the two countries, or exert any control over her daily activities. But if fantasizing about a future career in diplomacy and jabbering about personal events and peacebuilding aspirations with others like a friend and mentor who happens to be an officer from some foreign government agency (whether or not that officer is then acting in an official capacity) makes one a foreign agent, then scores of people are unknowingly violating this statute.

The problem is that section 951 is unlimited in its reach.[1] The First Amendment protects the expression of views and opinions no matter how unpopular or controversial. However, the word "acts" and the phrase "operate within the United States," among others, cover such a massive amount of conduct that is otherwise protected and legal. Because the statute further fails to

---

[1] *Compare, e.g.,* 18 U.S.C. § 951 *with* 22 U.S.C. § 611 *et seq.*, the latter of which has a number of limitations and exceptions.

establish minimal guidelines to govern federal authorities, it manifests arbitrary and discriminatory enforcement. The combination of these serious flaws counsel toward the dismissal of Count Two.

Additionally, the indictment is defective because the offenses, under *Blockburger v. United States*, 284 U.S. 299 (1932), are not sufficiently distinct. There are no circumstances where a defendant can be guilty of "*agree[ing]* to operate within the United States" for a foreign government or official under section 951, without also being guilty of *agreeing* (*i.e.*, conspiring) to commit a crime against the United States (*i.e.*, agreeing to act as a foreign agent) under sections 371, 951. In other words, a conviction for section 951 necessarily includes a conviction for section 371, rendering the counts mulitplicitous. A multiplicitous indictment violates the Double Jeopardy Clause of the Fifth Amendment. It also unfairly prejudices a jury against a defendant by creating the false impression of more criminal activity when, in law and fact, only one crime could have occurred. Correspondingly, the court should compel the government to elect between the multiple counts and dismiss the other.

## II. <u>Legal Standard</u>

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Pretrial motions may challenge "a defect in the indictment or information," such as failing to state an offense or multiplicity of counts, as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B).

## III. <u>Argument</u>

### A. <u>Count Two of the Indictment is Unconstitutional as Overbroad and As Applied</u>

Maria Butina moves to dismiss Count Two of the indictment, asserting both facial and as-applied challenges to the constitutionality of 18 U.S.C. § 951. "When asserting a facial challenge,

a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question." *City of Chi v. Morales*, 527 U.S. 41, 55, n.22 (1999). In contrast, an as-applied challenge is one where the litigant argues that a statute, even though generally constitutional, operates unconstitutionally as to him or her because of the particular circumstances. Maria bases her facial attack on the overbreadth doctrine. Her as-applied challenge relates to the vagueness of the statute and realized risk of arbitrary enforcement.

## 1.     18 U.S.C. § 951 is Unconstitutional as Overbroad

First, section 951 is facially unconstitutional as overbroad because it permits the criminalization of a substantial amount of constitutionally protected conduct. Generally, a facial challenge to a statute is "the most difficult challenge to mount successfully." *General Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). If a statute has even a single constitutional application, the facial challenge must fail. However, free speech and expression concerns present an exception to the normal rule regarding facial invalidity, under which a litigant must show that "no set of circumstances exist" where the challenged statute could be valid. *Salerno*, 481 U.S. at 745. Instead, under the "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

Maria has standing to bring her facial challenge to section 951 as overbroad because parties accused of violating an overbroad statute are entitled to have the court evaluate its constitutionality. *See, e.g., Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) ("an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face" based on the overbreadth doctrine); *Bond v. United States*, 564 U.S. 211, 226 (2011) (Ginsburg, J., concurring) ("Bond, like any other defendant, has a personal right not to be convicted under a

4

constitutionally invalid law."); *United States v. Bozarov*, 974 F.2d 1037, 1040 (9th Cir. 1992) ("A defendant in a criminal proceeding in entitled to insist that his conduct be judged in accordance with a rule that is constitutionally valid."); *United States v. Bozarov*, 974 F.2d 1037, 1040 (9th Cir. 1992); *United States v. Gonzales*, 957 F. Supp. 1225, 1227 (D.N.M. 1997) ("The fact that Mr. Gonzales has been indicted is sufficient to confer standing on him to raise a facial challenge to the laws he is charged with violating").

In bringing an overbreadth challenge, Maria is not limited to arguing that her own conduct was protected. *See, e.g., SEIU, Local 3 v. Mt. Lebanon*, 446 F.3d 419, 423 (3d Cir. 2006). Rather she may allege that other conduct, not within the facts of this case, would render the statute facially overbroad and unconstitutional. *Id.*; *see also Bozarov*, 974 F.2d at 1040 ("The government also contends that Bozarov is not entitled to bring a facial challenge to the [statute] because doing so requires him to raise the claims of third parties. We reject this argument."). This is because the traditional rule that a person "to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court" under *New York v. Ferber*, 458 U.S. 747, 767 (1982), does not apply to First Amendment overbreadth challenges. The "First Amendment needs breathing space." *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973). It follows that the overbreadth doctrine affords expanded "*jus tertii*" standing to challenge a statute not only because a litigant's "own rights of free expression are violated, but because . . . the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id*.

The Supreme Court has explained that the overbreadth doctrine prohibits the United States government "from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).

A statute may be unconstitutionally overbroad if it directly limits speech itself, or if it regulates expressive conduct. *Broadrick*, 413 U.S. at 612.

If a law "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," *id.* at 615, then it is invalid "until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression," *id.* at 613; *see also Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (same). Any overbreadth must be both "real" and "substantial" in order to be constitutionally deficient. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Although "substantial" overbreadth is not readily reduced to a mathematical formula, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984).

