UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,        .
                                 .
            Plaintiff,           .    CR No. 18-0218 (TSC)
                                 .
       v.                        .
                                 .
MARIIA BUTINA, a/k/a             .    Washington, D.C.
MARIA BUTINA,                    .    Thursday, December 13, 2018
                                 .    10:40 a.m.
            Defendant.           .
. . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF PLEA HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:          ERIK M. KENERSON, AUSA
                             THOMAS N. SAUNDERS, AUSA
                             U.S. Attorney's Office
                             National Security Section
                             555 Fourth Street, NW
                             Washington, DC 20530
                             (202) 252-7790

                             WILLIAM MACKIE, ESQ.
                             U.S. Department of Justice
                             National Security Division
                             950 Pennsylvania Avenue, NW
                             RFK Building, Suite 7700
                             Washington, DC 20530
                             (202) 233-2122

For the Defendant:           ROBERT N. DRISCOLL, ESQ.
                             ALFRED D. CARRY, ESQ.
                             McGlinchey Stafford, PLLC
                             1275 Pennsylvania Avenue, NW
                             Suite 420
                             Washington, DC 20004
                             (202) 802-9999

```
Advisory Counsel               A.J. KRAMER, ESQ.
For Defendant:                 Federal Public Defender
                               District of Columbia
                               625 Indiana Avenue, NW
                               Suite 550
                               Washington, DC 20004
                               (202) 208-7500


Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                               U.S. Courthouse, Room 4704-A
                               333 Constitution Avenue, NW
                               Washington, DC 20001
                               (202) 354-3186
```

**Proceedings reported by stenotype shorthand.**
**Transcript produced by computer-aided transcription**

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have criminal action 18-218, United States of America versus Mariia Butina.  We have Mr. Erik Kenerson, Mr. Thomas Saunders, and Mr. William Mackie representing the government.  We have Mr. Alfred Carry and Mr. Robert Driscoll representing Ms. Butina, who is present, and we also have Mr. A.J. Kramer representing the Federal Public Defender's Office.

THE COURT:  Good morning, everybody.  I understand that there's going to be a disposition in this case, but before we get to that -- well, a few preliminary matters.

Good morning, Ms. Butina.  I think at the original arraignment, there was an interpreter.  But is there any concern -- I know you've been studying at AU, Ms. Butina, so English, you'll have no problem understanding what's being said?  All right.  Good.  So we don't need an interpreter.

All right.  The first thing I'd like is for counsel to approach the bench.

(Bench conference.)

THE COURT:  All right.  So I know that you have no objection, Mr. Driscoll, to unsealing the last bench matter.  However, since you filed the motion for transportation orders, those were filed under seal, and at the last bench conference you mentioned the transportation motion.  I'm assuming that both the --

1          MR. DRISCOLL:  That's fine.  We're going to be

2     mentioning that at sentencing anyway.

3          THE COURT:  All right.  Great.  Just double checking.

4     Thank you.

5          MR. DRISCOLL:  Thank you so much.

6          THE COURT:  Thank you.

7       (End of bench conference.)

8          THE COURT:  Okay.  We've taken care of some

9     housekeeping matters.  All right.  I've consulted with defense

10    counsel and government counsel.  Neither side sees any reason

11    why I should not unseal the last hearing, so all portions of

12    the last hearing will be unsealed, in addition to the bench

13    conference we just had will be unsealed.

14       The Court, upon consent of both parties, unseals the sealed

15    portion of the transcript from December 6th, and the Court's

16    December 6th order to show cause is therefore deemed resolved.

17    Therefore, based on the representations and the agreement of

18    counsel, the Court will also unseal the prior sealed motions

19    and orders, ECF Nos. 33, 35, 43, 45, 46, and 49.  The Court

20    will also unseal the prior sealed motion, ECF No. 62, which is

21    a sealed motion for a telephone conference, and the motion is

22    hereby terminated.

23       All right.  So we've dealt with those housekeeping matters.

24       Now, Ms. Butina, on December 6, 2018, there was a telephone

25    conference held in this case.  I don't believe you were on that

telephone conference; but your attorneys waived your appearance for that, and part of that telephone conference was under seal. The Court has just unsealed it. And I'm sure I'm telling you matters that you've already been informed of, but I just want to make sure that, on the record, we're all clear.

At that telephone conference, a potential conflict-of-interest issue regarding your attorney was brought to this Court's attention. It was proffered to this Court that the government had in its possession recorded calls from the jail between you and a journalist. I don't know who that journalist is.

At the time of those phone calls, there was what we call a "gag order." That is an order, you may recall, that I issued that counsel not speak to the press about this case. So there was a gag order in effect. The government proffered to me at our telephone conference that, during those phone calls, you allegedly made reference to an individual who could be your lawyer, but the government does not know for sure that those references were with regard to your lawyer.

And in those calls -- I haven't heard them, and I'm not going to hear them because I'm resolving this issue -- you allegedly disclosed certain information that could be interpreted, in the light least favorable to you, as defense counsel's potentially acting as a go-between at a certain point, which was potentially a violation of my gag order. Okay?

1          So in an abundance of caution, the government raised this

2     issue as a potential conflict of interest.  The government

3     stated that someone viewing those conversations in the least

4     favorable light to you, if they really wanted to put a nefarious

5     spin on those conversations, someone could argue that it could

6     have been possible that your defense counsel was assisting you

7     in violating my gag order by using you to pass messages to

8     journalists.  I'm not making that finding.  All right?

9          But this created a cause for concern, and the government

10    believed that there might be a potential conflict because, if

11    there was an allegation that your defense counsel was assisting

12    you in violating my gag order and that your lawyer was aware

13    that the government had transcripts of those phone calls, then

14    that could give defense counsel an incentive to convince you to

15    plead guilty to avoid the potential violation of the gag order.

16         The government also proffered that it was in possession

17    of information from other inmates at the jail that you had told

18    other inmates to talk to your lawyer, or to talk to the media at

19    the advice of your lawyer, and this created the same potential

20    conflict.

21         Therefore, with the consent of both your lawyer and the

22    government, I decided to appoint advisory counsel for you just

23    to make sure that you were pleading guilty of your own volition

24    and there was no coercion on the part of anyone.

25         So, I went straight to the top and asked Mr. Kramer, who is

1    the Federal Public Defender for the District and is held in

2    the highest esteem by the judges in this court, to meet with

3    you, to act as advisory counsel, to make sure that there was no

4    potential conflict of interest, and also to make sure that your

5    decision in this case to change your plea from not guilty to

6    guilty was voluntary, made freely, and was conflict-free, based

7    on advice of your attorneys.

8        Now, I want to be very clear.  This Court has not made,

9    and is not going to make, any findings about any violations of

10   the Court's order either by you or attorneys.  I don't have any

11   information in front of me that those calls that you had were

12   improper or proper, or that your lawyer was attempting to evade

13   my gag order.  I have no information that that happened.

14       So I'm not making any finding that Mr. Driscoll acted

15   improperly.  I have no information to that.  I just needed

16   to make sure, before you engaged in a very important decision,

17   that you were doing that with conflict-free advice.

18       So, at this time, I don't have any applications or any

19   motions in front of me to make those types of findings regarding

20   the gag order, and I'm unaware of the government having any

21   plans to make such a motion.

22       Is that correct?  Does the government have any intention

23   of making such a motion?

24           MR. KENERSON:  Not at this time, Your Honor.  No.

25           THE COURT:  Okay.  Good.

1          So, to my satisfaction, the matter is at rest.  However,

2     as I said, I did speak to Mr. Kramer, just to be on the safe

3     side, and appointed him as advisory counsel, and the Court and

4     the parties are aware that Mr. Kramer has met with you.

5          So I'm going to ask Mr. Kramer first, and then you, just to

6     address the potential conflict so that I can make certain that

7     we are proceeding without any complications.  Before I ask

8     Mr. Kramer to address the Court, do you have any questions about

9     what I just told you, Ms. Butina?

10               THE DEFENDANT:  No.  Thank you.

11               THE COURT:  All right.  Mr. Driscoll, do you have

12     anything that you wish to add based on what I just said?

