**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  18-218 (TSC)** |
| **v.** | : | |
| | : | |
| | : | |
| **MARIIA BUTINA, also known as** | : | |
| **MARIA BUTINA,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing for defendant Mariia Butina.  For the reasons stated herein, the government submits that an appropriate sentence in this case prior to taking the defendant's cooperation into account is 24 months' incarceration.  For those reasons, as well as those in the government's Supplemental Memorandum in Aid of Sentencing and Motion for a Downward Departure, which we will file under seal contemporaneously with this memorandum, we request that the Court impose a sentence of 18 months' incarceration.

# I.   INTRODUCTION

The defendant is before the Court having entered a plea of guilty to Count 1 of the Indictment, which charges her with conspiracy to act as an agent of the Russian Federation, in violation of 18 U.S.C. §§ 371 and 951.

From approximately 2015 to 2017, the defendant acted in the United States as an agent of a Russian government official ("Russian Official").[1]  Under his direction, the defendant provided

---

[1]     Throughout this memorandum, the terms "Russian Official," "Political Party 1," "U.S.

key information about Americans who were in a position to influence United States politics and took steps to establish an unofficial line of communication between Russia and these Americans. As laid out in the Statement of Offense, she sought to do so for the benefit of the Russian Federation. Statement of Offense at 2. Russia has long targeted the United States and U.S. allies in an effort to expand Russia's sphere of influence and relative strength. As is demonstrated by the attached declaration, the activities at issue in this case are part of Russia's broader scheme to acquire information and establish relationships and communication channels that can be exploited to the Russian Federation's benefit. See Declaration of Robert Anderson, Jr., attached hereto as Exhibit 1[2].

Butina was not a spy in the traditional sense of trying to gain access to classified information to send back to her home country. She was not a trained intelligence officer. But the actions she took were nonetheless taken on behalf of the Russian Official for the benefit of the Russian Federation, and those actions had the potential to damage the national security of the United States.

The defendant took her actions without notifying the Attorney General as required by law. Her failure to notify the Attorney General that she was acting as an agent of the Russian Federation—far from rendering this a mere registration offense, as her counsel has claimed—was an integral part of her and the Russian Official's success in advancing Russia's interests. Had the

---

Person 1," "MFA," "U.S.-Russia Friendship Dinners," and "Gun Rights Organization" have the same meanings they did in the Indictment and the Statement of Offense.

[2]     Robert Anderson is the former Assistant Director of the FBI's Counterintelligence Division. He is currently the Chief Executive Officer of Cyber Defense Labs in Dallas, Texas. He was retained by the government in connection with this case. The Government will make Mr. Anderson available at the sentencing hearing, should the Court or defense have any questions for him.

defendant made an honest notification, she may have been denied access to the United States altogether, or at the very least, the prominent Americans whom she strove to influence on behalf of Russia would have been alerted that she was more than simply a Russian student interested in gun rights and international politics.

## II.     BACKGROUND ON FOREIGN OPERATIONS

To put the nature and seriousness of Butina's offense of acting as an illegal agent into context, the government respectfully submits that it is important for the Court to appreciate why the government of the Russian Federation, in general, and Russian Official specifically, would seek to task Butina to act as she did in the United States.   This necessarily includes an understanding of the value of the information and introductions provided by Butina to the Russian government.

### A. Spotting and Assessing

Acquiring information valuable to a foreign power does not necessarily involve collecting classified documents or engaging in cloak-and-dagger activities.    Something as basic as the identification of people who have the ability to influence policy in a foreign power's favor is extremely attractive to those powers. This identification could form the basis of other forms of intelligence operations, or targeting, in the future.

In addition to identification, or "spotting," of individuals, foreign powers seek to understand the motivations and vulnerabilities of such individuals, particularly in settings where the information can be elicited casually and without raising suspicion.  Foreign agents, acting as "access agents," may simply arrange networking opportunities and introductions, particularly to those within their field.   While completely innocuous in other contexts, access agents play a key role for foreign intelligence services in the conduct of influence operations.    Access agents may

or may not be witting—and may be somewhat witting—about the intent behind the foreign government's taskings.

## B.  Backchannel Lines of Communication

A backchannel is a line of communication with a foreign government or with representatives of foreign governments that is discreet and does not go through official channels of diplomacy.  The term often refers to lines of communication between two adversarial governments through an intermediary or third party.  Such channels bypass open channels of diplomacy and can be used to win concessions or influence positions that contradict declared official policies articulated by governments.

## III.       FACTUAL SUMMARY

The conspiracy in which Butina engaged was ambitious: she—with the backing of a Russian government official—sought to establish unofficial lines of communication between Russia and Americans having power and influence over U.S. politics and to use those lines of communication for the benefit of the Russian Federation.  Statement of Offense at 2.  Throughout the conspiracy's existence, as explained more fully below, Butina was keenly aware that portions of her work were being reported to the wider Russian government beyond Russian Official and that factions within the Russian government would be interested in the "valuable contacts" she was developing.  See Exhibit 2.[3]

### A.  Butina Intended to Circumvent the Diplomatic Process

Butina believed from early on in the conspiracy—at least as far back as March 2015—that the official channels of communication normally open to two countries would be insufficient for

---

[3]       This and all other exhibits that were originally written in Russian have been translated into English by FBI linguists.

Russia to influence U.S. policy, given the then-existing relationship between the two countries. She actively promoted the idea that Russia could use this backchannel of communication she planned to establish to influence U.S. policy towards Russia.  She laid out a plan in March 2015, which she called the "Diplomacy Project," to use connections she had made at the Gun Rights Organization to attempt to create this unofficial communication channel with the next U.S. presidential administration.  Id.  She sought the advice of U.S. Person 1, and she included his analysis of the U.S. political landscape in a proposal, which she sent to the Russian Official and others in Russia, who in turn informed her that her proposal would be supported, at least in part. Id. at 2-3.  A copy of the translated Diplomacy Project proposal is attached hereto as Exhibit B.

### B. Butina Immediately Began Targeting Political Party 1 and the Gun Rights Organization.

Soon after she drafted the Diplomacy Project proposal, in April 2015, she traveled to the United States to attend the Gun Rights Organization annual meetings with the Russian Official, where she highlighted her experience as a gun-rights advocate in Russia and was introduced to influential members of Political Party 1, one of whom announced his Presidential campaign shortly thereafter.  Statement of Offense at 3.  She did so in furtherance of the conspiracy's goal to establish the back channel of communication as laid out in the Diplomacy Project.  Id. at 3.  Butina attended this announcement event in July 2015 and, after being tasked by the Russian Official to do so, wrote a report to him in which she emphasized the fact that she was introduced to one of that candidate's three advisors for matters concerning international politics.  A copy of the Twitter chats, along with the report, is attached hereto as Exhibit 4.  According to her notes from a meeting with then-Russian Ambassador Sergei Kislyak in May 2015, she said she would "send the name of the advisor [to the candidate whose announcement event she later attended] who can come to

Moscow."[4]  A copy of those notes is attached hereto as Exhibit 5.

In December 2015, Butina invited powerful members of the Gun Rights Organization to Moscow as part of the conspiracy's plan to establish the unofficial channel of communication. Statement of Offense at 3.  She actively sought out meetings for this group with high-level Russian government officials, as arranged by the Russian Official.  Id.  As part of this endeavor, the defendant sought information from U.S. Person 1 about the degree of political influence held by the Gun Rights Organization members in the United States and stressed the need for a "political program" as part of the Gun Rights Organization trip to Moscow.  Id. at 3-4.

Following the Gun Rights Organization trip to Moscow, the defendant and the Russian Official discussed the need to "hold the spot" now that "everyone has realized that [the Gun Rights Organization] is a valuable contact," and she noted that there will be "attempts to seize the initiative."  Exhibit 2. Butina has since confirmed that she was worried about others within the Russian government or a political group or activist noticing that the contacts she had built with the Gun Rights Organization were valuable and cutting her and the Russian Official out of the loop. Just days later, Butina noted to the Russian Official that they would "quietly press" or "put pressure on [members of the Gun Rights Organization] later."  Statement of Offense at 4.

### C.  Butina Used Friendship Dinners to Hone Her Approach.

Butina also used seemingly innocuous events, such as U.S.-Russia "friendship dinners," where wealthy and influential Americans discussed U.S.-Russia relations, to advance the conspiracy.  Butina used these dinners to cultivate lines of communication with individuals she believed would have the ear of the next U.S. presidential administration.  Id.  They afforded her

---

[4]     All available evidence indicates that Butina and former Ambassador Kislyak did not get along well with each other.

an opportunity to adjust her "pitch" based on how the influential attendees responded to her.  <u>Id.</u>
Butina reported on potential attendees at these dinners to the Russian Official.  <u>Id.</u>

Butina wrote, in a document recovered from her computer, that it was good that people on the list were affiliated with both major U.S. political parties, noting, "This fact is a kind of guarantee of not becoming dependent on the support of just one of the parties and exerting influence on foreign policy regardless of which party is in control of the US Congress or the White House."  A copy of that document is attached hereto as Exhibit 6.  In a separate document recovered from her computer, Butina evinced her knowledge of the power of concealing any official connection to the Russian government at these events, stating, "The special advantage of this proposal [U.S.-Russia Friendship Dinners] resides in the fact that the presence of bilateral interest will, on the one hand, cancel out the questions of American ill-wishers about 'the Kremlin's hand' in the organization and in attempts at propaganda and, on the other hand, will make it possible to exert the speediest and most effective influence on the process of making decisions in the American establishment."  A copy of this document is attached hereto as Exhibit 7.

