**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Criminal Case:  18-218 (TSC)** |
| **v.** | : | |
| | : | |
| | : | |
| **MARIIA BUTINA, also known as** | : | |
| **MARIA BUTINA,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Memorandum in Aid of Sentencing for defendant Mariia Butina.  For the reasons stated herein, the government submits that an appropriate sentence in this case prior to taking the defendant's cooperation into account is 24 months' incarceration.  For those reasons, as well as those in the government's Supplemental Memorandum in Aid of Sentencing and Motion for a Downward Departure, which we will file under seal contemporaneously with this memorandum, we request that the Court impose a sentence of 18 months' incarceration.

## I.    INTRODUCTION

The defendant is before the Court having entered a plea of guilty to Count 1 of the Indictment, which charges her with conspiracy to act as an agent of the Russian Federation, in violation of 18 U.S.C. §§ 371 and 951.

From approximately 2015 to 2017, the defendant acted in the United States as an agent of a Russian government official ("Russian Official").[1]  Under his direction, the defendant provided

---

[1]    Throughout this memorandum, the terms "Russian Official," "Political Party 1," "U.S.

key information about Americans who were in a position to influence United States politics and took steps to establish an unofficial line of communication between Russia and these Americans. As laid out in the Statement of Offense, she sought to do so for the benefit of the Russian Federation.  Statement of Offense at 2.   Russia has long targeted the United States and U.S. allies in an effort to expand Russia's sphere of influence and relative strength.   As is demonstrated by the attached declaration, the activities at issue in this case are part of Russia's broader scheme to acquire information and establish relationships and communication channels that can be exploited to the Russian Federation's benefit.   See Declaration of Robert Anderson, Jr., attached hereto as Exhibit 1[2].

Butina was not a spy in the traditional sense of trying to gain access to classified information to send back to her home country.  She was not a trained intelligence officer.  But the actions she took were nonetheless taken on behalf of the Russian Official for the benefit of the Russian Federation, and those actions had the potential to damage the national security of the United States.

The defendant took her actions without notifying the Attorney General as required by law. Her failure to notify the Attorney General that she was acting as an agent of the Russian Federation—far from rendering this a mere registration offense, as her counsel has claimed—was an integral part of her and the Russian Official's success in advancing Russia's interests.  Had the

---

Person 1," "MFA," "U.S.-Russia Friendship Dinners," and "Gun Rights Organization" have the same meanings they did in the Indictment and the Statement of Offense.

[2]      Robert Anderson is the former Assistant Director of the FBI's Counterintelligence Division.  He is currently the Chief Executive Officer of Cyber Defense Labs in Dallas, Texas.  He was retained by the government in connection with this case.  The Government will make Mr. Anderson available at the sentencing hearing, should the Court or defense have any questions for him.

defendant made an honest notification, she may have been denied access to the United States altogether, or at the very least, the prominent Americans whom she strove to influence on behalf of Russia would have been alerted that she was more than simply a Russian student interested in gun rights and international politics.

## II.    BACKGROUND ON FOREIGN OPERATIONS

To put the nature and seriousness of Butina's offense of acting as an illegal agent into context, the government respectfully submits that it is important for the Court to appreciate why the government of the Russian Federation, in general, and Russian Official specifically, would seek to task Butina to act as she did in the United States.   This necessarily includes an understanding of the value of the information and introductions provided by Butina to the Russian government.

### A. Spotting and Assessing

Acquiring information valuable to a foreign power does not necessarily involve collecting classified documents or engaging in cloak-and-dagger activities.   Something as basic as the identification of people who have the ability to influence policy in a foreign power's favor is extremely attractive to those powers. This identification could form the basis of other forms of intelligence operations, or targeting, in the future.

In addition to identification, or "spotting," of individuals, foreign powers seek to understand the motivations and vulnerabilities of such individuals, particularly in settings where the information can be elicited casually and without raising suspicion.  Foreign agents, acting as "access agents," may simply arrange networking opportunities and introductions, particularly to those within their field.   While completely innocuous in other contexts, access agents play a key role for foreign intelligence services in the conduct of influence operations.   Access agents may

or may not be witting—and may be somewhat witting—about the intent behind the foreign government's taskings.