Here, section 951 criminalizes *any* act taken in the United States at the direction of a foreign government or official by someone who is not a diplomat, consular officer, or attaché without prior registration. *See* 18 U.S.C. § 951. As a whole, the statute "creates a criminal prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 461 (2010). It does not matter whether the act was lawful at the time and place it occurred, so long as the offender did it at the direction of a foreign official. There are no exceptions for "activities that in ordinary circumstances constitute an exercise of freedom of speech." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). Consider the following:

Unregistered foreign journalists who work in U.S. outlets based in nations with state-owned media violate the statute by being present at a newsworthy event to report the news if so directed by an officer from their foreign state-controlled news agency. Section 951 cannot be

interpreted to ensnare and criminally prosecute journalists engaging in lawful, constitutionally protected newsgathering activities. The First Amendment protects the "important role" of the press in our democracy. *Mills v. Alabama*, 384 U.S. 214, 219 (1966); *see also United States v. Dumeisi*, 424 F.3d 566, 579 (7th Cir. 2005) (affirming the district judge's repeated jury instruction throughout the trial that under section 951, the defendant "should not, and legally could not, be convicted simply for publishing unpopular or even despicable opinions" in a newspaper article as the predicate act).[2]

An unregistered, American college student dating the son or daughter of a foreign ambassador to the United States violates the statute by attending a public rally to protest against a U.S. government action (*e.g.*, the separation of families at the border) if directed and invited by the ambassador. Political speech is at the heart of the First Amendment; and yet under section 951, this student would be guilty even if he or she personally agreed with the purpose of the rally. Dissent is the backbone of our democratic system. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *Carey v. Brown*, 447 U.S. 455, 467 (1980) ("Public-issue picketing . . . an exercise of . . . basic constitutional rights in their most pristine and classic form . . . has always rested on the highest rung of the hierarchy F.3d 1011,

---

[2] The district judge in *United States v. Dumeisi* went on to give the following final charging instruction to the jury:

> The First Amendment to the Constitution protects the right to free speech and the freedom of the press. This means that individuals are permitted to express views that are controversial or even despicable. The speech that Mr. Dumeisi gave at the Iraqi Mission and newspaper articles he authored or published are protected by the First Amendment. The speech and newspaper articles, as well as Mr. Dumeisi's opinion and political views, are to be considered only insofar as they may pertain to issues of motive and intent.

*Dumeisi*, 424 F.3d at 579.

1021 (9th Cir. 2009) ("Political speech is core First Amendment speech, critical to the functioning of our democratic system."). This student shouldn't be a felon for expressing a political belief he or she believes in solely because the act happened to be directed by some foreign official.

This same college student would be guilty of violating the statute by simply making a dinner reservation, helping with an English translation, or predicting which candidate might win an election, as directed by the ambassador. This conduct might also qualify as "acts" taken at the "direction or control of a foreign . . . official[.]" 18 U.S.C. § 951(a) and (d). But the many permutations of unconstitutional applications that exemplify the statute's overbreadth continue.

An unregistered foreign visitor attends a civic-organization event in the United States about human rights and the elimination of discrimination based on some form of inequality (be it political, race-based, educational, gender, religious, economic, social, etc.). She violates the statute by writing a note to government leaders in her native country about how they can do it better if these leaders direct her to write the note for explanation. This visitor would be guilty even if she authored the note as instructed out of a sincere, personal desire for change and betterment. Thankfully, the protections of the First Amendment also extend to noncitizens in this country. *See Bridges v. Wixon*, 326 U.S. 135 (1945) ("freedom of speech and of press is accorded aliens residing in this country"); *Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th 1995) ("We conclude that the speech protections of the First Amendment at a minimum apply to all persons legally within our borders," including ones who are not permanent residents). "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion." *Thornhill*, 310 U.S. at 95.

An unregistered, lonely grandson from an unpopular, provincial country accepts the advice of his grandmother about how to make friends. She thoughtfully directs him to go to prayer groups and same-interest meetups to meet people with common interests. He violates section 951 if the grandmother is a foreign official, even though the grandmother provided such direction while visiting the United States on holiday.

An unregistered priest travels to the United States to persuade officials to abolish capital punishment. He lobbies politicians and persuades influential sections of the public that the death penalty is an inhumane attack on the inviolability and dignity of the person. He sends messages to officials at the diplomatic service of the Holy See in the Vatican City about his progress. He violates section 951 by carrying out this influence operation as directed and financed by the Holy See/Vatican City government, even though he believes capital punishment is a practice that is against the Church's teachings.

An unregistered, altruistic graduate student is studying international relations. She wants an international career focused on building prospects for peace on the Korean peninsula. She goes to recommended extracurricular activities and drafts notes with her plans and ideas for how U.S. foreign policy could help reduce tension and conflict. She violates section 951 by going to these extracurricular events and sharing her written ideas and work with the guest lecturing, foreign official who directed them.