13               MR. DRISCOLL:  Nothing, Your Honor.

14               THE COURT:  All right.  Mr. Kramer.

15               MR. KRAMER:  Good morning, Your Honor.

16          Your Honor, I spoke to both parties, the government and

17     Mr. Driscoll, and the government provided me with some materials

18     that were extremely helpful.  I went over, in detail, with

19     Ms. Butina the materials, what both parties had said about this

20     situation, and what she understood about this situation.

21          I advised her about whether I thought it was a conflict or

22     not, which was in a sense not determinative, because what she

23     needed to understand was that there was a possibility of a

24     conflict.  She did understand that, and she and I talked about

25     it at length.

1    I told her she could ask me any questions as long as she

2  wanted, and she did ask several questions.  And she, in my mind,

3  completely understands what I think is quite distant but the

4  possibility of a conflict and wishes -- if there was a potential

5  conflict, she wants to waive it.  She's extremely satisfied with

6  the services of her lawyers and is prepared to enter the guilty

7  plea and waives any potential conflict.

8              THE COURT:  All right.  Thank you, Mr. Kramer.

9              MR. KRAMER:  Thank you.

10             THE COURT:  Ms. Butina, are you satisfied -- well,

11  first of all, are you satisfied with the services of your

12  lawyer, Mr. Driscoll?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Having spoken to Mr. Kramer, are you

15  satisfied regarding your discussion with him about going

16  forward today?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  And do you wish to continue

19  to go forward today?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  All right.  Does the government have any

22  objection or issues that they want to raise at this time?

23             MR. KENERSON:  No, Your Honor.  Thank you.

24             THE COURT:  Thank you very much.

25        Okay.  Having heard from the parties, having heard from

1    Mr. Kramer, I don't find that -- well, I haven't received any

2    information that would indicate to me that there is a conflict.

3    Moreover, having heard from Mr. Kramer, I'm satisfied that, to

4    the extent there was any potential conflict, that conflict has

5    been waived and is resolved.  So I am prepared to go forward at

6    this point.  Thank you.

7        One question.  I have some documents that have been signed

8    by you, Ms. Butina, including a Statement of Offense and a plea

9    letter dated December 6th.  Did you sign -- well, the plea

10   letter is actually signed on the 8th of December.  The Statement

11   of Offense is signed on the 8th of December.  Did you sign those

12   documents before or after you met with Mr. Kramer?

13        THE DEFENDANT:  I signed them after I met with

14   Mr. Kramer.

15        THE COURT:  All right.  Perfect.  Great.  So you had

16   already been advised.  Okay.

17        So, Ms. Butina, I assume you have never pleaded guilty in

18   a court of law before.

19        THE DEFENDANT:  No.

20        THE COURT:  So the procedure takes a little while

21   because there are certain findings I have to make.  The first

22   thing I have to make sure is that your plea of guilty -- that

23   you're competent to make your plea of guilty; that is, you're

24   of sound mind and of clear mind and you understand what you're

25   doing.  So I'll ask you several questions in that regard.

1    The second phase is to make sure that your plea is knowing,

2    and therefore I'll ask you several questions to make sure you

3    understand the consequences of your plea and the rights that

4    you're giving up.

5    The third phase is for me to determine that your plea is

6    voluntary; that is, it's of your own free will and you're not

7    being coerced or threatened or forced into entering this plea.

8    So I'm going to have a lot of questions for you, but the

9    first thing I need to do is to have you placed under oath.

10    Mr. Bradley?

11    (The defendant is sworn.)

12    All right.  Now, the first thing I want to tell you is

13    that, when I ask you questions, it is normal to sometimes nod

14    or say "mm-hmm" or answer a question that way.  Because I have a

15    court reporter here who is taking down everything that's said,

16    you have to give a verbal answer.  You have to say "yes" or "no"

17    because they can't take down a nod.  All right?

18    THE DEFENDANT:  I understand.  Thank you.

19    THE COURT:  Now, you're now under oath, and I'm

20    going to ask you a series of questions to make sure that you

21    understand your rights and that your plea is voluntary and

22    knowing.  But I need to caution you at the beginning that, if

23    you don't answer my questions truthfully, you could be prosecuted

24    for perjury, for making a false statement, and that any false

25    answers you give here could be used against you in a prosecution

1    for perjury.  Do you understand that?

2              THE DEFENDANT:  Yes.  I understand.

3              THE COURT:  Now, the purpose of this hearing is for

4    you to make a decision of whether you want to proceed to trial

5    in this case or enter a plea of guilty, and in order to make

6    such a very, very important decision, it's important that you

7    understand everything that's happening here today and everything

8    that I'm asking you.

9         If at any point you don't understand a question of mine,

10   you have several options.  You can ask me to explain it.  Tell

11   me you don't understand it, and I'll explain it.  You can ask me

12   to repeat it.  You can ask to speak with your lawyer, which

13   you're perfectly entitled to do.

14        You should not, at any point, try to guess at the answer of

15   a question if you don't understand it or simply answer it in a

16   way that you think I want you to answer it.  I don't want you to

17   guess, and I don't want you to answer a question unless you're

18   answering it truthfully and unless you understand it.  We're not

19   going to rush this.  We will take all the time that's needed.

20   And if you need to stop and talk to your lawyer in the back,

21   that is perfectly fine.  Do you understand?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  And that goes for every question, right

24   to the end.  Do you understand?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.  What is your full name?

2          THE DEFENDANT:  Mariia Butina.

3          THE COURT:  And is that Mariia spelled with two i's?

4          THE DEFENDANT:  There are two versions.  In Russian

5   passport, it's spelled with two i's.

6          THE COURT:  All right.  How old are you, Ms. Butina?

7          THE DEFENDANT:  Thirty years old.

8          THE COURT:  How far have you gone in school?

9          THE DEFENDANT:  Graduate level.

10          THE COURT:  Therefore, I assume you can read and write.

11          THE DEFENDANT:  Yes.

12          THE COURT:  And you can read and write English.

13          THE DEFENDANT:  Yes.

14          THE COURT:  Now, Section 12 of the plea agreement

15   states that you are not a citizen of the United States.

16   Therefore, it is important for you to understand that there are

17   certain things that could result from your pleading guilty here

18   today.  Do you understand that, as a result of your guilty plea

19   here today, you could be deported from the United States?

20          THE DEFENDANT:  Yes.  I understand.

21          THE COURT:  Do you understand that the deportation

22   would occur following the completion of any prison sentence

23   that I impose?

24          THE DEFENDANT:  Yes.  I understand.

25          THE COURT:  And do you understand that your conviction

1    may preclude you from acquiring citizenship if you seek to

2    become a citizen in the future?

3             THE DEFENDANT:  Yes.  I understand.

4             THE COURT:  And do you also understand that your

5    conviction could also affect any application you make in the

6    future for a United States visa?

7             THE DEFENDANT:  Yes.

8             THE COURT:  All right.  Have you carefully reviewed

9    Section 12 of the plea agreement with your lawyer?

10            THE DEFENDANT:  Yes.

11            THE COURT:  And do you understand it?

12            THE DEFENDANT:  Yes.

13            THE COURT:  Have you taken any alcohol or any drugs

14   in the last 48 hours or any medicine that could affect your

15   ability to understand what you're doing by pleading guilty?

16            THE DEFENDANT:  No.

17            THE COURT:  Is your mind clear?

18            THE DEFENDANT:  Absolutely clear.

19            THE COURT:  All right.  Have you received any

20   treatment recently for any type of mental illness or emotional

21   disturbance or addiction to narcotic drugs of any kind?

22            THE DEFENDANT:  No.

23            THE COURT:  Mr. Driscoll, on November 27, 2018, you

24   filed a corrected motion to transfer Ms. Butina into general

25   population housing, ECF No. 59.  In this motion, you stated that

1   since November 21, 2018, Ms. Butina had been in administrative

2   segregation housing at William Truesdale Adult Detention Center

3   in Alexandria, Virginia, and you described in your motion that

4   Ms. Butina was suffering certain deprivations.  She was deprived

5   of meaningful human contact or sensory stimulation.