### D. <u>Butina was Aware that the Russian Official Spoke to the Wider Russian Government About Their Activities.</u>

The Russian Official tasked Butina with writing a note to the Russian Ministry of Foreign Affairs (MFA) explaining why he should be permitted to travel to the Gun Rights Organization annual meetings in the United States.  Statement of Offense at 5.[5]  In responding to the tasking, Butina drafted a note that she sent to the Russian Official, explaining the opportunities he would have to meet with political candidates:

**In May 2016 [Russian Official] has the chance to speak personally with**

---

[5]     The Statement of Offense incorrectly states that this tasking occurred in May 2016. Although the Gun Rights Organization meetings were scheduled for May 2016, the tasking and defendant's response thereto occurred in late April 2016.

> **the leaders of the [Political Party 1] primary race . . .**
>
> In conclusion it is important to note that on April 22, 2016 **[Presidential Candidate] announced a change** in the management of his primary campaign staff and in his **election strategy, where the candidate plans to pay closer attention to foreign policy.  Important** in these circumstances **are those contacts with the candidate and his entourage that will help form [the candidate]'s correct view of Russian-American relations. Attending the general assembly of the [Gun Rights Organization] in May 2016 fully provides this unique opportunity**"

(Emphasis in original).  Butina and the Russian Official continued to plan for his trip as if he were planning to seize an opportunity to begin creating a back channel of communication.  For example, Butina suggested the Russian Official give the Presidential Candidate a gift of a gold coin from the Russian Central Bank, noting that the symbolism would be: "relations between our countries are just as valuable as gold, the most valuable metal."   Despite their intentions, Butina and the Russian Official did not meet with Presidential Candidate at the Gun Rights Organization meetings.

In July 2016, after Butina had arrived in the United States pursuant to her student visa— for which she applied without mentioning that she continued to work as an agent of the Russian Official or that she was trying to establish unofficial communication channels between Russian and American officials (Statement of Offense at 4)—she wrote a forecast on the 2016 presidential election that the Russian Official told her he was considering sending to the MFA.  She later asked the Russian Official's advice on whether the Russian government was ready to meet U.S.-based political advisors, and he asked her what she planned to do with her contacts, lest the two of them be forgotten after the 2016 election.  Statement of Offense at 5.

### E. After the 2016 Election, Butina Marketed Her Contacts to the Wider Russian Government.

Almost immediately following the 2016 election, Butina worked tirelessly to draft two

proposals for the Russian Official that she has since confirmed she hoped would be distributed to the Russian government or to any Russian businesspeople who may have been hurt by U.S. sanctions.  In one of those proposals, sent to the Russian Official on November 10, 2016, she noted that its goal would be to "use the existing personal groundwork" she and the Russian Official had laid "in establishing informal relationships in U.S. political circles . . . for the purpose of assessing, monitoring, forecasting, and developing the policies of the [Russian Federation] vis-a-vis" the U.S. government.  Butina also noted:

> During the last 5 years, [Russian Official] and Butina have constantly worked on establishing unofficial contact, based on common views and a system of conservative values, with a number of key [Political Party 1] organizations in the US, including the executive level of [Political Party 1], its intellectual establishment and [Political Party 1] organizations.

On the following day, November 11, the defendant provided the Russian Official with the name of an individual she claimed was being considered for Secretary of State.  She asked the Russian Official to seek the input of the Russian government on the name she provided and told him, "our opinion will be taken into consideration" in the United States.

Later on November 11, Butina sent the Russian Official a second note with a project proposal entitled, "Establishing a dialogue with the team of the Newly-elected US President . . . a conference in Washington, DC."  Butina proposed to hold a conference on ways and means of building Russian-American relations under the President-Elect, noting that the "conference must be presented as a private initiative, not a government undertaking."  Butina noted under advantages, "The event does not pose any risks because no government officials from either country will attend; yet it creates a foundation for further talks on the level of government officials."  Russian Official responded days later that he had read it the proposal, but that the MFA would not go for it.  Therefore, this event did not occur.

**F.  Butina Hoped the 2017 National Prayer Breakfast Would Establish the Unofficial Communication Channel.**

At the direction of the Russian Official, Butina included certain individuals within the Russian delegation to the 2017 National Prayer Breakfast, and she noted specifically that those individuals were "coming to establish a back channel of communication."  Statement of Offense at 5.  The Russian delegation to the National Prayer Breakfast organized by Butina ultimately included approximately fifteen people, which is significantly more than attended in the years prior to 2017.  The delegation attended a U.S.-Russia Friendship Dinner two days prior to the actual event.

According to a document written by Butina after the event, in the lead-up to the National Prayer Breakfast, she and the Russian Official were promised a private meeting with the President of the United States by one of the organizers of the event.  A copy of this document is attached hereto as Exhibit 8.  This promised meeting never materialized.  After the event, and Butina's and the Russian Official's failure to meet privately with the President, she was worried that another Russian national (i.e., not the Russian Official) would attempt to seize the initiative, as demonstrated in her Twitter conversation with the Russian Official:

> Butina: It would be good if you could talk directly with the MFA or the administration.  Before [Russian national who attended the breakfast] worms his way in there.
>
> Russian Official: Everything will be fine.  I already conducted the necessary informal consultations on Saturday.  I just don't want to overload Twitter, which is read.  We need to build relationships with the USA, but there are many who oppose this! . . .

According to Butina, this other Russian national referred to was another member of the Russian government whom Butina feared would overtake her and the Russian Official as the primary Russian point of contact for the National Prayer Breakfast.

In short, while Butina was in the United States claiming merely to be a student, she was spending much of her time devoted to another purpose—advancing the interests of the Russian Federation.  During this time period of about two years, she acted at the direction and control of the Russian Official, fully aware that he reported to the rest of the Russian government and her actions were ultimately for the benefit of the foreign government.  The defendant's failure to disclose her direction by the Russian government allowed her access to the United States and to prominent individuals whom she at least attempted to influence on Russia's behalf.

## IV.    DETERMINING THE SENTENCE

This Court must sentence the defendant consistently with the factors described in 18 U.S.C. § 3553. When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. See 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines (U.S.S.G. or Guidelines) are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Gall v. United States, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a),

the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).

### A.   United States Sentencing Guidelines Calculation

The government agrees with the Presentence Report (PSR) that the Guideline range for a violation of 18 U.S.C. § 371 follows the underlying substantive offense and that the U.S.S.G. does not specify a Guidelines range for a violation of 18 U.S.C. § 951.  Where the Guidelines do not expressly specify a Guideline range, the court should "apply the most analogous guidelines.  If there is not a sufficient analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." U.S.S.G. § 2X5.1.

The government also agrees with the Presentence Report that there is no sufficiently analogous Guideline for the conduct at issue here.  The defense contention that the proper guideline is § 2B1.1 is misplaced, and its objection to the PSR's Guidelines determination should be overruled.[6]

---

[6]   Defendant also objected to Paragraph 73 of the Draft Presentence Report as incomplete because "the plea agreement also states that the parties agreed for allocution purposes that a sentence within the Estimated Guideline Range of 0 to 6 months' imprisonment would be reasonable in light of all the sentencing factors."  Letter to Probation at 11.  Defendant's interpretation is inaccurate.  The plea agreement states that *if the Court finds that a sentencing*

The majority of courts that have looked at the issue of what Guideline range to apply to violations of 18 U.S.C. § 951 have determined that there is no sufficiently analogous Guideline. See United States v. Soueid, No. 11-CR-494, Doc. 59 (E.D. Va.) (Defendant convicted of a violation of § 951 for conducting surveillance on Syrian dissidents in the United States on behalf of Syrian government; Court found no sufficiently analogous Guideline); United States v. Chun, No. 16-CR-618, Doc. 17 at 10 (S.D.N.Y.) (Defendant, a FBI technician, convicted of violating § 951 for providing sensitive, but not classified, information to Chinese officials) (Parties jointly submitted that there was no analogous Guideline, and Court agreed); United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.) (Defendant responded to taskings by Cuban intelligence services over thirty-year period and sent reports back to Cuba in response to those taskings; Court found no sufficiently analogous Guideline range); United States v. Buryakov, No. 15-CR-73 (S.D.N.Y.), Doc. 158 at 6-7, 17 (Defendant convicted for violating § 951, following a plea pursuant to Fed. R. Crim. P. 11(c)(1)(C), for agreeing to provide information to a Russian official; Court found no analogous Guideline range); United States v. Duran, No. 07-CR-20999 (S.D. Fla.), Doc. 488 at 42-43 (Defendant convicted of §§ 371 and 951 for attempting to bribe/extort a U.S. citizen on behalf of the government of Venezuela; Court found no analogous Guideline).

The defense urges Probation, and presumably this Court, to apply an elements-based approach in determining whether a guideline is sufficiently analogous, citing United States v. Osborne, 164 F.3d 434, 437 (8th Cir. 1999). Assuming *arguendo* that the Court should compare the elements of § 951 with the elements of potentially analogous cases in assessing which

---

*range applies*, a sentence within that Estimated Guidelines Range would constitute a reasonable sentence in the event of an appeal.  ECF No. 67 at ¶ 5 (emphasis added).  The government maintains for the reasons set forth herein that there is no applicable sentencing guideline range.