### B.  Backchannel Lines of Communication

A backchannel is a line of communication with a foreign government or with representatives of foreign governments that is discreet and does not go through official channels of diplomacy.  The term often refers to lines of communication between two adversarial governments through an intermediary or third party.  Such channels bypass open channels of diplomacy and can be used to win concessions or influence positions that contradict declared official policies articulated by governments.

## III.        FACTUAL SUMMARY

The conspiracy in which Butina engaged was ambitious: she—with the backing of a Russian government official—sought to establish unofficial lines of communication between Russia and Americans having power and influence over U.S. politics and to use those lines of communication for the benefit of the Russian Federation.  Statement of Offense at 2.  Throughout the conspiracy's existence, as explained more fully below, Butina was keenly aware that portions of her work were being reported to the wider Russian government beyond Russian Official and that factions within the Russian government would be interested in the "valuable contacts" she was developing.  See Exhibit 2.[3]

### A.  Butina Intended to Circumvent the Diplomatic Process

Butina believed from early on in the conspiracy—at least as far back as March 2015—that the official channels of communication normally open to two countries would be insufficient for

---

[3]        This and all other exhibits that were originally written in Russian have been translated into English by FBI linguists.

Russia to influence U.S. policy, given the then-existing relationship between the two countries. She actively promoted the idea that Russia could use this backchannel of communication she planned to establish to influence U.S. policy towards Russia. She laid out a plan in March 2015, which she called the "Diplomacy Project," to use connections she had made at the Gun Rights Organization to attempt to create this unofficial communication channel with the next U.S. presidential administration. Id. She sought the advice of U.S. Person 1, and she included his analysis of the U.S. political landscape in a proposal, which she sent to the Russian Official and others in Russia, who in turn informed her that her proposal would be supported, at least in part. Id. at 2-3. A copy of the translated Diplomacy Project proposal is attached hereto as Exhibit B.

### B. Butina Immediately Began Targeting Political Party 1 and the Gun Rights Organization.

Soon after she drafted the Diplomacy Project proposal, in April 2015, she traveled to the United States to attend the Gun Rights Organization annual meetings with the Russian Official, where she highlighted her experience as a gun-rights advocate in Russia and was introduced to influential members of Political Party 1, one of whom announced his Presidential campaign shortly thereafter. Statement of Offense at 3. She did so in furtherance of the conspiracy's goal to establish the back channel of communication as laid out in the Diplomacy Project. Id. at 3. Butina attended this announcement event in July 2015 and, after being tasked by the Russian Official to do so, wrote a report to him in which she emphasized the fact that she was introduced to one of that candidate's three advisors for matters concerning international politics. A copy of the Twitter chats, along with the report, is attached hereto as Exhibit 4. According to her notes from a meeting with then-Russian Ambassador Sergei Kislyak in May 2015, she said she would "send the name of the advisor [to the candidate whose announcement event she later attended] who can come to

Moscow."[4]  A copy of those notes is attached hereto as Exhibit 5.

In December 2015, Butina invited powerful members of the Gun Rights Organization to Moscow as part of the conspiracy's plan to establish the unofficial channel of communication. Statement of Offense at 3.  She actively sought out meetings for this group with high-level Russian government officials, as arranged by the Russian Official.  Id.  As part of this endeavor, the defendant sought information from U.S. Person 1 about the degree of political influence held by the Gun Rights Organization members in the United States and stressed the need for a "political program" as part of the Gun Rights Organization trip to Moscow.  Id. at 3-4.

Following the Gun Rights Organization trip to Moscow, the defendant and the Russian Official discussed the need to "hold the spot" now that "everyone has realized that [the Gun Rights Organization] is a valuable contact," and she noted that there will be "attempts to seize the initiative."  Exhibit 2. Butina has since confirmed that she was worried about others within the Russian government or a political group or activist noticing that the contacts she had built with the Gun Rights Organization were valuable and cutting her and the Russian Official out of the loop. Just days later, Butina noted to the Russian Official that they would "quietly press" or "put pressure on [members of the Gun Rights Organization] later."  Statement of Offense at 4.

### C.  Butina Used Friendship Dinners to Hone Her Approach.

Butina also used seemingly innocuous events, such as U.S.-Russia "friendship dinners," where wealthy and influential Americans discussed U.S.-Russia relations, to advance the conspiracy.  Butina used these dinners to cultivate lines of communication with individuals she believed would have the ear of the next U.S. presidential administration.  Id.  They afforded her

---

[4]     All available evidence indicates that Butina and former Ambassador Kislyak did not get along well with each other.

an opportunity to adjust her "pitch" based on how the influential attendees responded to her.  Id.