There are endless factual examples of individuals engaging in completely legal conduct who are nonetheless at risk of prosecution for violating section 951 under a strict reading of that statute. "Acts" can purportedly be legal. 18 U.S.C. § 951. "Direction or control" can ostensibly be *de minimis*. *Id.* The title "official" seems to be a matter of only status, even though the officer may then be acting in an individual capacity. *Id.* Indeed, the statute does not even appear to require the

foreign government or official to derive a benefit from the act directed. *Id.* As for scienter, the statute specifies none. By extension, the accused's specific intent or knowledge of wrongdoing is somehow irrelevant. According to two circuit courts, all he or she must do is generally intend to do the act that the law proscribes. *See United States v. Duran*, 596 F.3d 1283, 1291-92 (11th Cir. 2010) (holding that "[t]he silence of § 951 as to a specific intent element is dispositive of the fact that Congress intended it to be one of general intent."); *see also Dumeisi*, 424 F.3d at 581 (7th Cir. 2005) ("Knowledge of the requirement to register is not an element of § 951.").[3] The outgrowth of all this leads to the absurd result where someone can be imprisoned for up to ten years, under section 951, for agreeing to book travel and help with English translations at the direction of some foreign official during his vacation trip to Disney World.

More precisely, the broad sweep of section 951 creates an overabundance of real possibilities under which those engaged in protected conduct may choose to abstain from exercising their constitutional rights than risk conviction. When, as here,

> [m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas

—the court has a duty to address these serious constitutional concerns. *Hicks*, 539 U.S. at 119 (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486-87 (1965)).

However, the choice before this court is not necessarily between wholesale invalidation or upholding the statute entirely. After all, a court that has the power to enjoin *all* applications of a

---

[3] *But see United States v. Lindauer*, 2004 WL 2813168, at *4 (S.D.N.Y. Dec. 6, 2004) (acknowledging the lack of scienter in section 951, but ruling that "What level of knowledge and criminal intent defendants must have manifested in order to be convicted of violating the statute is something that can and should be discussed at or before trial.") (citing *Miller v. French*, 530 U.S. 327, 341 (2000) (courts are not free to disregard the clear unconstitutionality of a statute in order to save it)).

statute as overly broad also has the power to enjoin *some* applications of it. *Dombrowski*, 380 U.S. at 491. "[A] limiting construction or partial invalidation . . . to remove the seeming threat or deterrence to constitutionally protected express" can save a law that punishes protected expression. *Broadrick*, 413 U.S. at 613; *see also Stevens*, 559 U.S. at 490 ("In sum, we have a duty to interpret [the statute] so as to avoid serious constitutional concerns, and [the statute] may reasonably be construed not to reach almost all, if not all, of the depictions that the Court finds constitutionally protected.") (Alito, J., dissenting); *Cox v. New Hampshire*, 312 U.S. 569 (1941); *United States v. Thirty-Seven Photographs*, 402 U.S. 363 (1971); *Thornhill*, 310 U.S. 88 (1940) (showing the Supreme Court reaching for dividing lines, although it was ultimately unable to parse protected from unprotected behavior).

In this instance, the court could simply indicate what conduct can and cannot be reached by section 951 under the Constitution and enjoin from enforcement that which would be unconstitutional. Such a limiting construction would be particularly appropriate here when the government, appreciating the statute's "legitimate sweep," *Broadrick*, 413 U.S. at 615, undeniably has a genuine state interest in knowing the identity of those operatives who are engaging in harmful types of activities within the United States on behalf of foreign governments. *See, e.g., Hicks*, 539 U.S. at 119 ("there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting *all* enforcement of that law" (emphasis mine) (citing *Broadrick*, 413 U.S. at 615)).

For example, the primary conduct Congress sought to target through its original passage of section 951 was espionage and subversive acts by deep spies and sleeper agents sent to the

United States without diplomatic cover.[4] It is undisputed that this type of unprotected conduct may be constitutionally prohibited.

However, the many other types of protected conduct banned by the statute or chilled in the process merit First Amendment protection. Maria's expressive conduct at issue here similarly merits protection. She is accused of conducting an "influence operation" to penetrate "the U.S. national decision making apparatus" (*see* Compl. and Indictment)—considered by Congress to be 'political activity.'[5] The government alleges she traveled openly in the United States to attend events of civil society groups with her purported "handler," a preexisting personal lifetime member of such groups, who took personal time off from his government job to travel here. She helped with English/Russian translations and travel arrangements. She networked and took pictures with political celebrities. She attended political events and civic groups with members of similar beliefs at the invitation of American citizens. She is accused of arranging dinners to promote cultural exchange between citizens and academics, not government officials, although such dinners were also organized and directed by an American citizen. She is branded a foreign agent because she explained the complexities of American politics and shared her extraordinary affinity for American culture with family and friends back home. She is alleged to be a Kremlin agent because she genuinely wanted peace and better diplomatic relations between her home country and the United

---

[4] *See United States v. Duran*, 596 F.3d 1283, 1294 n.4 (11th Cir. 2010) ("The earliest form of § 951 was enacted on June 15, 1917, shortly after the United States entered World War I. It was part of "An Act To punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes." Act of June 15, 1917, ch. 30, 40 Stat. 217 (codified as amended at 18 U.S.C. § 951 (1948)). . . . Legislative history suggests that the 1917 Act was a war-time act to protect the United States from subversive elements that could threaten America's war effort. This is because, in its Congressional Reports, Congress labeled the act, "To Punish Espionage and Enforce the Criminal Laws of the United States," H.R. Rep. No. 65–30, at 1 (1917), and "Espionage Bill," H.R. Rep. No. 65–65, at 1 (1917) (Conf. Rep.); H.R. Rep. No. 65–69, at 1 (1917) (Conf. Rep.).").

[5] See note 7, *infra* (citing 22 U.S.C. § 611(o)) and surrounding discussion.

States, as well as a future career in international relations—the logical next step having completed a master's degree in a school of international service.