6       Importantly, for the purposes of this hearing, you stated

7   that "prolonged deprivation of human contact and interaction is

8   starting to have a profound psychological impact on Ms. Butina.

9   Unless the Court intervenes, she will continue to be held in

10  this manner and ultimately will require the attention of mental

11  health professionals."  I denied that motion.

12      So what I'm getting at is, as of November 27, 2018,

13  you represented to the Court that you believed Ms. Butina's

14  confinement was not only having a psychological impact on her

15  but a profound one, and since the Court did not intervene, I

16  have to ask you about your belief that her psychological

17  condition would get so bad that it would require the attention

18  of mental health professionals.

19      Has your opinion changed?  And what assurances can you give

20  the Court that Ms. Butina is competent to change her plea given

21  her housing situation and the psychological implications that

22  you were concerned about?

23      MR. DRISCOLL:  Thank you, Your Honor.  We remain

24  concerned of the long-term effects of administrative segregation

25  or solitary confinement.  Since that motion was filed, Ms. Butina

1  has been allowed time out of the cell at night and occasional

2  time out for certain activities such as church and other things

3  and visits with a Russian orthodox minster, which has helped her

4  cope with the conditions of administrative segregation.

5      So I think, as of today, while we could have a longer

6  discussion about my concern about the overuse of administrative

7  segregation, I believe that she is doing well mentally and is

8  competent to make the decision she is making today.

9          THE COURT:  Ms. Butina, I'm asking about this because,

10  again, I have to make sure that your plea is voluntary, and I

11  want to make sure that you're pleading today because you're

12  guilty and not because you've been so affected by your

13  segregation that you're just doing this to hopefully get out

14  of that.  I want to make sure that your plea is not affected

15  by that.  Do you understand?

16          THE DEFENDANT:  I understand, Your Honor.

17          THE COURT:  And do you feel that, despite your

18  administrative segregation, you are able to clearly and openly

19  make this decision?

20          THE DEFENDANT:  Yes, I am.

21          THE COURT:  All right.

22      Does the government have a position on that?

23          MR. KENERSON:  Nothing additional, Your Honor.

24          THE COURT:  All right.  Ms. Butina, are you completely

25  satisfied with the services of your lawyers, Mr. Driscoll and

1   Mr. Carry, in this case?

2             THE DEFENDANT:  Yes, I am.

3             THE COURT:  And are you satisfied with the advice

4   and counsel you received from Mr. Kramer in this case?

5             THE DEFENDANT:  Yes, I am.

6             THE COURT:  Have you had enough time to talk with

7   Mr. Driscoll and Mr. Carry and Mr. Kramer to discuss the charges

8   against you and the government's plea offer and whether or not

9   you should accept it?

10            THE DEFENDANT:  Yes, I have.

11            THE COURT:  All right.  Have you received a copy of

12  the criminal indictment pending against you?  Those are the

13  written charges against you in this case.

14            THE DEFENDANT:  Yes, I did.

15            THE COURT:  Okay.  Have you read the charges and

16  fully discussed those charges and the case in general with

17  Mr. Driscoll and Mr. Carry?

18            THE DEFENDANT:  Yes, I did.

19            THE COURT:  I know I asked you these questions before,

20  but I'm going to ask them to you again.  Do you understand why

21  I appointed Mr. Kramer as advisory counsel?

22            THE DEFENDANT:  Yes.  I understand.

23            THE COURT:  Have you had enough time to discuss the

24  charges against you with Mr. Kramer?

25            THE DEFENDANT:  Yes, we did have.

```
 1                    THE COURT:  Have you had enough time to discuss the

 2      government's plea offer with Mr. Kramer?

 3                    THE DEFENDANT:  Yes.

 4                    THE COURT:  Have you had enough time to discuss

 5      whether or not you should accept the plea offer with Mr. Kramer?

 6                    THE DEFENDANT:  Yes.

 7                    THE COURT:  Again, I know I've asked this before,

 8      but have you had enough time to discuss with Mr. Kramer the

 9      potential conflict your attorneys may have?

10                    THE DEFENDANT:  Yes.

11                    THE COURT:  And was Mr. Kramer able to answer all

12      your questions?

13                    THE DEFENDANT:  Yes.

14                    THE COURT:  And do you have any additional questions

15      about the potential conflict at this time?

16                    THE DEFENDANT:  No, I do not.

17                    THE COURT:  And do you waive any possible conflict?

18                    THE DEFENDANT:  Yes.

19                    THE COURT:  Are you fully satisfied with the services

20      of Mr. Kramer?

21                    THE DEFENDANT:  Yes.

22                    THE COURT:  Okay.  Mr. Kramer, as you previously --

23      I don't need you to repeat your previous assurances that you're

24      satisfied that Ms. Butina understands any potential conflict and

25      waives them.
```

1          MR. KRAMER:  Yes, Your Honor.

2          THE COURT:  In which case, Mr. Kramer, I will

3     discharge your appointment.  Thank you very much.  You can stay

4     if you want, but thank you very, very much for your assistance,

5     on such short notice, to the Court and to Ms. Butina.

6          MR. KRAMER:  No problem.

7          THE COURT:  All right.  Mr. Kenerson and Mr. Driscoll,

8     do either of you -- is it Mr. Kenerson who's going to be -- do

9     either of you have any questions as to the defendant's

10    competence to plead at this time?

11         MR. DRISCOLL:  No, Your Honor.

12         MR. KENERSON:  No, Your Honor.

13         THE COURT:  Mr. Kramer?

14         MR. KRAMER:  No, Your Honor.

15         THE COURT:  Based on the answers that have been

16    provided here in open court, as well as the representations of

17    counsel and this Court's own observation of Ms. Butina, I find

18    that Ms. Butina is fully competent and capable of entering an

19    informed plea.  So that's the first part regarding competency.

20         Now I'm going to go on to whether your plea is knowing.

21    I want to explain to you certain rights that you have in this

22    case and find out whether you understand those rights.  Again,

23    please listen carefully to my questions and let me know if

24    there's anything you don't understand.

25         You have been indicted by a grand jury of one count of

1    Conspiracy to Act As an Agent of a Foreign Government, in

2    violation of Title 18 United States Code §§ 371 and 951, and one

3    count of being an Agent of a Foreign Government, in violation of

4    Title 18 United States Code § 951.  I think I already said 951.

5        You have a right to plead not guilty and to have a jury

6    trial in this case, and that means that 12 citizens of the

7    District of Columbia would sit over there in the jury box and

8    determine your guilt or innocence based upon evidence presented

9    in this courtroom.  Do you understand your right to a jury

10   trial?

11           THE DEFENDANT:  Yes, I do.

12           THE COURT:  Okay.  If you had a trial, you would have

13   a right to be represented by your lawyer at that trial and at

14   every other stage of the proceeding and, if necessary, have the

15   court appoint counsel for you.  Do you understand that?

16           THE DEFENDANT:  Yes.

17           THE COURT:  If you had a trial, you would have the

18   right, through your lawyer, to confront and cross-examine any

19   witness against you.  Do you understand?

20           THE DEFENDANT:  Yes.

21           THE COURT:  And if you had a trial, you would have

22   the right, if you wanted to, to present your own witnesses and

23   the right to subpoena them to require them to testify in your

24   defense.  You would also have the right to testify and present

25   evidence on your behalf if you wanted to.

1    Do you understand that?

2         THE DEFENDANT:  Yes, Your Honor.

3         THE COURT:  Do you also understand that you would not

4    have to testify or to present any evidence at the trial if you

5    didn't want to because, first of all, it's the government's

6    burden to prove you guilty, not your burden to prove yourself

7    innocent, and because you cannot be forced to incriminate

8    yourself or to present evidence of your own guilt and that your

9    choice not to testify or to present evidence could not be used

10   against you.  Do you understand that?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  And do you understand that, unless and

13   until I accept your guilty plea, you are presumed by the law to

14   be innocent because, as I said before, it is the government's

15   burden to prove your guilt beyond a reasonable doubt, and until

16   it does, you cannot be convicted at trial.  Do you understand?