Guideline is most analogous, the defense's attempt to analogize a violation of § 951 to false statement or pure withholding-of-information offenses fails. The defense position flows from the proposition that "the essence [of a § 951 violation] is failing to register." Id. at 7. In coming to this conclusion, the defense downplays § 951's requirement of *action* on behalf of a foreign government or official within the United States. See, e.g., United States v. Dumeisi, 2004 WL 5370253 (jury instructions given in N.D. Ill January 12, 2004) (relevant elements of a § 951 violation are: (1) that the defendant acted in the United States as an agent of a foreign government; (2) that the defendant failed to notify the Attorney General that the defendant would be acting in the United States as an agent of a foreign government prior to so acting; and (3) that the defendant acted knowingly, in that the defendant knew that he had not notified the Attorney General). The government must prove action in the United States just as surely as it must prove failure to notify.

None of the offenses that the defense contends are analogues (Letter to Probation at 7)— false statements or failure to report campaign contributions, maintain pension records, register for military service, or file a tax return—requires any additional act in addition to the deceptive statement or withholding of information. Section 951, by contrast, requires acts taken within the United States at the direction or control of a foreign government or official.[7]

In addition to finding little support from a comparison of the elements or sentences imposed

---

[7] The defense would urge the Court to discount the action element because "the legality of the predicate act for a conviction of section 951, at least according to two circuits, is seemingly irrelevant." Letter to Probation at 6-7. The defense cites two cases for that proposition, United States v. Duran, 596 F.3d 1283 (11th Cir. 2010) and United States v. Latchin, 554 F.3d 709 (7th Cir. 2009). Although the Guidelines were not challenged on appeal in either case, in Duran, the trial court found there was no analogous Guideline, as discussed above, and while the Guideline range relied up on by the district court in Latchin is not readily discernible from the record, he was sentenced to 48 months' incarceration for his violation of § 951, significantly more incarceration time than the 0-6 month range prescribed by U.S.S.G. § 2B1.1, assuming no loss amount. See United States v. Latchin, No. 04-CR-661, Doc. 239 (N.D. Ill.).

in similar cases, the defense's position is not supported by the facts of this case or the Guidelines as a whole.  Section 2B1.1 is primarily the Guideline for theft and embezzlement offenses, as evidenced by the base offense level's correlation to a loss amount in dollars.  <u>See</u> U.S.S.G. § 2B1.1(b)(1).  Although § 2B1.1 has also been designated by the U.S.S.G. as the Guideline for false statements in violation of 18 U.S.C. § 1001, as discussed above, the gravamen of a violation of § 951 is not providing false information, or even withholding it.  It is *acting within the United States as an agent of a foreign government* without first notifying the Attorney General.  Although failure to notify the Attorney General is undoubtedly an element, it is a coequal element to taking actions on behalf of a foreign official or government, and there is no other sufficiently analogous Guideline to capture the defendant's offense.

Moreover, as discussed below, sentences imposed by courts for violations of 18 U.S.C. § 951 (or convictions for conspiracies to violate that statute) have almost always involved significantly longer periods of incarceration than the 0-6 month range that would result if U.S.S.G. § 2B1.1 were the proper Guideline.  The Court should thus overrule the defense's objection to the PSR's Guideline determination.[8]

---

[8]  The government is only aware of one case where a court has decided, as the defense urges here, that the proper Guidelines range for a violation of § 951 is U.S.S.G. § 2B1.1.  That case is <u>United States v. Dumeisi</u>, which the defense cited in its objections to the PSR.  Letter to Probation Officer at 8.  As an initial matter, although the district judge in <u>Dumeisi</u> found that U.S.S.G. § 2B1.1 was the most analogous Guideline, the court nonetheless sentenced Dumeisi to a total term of 46 months of incarceration, although it did not break out its sentences by count.  <u>United States v. Dumeisi</u>, No. 03-CR-664 (N.D. Ill.), Doc. 125.  The government has been unable to locate reasoning expressed by the judge in that case, and the defense has proffered none.  Without more, the Court should not find the <u>Dumeisi</u> decision persuasive enough to overcome the determinations by many other district court judges, as well as Probation's determination in this case, that there is no sufficiently analogous Guideline for a violation of § 951.

**B.      Statutory Penalties**

Butina is facing a maximum sentence of five years' imprisonment, a fine of not more than

$250,000, or both, for her conviction.  18 U.S.C. §§ 371, 3571(b)); see also PSR at ¶¶ 70, 85. The

Court may impose a period of not more than three years supervised release, but may choose not to

impose such period in the case of a deportable alien, such as Butina. Id. at ¶¶ 75-76.

**C.      Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)**

As discussed in detail below, an analysis of the factors enunciated to 18 U.S.C. § 3553(a)

demonstrates that the imposition of a significant period of incarceration is appropriate for this

offense.

**1.      The Nature and Circumstances of the Offense**

The conspiracy in which the defendant participated is undoubtedly a serious offense.  The

government brings former Assistant Director Anderson's declaration to the Court's attention to

underscore the seriousness of the offense the defendant committed.  As Mr. Anderson's declaration

makes clear, the types of services the defendant provided to the Russian Federation are specifically

of the type that that Russia would seek to use against the United States, and the United States is a

primary target of these types of Russian operations.  Such operations can cause great damage to

our national security by giving covert agents access to our country and powerful individuals who

can influence its direction.

Butina had access to high-level donors to the Gun Rights Organization and organized a trip

that brought them to Moscow (though not before seeking information about their "political

importance").  She had access to advisors to political candidates (and spoke to the Russian

Ambassador about at least one of them) and sometimes to candidates themselves.

Butina's work involved building a rolodex of and information about powerful people who

had, or were likely to get, access to and influence over the next presidential administration.

16

Butina's reports back to the Russian Official on the people she was meeting have all the hallmarks of spotting-and-assessing reports.  The value of this information to the Russian Federation is immense, as former Assistant Director Anderson's declaration makes clear.

The Statement of Offense, combined with the exhibits proffered by the government, establish that she was deliberately putting herself in a position to be the conduit between the Russian government and the next U.S. presidential administration.  This intent is evidenced throughout the exhibits and the Statement of Offense.  She posited that her contacts with the Gun Rights Organization had put her in a position to be the conduit for an unofficial channel of communication; voiced worry that others in the government would steal the initiative; provided the Russian Official with the name of a potential Secretary of State nominee and asked for Russian government input on that name; drafted a proposal she hoped would go to the Russian government or to a Russian businessperson hurt by U.S. sanctions wherein she touted her constant work with the Russian Official "establishing unofficial contact, based on common views and a system of conservative values, with a number of key [Political Party 1] organizations in the United States, including the executive level of [Political Party 1];" and she unsuccessfully attempted to meet with the President at the National Prayer Breakfast.

The defendant knew, as she was providing information back to the Russian Official, that he was a conduit of information to the Russian Government writ large, and she knew that he was providing at least some of the information she provided him to the rest of the government as well. Although the government does not contend that she knew exactly what happened or would happen with the information she provided and the contacts she had made, she undeniably worked in the United States to gather that information, provide it, and attempt to establish herself as a backchannel of communication.  Had she successfully done so, the risks to the United States would

have included harm to this country's political processes, internal government dealings, and U.S. foreign policy interests.  Exhibit 1 at 2.

Butina's failure to notify the Attorney General of her activities on behalf of the Russian Federation warrants mention here as well.  The defense has contended, e.g., Letter to Probation Officer at 6; Memorandum in Support of Bond Review Motion, ECF No. 23-1 at 5, that all of the defendant's actions would have been legal had she notified the Attorney General that she intended to operate within the United States as an agent of the Russian Federation.  Even if true, this line of argument does not detract from the reason for or the seriousness of the notification requirement, which provides the United States government or anyone trying to evaluate an individual's acts with full information.  We, of course, cannot know with certainty how the defendant's conspiracy would have played out had she complied with § 951's notice requirement, but the U.S. government undoubtedly could have made a more informed choice about, for example, whether to grant her visa applications.  Other people she met with, including government officials and staff, may have declined meetings with her had they know she was a Russian agent.  The FBI could have done defensive briefings for her targets.  Most importantly, the Russian government could not have effectively denied its involvement.

2.    **The History and Characteristics of the Offender**

Butina is well educated and capable of making a living through non-criminal means when she is released from incarceration. She also has no prior convictions of which the government is aware.

The defendant is a Russian national who will be immediately subject to removal.  Indeed, the parties have asked the Court to sign an order of judicial removal upon the defendant's sentencing.  ECF No. 92.  The PSR did not find a basis to depart downward under Smith v. United

18

States, 27 F.3d 649 (D.C. Cir. 1994), and the defense did not object.  The government agrees that a Smith departure would not be appropriate in this case.

Smith offers two bases for the departure.  The first is that the defendant's status as a deportable alien prevents her from being assigned to serve any part of her sentence at a minimum-security prison.  Id. at 651.  Even if the Court imposes an 18-month sentence, the defendant has already served most of her sentence in the D.C. Jail and the Alexandria Detention Center.  Assuming arguendo that her federal designation will be to a higher level than it would have been if she were not a deportable alien, she will not have endured more harsh prison conditions for any appreciable period of time based on her deportable alien status.

The second basis for a Smith departure is that the defendant's status as a deportable alien generally renders the defendant ineligible for the benefits of 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend the last ten percent of their sentences (but no more than six months) under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.  Id. at 650-51.  If the Court imposes 18 months, then, the maximum departure would be 1.8 months.  For the reasons below, even that departure would not be warranted in this case.