Butina reported on potential attendees at these dinners to the Russian Official.  Id.

Butina wrote, in a document recovered from her computer, that it was good that people on the list were affiliated with both major U.S. political parties, noting, "This fact is a kind of guarantee of not becoming dependent on the support of just one of the parties and exerting influence on foreign policy regardless of which party is in control of the US Congress or the White House."  A copy of that document is attached hereto as Exhibit 6.  In a separate document recovered from her computer, Butina evinced her knowledge of the power of concealing any official connection to the Russian government at these events, stating, "The special advantage of this proposal [U.S.-Russia Friendship Dinners] resides in the fact that the presence of bilateral interest will, on the one hand, cancel out the questions of American ill-wishers about 'the Kremlin's hand' in the organization and in attempts at propaganda and, on the other hand, will make it possible to exert the speediest and most effective influence on the process of making decisions in the American establishment."  A copy of this document is attached hereto as Exhibit 7.

**D. Butina was Aware that the Russian Official Spoke to the Wider Russian Government About Their Activities.**

The Russian Official tasked Butina with writing a note to the Russian Ministry of Foreign Affairs (MFA) explaining why he should be permitted to travel to the Gun Rights Organization annual meetings in the United States.  Statement of Offense at 5.[5]  In responding to the tasking, Butina drafted a note that she sent to the Russian Official, explaining the opportunities he would have to meet with political candidates:

**In May 2016 [Russian Official] has the chance to speak personally with**

---

[5] The Statement of Offense incorrectly states that this tasking occurred in May 2016. Although the Gun Rights Organization meetings were scheduled for May 2016, the tasking and defendant's response thereto occurred in late April 2016.

**the leaders of the [Political Party 1] primary race . . .**

**In conclusion it is important to note that on April 22, 2016 [Presidential Candidate] announced a change** in the management of his primary campaign staff and in his **election strategy, where the candidate plans to pay closer attention to foreign policy. Important** in these circumstances **are those contacts with the candidate and his entourage that will help form [the candidate]'s correct view of Russian-American relations. Attending the general assembly of the [Gun Rights Organization] in May 2016 fully provides this unique opportunity**"

(Emphasis in original). Butina and the Russian Official continued to plan for his trip as if he were planning to seize an opportunity to begin creating a back channel of communication. For example, Butina suggested the Russian Official give the Presidential Candidate a gift of a gold coin from the Russian Central Bank, noting that the symbolism would be: "relations between our countries are just as valuable as gold, the most valuable metal."   Despite their intentions, Butina and the Russian Official did not meet with Presidential Candidate at the Gun Rights Organization meetings.

In July 2016, after Butina had arrived in the United States pursuant to her student visa— for which she applied without mentioning that she continued to work as an agent of the Russian Official or that she was trying to establish unofficial communication channels between Russian and American officials (Statement of Offense at 4)—she wrote a forecast on the 2016 presidential election that the Russian Official told her he was considering sending to the MFA. She later asked the Russian Official's advice on whether the Russian government was ready to meet U.S.-based political advisors, and he asked her what she planned to do with her contacts, lest the two of them be forgotten after the 2016 election. Statement of Offense at 5.

### E. **After the 2016 Election, Butina Marketed Her Contacts to the Wider Russian Government.**

Almost immediately following the 2016 election, Butina worked tirelessly to draft two

proposals for the Russian Official that she has since confirmed she hoped would be distributed to the Russian government or to any Russian businesspeople who may have been hurt by U.S. sanctions.  In one of those proposals, sent to the Russian Official on November 10, 2016, she noted that its goal would be to "use the existing personal groundwork" she and the Russian Official had laid "in establishing informal relationships in U.S. political circles . . . for the purpose of assessing, monitoring, forecasting, and developing the policies of the [Russian Federation] vis-a-vis" the U.S. government.  Butina also noted:

> During the last 5 years, [Russian Official] and Butina have constantly worked on establishing unofficial contact, based on common views and a system of conservative values, with a number of key [Political Party 1] organizations in the US, including the executive level of [Political Party 1], its intellectual establishment and [Political Party 1] organizations.