In short, the gravamen of the government's case is that Maria lobbied on behalf of a Russian official for better diplomatic relations with the United States. The government does not allege that she was an intelligence operative, stole national secrets, acted covertly, engaged in subversive activities, plotted against the United States, had ill will, or undertook any independently-criminal act in the United States as part of some "espionage-related purpose or goal." *Duran*, 596 F.3d at 1293 n.3 (noting that all of the section 951 cases have at least involved espionage-related purposes or goals). Instead, the government relies on isolated Twitter direct messages (that she voluntarily supplied to the U.S. Senate Select Committee on Intelligence in their entirety) to establish that she was somehow operating under the direction or control of a Russian official to build peace, even though the Russian Federation did not direct her to go to the United States, did not direct her to attend dinners or civic-organization events, and did not pay for her travel to the United States, her tuition, her living expenses, or make any payments to her at all.

Nothing about her conduct by itself, as the government has conceded in prior briefing, is illegal. And although the Eleventh Circuit has observed that "the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful," *Duran*, 596 F.3d at 1293 (citing *United States v. Latchin*, 554 F.3d 709, 715 (7th Cir. 2009) (for the proposition, in dicta, on a sufficiency of the evidence standard of review requiring only *some evidence* toward every element of the crime to affirm a conviction, that "acts of *some kind*" are sufficient for a jury finding of guilt under section 951 (emphasis in original)), the Eleventh Circuit

expressly refrained from opining on the constitutionality of section 951 applications to completely innocent or protected conduct. As the circuit court noted,

> Because Duran's conduct was not innocent[—as it involved bribery, kickbacks and other patently criminal behavior—]we need not in this case express an opinion as to the constitutionality of possible applications of § 951 to completely innocent conduct.

*Duran*, 596 F.3d at 1296 n.9; *see also id.* at 1293 n.3 (further surveying the cases with section 951 convictions and noting that at a minimum, all of them "involved agents of a foreign government acting for espionage-related purposes and goals[.]").

At the time *Duran* was decided, no circuit court had ruled on an overbreadth challenge to section 951 based on the above reasons.[6] The same is true since *Duran*. Because this statute "does not aim specifically at evils within the allowable area of control . . . but sweeps within its ambit" conduct and exercises of First Amendment rights, there is a probable public hazard of criminalizing protected conduct. *Thonhill*, 310 U.S. at 97. To resolve the constitutional problem presented by the statute's broad application, this court should—at least as to political activities—narrow the sweep of section 951 so that it aligns more closely with the constitutional safeguards recognized by Congress in the Foreign Agent Registration Act (known as "FARA").

FARA, codified at 22 U.S.C. § 611 *et seq.*, specifically enumerates defined terms like "political activities" precisely to avoid the overbreadth challenges section 951 creates.[7] FARA was

---

[6] Nearly forty years ago, the Fourth Circuit ruled the statute was not overly broad. *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980). But the Fourth Circuit made this ruling in response to a narrow objection that challenged the constitutionality of the statute based on the word "agent" being "impermissibly vague and overbroad." *Id.* at 919-20. The court disagreed. *Id.*

[7] Under FARA, "[t]he term "political activities" means any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party[.]" 22 U.S.C. § 611(o).

enacted to identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda. To avoid First Amendment complications, Congress did not enact FARA to regulate or criminalize the propaganda or acts and expression of ideas. Rather Congress just required those agents to make a public record with the Attorney General describing the nature of their employment and work, imposing penalties for nonregistration. *Viereck v. United States*, 318 U.S. 236, 241 (1941); *cf. United States v. Peace Information Center*, 97 F. Supp. 255, 262 (D.D.C. 1951) ("The [FARA] statute under consideration neither limits nor interferes with freedom of speech. It does not regulate expression of ideas. Nor does it preclude the making of any utterances. It merely requires persons carrying on certain activities to identify themselves by filing a registration statement.").

Unlike FARA, section 951 does not define the "acts" or "operat[ions]" the statute is designed to police. 18 U.S.C. § 951 (a) and (d). Nor does the statute offer any guidelines with respect to how it should apply to expressive conduct like 'political activities.' An act taken by an individual that is legal and constitutionally protected by itself does not lose its legality because some third party directed it. Indeed, one cannot conspire to do a legal act.

The Department of Justice nevertheless seems to recognize the incongruence of bringing a section 951 prosecution against a person engaged in political activity who does not meet the statutory standards for prosecution under FARA when it describes section 951, on its own website, as being applicable to *non*-political activities.[8] However, such a restriction does not exist under a strict reading of section 951. Thus, the statute runs headlong into the very constitutional problems the drafters of FARA recognized and sought to avoid, rendering section 951 overbroad, applicable

---

[8] *See* DOJ Answers to Frequently Asked Questions, *available at* https://www.justice.gov/nsd-fara/general-fara-frequently-asked-questions (last visited Oct. 26, 2018) (emphasis added).

to perfectly legal and protected conduct, and unconstitutional (or in need of a limiting construction). A law that is unconstitutional for any reason is invalid and no violation of an invalid law may be found. *See Ex parte Siebold*, 100 U.S. 371, 376-77 (1879) ("An unconstitutional law is void, and is as no law. An offence created by it is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment.").