17        THE DEFENDANT:  Yes, Your Honor.

18        THE COURT:  Do you also understand that, if you went

19   to trial and were convicted, you would have a right to appeal

20   your conviction to the court of appeals and to have a lawyer

21   help you prepare your appeal?

22        THE DEFENDANT:  Yes.  I understand.

23        THE COURT:  And do you understand that, by pleading

24   guilty, you're giving up all your rights to appeal your

25   conviction of guilt in this case except for four exceptions

1   that I'm going to go over with you.  Beyond those four

2   exceptions, you're giving up your rights to appeal your

3   conviction.  Do you understand?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Do you also understand that, under your

6   plea agreement, you're giving up the right to appeal the

7   sentence that I set?

8           THE DEFENDANT:  Yes.  I understand.

9           THE COURT:  Subject to some exceptions that, again,

10  I'll tell you about.  And by "sentence" I mean any term of

11  imprisonment, fine, forfeiture, award of restitution, term of

12  supervised release, or my authority to set conditions of

13  release.  All those things are included in the term "sentence."

14  Do you understand?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Now the exceptions.  You will still have

17  the right to appeal the sentence that I give you if, one, I give

18  you what's called an illegal sentence; I give you a sentence

19  above the statutory maximum.

20      Say the penalty for the count for which you plead is

21  10 years, and I give you 15 years.  You could appeal that as

22  an illegal sentence.  Or if I give you a sentence above the

23  guideline range, you could appeal that.  That's one.

24      Two.  You still have the right to appeal the sentence I

25  give you if you claim that you received ineffective assistance

1   from your lawyer.  Do you understand that?

2                THE DEFENDANT:  Yes.

3                THE COURT:  And apart from those two -- well, those

4   two and two more, you're giving up your rights to challenge

5   other issues with your sentencing.  Do you understand that?

6                THE DEFENDANT:  Yes.

7                THE COURT:  Okay.  Now, under the plea agreement, you

8   are also giving up the right to challenge your sentence in what

9   is sometimes called a "collateral attack."  That is a challenge

10  that you file at the end of your criminal case by a petition for

11  habeas corpus under 28 U.S.C. § 2255, or a motion under civil

12  rule 60(b).  So you're giving up that right.

13               THE DEFENDANT:  Yes.

14               THE COURT:  And your lawyer's talked to you about

15  that right?

16               THE DEFENDANT:  Yes.

17               THE COURT:  Because it's a little complicated.

18  However, you would still have the right to challenge your

19  sentence -- this is exception number three -- if there is newly

20  discovered evidence.  Okay?

21       So if, after you enter your plea and you're sentenced,

22  there is newly discovered evidence in your case and your lawyer

23  thinks it's advisable to file a motion challenging the sentence

24  because of that newly discovered evidence, you still have that

25  right.  Do you understand?

1          THE DEFENDANT:  Yes.  Thank you.

2          THE COURT:  Okay.  And then also, four.  Under the

3    plea agreement, you still have the right to file a motion under

4    18 U.S.C. § 3582(c)(2), which states simply that if the sentence

5    that I impose is based on the United States Sentencing Guidelines

6    and they are later changed to reflect and recommend a lower

7    sentencing range for your offense, then you can, through your

8    lawyer, ask me to lower your sentence in accordance with that

9    change to the guidelines.  Do you understand?

10          THE DEFENDANT:  Yes.  I understand.

11          THE COURT:  Okay.  You still have that right.

12    I still have to consider that motion as I do any motion

13    regarding a sentence, and if I deny that motion, you don't

14    have the right to appeal it.  Do you understand?

15          THE DEFENDANT:  Yes.

16          THE COURT:  So there are four exceptions to the rights

17    you're waiving: (1) if I give you an illegal sentence above the

18    statutory maximum, (2) if you claim you received ineffective

19    assistance from your lawyer, (3) if there's newly discovered

20    evidence, (4) if the sentencing guidelines are changed to

21    reflect a lower range.  You understand those four exceptions?

22          THE DEFENDANT:  Yes.  I understand.

23          THE COURT:  And apart from those exceptions, if

24    I accept your guilty plea, you're giving up all your rights

25    that I just explained to you, and there will be no trial.

1    Do you understand that?

2            THE DEFENDANT:  Yes.  I understand, Your Honor.

3            THE COURT:  Now, as I mentioned to you earlier, do

4    you understand that conviction in this case may result in your

5    deportation, exclusion from the United States, or denial of

6    citizenship under our immigration laws?

7            THE DEFENDANT:  Yes.  I understand.

8            THE COURT:  Do you also understand that, by pleading

9    guilty to a felony offense, you may later be deprived of

10   valuable civil rights?  Well, normally I would say "such as the

11   right to vote."  But you're not a U.S. citizen, so that's not

12   one of them.  But the right to hold public office, the right to

13   serve on a jury -- also contingent on citizenship -- and the

14   right to possess a firearm.  Do you understand that?

15           THE DEFENDANT:  Yes.

16           THE COURT:  All right.  Having discussed all these

17   rights with you and the rights that you would be giving up if

18   you pleaded guilty, do you still want to plead guilty in this

19   case and to give up your rights to a trial and all the rights

20   I explained you would have if your case went to trial?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  All right.  Now, your lawyer and the

23   prosecutors have given me a document called Statement of Offense

24   that describes what the government would be prepared to prove at

25   trial about your criminal conduct.  This is an important document,

1    and I'll tell you why.

2        I don't know a lot of detail about your case other than

3    what's reported in the media, and you wouldn't want me to go on

4    that, would you?  But this Statement of Offense is going to tell

5    me what the government maintains that you did, the crime that

6    you committed.  So it will be important for me when I come back

7    for sentencing or when I'm getting ready for sentencing to read

8    this and understand what the government is claiming your conduct

9    is.  So it's important that you have -- and you have signed

10   this, right?  That's your signature on December 8?

11               THE DEFENDANT:  That is correct.

12               THE COURT:  And by signing it, you are agreeing that

13   this is correct and true, and this is what you did.  So I have

14   to make sure that -- because if we come back for sentencing, you

15   can't say, well, I just signed it, but I didn't really do

16   paragraph 3 or paragraph 4.  Because you signed it.  So I have

17   to make sure that you understand it.  Have you read the

18   Statement of Offense and discussed it fully with your lawyer?

19               THE DEFENDANT:  Yes.

20               THE COURT:  Okay.  Is that your signature on the

21   last page acknowledging that you've read the description of

22   the criminal conduct and fully understand it?

23               THE DEFENDANT:  Yes, Your Honor.

24               THE COURT:  Does this Statement of Offense truly and

25   accurately describe what you did in this case?

1        THE DEFENDANT:  Yes.

2        THE COURT:  Ms. Butina, beginning no later than in or

3   around 2015 and possibly earlier, continuing until in or around

4   2018, in the District of Columbia and elsewhere, did you, with

5   others, knowingly combine, conspire, confederate, and agree

6   together and with each other to commit an offense against the

7   United States?

8        THE DEFENDANT:  Yes.

9        THE COURT:  Would the government now please state

10  and describe the evidence of the charges against Ms. Butina.

11  Mr. Kenerson, you don't need to read from the Statement of

12  Offense, but if you could simply summarize the evidence that

13  would prove the elements of the charge.

14       MR. KENERSON:  Certainly, Your Honor.

15       THE COURT:  And if you want to incorporate the

16  Statement of Offense --

17       MR. KENERSON:  I think it would be our preference

18  to read the Statement of Offense, if that's all right with

19  the Court.

20       THE COURT:  That's fine.  Just go slow, because

21  we tend to speed up when we read, and I have to be mindful

22  of Mr. Wayne.

23       MR. KENERSON:  Understood.  So the government's

24  evidence includes but is not limited to the following:

25     Mariia V. Butina, also known as Maria Butina, is a citizen

of the Russian Federation.  U.S. Person 1 is a United States citizen.