As the D.C. Circuit made clear in Smith, "For a departure on such a basis to be reasonable[,] the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence."  Id. at 655.  That is clearly not the case here.  The Smith court also expressed its belief that "the circumstances justifying a downward departure on account of the deportable alien's severity of confinement may be quite rare."  Id.  Indeed, for this ground to be a basis for departure at all, under the Guidelines, it must be "highly infrequent."  Id. (citing U.S.S.G., Ch. 1, Pt. A, sec. 4(b)).  Here,

while it is certainly the case that a U.S. citizen can violate 18 U.S.C. § 951, it is hardly outside the heartland of § 951 offenses that the offender is a deportable foreign national.  Because Butina's status as a deportable alien is comfortably within the heartland of § 951 offenders, there is no basis for a departure.

The government also acknowledges the substantial assistance the defendant has provided to law enforcement, as detailed in the sealed Supplemental Memorandum attached hereto, and it asks the Court to depart downward from the sentence it would otherwise impose pursuant to U.S.S.G. § 5K1.1.

### 3.    The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public

Sentencing the defendant to a significant term of incarceration will serve the governmental interests in providing a just punishment that sufficiently deters others and protects the public. The defendant's actions here were harmful to U.S. national security interests for the reasons stated above and in Mr. Anderson's declaration.    The Court can and should deter others who would engage in similar campaigns in the future by treating the defendant's conduct with the seriousness it deserves.

The sentence proposed by the government recognizes that Butina pled guilty early in the case, took responsibility for her actions, and cooperated with the government, as discussed in more detail in the government's Supplemental Memorandum.[9]

---

[9]    Specifically, the government has factored in that, had the U.S. Sentencing Guidelines specified an offense level under the Guidelines, Butina would have been entitled to either a two-level or three-level reduction of that offense level, depending on whether the Total Offense Level was more or less than 16.  See U.S.S.G. § 3E1.1.

4. **The Need to Provide the Defendant with Educational or Vocational Training**

Butina has no need for additional educational or vocational training.

5. **The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government acknowledges that sentences for violations of 18 U.S.C. § 951 and conspiracies to commit that offense vary greatly. But the government's recommendation—that the defendant's conduct warrants a sentence of 24 months' incarceration prior to factoring in cooperation—is within the heartland of sentences imposed across the country for similar offenses. We highlight some examples below:

- In United States v. Chun, No. 16-CR-518 (S.D.N.Y.), the defendant entered a guilty plea to violating § 951. The defendant was an FBI electronics technician with a Top Secret security clearance who sold sensitive FBI information to Chinese officials over a period of years. The parties agreed that, although there was no sufficiently analogous Guideline, a range of 21-27 months of incarceration was appropriate after factoring in acceptance of responsibility. The Court imposed a sentence of 24 months of incarceration.

- In United States v. Soueid, No. 11-CR-494 (E.D. Va.), the defendant entered a guilty plea to a violation of § 951, stemming from his work on behalf of the Syrian government in conducting surveillance of Syrian dissidents within the United States. The court imposed a sentence of 18 months of incarceration.

- In United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.), the defendant entered a

guilty plea to one count of conspiracy to act as an agent of Cuba in violation of §§ 371 and 951.  Over a period of approximately 30 years, the defendant responded to coded taskings sent by Cuban intelligence and sent reports back to Cuba in response to those taskings.  The Court imposed the statutory maximum of 60 months of imprisonment.

- In <u>United States v. Duran</u>, No. 07-CR-20999 (S.D. Fla.), the defendant was convicted at trial for violating 18 U.S.C. § 951 and conspiracy to violate that statute.  The government's case established that the defendant came to the United States as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen.  <u>See</u> <u>United States v. Duran</u>, 596 F.3d 1283, 1295-96 (11th Cir. 2010).  The court imposed a sentence of 48 months' incarceration on each count, to run concurrently.

- In <u>United States v. Al-Awadi</u>, No. 07-CR-20314 (E.D. Mich.), the defendant entered a guilty plea to one count of violating § 951, stemming from his work reporting on Iraqi dissidents within the United States for the Iraqi Intelligence Services.  The court sentenced the defendant to 18 months' incarceration.

- In <u>United States v. Dumeiei</u>, No. 03-CR-664 (N.D. Ill.), the defendant was found guilty at trial for violating § 951, conspiring to violate that statute, and two counts of perjury. The Court sentenced the defendant to a total of 46 months of incarceration.

- In <u>United States v. Buryakov</u>, No. 15-CR-73 (S.D.N.Y.), the defendant pled guilty to violating § 951, stemming from an agreement to take actions within the United States at the direction of a Russian government official.  The parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), to a sentence of 30 months of incarceration.  The court accepted that agreement and imposed a sentence of 30 months.

The defendant's actions in this matter are within the same general range as the cases cited

above.  She agreed to act within the United States at the direction of a Russian government official, and she did indeed so act for a period of almost two years.  The government's recommended sentence of 24 months (prior to factoring in cooperation), with a downward departure to 18 months, based on substantial assistance to law enforcement, is well within the range of sentences imposed by courts for similar conduct.

<u>**Conclusion**</u>

WHEREFORE, the government respectfully recommends that Butina be sentenced to a term of imprisonment of 18 months, and that the Court execute the requested Order of Judicial Removal.

Respectfully Submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By:_____/s/_____
ERIK M. KENERSON
THOMAS N. SAUNDERS
Assistant United States Attorneys
Ohio Bar Number 82960 (Kenerson)
N.Y. Bar Number 4876975 (Saunders)
United States Attorney's Office
555 Fourth Street, NW
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov

_____/s/_____
WILLIAM A. MACKIE
Trial Attorney, National Security Division
N.C. Bar Number 13816
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Washington, D.C. 20530
Telephone: 202-233-2122
Email: Will.Mackie@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal Case:  18-218 (TSC)** |
| | : | |
| | : | |
| **MARIIA BUTINA, also known as** | : | |
| **MARIA BUTINA,** | : | |
| | : | |
| **Defendant.** | : | |

### Declaration of Robert Anderson, Jr.

I, Robert Anderson, Jr., declare as follows:

1.      From August 2012 to March 2014, I was the Assistant Director of the Federal Bureau of Investigation (FBI)'s Counterintelligence Division.  I also have served as the Executive Assistant Director of the FBI's Criminal, Cyber, and Response and Services Branch; the Deputy Assistant Director of the Counterintelligence Division; and the Special Agent in Charge of the Intelligence Division of the FBI's Washington Field Office.  In total, I served for 20 years as a Special Agent with the FBI from 1995 through 2015.  I retired from the FBI at the end of 2015 and am now the Chief Executive Officer of Cyber Defense Labs in Dallas, Texas.  I have testified as an expert witness in two civil litigation depositions.  My testimony in those matters concerned cyber security and intrusions by nation-state actors.

2.      This declaration is submitted on behalf of the government in support of its Memorandum in Aid of Sentencing filed in this case.  The information provided in this declaration is based on my years of experience investigating and prosecuting counterintelligence cases, as well as my review of open source materials, such as media reports and interviews; public filings in this

case; discussions with the case agents; and evidence collected throughout the investigation that has been produced in discovery.

3.      Based on my review of those materials, it is my expert opinion that Mariia Butina's activities in the United States from approximately 2015 to 2017 were part of a deliberate intelligence operation by the Russian Federation.  I assess that the main purpose of this operation was to collect in the United States, and then provide to the Russian government, information that the Russian government deemed to be of intelligence value.  Based on my review of the information Butina in fact provided the Russian Official, which may have been shared with others within the Russian government, I assess that this information was of substantial intelligence value to the Russian government and that Russian intelligence services will be able to use this information for years to come in their efforts to spot and assess Americans who may be susceptible to recruitment as foreign intelligence assets.

4.      In addition, Butina's stated goal of establishing a backchannel of communication, if it had been achieved, would have benefited the Russian government by enabling Russia to bypass formal channels of diplomacy, win concessions, and exert influence within the United States.  Such benefits to the Russian government would have carried with them commensurate harm to the United States, including harm to the integrity of the United States' political processes and internal government dealings, as well as to U.S. foreign policy interests and national security.

5.      The United States is Russia's primary target for malign and intrusive intelligence operations.  Russia's intelligence capabilities are focused on the United States more than they are focused on any other nation, by a considerable margin.  In targeting the United States, Russia works to obtain not only classified material or trade secrets, but also to collect any information that could, by itself or in conjunction with other efforts, assist the Russian government in

increasing its geopolitical power or undermining and harming that of the United States. Russia's efforts targeting the United States take a myriad of forms — it is, in essence, a numbers game. Not every intelligence campaign needs to be successful for Russia to have achieved its goals.

6.     As part of its larger efforts to target the United States, Russia has engaged and continues to engage in spot-and-assess operations. A spot-and-assess operation is an intelligence operation that seeks to identify individuals who could potentially be recruited as an intelligence asset — or "source" — at a later date. Spotting and assessing involves the collection of information about individuals who may be susceptible to recruitment as a foreign intelligence source. When collecting such information, an effective agent will not simply focus on mere biographical details of the target's life or career. Rather, the agent will collect information about the target's potential value as an intelligence asset, including whether the target has significant political influence or has access to high-ranking officials or to sensitive information. An effective agent will also collect information about the target's personal life and character, such as the target's family and social ties, likes and dislikes, habits, ideological leanings, character flaws, vices, and any other information that might make the target amenable to recruitment. The agent then compiles this information into targeting packages that are shared with the agent's handlers for further analysis.