On the following day, November 11, the defendant provided the Russian Official with the name of an individual she claimed was being considered for Secretary of State.  She asked the Russian Official to seek the input of the Russian government on the name she provided and told him, "our opinion will be taken into consideration" in the United States.

Later on November 11, Butina sent the Russian Official a second note with a project proposal entitled, "Establishing a dialogue with the team of the Newly-elected US President . . .  a conference in Washington, DC."  Butina proposed to hold a conference on ways and means of building Russian-American relations under the President-Elect, noting that the "conference must be presented as a private initiative, not a government undertaking."  Butina noted under advantages, "The event does not pose any risks because no government officials from either country will attend; yet it creates a foundation for further talks on the level of government officials."  Russian Official responded days later that he had read it the proposal, but that the MFA would not go for it.  Therefore, this event did not occur.

**F. Butina Hoped the 2017 National Prayer Breakfast Would Establish the Unofficial Communication Channel.**

At the direction of the Russian Official, Butina included certain individuals within the Russian delegation to the 2017 National Prayer Breakfast, and she noted specifically that those individuals were "coming to establish a back channel of communication."  Statement of Offense at 5.  The Russian delegation to the National Prayer Breakfast organized by Butina ultimately included approximately fifteen people, which is significantly more than attended in the years prior to 2017.  The delegation attended a U.S.-Russia Friendship Dinner two days prior to the actual event.

According to a document written by Butina after the event, in the lead-up to the National Prayer Breakfast, she and the Russian Official were promised a private meeting with the President of the United States by one of the organizers of the event.  A copy of this document is attached hereto as Exhibit 8.  This promised meeting never materialized.  After the event, and Butina's and the Russian Official's failure to meet privately with the President, she was worried that another Russian national (i.e., not the Russian Official) would attempt to seize the initiative, as demonstrated in her Twitter conversation with the Russian Official:

> Butina: It would be good if you could talk directly with the MFA or the administration.  Before [Russian national who attended the breakfast] worms his way in there.
>
> Russian Official: Everything will be fine.  I already conducted the necessary informal consultations on Saturday.  I just don't want to overload Twitter, which is read.  We need to build relationships with the USA, but there are many who oppose this! . . .

According to Butina, this other Russian national referred to was another member of the Russian government whom Butina feared would overtake her and the Russian Official as the primary Russian point of contact for the National Prayer Breakfast.

In short, while Butina was in the United States claiming merely to be a student, she was spending much of her time devoted to another purpose—advancing the interests of the Russian Federation.  During this time period of about two years, she acted at the direction and control of the Russian Official, fully aware that he reported to the rest of the Russian government and her actions were ultimately for the benefit of the foreign government.  The defendant's failure to disclose her direction by the Russian government allowed her access to the United States and to prominent individuals whom she at least attempted to influence on Russia's behalf.

## IV.     DETERMINING THE SENTENCE

This Court must sentence the defendant consistently with the factors described in 18 U.S.C. § 3553. When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. See 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines (U.S.S.G. or Guidelines) are no longer mandatory. However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Gall v. United States, 552 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a),

the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 92 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).

## A.    United States Sentencing Guidelines Calculation

The government agrees with the Presentence Report (PSR) that the Guideline range for a violation of 18 U.S.C. § 371 follows the underlying substantive offense and that the U.S.S.G. does not specify a Guidelines range for a violation of 18 U.S.C. § 951. Where the Guidelines do not expressly specify a Guideline range, the court should "apply the most analogous guidelines. If there is not a sufficient analogous guideline, the provisions of 18 U.S.C. § 3553 shall control." U.S.S.G. § 2X5.1.

The government also agrees with the Presentence Report that there is no sufficiently analogous Guideline for the conduct at issue here. The defense contention that the proper guideline is § 2B1.1 is misplaced, and its objection to the PSR's Guidelines determination should be overruled.[6]

---

[6]    Defendant also objected to Paragraph 73 of the Draft Presentence Report as incomplete because "the plea agreement also states that the parties agreed for allocution purposes that a sentence within the Estimated Guideline Range of 0 to 6 months' imprisonment would be reasonable in light of all the sentencing factors." Letter to Probation at 11. Defendant's interpretation is inaccurate. The plea agreement states that *if the Court finds that a sentencing*