### 2.   18 U.S.C. § 951 is Unconstitutional as Applied to Maria Butina

Second, section 951 is unconstitutional as applied to Maria Butina and her circumstances because the statute fails to provide "clearly marked" "boundaries of the forbidden areas" as to what conduct for a foreign government or official is criminal or not. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

Under the Due Process Clause of the Fifth Amendment, a criminal statute is unconstitutionally vague if it is written so imprecisely "that it fails to give ordinary people fair notice of the conduct it prohibits," or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015). As observed by the Supreme Court in *Papachristou v. City of Jacksonville*, 405 U.S. 156,162 (1972), "living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Quoting Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

These concerns are more sensitive in the First Amendment context, where "a more stringent vagueness test should apply." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010). As the Court stated in *Grayned v. City of Rockford*:

> [W]here a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms' it 'operates to inhibit the exercise of (those) freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'

*Grayned*, 408 U.S. at 108-09 (internal citations omitted). [9]

The freedom of speech is "delicate and vulnerable, as well as supremely precious in our society . . . [and] the threat of sanctions may deter [its] exercise almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415 (1963); *Smith v. Avino*, 91 F.3d 105, 108 (11th Cir. 1996); *Cramp v. Bd. Of Pub. Instruction of Orange County, Fla.*, 368 U.S. 278, 287 (1961) ("The vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution"). Like the freedom of speech, the freedom of assembly is a right of cornerstone significance in our system. "[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982).

"To trigger heightened vagueness scrutiny, it is sufficient that the challenged statute regulates and potentially chills speech which, in the absence of any regulation, receives some First Amendment protection." *Cal. Teachers Ass'n v. State Bd. Of Educ.*, 271 F.3d 1141, 1149-50 (9th Cir. 2001). And noncitizens as well as non-permanent residents in the United States have broad First Amendment rights. *See, e.g., Bridges v. Wixon*, 326 U.S. 135 (1945); and *Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th 1995).

In determining the constitutional sufficiency of notice under a statute, the statute must necessarily be examined in the light of the conduct in which the defendant is charged. *United States*

---

[9] This is not to conflate an as-applied vagueness challenge with a facial overbreadth challenge. Vague statutes fail to provide sufficient notice and allow for arbitrary enforcement. Overbroad statutes permit the criminalization of constitutionally protected conduct. Not all overbroad statutes are vague, nor are all vague statutes overbroad. However, either may pose a threat to constitutionally protected conduct.

*v. National Dairy Products Corp.*, 372 U.S. 29, 33 (1963); *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

Here, the statute functions unconstitutionally as applied to Maria because it deprives her of adequate notice of what is prohibited. Section 951 fails to define what kinds of "acts" are proscribed. 18 U.S.C. § 951(a). The vague reference to "operat[ions] for a foreign government or official" adds no clarity. § 951(d). Who qualifies as a foreign "official" is unknown. *Id.* The extent of "direction or control" required to trigger liability is unquantified, *id.*, and whether the "official" must then be acting in such capacity at the time of any "direction or control" is uncertain, *id.*

Simply put, section 951 does not sufficiently warn her that the conduct described in the indictment and other government pleadings, to include

- applying for an F-1 Student Visa (*see* Indictment, Doc. 7);

- enrolling in a full-time graduate school master's degree program (*id.*);

- going to Russian-American "friendship and dialogue dinners" organized by American citizens (*id*; *see also* Helson Aff., Doc. 1-1);

- attending "events sponsored by special interest groups" like the National Rifle Association to befriend people having similar beliefs (*id.*);

- receiving so-called "taskings" (*id.*) that are not missions, but rather favors and innocent conversations such as buying gifts for children and answering questions about the weather, the news, and other experiences;

- shaking hands and taking pictures with political celebrities, like hundreds of people (*id.*);

- attending and meeting people at the National Prayer Breakfast in Washington, DC (*see* Indictment, Doc. 7); and

- sharing the excitement and memory of such "various encounters" (*id.*) with

  family, friends, and mentors back home, simultaneously dreaming about peace

  and exploring ideas for a future career in diplomacy and international relations

—expressive conduct and actions not in any way tied to "espionage-related purposes or goals,"

*Duran*, 596 F.3d at 1293 n.3—is criminal without first notifying the Attorney General.

Moreover, section 951 is unconstitutional as applied because it exposes her to arbitrary

enforcement. To be sure, the very examples of unconstitutionally overbroad applications discussed

above depict the real risk of arbitrary enforcement. As the Supreme Court explained in *Kolender*

*v. Lawson*, 461 U.S. 352 (1983):

> Although the [void for vagueness] doctrine focuses both on actual notice to citizens
> and arbitrary enforcement, we have recognized recently that the more important
> aspect of vagueness doctrine "is not actual notice, but the other principal element
> of the doctrine—the requirement that a legislature establish minimal guidelines to
> govern law enforcement." Where the legislature fails to provide such minimal
> guidelines, a criminal statute may permit "a standardless sweep [that] allows
> policemen, prosecutors, and juries to pursue their personal predilections."

*Id.* at 357-58 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). *Kolender* concerned a law that

required validly *Terry*-stopped suspects to provide "credible and reliable" identification and to

account for their presence when requested by a police officer. The Court held that the law was

vague because it allowed arbitrary enforcement.

> It is clear that the full discretion accorded to the police to determine whether the
> suspect has provided a "credible and reliable" identification necessarily "entrust[s]
> lawmaking 'to the moment-to-moment judgment of the policeman on his beat.'" . .
> . [The statute at issue] "furnishes a convenient tool for 'harsh and *discriminatory*
> *enforcement by local prosecuting officials, against particular groups deemed to*
> *merit their displeasure*,'" and "confers on police a virtually unrestrained power to
> arrest and charge persons with a violation."