Beginning no later than March of 2015, Butina and U.S. Person 1 agreed and conspired, with a Russian government official ("Russian Official") and at least one other person, for Butina to act in the United States under the direction of Russian Official without prior notification to the Attorney General.

Russian Official has served as the Deputy Governor to the Russian Central Bank since at least 2015.  He previously served as the First Deputy Chairman of the Federation Council of the Russian Federation.  Butina knows Russian Official.

With U.S. Person 1's assistance, and subject to Russian Official's direction, Butina sought to establish unofficial lines of communication with Americans having power and influence over U.S. politics.  Butina sought to use those unofficial lines of communication for the benefit of the Russian Federation acting through Russian Official.

In furtherance of the conspiracy, Butina drafted a proposal in March of 2015 titled *Description of the Diplomacy Project*. In it, Butina downplayed the possibility of influencing U.S. foreign policy towards Russia through official channels, criticizing government unwillingness to compromise.

As an alternative, Butina suggested that Russia could use unofficial channels of communication to the same end.  Butina then cast herself as a possible "unofficial transmitter" of

communications between Russia and the United States.  Further,
Butina opined that the circumstances were favorable for building
relations with a certain U.S. political party (hereafter,
"Political Party #1").

Butina predicted that the candidate nominated by Political
Party #1 would likely win the upcoming U.S. presidential
election.  Pointing to her recent travel to the United States,
her experience, and her attendance at conferences organized by
a certain U.S. civil society gun rights organization (hereafter,
"Gun Rights Organization") which Butina posited had influence
over Political Party #1, Butina stated that she had laid the
groundwork for an unofficial channel of communication with the
next U.S. administration.

For example, Butina listed actions she had already taken
including being introduced to leaders of Political Party #1 as
an unofficial representative of Russian Official.  She also
identified in her proposal a series of upcoming conferences
associated with Political Party #1 that she could attend
to further the goal.

The description of the diplomacy project was drafted by
Butina with U.S. Person 1's assistance.  U.S. Person 1 assisted
with the proposal by providing Butina with information about
prominent U.S. political figures and a forecast of the upcoming
presidential election.  U.S. Person 1 also assisted by providing
information about Vladimir Pozner, a Russian media commenter

who, as described in the proposal, had served as the "unofficial transmitter" of the politics of Mikhail Gorbachev and Boris Yeltsin in the United States.  Butina sent a Google-translated version of the proposal to U.S. Person 1, once drafted, and asked for U.S. Person 1's advice on it, which he agreed to provide.  Butina sent the proposal to Russian Official and others.

As part of the proposal, she requested $125,000 from a Russian billionaire to attend conferences identified in the proposal and "separate meetings with interested parties" -- including other Russian businessmen or persons at the Russian Ministry of Foreign Affairs (the "MFA") -- to help "determine where the focus of Russian interest lies [sic] in cooperating with the U.S."  Butina informed U.S. Person 1 that she was meeting with Russian Official and others about the proposal. Russian Official informed Butina that her proposal would be supported, at least in part.

Without prior notification to the Attorney General, Butina then took steps to achieve the object of her agreement with U.S. Person 1.  For example, in April of 2015, Butina traveled to the United States to attend a Gun Rights Organization convention. There, Butina highlighted her experience as a gun rights advocate in Russia to gain the attention of the Gun Rights Organization and its members.  She was introduced to influential members of Political Party #1, one of whom announced his

campaign to run for the presidency of the United States shortly thereafter.

Butina also invited powerful members of the Gun Rights Organization to Moscow to advance her agenda.  Before they arrived, U.S. Person 1 provided Butina with background information on the invitees, including his assessment of their degree of political influence in the United States.

The members came to Moscow in December of 2015.  During the trip, the Gun Rights Organization members met with high-level Russian government officials as arranged by Russian Official. Prior to the visit, Butina stressed the importance of a political program as part of the trip and asked Russian Official to set up the meetings with high-level Russian politicians.

After their visit, Butina sent Russian Official a message in Russian, referring to members of the Gun Rights Organization, which has been variously translated as saying, "We should let them express their gratitude now, we will put pressure on them quietly later," and "We should allow them to express their gratitude now, and then quietly press."

Butina also assisted a wealthy and well-connected U.S. person in hosting multiple, large "friendship dinners" where other wealthy and influential Americans discussed U.S.-Russian relations.  Butina used these "friendship dinners" to cultivate lines of communications with individuals she believed would have the ear of the next U.S. presidential administration.  At these

dinners, Butina was able to meet individuals with political capital, learn their thoughts and inclinations towards Russia, gauge their responses to her, and adjust her pitch accordingly.

In March of 2016, prior to the first of these dinners, Butina told Russian Official about potential American attendees to one of these dinners based on information Butina obtained from U.S. Person 1.  Following that message, she e-mailed the wealthy, connected U.S. person, copying U.S. Person 1, to say "[Russian Official] is very impressed by you and expresses his great appreciation for what you are doing to restore the relations between the two countries.  He also wants you to know that Russians will support the efforts from our side."

In June of 2016, Butina received an F-1 student visa to enter the United States.  There's a footnote that says, "All available evidence indicates that Butina had interest in a graduate school education."  In connection with her application, Butina did not disclose that she would be acting as an agent of a foreign government official or otherwise would be working to establish channels of communication between Russian and American government officials.

Also in furtherance of the conspiracy, Butina helped Russian Official organize a Russian delegation to the 2017 National Prayer Breakfast in Washington, D.C.  Russian Official directed Butina to include certain people within the delegation, and Butina complied with his instructions.  Butina then e-mailed

that list of delegation invitees to U.S. Person 1.  Butina explained that the people on the list had been "hand-picked by [Russian Official] and me," and that they were "coming to establish a back channel of communication."

Later, U.S. Person 1 e-mailed another person, copying Butina, to say "Reaction to the delegation's presence in America will be relayed DIRECTLY" to the Russian president and foreign minister.  The quote ends after "DIRECTLY."

Throughout the conspiracy, Butina wrote notes to Russian Official about her efforts and her assessment of the political landscape in the United States in advance of the 2016 election. Butina wrote some of those notes in response to specific requests from Russian Official.  Others she wrote on her own.

Butina also sought Russian Official's advice on whether to make meetings with certain people.  She asked him for direction on whether the Russian "government" was ready to meet with some of those people, and he asked her what she planned to do with her "contacts," lest she and Russian official be forgotten after the election.

Butina was aware that Russian Official sometimes acted in consultation with the MFA, in addition to his superiors at the Russian Central Bank.  For example, in May of 2016, Russian Official tasked Butina with writing him a note to explain why he should be permitted to travel to the United States to attend the annual Gun Rights Organization meeting.  She did as he directed,

encouraging his attendance partly because of the opportunity to meet political candidates.  Butina knew that Russian Official would share this note with his superiors at the Russian Central Bank and MFA to support a request that Russian Official be sent to the annual Gun Rights Organization meeting.

In November of 2016, in response to a note from Butina about how to create a dialogue with the then President-elect's advisors, Russian Official told her that he did not believe the MFA would "go for it."

Butina failed to notify the U.S. Attorney General that she would be acting in the United States as an agent of a foreign government official, as required by 18 United States Code § 951. At no time relevant to this proffer was Butina a duly accredited diplomatic or consular officer; an officially and publicly acknowledged and sponsored official or representative of the Russian Federation; or an officially and publicly acknowledged and sponsored staff member, employee, or representative thereof.

Finally, if this case had proceeded to trial, the government would have shown that Butina took one or more actions in furtherance of the conspiracy in the District of Columbia.

THE COURT:  Thank you, Mr. Kenerson.

MR. KENERSON:  Thank you, Your Honor.

THE COURT:  Ms. Butina, you heard the government read the Statement of Offense.  Do you understand the charges against you?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And is what the government just read into

3     the record correct?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Now, the parties have submitted a written

6     letter outlining the plea agreement, and before we discuss the

7     terms of the agreement, let me ask you, Mr. Driscoll, does this

8     plea agreement reflect the only plea offer made to Ms. Butina in

9     this case?  And the reason I ask is because there's binding

10    precedent that says that I have to inquire as to whether every

11    single plea offer has been conveyed to Ms. Butina and whether

12    she has rejected or -- the decision to reject those previous

13    offers was hers.