7.     Targets of spot-and-assess campaigns are not limited to high-level officials or people with direct access to classified or sensitive information. Rather, targets can also include individuals who are connected to influential persons in the government or in private companies, or individuals who are expected to obtain access to classified or sensitive information at a later time.

8.     An agent conducting a spot-and-assess operation typically does not directly recruit a source or ask the source to provide sensitive or classified information. Rather, a spot-and-assess

agent focuses primarily on collecting information about their targets, so that information can be used later by trained intelligence officers as part of carefully orchestrated recruitment efforts. The recruitment of a foreign intelligence source can take years or even decades. Spotting and assessing is simply a first step in a much longer process.

9.      Agents conducting spot-and-assess operations are often not trained intelligence officers. Spotting and assessing activity can present a high risk of exposure. A government intelligence service would not want to risk exposing a trained intelligence officer by having such a person engage in this type of conduct. The use of untrained personnel also provides the intelligence service with plausible deniability should the spotter and assessor ever be discovered and exposed.

10.      A spot-and-assess operation does not require secret encryption, dead drops, or any other trappings of a Hollywood spy story. In fact, the majority of operations conducted by foreign governments do not involve traditional espionage "trade craft" in the sense that phrase is commonly understood. Yet, spot-and-assess operations are an essential component of intelligence work.

11.      In my expert opinion, Butina's activities in the United States from 2015 to 2017 fit the classic pattern of a spot-and-assess operation. For example, the reports she sent back to the Russian Official have all the hallmarks of targeting packages used in spot-and-assess operations. That Butina presented herself as someone with high-level connections in the Russian government but never asked potential targets to provide any confidential information or do anything obviously illegal is entirely consistent with a spot-and-assess operation.

12.      I assess that the information Butina provided to the Russian government through the Russian Official was of tremendous intelligence value. Butina collected information about

numerous American citizens who she believed had access to and influence with senior levels of the United States government.  She focused specifically on Americans with political influence and Americans who had access, or were expected to acquire access, to the incoming presidential administration.  Her ability to gain meaningful access to these powerful individuals would be incredibly valuable to the Russian government.  Butina compiled information about these individuals in reports that were sent back to a high-ranking Russian government official. Consistent with a spot-and-assess operation, her reports did not focus on mere biographical details. Rather, she identified the political importance of those individuals upon whom she was reporting. Such information is the essence of a spot-and-assess report.

13.     Butina provided Russia with information that has tremendous intelligence value. Certainly, it is the type of information I would have found extremely valuable had I received such information about an adversary as Assistant Director of the FBI's Counterintelligence Division.  I have little doubt that at least some of the information Butina provided to Russia has been presented to the Russian equivalent to the FBI's Assistant Director for Counterintelligence — or even to more senior government officials.

14.     In my expert opinion, Butina provided the Russian Federation with information that skilled intelligence officers can exploit for years and that may cause significant damage to the United States.

_____

Robert Anderson, Jr.

13 Dec 2015

It is great that your clout substantially increased in their eyes! They are not going to get a reception like that in any country (in terms of both the level of the meetings and the level of the service – the best hotel, really the best restaurants and so on. We have "paid off" our reception in Tennessee royally!)

What about the theater, did [they] like it? How did [they] wake up, how was the flight? It all went without any incidents?

13 Dec 2015
MB: [They] liked it very much! They all departed. Everything is great. Now they are looking forward to our visit.

13 Dec 2015
▇ : God willing! ))) Alright! Need to work out the "Prayer Breakfast." This is the next step.

13 Dec 2015
MB: We are yet to reap dividends from the outcome of this one.
You should speak in this regard at the Board of Trustees tomorrow.

13 Dec 2015
MB: We need to hold the spot. Now everyone has realized that this is a valuable contact. There will be attempts to seize the initiative.

13 Dec 2015
▇ : There definitely will be! But this is not the point! To sacrifice everything on the Altar of Fatherland! What should I talk about at the Board of Trustees? There is not much to say in regard to our affairs!

13 Dec 2015
MB: This is the most important thing. They will seize and spoil it. You have an important mission of reviving relationships between the two countries. It is a long game. No one else can manage that. It is necessary to stay in charge of the initiative and you should mention casually that you spoke there, and they spoke here. With whom [they] met. We will discuss more tomorrow. Ch [sic] I will think about it.

UNCLASSIFIED

**UNITED STATES DEPARTMENT OF JUSTICE**

**FEDERAL BUREAU OF INVESTIGATION**



Washington Field Office
601 4th Street NW
Washington DC 20005

File Number:

Requesting Official(s) and Office(s):

Task Number(s) and Date Completed:

Name and Office of Linguist(s):                ████████, WFO

Name and Office of Reviewer(s):                ████████, WFO

Source Language(s):                Russian

Target Language:                English

Source File Information

████████Source Material 8_2018_05_31_14_57_59_746

VERBATIM TRANSLATION

**Description of the Diplomacy Project**

**Status Quo: Russian-American relations**

It is highly likely that **the US �ના░░░░ Party (the ▨P) will gain full control of governing the country as a result of 2016 presidential elections**.

**As early as November 2014 the ░░░░░░ attained a majority in the US Congress** (the ▨P has 54 seats vs. the ░░░░░ 44 in the US Senate, and 247 seats vs. the ░░░░░ 188 in the House of Representatives).  ░░░░░ dominance in the institutions of U.S. state power will be finalized by victory in the presidential election.  This is very likely for two reasons.

- The ████ have had more than two terms in a row only twice in the US history; ░░░ has already served his two terms;
- The level of support for the only probable ░░░░░ candidate in the 2016 presidential elections, ░░░░░, is low (the scandal of breaking the law and having a personal email account, March 2015, the gender of the candidate (a woman has never won in the US).  It is acceptable that ░░░ won against the emotional background of the black population that went through deep complexes during the years of slavery, but it seems highly unlikely that the people will have another emotional impulse to elect a woman given all her other negative aspects (her age, her husband's reputation, etc.).  The ░░░░ Party does not seem to have any other candidates.

It is important to understand, however, that despite the low, but still real chance that the ▨P will lose the presidential race, the Party still holds a majority in Congress, and that allows it to play a key role in the American political system.

Traditionally, the ▨P is associated with a negative and aggressive foreign policy, in particular towards Russia.  The present time, however, is a favorable one for building constructive relations if negotiations are conducted in the right way.

The situation is unfolding while the US economy is declining and unemployment is rising (fueled by Obama Care, the social program for the unemployed; this will also hurt the ░░░░ in the upcoming elections).  As a result, the people are dissatisfied with their policies.  One of the reasons for the crisis are the sanctions imposed on Russia and the  corresponding sanctions that RF imposed on the West; these measures inevitably lead to consequences of that kind, undermining commercial-economic relationships between Russian and American companies.

One of many obvious examples is the termination of cooperation between the Russian company ░░░░ and the American company ░░░░░ due to the sanctions (the cooperation agreement was signed in 2011); the agreement pertained to geo-exploration and extraction of hydrocarbon deposits in the Russian shelf of the Black and Caspian Seas, in Western Siberia and also in the US, Canada and other countries.  It also provided for creation of the Arctic Research Center (ARC) for sea-shelf exploration and for conducting joint research.  The agreement was signed in the presence of Prime Minster of RF V.V. Putin in Sochi.  Another example: ░░░░░ used the sanctions to stop imports of Russian weapons made by the ░░░░ Company; this led not only to the collapse of the Russian company

(US sales made 80% of the Company's exports), but also prevented people from buying original Russian AKs in the US, and the people perceived this as an infringement of the Second Amendment of the US Constitution, which gives US citizens the right to bear arms.


**Situation inside the ▆P**

Selection of presidential candidates from political parties in the US is done in closed primaries.  It is already possible, however, to make a forecast of what is likely to happen.  The annual conference of the ▆▆▆▆▆▆▆▆▆▆▆ is an important indicator of the outcome of the ▆▆P primaries; the conference is also known as "the heart of the ▆▆▆▆▆▆ Party"; it takes place annually in Washington.  All future candidates (and consequently all ▆▆▆▆▆▆ presidents) have always been speakers at the ▆▆▆  In 2015, the situation did not change.  Moreover, the conference organizers conduct pre-elections (pool [sic]) by asking the attendees about their preferences for the ▆▆▆▆▆ presidential candidate.  The results of the poll always match the results of the primaries later.  According to the poll results, the favorites in the race are ▆▆▆▆▆▆ and ▆▆▆▆▆▆▆ **who, according to information partly drawn from insider sources, will be the ▆▆▆▆▆ candidate in the 2016 presidential election campaign.**

**The ▆▆▆▆▆▆▆▆▆▆▆▆ plays a central role in the ▆▆P and exerts influence on it.**   The ▆▆ is the biggest sponsor of the US Congressional elections; it also sponsors the ▆▆ and other ▆P events.  The causes for this are economic – The ▆▆ includes all the US arms manufactures and the majority of the biggest foreign arms manufacturers as well.  To take part in ▆▆ activities companies are charged a minimum fee of $1,000,000 USD annually.