The majority of courts that have looked at the issue of what Guideline range to apply to violations of 18 U.S.C. § 951 have determined that there is no sufficiently analogous Guideline. See United States v. Soueid, No. 11-CR-494, Doc. 59 (E.D. Va.) (Defendant convicted of a violation of § 951 for conducting surveillance on Syrian dissidents in the United States on behalf of Syrian government; Court found no sufficiently analogous Guideline); United States v. Chun, No. 16-CR-618, Doc. 17 at 10 (S.D.N.Y.) (Defendant, a FBI technician, convicted of violating § 951 for providing sensitive, but not classified, information to Chinese officials) (Parties jointly submitted that there was no analogous Guideline, and Court agreed); United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.) (Defendant responded to taskings by Cuban intelligence services over thirty-year period and sent reports back to Cuba in response to those taskings; Court found no sufficiently analogous Guideline range); United States v. Buryakov, No. 15-CR-73 (S.D.N.Y.), Doc. 158 at 6-7, 17 (Defendant convicted for violating § 951, following a plea pursuant to Fed. R. Crim. P. 11(c)(1)(C), for agreeing to provide information to a Russian official; Court found no analogous Guideline range); United States v. Duran, No. 07-CR-20999 (S.D. Fla.), Doc. 488 at 42-43 (Defendant convicted of §§ 371 and 951 for attempting to bribe/extort a U.S. citizen on behalf of the government of Venezuela; Court found no analogous Guideline).

The defense urges Probation, and presumably this Court, to apply an elements-based approach in determining whether a guideline is sufficiently analogous, citing United States v. Osborne, 164 F.3d 434, 437 (8th Cir. 1999).  Assuming *arguendo* that the Court should compare the elements of § 951 with the elements of potentially analogous cases in assessing which

---

*range applies*, a sentence within that Estimated Guidelines Range would constitute a reasonable sentence in the event of an appeal.  ECF No. 67 at ¶ 5 (emphasis added).  The government maintains for the reasons set forth herein that there is no applicable sentencing guideline range.

Guideline is most analogous, the defense's attempt to analogize a violation of § 951 to false statement or pure withholding-of-information offenses fails. The defense position flows from the proposition that "the essence [of a § 951 violation] is failing to register." Id. at 7. In coming to this conclusion, the defense downplays § 951's requirement of *action* on behalf of a foreign government or official within the United States. See, e.g., United States v. Dumeisi, 2004 WL 5370253 (jury instructions given in N.D. Ill January 12, 2004) (relevant elements of a § 951 violation are: (1) that the defendant acted in the United States as an agent of a foreign government; (2) that the defendant failed to notify the Attorney General that the defendant would be acting in the United States as an agent of a foreign government prior to so acting; and (3) that the defendant acted knowingly, in that the defendant knew that he had not notified the Attorney General). The government must prove action in the United States just as surely as it must prove failure to notify.

None of the offenses that the defense contends are analogues (Letter to Probation at 7)—false statements or failure to report campaign contributions, maintain pension records, register for military service, or file a tax return—requires any additional act in addition to the deceptive statement or withholding of information. Section 951, by contrast, requires acts taken within the United States at the direction or control of a foreign government or official.[7]

In addition to finding little support from a comparison of the elements or sentences imposed

---

[7] The defense would urge the Court to discount the action element because "the legality of the predicate act for a conviction of section 951, at least according to two circuits, is seemingly irrelevant." Letter to Probation at 6-7. The defense cites two cases for that proposition, United States v. Duran, 596 F.3d 1283 (11th Cir. 2010) and United States v. Latchin, 554 F.3d 709 (7th Cir. 2009). Although the Guidelines were not challenged on appeal in either case, in Duran, the trial court found there was no analogous Guideline, as discussed above, and while the Guideline range relied up on by the district court in Latchin is not readily discernible from the record, he was sentenced to 48 months' incarceration for his violation of § 951, significantly more incarceration time than the 0-6 month range prescribed by U.S.S.G. § 2B1.1, assuming no loss amount. See United States v. Latchin, No. 04-CR-661, Doc. 239 (N.D. Ill.).

in similar cases, the defense's position is not supported by the facts of this case or the Guidelines as a whole.  Section 2B1.1 is primarily the Guideline for theft and embezzlement offenses, as evidenced by the base offense level's correlation to a loss amount in dollars.  See U.S.S.G. § 2B1.1(b)(1).  Although § 2B1.1 has also been designated by the U.S.S.G. as the Guideline for false statements in violation of 18 U.S.C. § 1001, as discussed above, the gravamen of a violation of § 951 is not providing false information, or even withholding it.  It is *acting within the United States as an agent of a foreign government* without first notifying the Attorney General.  Although failure to notify the Attorney General is undoubtedly an element, it is a coequal element to taking actions on behalf of a foreign official or government, and there is no other sufficiently analogous Guideline to capture the defendant's offense.