*Id.* at 358-361 (internal citations omitted) (emphasis added).

Like the unconstitutional law in *Kolender*, the standardless nature of section 951 confers federal authorities with ungoverned discretion to judge which suspects are worthy of arrest or not. This allows section 951 prosecutorial decisions to be based on the accused's country of origin, the kind of 'act' taken, identity of the 'official,' level of 'direction or control,' and location of the foreign government—central terms in section 951 that are not qualified with the requisite "minimal guidelines to govern" investigators and prosecutors charged with enforcing them. *Id.* at 357-58. As a result, section 951 furnishes a convenient tool for "harsh and discriminatory enforcement" by law enforcement against particular groups of people who merit the government's displeasure. *Id.* at 361. And the risk of arbitrary enforcement becomes reality in Maria's case, as she is Russian during a time of increased tensions regarding the United States' posture toward her country.

Consider recent events regarding Israeli soldiers touring cities across the United States for the *11th Israeli Soldiers Tour* to speak at venues, including college campuses, to raise awareness of the realities of their service.[10] Sponsored by StandWithUs, an Israel advocacy group funded and supported by hasbara organizations and the Israeli government, these soldiers travel the United States to conduct influence operations intended to pacify U.S. views, change foreign policy, and put a human face on the Israeli military. Is there any doubt that such unregistered agents could be charged under the same interpretation of section 951 used against Maria– for operating in the

---

[10] Shiri Moshe, *Israeli Soldiers Share Their Stories on College Campuses, Face Some Protests*, THE ALGEMEINER (Oct. 23, 2018), *available at* https://www.algemeiner.com/2018/10/23/israeli-soldiers-share-their-stories-on-college-campuses-face-some-protests (last visited Oct. 26, 2018); Israeli Soldiers Tour, *StandWithUs welcomes IDF personnel to Michigan*, JEWISH NEWS (Oct. 11, 2018), *available at* https://thejewishnews.com/2018/10/11/israeli-soldiers-tour (last visited Oct. 26, 2018). *See also* Philip Giraldi, *Finding the Foreign Agents*, THE AMERICAN CONSERVATIVE (Jan. 30, 2015), *available at* https://www.theamericanconservative.com/articles/finding-the-foreign-agents (last visited Oct. 26, 2018) (concluding that StandWithUs is demonstrably an unregistered foreign agent); and Itamar Bazz, *StandWithUs to take cash, messaging from Israeli gov't*, +972 (Jan. 13, 2015), *available at* https://972mag.com/standwithus-to-take-cash-messaging-from-israeli-govt/101314 (last visited Oct. 26, 2018) (confirming Isareli government funding to disseminate propaganda on behalf of the Israeli government).

United States as "agents" of Israel when directed to go to U.S. schools and then brief their IDF[11] military commanders on their reception in the United States? Is there any doubt that they wouldn't be? The point is not that such activities are improper. They are not. However, they are precisely the kind of educational exchanges and necessary uninhibited marketplace of ideas that are sought and encouraged when foreign students and visitors like Maria are admitted to U.S. universities.

In Maria's case, accepting the government's allegations as true, she is charged with doing what nearly every foreign student or visitor does: seeking through extracurricular activity and off-campus cultural events to improve Americans' understanding of her home country, seeking to focus on commonalities rather than differences between two counties, and seeking to understand American culture and politics through participation in civil society groups and democratic, citizenry discourse. Because nearly every foreign visitor (let alone every Washingtonian in the District) having a personal connection with some officer of an agency within a foreign government could run afoul of the government's strained interpretation of section 951 by doing any act at the direction of that official, regardless of the legality of the underlying act and regardless of whether the official is then acting in that capacity, the decision to prosecute Maria because her home country happens to be Russia is exactly the kind of arbitrary enforcement that is constitutionally suspect.

The statute is simply too obtuse about who is protected and what it takes to commit "acts" or "to operate within the United States" at the "direction or control" of a "foreign government or official." 18 U.S.C. § 951(a) and (d). The absence of such legislative "minimal guidelines" encourages discriminatory enforcement and invites federal investigators and prosecutors—as Maria was exposed to in this case—to weigh the perceived political threat, the makeup of the

---

[11] IDF stands for Israel Defense Forces, which refers to the military forces of the State of Israel.

accused, the public opinion of the supposed criminal act, and to subjectively assess the validity of the grievance claimed, thereby permitting law enforcement, government prosecutors, and juries "to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

Worse, as for cases involving 'political activities,' it allows the government to pursue harsher penalties with additional restraints on individual liberty, *compare* 18 U.S.C. § 951 (10 years imprisonment) *with* 22 U.S.C. § 618 (5 years imprisonment), without enduring the additional cost of satisfying higher burdens of proof, *see* 22 U.S.C. §§ 611(o) and 618(a) (authorizing prosecution only for "willful" violations and specific kinds of "political activities"), thus circumventing the inherent check on government overreaching that the Fifth Amendment Due Process Clause was designed to instill. If left unchecked, federal investigators and prosecutors will have strong incentives to prosecute political activity cases under section 951 instead of FARA, so they can reap the law-enforcement benefits of section 951's penalties without paying the price of higher burdens of proof.

To avoid that distortion, this court should consider the catch-all, sweeping application of section 951 when applied to political activities, in comparison with the statutory restraints of FARA as applied to the same, in assessing whether section 951 exposes Maria to the risk of arbitrary enforcement. Such an approach would provide an accurate answer to the doctrinal question at hand: whether section 951 is constitutionally deficient (and/or in need of a limiting construction) because it "confers on police a virtually unrestrained power to arrest and charge persons with a violation" thereby permitting "policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

For all of these reasons, the court should limit the application of section 951 or dismiss the allegation against Maria Butina as unconstitutionally applied to her and her circumstances.