14         MR. DRISCOLL:  Thank you, Your Honor.  As to what

15    she would plead to in the applicable guidelines and sentencing

16    factors, this is the only offer that was made in principle.

17    While we subsequently negotiated over the exact terms and

18    particular language, with Ms. Butina's involvement at every

19    turn, this, broadly speaking, is the only plea offer that was

20    received.

21         THE COURT:  All right.  Ms. Butina, do you understand

22    that the plea in this case resulted from negotiations between

23    your lawyer and the government?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Did your lawyer keep you apprised at all

1    stages of the negotiation?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  And was the decision whether to accept

4    this plea made by you?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  Now, do you have a copy of the plea

7    agreement?

8            THE DEFENDANT:  Yes.

9            THE COURT:  And it's long, single-spaced, and contains

10   a lot of complicated legal terms.  Have you read it carefully?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Do you understand it?

13           THE DEFENDANT:  Yes.

14           THE COURT:  Have you gone over it with your lawyers?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And have you had enough time to discuss it

17   with your lawyers?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Okay.  Mr. Driscoll, if you could please

20   summarize the salient terms of the plea agreement.  You don't

21   need to read it.

22           MR. DRISCOLL:  I will not, Your Honor.

23           THE COURT:  It's in the record, so if you could just

24   summarize the terms.

25           MR. DRISCOLL:  Yes, Your Honor.

1        Pursuant to the plea agreement, Ms. Butina agrees to plead

2    guilty to Count 1 of the indictment charging her with Conspiracy

3    to Act As a Foreign Agent Without Prior Registration, in

4    violation of 18 U.S.C. § 371.  She understands the violation

5    carries a maximum sentence of five years, a fine of up to

6    $250,000, a term of supervised release of up to three years,

7    as well as the likely penalty of deportation, among other

8    immigration consequences.

9        She agrees to the facts stated in the government's factual

10   proffer.  She agrees to waive certain trial and appellate rights

11   that you've gone over with her.  She agrees to cooperate with

12   the government.

13       In exchange, the government agrees not to further prosecute

14   Ms. Butina for the facts described in the proffer, to dismiss

15   the remaining count in the indictment at sentencing, as well as

16   to bring to the Court's attention the extent of her assistance

17   no matter how consequential it is.

18       Although the parties agree that the guidelines do not

19   specify a guideline range, the government offers no sufficiently

20   analogous guideline.  The defense submits that the guideline

21   that's most analogous for sentencing purposes is 2B1.1, and if

22   the Court proceeded on that range, there would be a base offense

23   level of 6, minus a two-level reduction for acceptance, which

24   would yield a final offense level of 4.

25       The parties estimate that Ms. Butina has no criminal

1    history, and if the Court finds that that guideline range

2    applies, the parties agree for allocution purposes that a

3    sentence within the estimated guideline range of zero to six

4    months' imprisonment would constitute a reasonable sentence

5    in light of all the general sentencing factors set forth in

6    18 U.S.C. § 3553 and if reviewed on appeal.

7         Ultimately, Ms. Butina understands that the sentence in

8    this case is a matter to be determined solely by the Court.

9    The remaining specifics are in the plea agreement.

10        THE COURT:  Thank you, Mr. Driscoll.  And the defense

11   does not contest Ms. Butina remaining in her current detention

12   status until sentencing.  Is that correct?

13        MR. DRISCOLL:  That was part of the agreement,

14   Your Honor.

15        THE COURT:  All right.  Ms. Butina, you heard

16   Mr. Driscoll summarize the terms of your plea agreement.

17   Is that what you agreed to?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Do you have any confusion or questions

20   about this agreement that you would like to ask me or your

21   lawyers about?

22        THE DEFENDANT:  No.

23        THE COURT:  Okay.  All right.  I accept that this plea

24   agreement is of the type authorized by Federal Rule of Criminal

25   Procedure 11(c)(1)(A) in that it specifies that Ms. Butina will

not be further prosecuted criminally by the United States

Attorney's office for the District of Columbia -- and I always

say this, but that obviously includes the Department of Justice,

does it not?  Okay. -- for the District of Columbia for the

conduct set forth in the Statement of Offense, and that

Ms. Butina will not be charged with any nonviolent criminal

offense in violation of federal or District of Columbia law

which she committed within the District of Columbia prior to

execution of the plea agreement and about which the United

States Attorney's Office for the District of Columbia was made

aware prior to execution of the plea agreement.

    Now, Ms. Butina, have you and your lawyers talked about

sentencing and how the statute and the sentencing guidelines

may apply to your case?

            THE DEFENDANT:  Yes.

            THE COURT:  Do you understand that if I accept your

guilty plea in this case, you could receive a maximum sentence

of five years of imprisonment?

            THE DEFENDANT:  Yes.

            THE COURT:  Now, again, as I told you earlier, it's

important that you understand that I can never sentence you to

more than five years of imprisonment.  Do you understand that?

            THE DEFENDANT:  Yes.

            THE COURT:  Now, this is kind of tricky.  I'm not

sure how this is going to work.  You could also be subject to

1    a period of supervised release following any term of

2    imprisonment that is imposed for this offense.  That means that,

3    if you are sent to prison, then upon your release you could be

4    under the supervision of the Probation Office and expected to

5    follow conditions and rules with which you must comply.  If you

6    violate any of those conditions, you could be sent back to prison

7    for an additional period of time.  Do you understand that?

8              THE DEFENDANT:  I understand that.

9              THE COURT:  Now, the decision as to whether and when

10   to deport you is not a decision that this Court is going to

11   make.  That decision is made by other agencies of the

12   United States government.  I don't have any -- I don't have

13   anything to do with that.

14       So I don't know if you would even be here for a period

15   of supervised release or not.  That is, again, not up to me.

16   But if you were to remain in this country for a period, then

17   you could be subject to a period of supervised release.

18   Do you understand?

19             THE DEFENDANT:  I understand.

20             THE COURT:  Okay.  By statute, the maximum term of

21   supervised release that I could impose is three years, and under

22   the sentencing guidelines, the supervised release range is one

23   to three years.  Do you understand that the maximum fine, by

24   statute, if I decided to impose a fine in this case, that you

25   could receive would be $250,000 or twice the pecuniary gain or

1    loss of the offense?  Do you understand?

2                THE DEFENDANT:  Yes.

3                THE COURT:  And do you understand that you will have

4    to pay a special assessment of $100 to the Clerk of the United

5    States District Court per felony conviction?  Do you understand?

6                THE DEFENDANT:  Yes.

7                THE COURT:  Now, I don't believe there's a forfeiture

8    count.  There's a mention of forfeiture.

9         Is the government seeking forfeiture in this case?

10               MR. KENERSON:  No, Your Honor.

11               THE COURT:  All right.  And, again, the government

12   isn't asking for any restitution, are they?

13               MR. KENERSON:  No, Your Honor.

14               THE COURT:  Now let me talk to you a little bit about

15   the sentencing guidelines, because you've heard them mentioned,

16   and I'm sure you've discussed them with your lawyer.

17        In determining your sentence, I am required, as I must in

18   every case, to calculate and consider the applicable sentencing

19   range recommended in the guidelines manual for your offense for

20   a person with your criminal history.  It used to be that I had

21   to impose the sentence set forth in the guidelines.  That is no

22   longer mandatory, but I still have to consider them in every

23   case.  Do you understand?

24               THE DEFENDANT:  Yes.

25               THE COURT:  And the plea agreement -- Mr. Kenerson and

1   Mr. Driscoll, the plea agreement references the 2016 guidelines

2   manual, but is there a reason we're not using the 2018 manual?

3   I have it.  I don't think there's any -- I don't think there's

4   any change that would be reflected if you used the 2018

5   guidelines, but I'm just wondering why I keep getting cases

6   using old guidelines.

7             MR. KENERSON:  I think the 2018 guidelines would be

8   fine from the government's perspective.  I haven't received a

9   copy yet.