**The spokesperson's positions in the ▆P**

In view of her activities in the "Arms" project and her political background, the spokesperson has already established good communications with the ▆▆ leadership (▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ he visited the RF in response to an invitation from the Right to Bear Arms organization to attend its annual meeting in 2013.  Furthermore, the spokesperson took part in the annual meeting of the ▆▆ in 2014 as well as in a closed meeting of the ▆▆ governing body in 2015 and in the ▆▆▆▆▆▆▆▆ conference (the ▆▆) in February of 2015.  This contact became possible thanks to personal connections and a visit to the US of ▆▆▆▆▆▆ then-senator and acting chairman of the ▆▆▆▆▆▆▆▆ of the RF.  **There are no other "informal" points of contact or experts on Russian-American relations in the ▆▆P.**

The number of Russian experts and social organizations for conveying the "unofficial" position which Russian state agencies in the US cannot voice, is extremely small (list is in the Attachment 1).   There are about 50 active Russian social organizations in the US, but they have no contacts with the future ruling Party.  Moreover, the ▆P leadership views the speaker spokesperson as a possible "second Pozner" who, as is known, was in fact the unofficial transmitter of Gorbachev's and Yeltsin's policies in the US; he did this, among other ways, by working with American television.

During her recent participation in the ▮P events in the US, the spokesperson was introduced to all the main RP leaders as "representative of the unofficial diplomacy" of the RF.   Also, she became personally acquainted with ▮▮▮▮▮▮▮ and all the presidential candidates in the ▮P primaries.

The Americans see the current situation as similar to the period of conflict resolution during the Cold War (let us remember that the two superpowers were able to defuse their nuclear standoff via an unofficial communications channel – the meeting between Soviet spy Fomin (Feklisov) and the ABC News correspondent John Scali where the Soviet government conveyed its conditions for resolving the conflict).   They are convinced that the official diplomatic establishments of the two countries cannot agree to compromise in negotiations without losing face and that building a relationship between the two countries in the future is possible only via an unofficial channel of communication.

**The ▮P leadership sees a connection: "Spokesperson – ▮ – access to VVP"** and the possibility of conveying the US position in order to achieve compromise and renewal of economic relations between the two countries.

It is important to understand that this American position is of a purely pragmatic nature – US business supports the ▮P because of its platform (maximum business freedom, reducing programs for the social welfare of the population, lowering taxes); that is, business is simply protecting the trade relationships between the two countries and its own profits.  US business has already harshly criticized ▮▮▮▮▮'s actions in 2014 because sanctions against the RF negatively affect business development.

**Results achieved so far**

During her stay in the US, the spokesperson

- received an invitation to speak as an expert on Russia on the biggest US news channel ▮▮▮▮▮▮ ▮▮▮▮ (the start of cooperation was postponed at the spokesperson's initiative until the points of the position that she would represent could be discussed).
- was admitted to the international speaker organization, ▮▮▮▮▮▮▮▮▮▮▮ headquartered in the US, as an expert on Russian-American relations.
- received an invitation to deliver a course of lectures on international politics in a number of US State Universities.
- was invited to speak on the topic of Russia and the US at the ▮▮▮▮▮▮▮▮ conference in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it gathers the ▮P leadership exclusively).
- personally met and has personal contact with the favorite of the ▮P primaries, ▮▮▮▮▮▮▮, and with members of the future ▮P administration of the White House including ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and foreign affairs advisor of the ▮P.

**Thus the groundwork for reliable contact in negotiating with the future US administration can be said to have been laid.**

**Further action**

**The resulting state of affairs needs to be strengthened specifically in the current time period,** before the 2016 presidential election.  After the election, conducting negotiations on that level will be

extremely problematic.  The spokesperson needs to participate in all the major upcoming ▮P conferences (about once a month in various US cities; the list is included below in attachment 2), to speak in the American media as an expert from Russia and to have constant contact with the ▮P leadership.

**Also, it is important to note the large number of players from Russia who are interested in this matter – entrepreneurs and RF citizens who own businesses and property in the US.**  If relations between the two countries do not improve and the process of imposing sanctions becomes harsher, Russian business will face a high risk of losing assets abroad.

Thus, we propose to consider the issue of providing the spokesperson with financial support for attending the events mentioned above (a total budget of about $125,000) as well as separate meetings with interested parties (the MFA, the Russian business representatives) in order to determine where the focus of Russian interests lies in cooperating with the US.

Attachment 1

RUSSIAN ORGANIZATIONS IN THE US



Attachment 2

**LIST OF MAIN ██ P EVENTS TO ATTEND**

May 14-16, 2015 -- ████████████████ , Washington
June 11, 2015 -- Dinner at ████████████ , Washington
July 8-11, 2015 – ████████████ convention, Las Vegas
July 11-12, 2015 – Conference of the ██████████████████████████
████ ), Washington
September 25-27, 2015 – ████████████ conference, Washington
October 2, 2015 – Dinner of the ██████████████████████████
████ ), Chicago
November 5-8, 2015 – ████████████ conference, South Carolina





 How are things, Mariya?
13 Jul 2015

MB: Good afternoon!  Excellent!  I'm going to  s announcement in a few hours.  I met  He is very intent on hunting in Kamchatka.
13 Jul 2015

MB: I'm working on this matter now.  Judging from American polls – our bet on  is correct.  What do they think in the RF about this?  How are things with you?
13 Jul 2015

 In the RF no one is even looking in that direction.  You will be the creator of something sensational, God willing!)  Things are going steadily!  On Thursday I'm going to the interview at the Embassy.
13 Jul 2015

MB: Excellent on all fronts!

MB: Do you have someone from your side for organizing the hunting or should I do it using my channels?

MB: Have you talked with 
13 Jul 2015

 No.  I haven't.  When does he plan on Kamchatka?

13 Jul 2015

MB:   In November, along with a group from the ▆▆▆
      13 Jul 2015

MB:   By the way, he's ready to organize Alaska for you anytime!

MB:   He has a friend who lives there!  And he will also take you to an island.  Just let him
      know the dates.
      13 Jul 2015

MB:   I'm already prepared to help do everything! Will you take me with you:)?
      13 Jul 2015

▆▆▆   I see!
      14 Jul 2015

▆▆▆:  Of course!)
      14 Jul 2015

MB:   Though it's better in the summer or autumn:)

MB:   I was at ▆▆▆'s announcement.  Impressed.  His chances are very high.
      14 Jul 2015

▆▆▆   Need to think about it.  ███████'s announcement – that's an event!)  Can you briefly
      describe for me the event in an e-mail?  Definitely need to go to Alaska.
      14 Jul 2015

MB:   Can I write in the morning?  It's nighttime here.

MB:   So, we'll plan Alaska for September?
      14 Jul 2015

▆▆▆   Okay!  In the morning.  Need to see the weather and clarify the goal of the trip (could do
      something artful – have an idea).
      14 Jul 2015

MB:   Hmm.  We'll do it.  I really want to see Alaska.
      14 Jul 2015



There's no question – it must be done!).
14 Jul 2015

[Text of analytical piece concerning ████'s announcement to run and his prospects to win the ████████ nomination; see pages 32-33 below.]

MB:   I'm sending a report page-by-page.  I was not sure that it should be sent through the TsB. So, sorry that it's so many pages.

[continuation of text of new story on ████████]

14 Jul 2015

[Text of analytical piece on ███████ s announcement from above sent on 7/14/2015.]
US ████████ Party candidate ████████ s announcement on joining the presidential race, analysis of the election campaign, and a preliminary forecast

US ████████ Party member and ████████████████ officially announced his 2016 presidential bid on ████████████████████ ████████████ ████████ announced his participation in the presidential race before three thousand supporters at ████████████████████████ ████████

Even prior to his announcement, ████████ was among the clear favorites of the presidential race, with opinion polls putting him at the top of a triumvirate of other popular candidates, specifically ████████ and ████████.

Due to the number of those wanting to attend ████████ s official announcement, there was advance registration to get free tickets…

████████ has won elections three times in his political career: twice the gubernatorial elections in ████████ and once a gubernatorial recall procedure, keeping his position and securing public support and trust.

These facts are extremely important elements of ████████'s possible victory in the ████ [████████ Party] primaries which will take place between February 1 and June 7, 2016.  It's also important to note that ████████ along with ████████████████, is the most popular persona in the media and the least criticized candidate: even ████████ s opponents respect him; while the most negatively criticized candidates as of today are ████████████ and ████████. ████████████ for his statements in the area of migration[sic] policy (proposal to kick out…

In his speech ████████ repeated the main points of his program: maximum rights "at the local level", strong foreign policy, lowering the tax burden, ending the Obama Care program.  In his speech, ████████ also touched upon the issue of relations with Russia, making a statement about the insufficiently tough position of Obama and promising that "America will be a loyal

UNCLASSIFIED

friend and a terrible enemy." The principal focus in matters of foreign policy have been shifted toward Iran, ISIS and China.

███████ handled himself in a confident manner, spoke without text prompts, and interacted with the crowd, easily deviating a bit from the script which made his speech impressively lively.

At the end of the event ███████ remained for an hour-long interview with the Fox News television channel which was broadcast that very evening on the most popular ███████ TV channel.