Moreover, as discussed below, sentences imposed by courts for violations of 18 U.S.C. § 951 (or convictions for conspiracies to violate that statute) have almost always involved significantly longer periods of incarceration than the 0-6 month range that would result if U.S.S.G. § 2B1.1 were the proper Guideline.  The Court should thus overrule the defense's objection to the PSR's Guideline determination.[8]

---

[8]     The government is only aware of one case where a court has decided, as the defense urges here, that the proper Guidelines range for a violation of § 951 is U.S.S.G. § 2B1.1.  That case is United States v. Dumeisi, which the defense cited in its objections to the PSR.  Letter to Probation Officer at 8.  As an initial matter, although the district judge in Dumeisi found that U.S.S.G. § 2B1.1 was the most analogous Guideline, the court nonetheless sentenced Dumeisi to a total term of 46 months of incarceration, although it did not break out its sentences by count.  United States v. Dumeisi, No. 03-CR-664 (N.D. Ill.), Doc. 125.  The government has been unable to locate reasoning expressed by the judge in that case, and the defense has proffered none.  Without more, the Court should not find the Dumeisi decision persuasive enough to overcome the determinations by many other district court judges, as well as Probation's determination in this case, that there is no sufficiently analogous Guideline for a violation of § 951.

### B.       Statutory Penalties

Butina is facing a maximum sentence of five years' imprisonment, a fine of not more than

$250,000, or both, for her conviction.  18 U.S.C. §§ 371, 3571(b)); see also PSR at ¶¶ 70, 85. The

Court may impose a period of not more than three years supervised release, but may choose not to

impose such period in the case of a deportable alien, such as Butina. Id. at ¶ ¶ 75-76.

### C.       Analysis of Factors Enunciated in 18 U.S.C. § 3553(a)

As discussed in detail below, an analysis of the factors enunciated to 18 U.S.C. § 3553(a)

demonstrates that the imposition of a significant period of incarceration is appropriate for this

offense.

### 1.       The Nature and Circumstances of the Offense

The conspiracy in which the defendant participated is undoubtedly a serious offense.  The

government brings former Assistant Director Anderson's declaration to the Court's attention to

underscore the seriousness of the offense the defendant committed.  As Mr. Anderson's declaration

makes clear, the types of services the defendant provided to the Russian Federation are specifically

of the type that that Russia would seek to use against the United States, and the United States is a

primary target of these types of Russian operations.  Such operations can cause great damage to

our national security by giving covert agents access to our country and powerful individuals who

can influence its direction.

Butina had access to high-level donors to the Gun Rights Organization and organized a trip

that brought them to Moscow (though not before seeking information about their "political

importance").  She had access to advisors to political candidates (and spoke to the Russian

Ambassador about at least one of them) and sometimes to candidates themselves.

Butina's work involved building a rolodex of and information about powerful people who

had, or were likely to get, access to and influence over the next presidential administration.

Butina's reports back to the Russian Official on the people she was meeting have all the hallmarks of spotting-and-assessing reports. The value of this information to the Russian Federation is immense, as former Assistant Director Anderson's declaration makes clear.

The Statement of Offense, combined with the exhibits proffered by the government, establish that she was deliberately putting herself in a position to be the conduit between the Russian government and the next U.S. presidential administration. This intent is evidenced throughout the exhibits and the Statement of Offense. She posited that her contacts with the Gun Rights Organization had put her in a position to be the conduit for an unofficial channel of communication; voiced worry that others in the government would steal the initiative; provided the Russian Official with the name of a potential Secretary of State nominee and asked for Russian government input on that name; drafted a proposal she hoped would go to the Russian government or to a Russian businessperson hurt by U.S. sanctions wherein she touted her constant work with the Russian Official "establishing unofficial contact, based on common views and a system of conservative values, with a number of key [Political Party 1] organizations in the United States, including the executive level of [Political Party 1];" and she unsuccessfully attempted to meet with the President at the National Prayer Breakfast.