Because the underlying substantive count is unconstitutional, conspiracy to violate that same statute suffers from the same fatal defects.

### B. The Indictment is Multiplicitous

Finally, the indictment is flawed as multiplicitous. A multiplicitious indictment violates the Fifth Amendment and also improperly prejudices a jury against the defendant, affording the government an unfair advantage by increasing the likelihood that a jury will convict on at least one count. When a defendant raises a timely multiplicity objection, the proper remedy is to require the government to elect between the multiple counts.

### 1. A Multiplicitous Indictment Violates the Double Jeopardy Clause

The Double Jeopardy Clause of the Fifth Amendment provides, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend V. This clause has been interpreted to prohibit both "successive prosecutions for the same offense" and the imposition of "multiple criminal punishments for the same offense." *Monge v. California*, 524 U.S. 721, 727-28 (1998). "It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause" of the Fifth Amendment. *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1980). Convictions for separate statutory charges based on the same conduct violate that clause's protection "against multiple punishments," and qualify as multiplicitous when those convictions are "for the same offense." *United States v. Mahdi*, 598 F.3d 883, 887 (D.C. Cir. 2010) (internal quotation marks omitted), *cert. denied*, 562 U.S. 971 (2010); *see United States v. Cooper*, No. 17-3015, 2018 WL 1542496, at *5 (D.C. Cir. March 30, 2018).

To determine whether two crimes under separate statutory provisions qualify as "the same offense" for double jeopardy purposes, courts have long applied the test set forth in *Blockburger*

*v. United States*, 284 U.S. 299 (1932) ("*Blockburger*"). This test asks "whether each provision requires proof of a fact which the other does not[.]" *Mahdi*, 598 F.3d at 888 (internal quotation marks and citation omitted). More precisely,

> [t]he same elements test, sometimes referred to as the "*Blockburger*" test, inquires whether each offense contains an element not contained in the other; if not, they are the "same offence" and double jeopardy bars additional punishment and successive prosecution.

*United States v. Dixon*, 509 U.S. 688, 696 (1993). A corollary to this is that "prosecution for a greater offense . . . bars prosecution for a lesser included offense." *Id.* at 705. For example, "[t]he prosecutor who has established auto theft necessarily has established joyriding as well." *Brown v. Ohio*, 432 U.S. 161, 167 (1977).

> As is invariably true of a greater and lesser included offense, the lesser offense . . . requires no proof beyond that which is required for conviction of the greater. . . . The greater offense is therefore, by definition, the "same" for purposes of double jeopardy as any lesser offense included in it.

*Brown*, 432 U.S. at 168.

The *Blockburger* test "calls for comparison of the statutorily-prescribed elements of the offenses, not the constituent facts either as alleged or proven." *United States v. Coachman*, 727 F.2d 1293, 1301 (D.C. Cir. 1984); *see, e.g.*, *Illinois v. Vitale*, 447 U.S. 410, 416 (1980) ("[T]he *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial."). The inquiry, at bottom, is whether proof of one of the two offenses "*necessarily* includes proof of" the other. *See Ball v. United States*, 470 U.S. 856, 862 (1985).

Applying *Blockburger*'s precise terms to the counts of this indictment, each offense must contain an element not contained in the other to be separate offenses. *Dixon*, 509 U.S. at 696 (citing *Blockburger*, 284 U.S. at 304). The offenses in this indictment do not. Here, the counts are the

same offense because proof of a criminal agreement for general conspiracy does not require proof of an element beyond those required to prove acting as a foreign agent. Where one "*agrees* to operate within the United States subject to the direction or control of a foreign government or official," 18 U.S.C. § 951(d) (emphasis added), he violates both the substantive offense of section 951 and general conspiracy offense of section 371. Indeed, there are *no* circumstances where one can be guilty of 'agreeing to operate' for a foreign government under section 951 without also being guilty of conspiring to do the same. In any prosecution in which the government proves the elements of section 951, the government will necessarily have proven the elements of conspiracy.

It is of no moment that there may be various means of violating the two statutes. The Supreme Court has made clear that the *Blockburger* test focuses only on the statutory elements, without regard to the facts or actual evidence that may be presented at trial. The inquiry "focuses exclusively on the statutory elements of the offenses." *United States v. Weathers*, 186 F.3d 948, 954 (D.C. Cir. 1999), *cert. denied*, 529 U.S. 1005 (2000). In this instance, the elements of proof for both counts show that they are not sufficiently distinct. Accordingly, Counts One and Two charge the same offense in violation of the Double Jeopardy Clause.

## 2.    A Multiplicitous Indictment Improperly Prejudices a Defendant

The chief vice of multiplicity is the threat of multiple punishments for a single crime. However, by exposing a defendant to multiple punishments for the same offense, a multiplicitous indictment not only violates the Double Jeopardy Clause, but also Rule 7 of the Federal Rules of Criminal Procedure. *United States v. Conley*, 291 F.3d 464, 470 (7th Cir. 2002); *United States v. Weathers*, 186 F.3d 948, 952 (D.C. Cir. 1999).