10             THE COURT:  Oh.  Well, I don't think it changes,

11   but if you think there's a change, you can discuss it and

12   file something.  All right?

13             MR. KENERSON:  All right.

14             MR. DRISCOLL:  Thank you, Your Honor.

15             THE COURT:  But I will proceed under the 2016.

16        Now, here's the thing to understand.  And I understand that

17   there is really -- as your lawyer said and Mr. Kenerson said,

18   this is an unusual situation.  There isn't really a specific

19   guideline range, but they're making an estimate.

20        The thing that you need to understand is that I will not be

21   able to determine the guideline range for your case until after

22   I review your presentence report and after your lawyer and the

23   government have had a chance to look at that report and make any

24   corrections that they see to be necessary.  Then I'll look at

25   the report, and I'll decide on the guidelines range.

1    Do you understand that?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  So that the final decision on the

4    guidelines range is going to be mine.  Do you understand that?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  And even though your lawyer and the

7    government have said what they think it will be, it may end

8    up that I decide that the range is different from what they

9    tell you they think it might be.  Do you understand that?

10              THE DEFENDANT:  Yes, Your Honor.

11              THE COURT:  And if that happens, you won't have a

12    right to withdraw your plea.  Do you understand?

13              THE DEFENDANT:  Yes.  I understand.

14              THE COURT:  And in a similar vein, the prosecutors

15    and your attorney have stated in the plea agreement what they

16    estimate your guidelines sentence to be.  Have you discussed

17    this with your lawyer?

18              THE DEFENDANT:  Yes.

19              THE COURT:  And do you understand that the sentence

20    that I impose may be different from any estimate that your

21    lawyer or the prosecutors think it may be?

22              THE DEFENDANT:  Yes, Your Honor.

23              THE COURT:  And do you also understand that, after

24    I've decided what guideline applies to your case and what the

25    advisory guidelines range is, I will have the authority in some

1    limited circumstances to impose a sentence that is more severe

2    or less severe than the sentence recommended by the guidelines?

3    Do you understand that?

4              THE DEFENDANT:  I understand, Your Honor.

5              THE COURT:  And, again, you cannot withdraw your plea

6    simply because you don't like or agree with the sentence that I

7    ultimately impose in your case.  Do you understand?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  As I said before, a violation of 18 U.S.C.

10   § 371 follows the underlying substantive offense, which in this

11   case is 18 U.S.C. § 951.  Both the government and your lawyers

12   agree that the United States Sentencing Guidelines do not

13   specify a guidelines range for violation of 18 U.S.C. 951.

14       As stated in the plea agreement, where the guidelines do

15   not expressly specify a guidelines range, the Court should apply

16   the most analogous guideline.  If there's not a sufficient

17   analogous guideline, the provisions of 18 U.S.C. § 3553 shall

18   control, except that any guidelines and policy statements that

19   can be applied meaningfully, in the absence of a Chapter 2

20   offense guideline, should remain applicable.

21       Do you understand that?

22             THE DEFENDANT:  Yes.  I understand that.

23             THE COURT:  Put simply, it means that there is no

24   specific guideline range, but I should apply the same factors

25   I use in every case to consider what is a reasonable sentence.

1    Do you understand that?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Your attorney's position is that the

4    guideline that best captures your offense behavior and is

5    most analogous and appropriate for sentencing here is U.S.

6    Sentencing Guideline §2B1.1.  Do you understand that?

7            THE DEFENDANT:  Yes.  I understand that.

8            THE COURT:  Have you discussed it with Mr. Driscoll?

9            THE DEFENDANT:  Yes.

10           THE COURT:  And the government's position is that

11   there's no sufficiently analogous guideline for the underlying

12   substantive offense and that the provisions of 18 U.S.C. § 3553

13   should control sentencing.  Do you understand that?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Now, there is mention about the government

16   filing a motion for a downward departure.  Now, I want you to

17   understand -- I'm sure your lawyer has told you this.  If the

18   government has agreed to consider filing a motion for a downward

19   departure from your guidelines range as a result of your

20   cooperation, it is the government's decision, and only the

21   government's decision, whether or not to file that downward

22   departure motion; and neither I, nor your lawyer, can force him

23   to do so.  Do you understand?

24           THE DEFENDANT:  I understand, Your Honor.

25           THE COURT:  So while it's true that you may have

1    entered this plea with the hope that the government will file a

2    motion for downward departure as a result of your cooperation,

3    it is ultimately up to the government to decide whether such a

4    motion is warranted.  Do you understand?

5             THE DEFENDANT:  Yes, Your Honor.

6             THE COURT:  They have ultimate discretion in this

7    particular aspect.  And the government can refuse to file a

8    downward departure motion, even if you have given assistance,

9    but in their opinion it is not sufficient assistance.

10   Do you understand?

11            THE DEFENDANT:  I understand, Your Honor.

12            THE COURT:  Only the government decides whether your

13   cooperation has been substantial enough to warrant a downward

14   departure motion.  Do you understand that?

15            THE DEFENDANT:  Yes.

16            THE COURT:  And even if the government decides to file

17   a motion for a downward departure, I will make the final decision

18   as to whether to grant that motion.  Do you understand that?

19            THE DEFENDANT:  Yes.  I understand.

20            THE COURT:  Now, in determining your sentence, as I

21   said, I have to consider, in every case, the factors set forth

22   in 18 U.S.C. § 3553(a), and that requires me to consider, in

23   every case, a number of things.  One the nature and

24   circumstances of the offense and the history and characteristics

25   of the defendant.  That's you.  Two, the kinds of sentences

1    available; three, the sentencing guidelines, which I've just

2    talked to you about; four, the need to avoid unwarranted

3    sentence disparities among defendants with similar records who

4    have been found guilty of similar conduct, and that simply means

5    that there should be consistency in sentencing across courts.

6    Do you understand?

7              THE DEFENDANT:  I understand.

8              THE COURT:  Five is the need to provide restitution.

9    That's not a factor here.  Six is the need for the sentence that

10   I impose to reflect the seriousness of the offense, to promote

11   respect for the law, and to provide for just punishment of the

12   offense, to afford adequate deterrence to criminal conduct, to

13   protect the public from further crimes that you may commit, and

14   to provide you with any needed educational or vocational

15   training, medical care, or other correctional treatment in the

16   most effective manner.

17       So do you understand that I have to consider all the

18   factors I've just described to you in determining your sentence?

19             THE DEFENDANT:  I understand, Your Honor.

20             THE COURT:  All right.  And do you also understand

21   that, under some limited circumstances, the government may have

22   the right to appeal my sentence?

23             THE DEFENDANT:  I understand.

24             THE COURT:  And, finally, do you understand that

25   parole has been abolished for federal charges?  So if you

are sentenced to prison, you will serve the sentence that I

impose, with a possible reduction for good-time credit of up

to 54 days a year, but you will not be released early on parole

as used to be the case or as is the case in some state courts.

Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  And, finally, do you understand -- I keep

saying "finally."  It's not finally.  Do you understand that if

the sentence in this case ends up being more severe than you

expected, you will still be bound by your plea and will have no

right to withdraw it?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  We've come to the final section

on voluntariness, so I have to ask you a series of questions

to make sure your plea is voluntary.

Has anyone forced, threatened, or coerced you in any way

into entering this plea of guilty?

THE DEFENDANT:  No.

THE COURT:  Has anyone, including your lawyers, the

police, the prosecutors, or any other person you have come in

contact with since your arrest, promised or suggested to you

that merely because you're pleading guilty I will give you a

lighter sentence?

THE DEFENDANT:  No.

THE COURT:  Do you understand that the agreement

1    reached in this case resulted from negotiations between your

2    lawyer and the government's lawyer?  Do you understand?

3                THE DEFENDANT:  Yes.

4                THE COURT:  Has anyone made any promises to you in

5    connection with your guilty plea other than those contained in

6    the plea agreement or stated here in open court?

7                THE DEFENDANT:  No.

8                THE COURT:  Other than what's in the plea agreement,

9    has anyone made any promises to you as to what sentence I will

10   impose if I accept your guilty plea?