After the event, Mariya Butina had an opportunity for a short personal contact with ███████ (the latter has a good memory for faces and easily remembered his interlocutor). As a reminder, Mariya Butina has had personal contact with ███████ more than once, taking part in his private reception under the framework of the ███████ annual conference in Washington, as well as in a private meeting at the annual gathering of members of the USA ███████ (The ███) in 2015. At the announcement event Mariya was also introduced to one of ███████s three advisors in matters of international politics – ███████ A meeting of Butina with a second ███████ advisor – ███████ will take place on July 15, 2015, in New York…

Overall conclusions: based on what took place on July 14, 2015, it is highly possible that precisely ███████ will become the winner of the USA █ primaries and the US presidential candidate. Taking into account the practice of a switch between the two key parties at the helm of the country, the █P is next in line; therefore, there is a high probability of ███████ being elected the US president in 2016.

Risks: ███████ who recently entered the race, is extremely unlikely to win the primaries; however, he could go all in and run as an independent candidate, which will split the ███████ electorate between the official winner of the primaries from the █P and ███████ In such a situation there is a serious risk of ███████'s victory.

UNCLASSIFIED

UNCLASSIFIED

**THE**
**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



WFO

File Number:

Requesting Official(s) and Office(s):

Task Number(s) and Date Completed:

Name and Office of Linguist(s): ███████, WFO

Name and Office of Reviewer(s): ███████, WFO

Source Language(s): Russian

Target Language: English

Source File Information

**HP 303964**

VERBATIM TRANSLATION

<u>Participants</u>:

<u>Abbreviations:</u> ███████
SF:  Federation Council
KhV: Cold War

UNCLASSIFIED

UNCLASSIFIED

[TN: ] (Delete if not needed.)

UNCLASSIFIED

Meeting with ▮▮▮▮▮▮

1. He will come to Moscow in the end of May, beginning of June to give a lecture.
2. He will provide contact information of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ editor.
3. I need to write an article on conservative values which unite Russians and Americans.
4. At the end of June, a trip to Moscow is planned from the Center.
5. At the end of June, ▮▮▮▮ will arrive with ▮▮▮▮▮▮  A meeting with ▮▮▮▮▮▮. Need to get information about ▮▮▮▮▮▮▮

▮▮▮▮▮▮

1. A separate meeting is possible.  Write before the trip to New York.

▮▮▮▮▮▮

1. Interview tomorrow at 11.
2. He will provide contact information of the programmer who made the program for them.

▮▮▮▮▮▮

1. Arrival of ▮▮▮▮▮▮▮▮▮▮ in Moscow before or after Israel (11/28/15 – 12/4/15).  Trip to Izhevsk is possible, hunting for bears in Kamchatka.  Get an exact list of people from ▮▮▮ including ▮▮▮▮▮▮▮▮▮▮▮
2. It's possible to invite ▮▮▮▮▮ foreign policy adviser with them.
3. Read the article which ▮▮▮▮ will send about approaches in US foreign policy. Find and buy foreign policy books which he recommended to ▮▮▮▮
4. He will provide contact information of the ▮▮▮▮ board member who was working on developing their program on membership registry.
5. Hunting on days off if ▮▮▮▮▮ wants.
6. Invitation to ▮▮▮▮▮▮▮▮ debates in January 2015 in New York.

Ambassador

1. I gave him the coins as a gift.  A question about whether or not they are real.
2. *I told about myself, that I have been ▮▮▮s assistant since the times of  the SF, and I have my own company in Moscow, I am a member of the board, founder of the organization, I'm writing my dissertation on international relations.*
3. *I read his publications about the lack of ideological differences which could become the beginning of a new KhV*
4. *He asked how the ▮▮▮▮ could be useful.*

5.  He shoots skeet, huge fan, ███████████  Invite to the Site.
6.  He visited the ██████ museum when its office was in Washington.
7.  Relations between the RF and the USA will be smoothing out in 1-2 years, they will become warm in 5 years.
8.  He's skeptical about ████████ s victory.  Send the name of the advisor who can come to Moscow.
9.  He likes The ██████████████████ and their joint project of cooperation with the Embassy.
10. He thinks that the ████████ can become one of the points of cooperation.
11.  He wants to meet with ████████ send his contact information.
12.

UNCLASSIFIED

**UNITED STATES DEPARTMENT OF JUSTICE**

**FEDERAL BUREAU OF INVESTIGATION**



Washington Field Office
601 4th Street NW
Washington DC 20005

| | |
|---|---|
| File Number: | ███████████████ |
| Requesting Official(s) and Office(s): | ███████ |
| Task Number(s) and Date Completed: | ████████████████ |
| Name and Office of Linguist(s): | ██████, WFO |
| Name and Office of Reviewer(s): | ███████, WFO |
| Source Language(s): | Russian |
| Target Language: | English |
| Source File Information | |

Hard copy 302345

VERBATIM TRANSLATION

**Notes regarding a series of Russian-American meetings for developing a joint position in the area of foreign policy for the future presidential administration of the USA**

**At the end of 2016, three meetings to develop a joint policy for Russian-American relations are being planned at the Americans' initiative.  The initiator, organizer and sponsor of these events is** ▆▆▆▆▆▆▆▆▆▆ **The proposed dates are: Monday, May 23, 2016 in Washington, DC, Tuesday, May 24, 2016, in New York.**

▆▆▆▆▆▆takes the position that Russia and the US should be partners; he is against confrontation between the two countries.  For the last ten years, he has sponsored several programs in this area. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ It is important to note that he maintains contact with a number of people from both the Republican and Democratic parties, making foreign policy his priority regardless of which party rules the White House.

About five years ago, ▆▆▆▆▆▆visited Moscow with a delegation and held a number of meetings for the purpose of establishing a reciprocal connection with the RF and getting political support from Russian government officials and the Russian scientific community for his initiatives.  One of the meetings that most impressed ▆▆▆▆▆and bolstered his resolve to continue Russian-American cooperation was at the Federation Council of the Federal Assembly with Federation Council member and vice-chairman (at that time) ▆▆▆▆▆▆▆▆▆▆▆▆

In February 2016 ▆▆▆▆▆▆ ▆▆▆▆▆▆met with ▆▆▆▆▆▆▆▆, now state secretary and vice chairman of the Bank of Russia; they discussed the issue of restarting the program provided the Russian business and political community were interested in developing a program for cooperation between Russia and the US.  According to ▆▆▆▆▆s statement, any such policy must be worked out on a bilateral basis.

After the meeting with ▆▆▆▆▆▆▆▆▆▆proposed to conduct 3 events at the end of May 2016 in Washington, DC and New York for the purpose of gathering like-minded Russians and Americans from the spheres of science, politics and business.  The main goal of the planned events is to work out recommendations to the future US Presidential Administration for developing Russian-American relations, and also for maintaining regular meetings as a means of informal dialogue between the two countries.  **List of US participants is attached.**  It is important to note that the persons on the list belong to the US political, business and scientific establishment of both Republican and Democratic parties.  This fact is a kind of guarantee of not becoming dependent on the support of just one of the parties and of exerting influence on foreign policy regardless of which party is in control of the US Congress or the White House.

**Among the participants are advisers to** ███████ **presidential candidate** ███████ **and also to** ███████ **Party candidate** ███████ **.**

The meetings are planned without media presence.

To summarize the results of the events, there is a plan to draw up a document with recommendations for the White House in the area of engagement with Russia.

As a **response from Russia,** ███████**envisions the following:**

1. **Participation in the events in May of 2016 on the part of** ████████ **state secretary and vice chairman of the Bank of Russia, of Maria Butina, social activist and board member of the Russian civic organization Right to Bear Arms and also of another representative to be proposed by Russia**.  As possible participants, ████████ envisions a representative of Russian big business who has interests in the US and who understands the importance of dialogue between the two countries or else a government official with analogous views.  Participants that Russia might propose for participation in the meetings are:

   - ████████████████████████████████████████████
   - ████████████████████████████████████████████

   However that may be, the Americans would agree to any representative who Russia considers to be the most fitting third participant in the meetings.  Obviously, it should be a figure who has a financial, political and/or ideological interest in developing relations between the two countries.

   Remember that the annual meeting of the ████████████████ will take place May 19-22, and that an invitation to the event might be issued, if need be, for this individual.

2. **Organization of a corresponding meeting in September-October 2016 at the Russians' initiative in Moscow** on the eve of the upcoming presidential election in the USA.

   In the future, ████████ **foresees the possibility of founding a research institute for studying and working out Russian-American policies.**

   **It is desirable to provide confirmation of readiness to attend the events and also a name of the proposed third participant before April 1, 2016,** in order to give the Americans enough time to organize the meetings.

Attachment

Proposed American Participants in the Informal Meeting Series,

"Dialogue between Russia and the USA"



UNCLASSIFIED



UNCLASSIFIED

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**



Washington Field Office
601 4th Street NW
Washington, DC 20535

File Number: ▓▓▓▓▓▓▓▓

Requesting Official(s) and Office(s): ▓▓▓▓▓▓▓▓

Task Number(s) and Date Completed: ▓▓▓▓▓▓▓▓▓▓

Name and Office of Linguist(s): ███████████, WFO

Name and Office of Reviewer(s): ████████, WFO

Source Language(s):          Russian

Target Language:          English

Source File Information
303340.docx

VERBATIM TRANSLATION

Participants:

████████████████████████████████████████
██
Mariya Valeryevna Butina


Abbreviations:
SF RS RF          Federation Council of the Federal Assembly of the Russian Federation
TsB          Central Bank


UNCLASSIFIED

[TN:

FOMIN, Alexander, whose real name was Aleksandr Semonovich FEKLIZOV, was the KGB Resident in Washington, DC at the time of the Cuban missile crisis.  He contacted John A. Scali to ask whether President John Kennedy would follow through on his threat to retaliate against Moscow, not Havana, if a Soviet missile were fired at the United States from Cuba.  According to Scali's friend Warren Rogers, Scali impulsively answered Fomin's question with the words, "You're goddamn right he would!" Then Fomin proceeded to lay out a plan by which the Soviet Union would dismantle the Cuban missile bases if the American government would pledge not to invade Cuba.  Scali undertook to relay this message to the State Department.

SCALI, John A., was hired in 1961 from the Associated Press to serve as diplomatic correspondent for ABC News. Having been approached by Alexander Fomin about a Russian plan to avoid confrontation in Cuba [see above], Scali returned to the State Department press office and relayed Fomin's message. Some hours later, when the State Department had already instructed Scali to tell Fomin that the Kennedy administration saw possibilities in his proposal, Khrushchev, communicating through the US embassy in Moscow, made a similar proposal but stipulated that the United States abandon its missile sites in Turkey.  However, the State Department did not cede to Khrushchev's demand and it continued to employ Scali as intermediary until the Cuban missile crisis was defused.  Internet sources imply that Scali's communications with Fomin paralleled Krushchev's communications with Kennedy but that the two channels were not initially coordinated.]

**Note on Forming a Channel of Informal Communication between Russia and the USA**

Informal communication among states always plays an important role and organically supplements formal channels such as embassies, committees and commissions, and work in the framework of international organizations.  Informal channels play a special role in forming a background for the work of formal institutions, but sometimes even a decisive role in resolving international conflicts (the author has in mind the meeting of Aleksandr Fomin with the American journalist John Scully at the time of the Caribbean crisis of 1962.  Through those two citizens, informal talks between the USSR and the USA were held (the author harbors no illusions about Mr. Fomin's workplace, but the main point is the fact that the talks were of an unofficial nature at a time when neither party to the conflict was able, without losing face, to make concessions).  Moreover, **informal communication serves to achieve such goals as forming relations of trust in the business milieu, developing a country's ability to attract investment and the dialogue of civic organizations, on the basis of communality of interests and similarity of cultures.**

**Russia has more than once made attempts at establishing an informal agent of influence on US territory** as, for example, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **partly fulfilled that function;** however, given the exacerbation of relations, the public and close link of the institute to the Kremlin immediately placed the institute in a "non-grata" position that, in the last analysis, led to its liquidation because it could not fulfill the tasks set for it.

▓▓▓▓▓▓ **is also located on US territory**:  a branch of it (now independent) is the ▓▓▓▓▓ ▓▓▓ in Moscow; however, as noted earlier, the head of the organization is now a US citizen and also a hired worker who directly depends on the American businessman ▓▓▓▓▓▓▓▓▓▓ and (according to unconfirmed but plausible data) in undetermined relations with ▓▓▓▓▓ ▓▓▓▓▓▓, the former head of the ▓▓▓▓▓▓ company.  It would be strange to expect from this center a consistent policy of forming a positive background for work with the Russian diplomatic mission in the USA.  Formally ▓▓▓▓▓ declares a pro-Russian agenda in US foreign policy yet, last year, the banker financing the center, an investor in the now reorganized ▓▓▓▓▓▓▓▓▓▓ may, in connection with events that occurred in the Russian banking system and the reorganization of his bank, either put an end to the pro-Russian line or close the center.  The first prognosis is already confirmed in practice – on the center's website ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ there were previously pro-Russian materials supporting the policy of Russia, taking a neutral position and recommending that the US leadership cooperate with the RF.  However, now (see illustration 1, dated February 26, 2016) the character of the materials has changed to a negative one. The author concedes that the change in rhetoric coincides with ▓▓▓▓▓▓▓▓▓▓▓ failure in Russia.  An organization like that is unlikely to become a channel of informal communication and a center for spreading dialogue between Russia and the USA.

Pro-Russian cultural centers for developing literature and music no doubt play an important role in preparing the background and developing informal communication; however, they are, as a rule, unsystematic, and are not authoritative in political and business circles.

To a certain degree, support centers for immigrants from Russia further the attainment of these goals, inasmuch as new US citizens immigrating from Russia or the USSR maintain contacts with the country of their previous citizenship but they often strive to cut off interaction completely and to represent the country of their previous citizenship as a hateful place in which their previous life was, for one reason or another, unsuccessful, and that is why they came to the United States.  That category experience natural nostalgia, as a rule towards the time of personality crisis at the age of 50, when they remember their youth and their negative memories are effaced, yet by that time their relations with Russia have already been broken off and their contacts are out of date.  What is more, communities of immigrants represent haphazard entities, interest groups of a sort, and cannot become an agent of influence.

**The fact that, on US territory, there are a certain number of opposition activists only aggravates the state of affairs.**  As a rule, these activists speak good English and take pleasure in actively transmitting their hatred toward the RF in the press, recounting tales about the terrible injustice done to them in Russia, the torture and the derision, obviously exaggerating the proportions of their misfortune.

**In such a situation it is very hard to expect a positive background for official diplomacy and the existence of informal channels of communication.**

**However, in the USA there are groups of scholars, businessmen and politicians who entertain positive views on the outlook for interrelations between Russia and the USA. Many of them are found on the very highest rungs of the hierarchy inside the US establishment.**   These are the very groups with which it would make sense to build dialogue, supporting and warming their positive inclinations, providing support for those initiatives.

**One such group is that of** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In 2012, under the leadership of ▮▮▮▮▮▮▮▮ adherents of such a position visited Moscow and met with several senators of the SF FS RF.  Yet, having received no gesture of response from Russians, they shifted their attention to domestic US projects in subsequent years.  Nevertheless, ▮▮▮▮ ▮▮▮▮ did not change his position or lose faith in the possibility of cooperation between the countries, taking the position of waiting for a gesture of response on the part of Russia.

In February 2016 ▮▮▮▮▮▮▮▮▮▮▮ met with ▮▮▮▮▮▮▮▮▮ Deputy Chairman of the TsB RF and Maria Butina, founder of the Russian national civic movement Right to Bear Arms.  The meeting took place at the Americans' initiative. ▮▮▮▮▮▮ had met previously with ▮▮▮▮▮▮ at the time of his trip to Moscow in 2012 and has a genuine and deep respect for ▮▮▮▮▮▮▮▮ Ms. Butina is united with ▮▮▮ by the presence of mutual friends in the ▮▮▮▮▮▮▮▮▮▮▮▮, which in December 2015 made its first official visit to Moscow, where it met with, among others, S. Lavrov, Minister of Foreign Affairs, I. Shchegolev and Yu. Trutnev, Assistants to the President, and also D. Rogozin, Vice-Premier.

Somewhat distraught by his unsuccessful attempt to establish informal communication with the Russian elite in 2012, �_____ nevertheless promised to think about the possibility of renewing his support for the project.  As early as the next day he announced that the Americans would again take up the topic, provided he saw corresponding readiness for dialogue on the part of Russia.

A week later Ms. Butina visited the residence of the �_____  In the framework of the conversation still more trusting relations were established between the parties, and details of the Americans' first step towards setting up an informal channel of communication were discussed.  **On the part of �_____  proposal was made to organize 3 events in Washington and New York May 23-25, 2016 for the purpose of gathering pro-Russian American politicians, scholars and business people and discussing how to set up an informal channel of communication on the basis of such regular meetings in the USA and Russia.**

It is noteworthy that, in spite of the fact that �_____ is a �_____ persons from the left and right wings of American politics and business will be present, who, nevertheless, concur on the position that cooperation between Russia and the USA is important.  According to the organizer's conception, all the events will take place without press coverage.  The organizer assumes this to be possible only if the Russians in attendance show signs of being ready for dialogue.  As participants he above all sees �_____ and Ms. Butina, and **also presumes the participation of still another representative** of Russian business and politics, leaving the choice of the person to the Russians' discretion.

**Provided there is corresponding interest on the part of Russia, �_____ plans include holding an analogous series of events in Moscow in October 2016.**  It is also noteworthy that �_____ enjoys proximity to the formation of the administration of the new White House (irrespective of which side wins) and for that reason presumes that those events must help experts in the White House to form the right relationship to Russia. In the capacity of attendees at the events there will necessarily be future representatives of the presidential administrations of both the Republicans and the Democrats

Furthermore, in the framework of the annual scholarly conference on foreign policy based at ▬▬▬▬ University, Washington, District of Columbia, in September, 2016, which ▬▬▬▬ is sponsoring, a special section on Russia will be opened, at which Russians are at liberty to propose the speakers.

In addition to the aforesaid ▬▬▬▬ sponsors the American journal, ▬▬▬▬▬▬▬▬▬▬▬▬ in which he is asking ▬▬▬▬▬▬ o write an article to consolidate his authority in US intellectual circles.

The indicated initiative may become the main channel of Russian-American informal communication mentioned at the beginning of the document, a platform for finding commonality among the interests of business, politics, culture and society, which will generate the necessary background for promoting pro-Russian sentiment in the USA.  The special advantage of this proposal resides in the fact that the presence of bilateral interest will, on the one hand, cancel out

the questions of American ill-wishers about "the Kremlin's hand" in the organization and in attempts at propaganda and, on the other hand, will make it possible to exert the speediest and most effective influence on the process of making decisions in the American establishment.  In connection with the aforesaid, the author assumes that it is possible not to impede the emergence of this channel, and also to facilitate its development by means of providing a platform for communication in Moscow and St. Petersburg in October 2016.