The defendant knew, as she was providing information back to the Russian Official, that he was a conduit of information to the Russian Government writ large, and she knew that he was providing at least some of the information she provided him to the rest of the government as well. Although the government does not contend that she knew exactly what happened or would happen with the information she provided and the contacts she had made, she undeniably worked in the United States to gather that information, provide it, and attempt to establish herself as a backchannel of communication. Had she successfully done so, the risks to the United States would

have included harm to this country's political processes, internal government dealings, and U.S. foreign policy interests.  Exhibit 1 at 2.

Butina's failure to notify the Attorney General of her activities on behalf of the Russian Federation warrants mention here as well.  The defense has contended, e.g., Letter to Probation Officer at 6; Memorandum in Support of Bond Review Motion, ECF No. 23-1 at 5, that all of the defendant's actions would have been legal had she notified the Attorney General that she intended to operate within the United States as an agent of the Russian Federation.  Even if true, this line of argument does not detract from the reason for or the seriousness of the notification requirement, which provides the United States government or anyone trying to evaluate an individual's acts with full information.  We, of course, cannot know with certainty how the defendant's conspiracy would have played out had she complied with § 951's notice requirement, but the U.S. government undoubtedly could have made a more informed choice about, for example, whether to grant her visa applications.  Other people she met with, including government officials and staff, may have declined meetings with her had they know she was a Russian agent.  The FBI could have done defensive briefings for her targets.  Most importantly, the Russian government could not have effectively denied its involvement.

**2.      The History and Characteristics of the Offender**

Butina is well educated and capable of making a living through non-criminal means when she is released from incarceration. She also has no prior convictions of which the government is aware.

The defendant is a Russian national who will be immediately subject to removal.  Indeed, the parties have asked the Court to sign an order of judicial removal upon the defendant's sentencing.  ECF No. 92.  The PSR did not find a basis to depart downward under Smith v. United

States, 27 F.3d 649 (D.C. Cir. 1994), and the defense did not object.  The government agrees that a Smith departure would not be appropriate in this case.

Smith offers two bases for the departure.  The first is that the defendant's status as a deportable alien prevents her from being assigned to serve any part of her sentence at a minimum-security prison.  Id. at 651.  Even if the Court imposes an 18-month sentence, the defendant has already served most of her sentence in the D.C. Jail and the Alexandria Detention Center.  Assuming *arguendo* that her federal designation will be to a higher level than it would have been if she were not a deportable alien, she will not have endured more harsh prison conditions for any appreciable period of time based on her deportable alien status.

The second basis for a Smith departure is that the defendant's status as a deportable alien generally renders the defendant ineligible for the benefits of 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend the last ten percent of their sentences (but no more than six months) under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.  Id. at 650-51.  If the Court imposes 18 months, then, the maximum departure would be 1.8 months.  For the reasons below, even that departure would not be warranted in this case.

As the D.C. Circuit made clear in Smith, "For a departure on such a basis to be reasonable[,] the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence."  Id. at 655.  That is clearly not the case here.  The Smith court also expressed its belief that "the circumstances justifying a downward departure on account of the deportable alien's severity of confinement may be quite rare."  Id.  Indeed, for this ground to be a basis for departure at all, under the Guidelines, it must be "highly infrequent."  Id. (citing U.S.S.G., Ch. 1, Pt. A, sec. 4(b)).  Here,

while it is certainly the case that a U.S. citizen can violate 18 U.S.C. § 951, it is hardly outside the heartland of § 951 offenses that the offender is a deportable foreign national.  Because Butina's status as a deportable alien is comfortably within the heartland of § 951 offenders, there is no basis for a departure.

The government also acknowledges the substantial assistance the defendant has provided to law enforcement, as detailed in the sealed Supplemental Memorandum attached hereto, and it asks the Court to depart downward from the sentence it would otherwise impose pursuant to U.S.S.G. § 5K1.1.

### 3.      The Need to Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and to Protect the Public

Sentencing the defendant to a significant term of incarceration will serve the governmental interests in providing a just punishment that sufficiently deters others and protects the public. The defendant's actions here were harmful to U.S. national security interests for the reasons stated above and in Mr. Anderson's declaration.     The Court can and should deter others who would engage in similar campaigns in the future by treating the defendant's conduct with the seriousness it deserves.

The sentence proposed by the government recognizes that Butina pled guilty early in the case, took responsibility for her actions, and cooperated with the government, as discussed in more detail in the government's Supplemental Memorandum.[9]

---

[9]     Specifically, the government has factored in that, had the U.S. Sentencing Guidelines specified an offense level under the Guidelines, Butina would have been entitled to either a two-level or three-level reduction of that offense level, depending on whether the Total Offense Level was more or less than 16.  See U.S.S.G. § 3E1.1.

4.      **The Need to Provide the Defendant with Educational or Vocational Training**

Butina has no need for additional educational or vocational training.

5.      **The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The starting point in the Court's analysis under § 3553(a)(6) should be to consider the sentences of "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government acknowledges that sentences for violations of 18 U.S.C. § 951 and conspiracies to commit that offense vary greatly.   But the government's recommendation—that the defendant's conduct warrants a sentence of 24 months' incarceration prior to factoring in cooperation—is within the heartland of sentences imposed across the country for similar offenses.  We highlight some examples below:

- In United States v. Chun, No. 16-CR-518 (S.D.N.Y.), the defendant entered a guilty plea to violating § 951.  The defendant was an FBI electronics technician with a Top Secret security clearance who sold sensitive FBI information to Chinese officials over a period of years.  The parties agreed that, although there was no sufficiently analogous Guideline, a range of 21-27 months of incarceration was appropriate after factoring in acceptance of responsibility.  The Court imposed a sentence of 24 months of incarceration.

- In United States v. Soueid, No. 11-CR-494 (E.D. Va.), the defendant entered a guilty plea to a violation of § 951, stemming from his work on behalf of the Syrian government in conducting surveillance of Syrian dissidents within the United States. The court imposed a sentence of 18 months of incarceration.

- In United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.), the defendant entered a

guilty plea to one count of conspiracy to act as an agent of Cuba in violation of §§ 371 and 951.  Over a period of approximately 30 years, the defendant responded to coded taskings sent by Cuban intelligence and sent reports back to Cuba in response to those taskings.  The Court imposed the statutory maximum of 60 months of imprisonment.

- In United States v. Duran, No. 07-CR-20999 (S.D. Fla.), the defendant was convicted at trial for violating 18 U.S.C. § 951 and conspiracy to violate that statute.  The government's case established that the defendant came to the United States as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen.  See United States v. Duran, 596 F.3d 1283, 1295-96 (11th Cir. 2010).  The court imposed a sentence of 48 months' incarceration on each count, to run concurrently.

- In United States v. Al-Awadi, No. 07-CR-20314 (E.D. Mich.), the defendant entered a guilty plea to one count of violating § 951, stemming from his work reporting on Iraqi dissidents within the United States for the Iraqi Intelligence Services.  The court sentenced the defendant to 18 months' incarceration.

- In United States v. Dumeiei, No. 03-CR-664 (N.D. Ill.), the defendant was found guilty at trial for violating § 951, conspiring to violate that statute, and two counts of perjury.  The Court sentenced the defendant to a total of 46 months of incarceration.

- In United States v. Buryakov, No. 15-CR-73 (S.D.N.Y.), the defendant pled guilty to violating § 951, stemming from an agreement to take actions within the United States at the direction of a Russian government official.  The parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), to a sentence of 30 months of incarceration.  The court accepted that agreement and imposed a sentence of 30 months.

The defendant's actions in this matter are within the same general range as the cases cited

above.  She agreed to act within the United States at the direction of a Russian government official, and she did indeed so act for a period of almost two years.  The government's recommended sentence of 24 months (prior to factoring in cooperation), with a downward departure to 18 months, based on substantial assistance to law enforcement, is well within the range of sentences imposed by courts for similar conduct.

**Conclusion**

WHEREFORE, the government respectfully recommends that Butina be sentenced to a term of imprisonment of 18 months, and that the Court execute the requested Order of Judicial Removal.

Respectfully Submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By:_____/s/_____
ERIK M. KENERSON
THOMAS N. SAUNDERS
Assistant United States Attorneys
Ohio Bar Number 82960 (Kenerson)
N.Y. Bar Number 4876975 (Saunders)
United States Attorney's Office
555 Fourth Street, NW
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov

_____/s/_____
WILLIAM A. MACKIE
Trial Attorney, National Security Division
N.C. Bar Number 13816
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Washington, D.C. 20530
Telephone: 202-233-2122
Email: Will.Mackie@usdoj.gov