It is improper to try a defendant on multiple counts charging the same offense. Rule 7 permits the government to "allege[] in a single count that the . . . defendant committed [an offense]

by one or more specified means." Fed. R. Crim. P. 7(c)(1). But as the Advisory Committee Note

explains, this provision "is intended *to eliminate the use of multiple counts* for the purpose of

alleging the commission of the offense by different means or in different ways." 4 F.R.D. 405, 412

(1945) (emphasis added). *See also United States v. Allied Chemical Corp.*, 420 F. Supp. 122, 123-

24 (E.D. Va. 1976) ("An indictment is multiplicitous, and thereby defective, if a single offense is

alleged in a number of counts, unfairly increasing a defendant's exposure to criminal sanctions.");

*United States v. Harris*, 959 F.2d 246, 250 (D.C. Cir. 1992) (per curiam).

Presenting a jury with an indictment that charges the same offense in multiple counts "may

prejudice the jury against the defendant by creating the impression of more criminal activity on

his part than in fact may have been present." *United States v. Carter*, 576 F.2d 1061 (3d Cir. 1978)

(citing Wright & Miller, 1 Federal Practice and Procedure, Criminal § 142, at 311 (1969)); *see

also United States v. Clarridge*, 811 F. Supp. 697, 702 (D.D.C. 1992) (multiplicitous indictment

may falsely suggest defendant committed several offenses). Multiplicitous counts also afford the

government an unfair advantage by increasing the likelihood that the jury will convict on at least

one count, if only as the result of a compromise verdict. "Compromise verdicts or assumptions

that, with so many charges pending the defendant must be guilty on at least some of them, pose

significant threats to the proper functioning of the jury system." *Clarridge*, 811 F. Supp. at 702.

In the Supreme Court case *Ball v. United States*, Justice Stevens explained it best:

When multiple charges are brought, the defendant is 'put in jeopardy' as to each
charge. To retain his freedom, the defendant must obtain an acquittal on all charges;
to put the defendant in prison, the prosecution need only obtain a single guilty
verdict. The prosecution's ability to bring multiple charges increases the risk that
the defendant will be convicted on one or more of those charges. The very fact that
a defendant has been arrested, charged, and brought to trial on several charges may
suggest to the jury that he must be guilty of at least one of those crimes. Moreover,
where the prosecution's evidence is weak, its ability to bring multiple charges may
substantially enhance the possibility that, even though innocent, the defendant may
be found guilty on one or more charges as a result of a compromise verdict. The

> submission of two charges rather than one gives the prosecution 'the advantage of offering the jury a choice—a situation which is apt to induce a doubtful jury to find the defendant guilty of the less serious offense rather than to continue the debate as to his innocence.'

*Ball*, 470 U.S. at 867-68 (Stevens, J., concurring) (emphasis added) (internal citations omitted). Requiring the government to elect between multiplicitous counts before trial prevents this unfair prejudice and advantage.

If a defendant raises a timely multiplicity objection, the proper remedy is to require the government to elect between the multiplicitous counts. *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981); *United States v. Lopez*, 585 F. Supp. 1391, 1392 (D.P.R. 1984); *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218 (1952) (affirming the dismissal of surplus counts of charging single offense consisting of continuing course of conduct); *United States v. Ketchum*, 320 F.2d 3 (2d Cir. 1963) (election is appropriate remedy); *United States v. Wilder*, 2008 WL 2004256 (E.D. Wisc. 2008) (requiring government to elect between multiple charges for simultaneous possession of firearm and ammunition); *United States v. Morrow*, 102 F. Supp. 3d 232, 246 (D.D.C. 2015) (affirming that in the District of Columbia, "multiplicitous charges improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes."); *United States v. Brown*, 503 F. Supp. 2d 217 (D.D.C. 2007) (same); *United States v. Bowyer*, 985 F. Supp. 153, 155 (D.D.C. 1997) (same); *Clarridge*, 811 F. Supp. at 702 (D.D.C. 1992) ("[o]nce such a message is conveyed to the jury, the risk increases that the jury will be diverted from a careful analysis of the conduct at issue"). Neither merger of the offenses at sentencing nor limiting instructions can address the "significant threat" of prejudice to a defendant that a multiplicitous indictment poses. *See United States v. Phillips*, 962 F. Supp. 200, 202 (D.D.C. 1997) (same).

The test for determining whether two counts of an indictment are multiplicitous is the same test under *Blockburger*. That is, "whether each [count] requires proof of an additional fact which

the other does not." *Blockburger*, 284 U.S. at 304. As shown above, Counts One and Two are the same offense. As such, these multiple counts for the same offense will improperly influence jurors to "assum[e] that, with so many charges pending the defendant must be guilty on at least some of them." *Id.* Indeed, the accumulation of sections 371 and 951 in the indictment will create the false impression of more criminal activity than actually could have occurred.

Many federal courts including this district court have been wary of and have prevented the government from presenting multiple counts of the same offense to the jury. To preserve Maria's right to a fair trial, this court should exercise its discretion, compelling the government to elect among the multiplicitous counts before trial.

## IV. Conclusion

For the foregoing reasons, Defendant Maria Butina respectfully requests that the court grant her motion, dismissing the indictment (or one of the counts thereof), or compelling election between the multiplicitous counts, granting such other relief as the court deems just and proper.

Dated: November 15, 2018      Respectfully submitted,

/s/Robert N. Driscoll
Robert N. Driscoll (DC Bar No. 486451)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 403-3870
rdriscoll@mcglinchey.com

/s/Alfred D. Carry
Alfred D. Carry (DC Bar No. 1011877)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 330-5897
acarry@mcglinchey.com
*Counsel for Defendant*