11               THE DEFENDANT:  No.

12               THE COURT:  Are you entering this plea voluntarily and

13   of your own free will because you are guilty?

14               THE DEFENDANT:  Yes.

15               THE COURT:  Is there anything that you do not

16   understand about this proceeding or about your plea in this case?

17               THE DEFENDANT:  No.

18               THE COURT:  Is there anything that you want to ask me

19   or your lawyer before you enter your plea?

20               THE DEFENDANT:  No.

21               THE COURT:  Are you now ready to say whether you want

22   to plead guilty or go to trial on the charges in this case?

23               THE DEFENDANT:  Yes.

24               THE COURT:  What do you want to do?

25               THE DEFENDANT:  Guilty.

1          THE COURT:  Finally, are you pleading guilty because

2     you are guilty?

3          THE DEFENDANT:  Yes.

4          MR. DRISCOLL:  For the record, Your Honor, that's as

5     to Count 1.

6          THE COURT:  Yes.  And the government will dismiss the

7     remaining counts at the time of sentencing.  Correct?

8          MR. KENERSON:  Correct.

9          THE COURT:  You may have a seat.

10     I am satisfied that Ms. Butina is fully competent and

11    capable of making a decision today, that she understands the

12    nature of the charges and the consequences of the plea, that the

13    plea of guilty is knowing and voluntary, that she is acting of

14    her own free will in pleading guilty, and that there is an

15    adequate factual basis containing each of the essential elements

16    of the offense for her plea.

17     Therefore, I will accept the guilty plea, and Ms. Butina

18    is now adjudged guilty of that offense.  I'll now sign and date

19    the Waiver of Jury Trial form.

20     I have before me, Ms. Butina, a document marked Waiver of

21    Trial by Jury.  It says, "With the consent of the United States

22    Attorney and the approval of the Court, the Defendant waives" --

23    well, it says "his right."  I'm going to cross that out -- "her

24    right to trial by jury."  Is that your signature?

25          THE DEFENDANT:  Yes.

1          THE COURT:  And did you understand what you were doing

2     by signing this?

3          THE DEFENDANT:  Yes.

4          THE COURT:  All right.  I will sign and date it.

5     Now I'm going to set the sentencing date based on my calendar

6     and the needs of the Probation Office.

7          Now, Ms. Butina, a presentence investigation report is

8     going to be prepared by the Probation Office to assist me in

9     sentencing because, as I told you earlier, I don't know a whole

10    lot about you, and I don't know a whole lot about this case

11    other than what's been filed before me.

12         I take sentencing very seriously.  I like to have as

13    much information as possible, and I like to consider each

14    defendant as an individual.  Therefore, the presentence report

15    is very important to me because it's going to give me a lot

16    of information about you which will help me in fashioning what

17    I think is a fair sentence.

18         You're going to be interviewed for this report, and

19    you'll be asked to give information for it.  Your attorney may

20    be present with you if you wish.  After the report -- and if

21    there are documents or people, or there's information you want

22    the presentence report writer to have, you should tell them.

23         Once the report is completed, before I see it, you and your

24    lawyer and the prosecutors will have a chance to review it, to

25    make any objections to any of the facts contained in it.  After

1    that process is completed, then I will get it.  Again, as I

2    said, it's an important document for purposes of sentencing.

3    It's important that you be as thorough and as forthcoming as you

4    can with the presentence writer.

5         At the sentencing, you and your lawyer will have a chance

6    to talk to me, to address the Court and say anything that you

7    want me to consider in fashioning a sentence.  You don't have to

8    speak.  I don't hold it against you if you don't want to speak,

9    but you're certainly very welcome and encouraged to speak if you

10   want to.

11        Counsel, I'm going to set a date.  Because the guidelines

12   range isn't clear for this case and because of other factors

13   having to do with this case, I really do want all sentencing

14   materials, including pleadings, exhibits, any letters, anything

15   that you want me to consider, 10 days before the sentencing.

16   And, Mr. Driscoll, I review sentencing materials many times

17   before I sentence, and so it is very important that I get

18   anything you want me to have at those 10 days.

19        Ms. Butina, if there are letters or certificates or

20   anything else you want me to see, make sure your lawyer gets

21   them so he can get them to me in time so that I can give them

22   my full consideration.

23        Did you have a question, Mr. Kenerson?

24             MR. KENERSON:  I did, Your Honor.  Given the ongoing

25   cooperation nature of the plea -- and this is actually

1    contemplated in the agreement -- our request would be to set

2    a status today.

3              THE COURT:  Okay.

4              MR. KENERSON:  But I think the parties are in

5    agreement, if the Court is able to do this, that it makes

6    sense to start the presentence investigation --

7              THE COURT:  Yes.

8              MR. KENERSON:  -- so that once cooperation is

9    complete, we can go quickly to sentencing.

10             THE COURT:  Okay.

11        So what Mr. Kenerson is saying is that, instead of setting

12   a sentencing date today, we're going to set a date for a status

13   hearing given that you have ongoing cooperation with the

14   United States attorneys, and when that's complete, we'll have a

15   sentencing date.

16        In the meantime, because it can take up to 75 days or

17   longer to do a presentence investigation, I'm going to start

18   that process.  I'm going to order that the Probation Office

19   begin preparing that report so that, when we come back for

20   status, if we set a sentencing date, we won't have to wait

21   additional time to get that report prepared.  Do you understand?

22             THE DEFENDANT:  Yes.

23             THE COURT:  All right.

24             MR. KENERSON:  And if the Court is available, the

25   parties had discussed the week of February 15th for that status.

1          THE COURT:  Have you all looked at your calendars?

2    Mr. Bradley, do you have mine?  So we are not going to set a

3    sentencing date today.  We're going to just have a status date,

4    and at the status hearing, very likely we'll set a sentencing

5    date.

6          THE DEPUTY CLERK:  Your Honor, we can do it Tuesday,

7    February 12, at 10 a.m.

8          THE COURT:  Is that agreeable?

9          MR. KENERSON:  That's good for the government,

10   Your Honor.

11         THE COURT:  Did you say the 10th?  12th.

12         THE DEPUTY CLERK:  12th.

13         THE COURT:  Mr. Driscoll?

14         MR. DRISCOLL:  Yes, Your Honor.

15         THE COURT:  Okay.  All right.  We'll have a status

16   hearing on February 12 at 10 a.m.  Is there anything -- oh.

17   So I will vacate the hearing on the 19th of December that was

18   previously set, and I think we have a couple more housekeeping

19   items.

20      Oh, the subpoena.  Do you want to -- there's currently a

21   Rule 17 subpoena that has been served on American University.

22   Per this Court's order, American University had until December

23   17th to comply with the subpoena.  It's my understanding --

24   Mr. Driscoll, are you withdrawing that subpoena?

25         MR. DRISCOLL:  Your Honor, with the Court's

1      permission, we'd like to keep it active because we think

2      there might be information we could use at sentencing.

3            THE COURT:  Okay.  Well, I received numerous pro se

4      motions from current and former students at AU to quash the

5      subpoena.  What I will do is I will hold it in abeyance.  If

6      you could let AU counsel know that they are -- you still want

7      the subpoena to be complied with?

8            MR. DRISCOLL:  That would be the hope.

9            THE COURT:  But you don't need it by December 17th.

10           MR. DRISCOLL:  No, but reasonably thereafter.

11           THE COURT:  Okay.  Just confer with AU counsel and

12     set a date for compliance with the subpoena.  I don't have to

13     monitor that.  Okay.  Well, that means I still have to deal with

14     the motions from the students, but I'll deal with that -- yeah.

15     And I think there's one other thing...

16         All right.  I think that's it.  Is there anything else

17     either side wants to raise?

18           MR. KENERSON:  Not for the government, Your Honor.

19           MR. DRISCOLL:  Not for the defense, Your Honor.

20           THE COURT:  All right.  I'll see you all on February 12.

21     Have a good afternoon.

22         (Proceedings adjourned at 11:51 a.m.)

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE