**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.: 1:18-cr-218 (TSC) |
| | ) | |
| MARIIA BUTINA, a/k/a | ) | |
| MARIA BUTINA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT MARIA BUTINA'S MOTION TO EXCLUDE AND STRIKE**
**THE DECLARATION OF ROBERT ANDERSON, JR.**

Defendant Maria Butina, by counsel, files this motion to exclude the opinions and testimony of Robert Anderson, Jr., striking his declaration (99-1), at the sentencing hearing in this matter. In support, Maria Butina states the following:

## I.   INTRODUCTION

The Anderson declaration must be stricken because it is itself untimely and was belatedly and inadequately disclosed in violation of due process and applicable Federal Rules of Criminal Procedure. While this violation is sufficient to strike the declaration, the fact that the government used this filing—made late in the evening on Good Friday, a mere 48 hours after a purported notice that bears no resemblance to the declaration itself, less than a week before sentencing—to unveil a complete new theory of the government's case creates additional due process issues that are sufficient to warrant its exclusion.

## II.   BACKGROUND

Late Friday evening, the government used the Anderson declaration to raise the curtain on its latest speculative theory regarding Maria Butina. While she may not have been trained by the Russian Federation and is not a "spy in the traditional sense" (Doc. 101 at 2), and while all of her activities in the United States might have been legal—save for her failure to notify the Attorney

General of her very public, unfunded, yet still un-noticed friendship and amateur diplomacy project activities as an agent of Aleksandr Torshin—Maria was really part of a Russian intelligence "spot and assess" operation. Under this newly-minted theory of the case, the fact that Maria undertook no espionage-like or covert activities, sought no sensitive or classified information (even when confronted with the opportunity  to do so), and had no intelligence training actually supports and is "entirely consistent with" (Doc. 99-1 at ¶ 11) the government's theory. Contrary to all evidence in the case, Maria's *real* mission was to provide invaluable (*see id.* at ¶ 13) information—that is publicly available, unclassified and not sensitive—about how to "access" (read: openly and publicly network, a legal activity for foreign nationals and everyone else) certain Americans, so that later—at some undetermined time—unnamed intelligence officers can compromise them.

To roll out this new theory for the first time in the metaphorical bottom of the ninth inning, one might assume the government's disclosure and Mr. Anderson's declaration would: (a) identify at least one of the hundreds of people Maria met with in the United States who was indeed "spotted"—that is, approached by Russian intelligence using information she gathered; (b) provide an actual example of invaluable or sensitive information that she passed on to someone in Russia from the thousands of communications she voluntarily disclosed as part of this case; or (c) provide some evidence from this case contradicting Maria's repeated denials that she has or had any role with foreign intelligence in the United States whatsoever. The Anderson declaration provides none of these facts.

Had the disclosure and declaration been timely, the defense could have retained its own intelligence  expert, fully explored any *Giglio* or *Jencks* issues, and pressed for any (much less a fulsome) identification of what evidence Anderson specifically relied on, other than his "experience," "media reports," "discussions with agents" and the "evidence collected throughout

the investigation." (Doc. 99-1 at ¶ 2.) But the government knew that the defense, representing a young incarcerated foreign national seeking a time-served sentence at a Friday hearing was not in a position to put off the sentencing to explore these issues. This is, by definition, a sandbag tactic, and it is not cured by making Mr. Anderson available for cross-examination. His declaration should be excluded.

### III. <u>ARGUMENT</u>

The time for speculation and changing prosecution theories is over. More than a year ago, Maria voluntarily turned over all of her communications with Alesandr Torshin to the Senate Select Committee on Intelligence, and voluntarily answered all of its questions about their relationship for eight hours under oath. Ten or so days later, federal investigators executed a warrant to search her apartment, with dozen of agents scouring her home and possessions to find evidence and obtain forensic copies of every single byte of data from her computers, phones, and—with the passwords she provided—her email, messenger, and social media accounts. In July last year, eschewing multiple offers from defense counsel to interview or discuss any of Maria's activities, the government decided to arrest and detain her, and she has not been free since. Incident to her arrest, the government seized all of her electronic devices again (with none of her passwords changed), this time also taking boxes of documents, books, diaries, journals, calendars, folders, notebooks, thumb drives, and other papers.

At Maria's initial bond hearing before Magistrate Judge Robinson, the government spun a theory that Maria was a Kremlin-trained agent, who was all packed and on the verge of bolting to Russia (Doc. 8 at 2); had access to a cache of money (*id.*); was "likely" in constant "contact with the FSB" while in the United States (*id.* at 4); had been surveilled meeting a suspected Russian intelligence operative (*id.*); posed as a student for a "cover occupation" (*id.* at 7-8); used sex to get a job within a US special-interest group (*id.* at 8); and was—owing to her being "on par with other

covert Russian agents" (*id.* at 6)—a flight risk who could easily hide in the Russian Embassy or be smuggled out of the country in the trunk of a car bearing diplomatic plates (*id.* at 4).

The government cherry-picked communications Maria never tried to hide, combined those snippets with an affidavit from FBI Counterintelligence Agent Kevin Helson, relying on his 'training and experience,' and used the less-strict evidentiary standards for bail hearings—proceeding by proffer—to introduce working theories masquerading as facts on who Maria was and what she was doing in the United States. All of them proved false.

In the nine months since then, subjected to normal discovery and evidentiary standards, pressed by defense counsel, and allowed dozens of interviews with Maria, the government's assertions based on assumptions have evaporated. The government withdrew its salacious allegations about 'sex for access,' conceded Maria was a legitimate graduate student at American University, dropped the claim about her being in constant contact with the FSB while in the United States, and now casually acknowledges that Maria "was not a trained intelligence officer" or "a spy in the traditional sense." (Doc. 101 at 2.)

No. Maria is not a trained intelligence officer nor a spy in *any* sense. The government knows that. Its prosecutors and federal agents behind closed doors have all but expressed that. There is no evidence to support that, and they have not charged her with any espionage-linked crime that addresses that. All Maria has done is accepted responsibility for conspiring to act as an "agent"—not a secret agent, not an intelligence agent—for Torshin, who was a friend but former foreign official of the Russian Central Bank. Maria made these admissions based on stipulated facts (in the Statement of Offense) that she has never denied and have nothing to do with her being part of some "spot-and-assess" intelligence operation.

Maria told the government and federal investigators how she had zero training and no connection or contact to any foreign intelligence operation in the United States. The government found and has no evidence to the contrary (which they've now scrutinized and had for months), and the government obviously agreed that Maria told the truth and had not lied, otherwise they wouldn't have moved for a USSG § 5K1.1 departure. Yet now at sentencing, with the lure of lowered evidentiary standards, the government advances for the *first* time a new theory of Maria being a "spotter." For support—apparently abandoning its own case agents who have dissected her materials for months and have interviewed Maria for over 50 hours—the government now submits the declaration of Mr. Robert Anderson, Jr., a Bureau alumn turned CEO of Cyber Defense Labs in Dallas, Texas.

His testimonial opinions are unreliable. His declaration can only be described as rife with speculation, circular logic, and bereft of any factual support. To be sure, Anderson never met Maria and never met her counsel. The government has moreover never disclosed the materials Anderson reviewed before rendering an opinion, the persons he spoke to before the same, the standards and metrics he employed, the resources he consulted, the date of his engagement, the duration of his study, the amount of his compensation, any *Jencks* or *Giglio* information, or other underlying notes or statements. *See* Fed.R.Crim.P. 32(i)(2) ("If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies."). Simply put, the government and Anderson have not offered any reliable information or specific evidence to support the testimonial conclusions and declaration. Thus, the court should exclude and strike them.

It is well-settled that trial judges have great latitude in the sentencing process. *United States v. Tucker*, 404 U.S. 443, 446 (1972); Fed.R.Crim.P. 32. This latitude permits a court to consider a wide range of facts concerning a defendant's character and crime, however not without limitations.

Sentencing decisions must rest on reliable information and appropriate considerations. Due process requires this. *Scott v. United States*, 419 F.2d 264, 266 (D.C. Cir. 1969); *Dorszynski v. United States*, 418 U.S. 424, 431 n.7 (1974); *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *see United States v. Campbell*, 684 F.2d 141, 152-53 (D.C. Cir. 1982). And due process is violated when the sentencing judge relies on speculation and supposition as to any facts asserted that are relevant to sentencing. *Id.* The court should not place on the defendant the burden of bringing forth evidence or information to rebut unreliable information. Rather, the government must support its claims with reliable and specific evidence. *See, e.g., United States v. Lawrence*, 47 F.3d 1559, 1566-69 (11th Cir. 1995) (government bears the burden); *United States v. Wise*, 976 F.2d 393, 402-03 (8th Cir. 1992).

In this instance, Mr. Anderson says he reviewed case material, although his declaration cites none and the government discloses none. In reality, this declaration amounts to nothing more than a vehicle for the government to proffer a new speculative theory of the case while standing in the rubble of its old one. Consider the following points:

First, Anderson speculates Maria was a spotter for the Russians, tasked with identifying possible targets as part of some intelligence-gathering mission for the Russian government. Yet supposedly armed with the entire case file, he cannot identify a single directive to Maria that comes even remotely close to such a mission statement, let alone any one target who was actually "spotted"—that is,  someone later approached by Russian intelligence for recruitment, talks, asset building, or something else—as a result of Maria's activities.

Second, Anderson speculates Maria was a spotter merely because she looked like a spotter. Specifically, he supposes she was a spotter because "the reports she sent back to the Russian Official have all the hallmarks of targeting packages used in spot-and-assess operations." (Doc.

99-1 at ¶ 11.) But he doesn't define targeting packages, identify such a package in this case, or offer an example of a peer-reviewed exemplary one to test his claims and theories. He further discloses no underlying information on what a spot-and-assess operation looks like, no context, no historical clues, no case studies, no examples, no distinguishing characteristics or differentials, no methodologies, no standards, no metrics, no data, and no specific evidence that specifically applies to Maria. Instead, the government and Anderson ask this court to infer she's a spotter simply based on *appearances*. Such an opinion would never be admissible at trial and should remain inadmissible as a consideration at sentencing. Contrary to the government and National Security Section leadership's claims, mere *appearances* have no evidentiary value because they are not sufficiently reliable. All wolves have teeth, but not all animals with teeth are wolves.

Third, Anderson speculates Maria provided information of "substantial intelligence value" to the Russian intelligence services. (Doc. 99-1 at ¶ 3.) But he does not link Maria to any Russian intelligence service let alone make an attempt to tie this conjecture to any specific evidence in the case. Furthermore, he does not explain how he concluded the information she provided to have immense value. For instance, he does not explain the data, metric, scale or methodology for measuring the value of information, or produce or cite any standard, principle, or reliable underlying materials or resources to corroborate the same. These deficiencies are especially troubling given that the real (articulated) reason for Anderson's 'substantial value' opinion is circular. That is, Anderson opines the material had "tremendous intelligence value" merely because it was the "type of information" *he* "would have found extremely valuable" if an intelligence officer. (Doc. 99-1 at ¶ 13.) This is not how expert opinions work.

Anderson has purportedly had access to the whole case file, all of Maria's communications with Torshin, and he cannot identify a single communication of "substantial intelligence value."

And yet, a review of the Statement of Offense shows why: Anderson cannot say that a Wikipedia entry on a presidential candidate or that open-source, internationally and publicly-available biographical information about a person she met is particularly valuable. So he hides behind the veil of his 'training and experience' as a former FBI counterintelligence agent and invites even more speculation by saying "access"—to include meeting people and networking—has intelligence value and is thus clandestine and nefarious, which would effectively criminalize all networking behavior if done by a foreign national.

Finally, Anderson speculates that Maria *not* undertaking any illegal or intelligence-related activities herself is somehow "[c]onsistent with" his theory that she is a spotter. (Doc. 99-1 at ¶ 12.) Using the absence of criminal activity as the basis for speculation that activity is in fact criminal is almost incomprehensibly speculative.

The bottom line is that the Anderson affidavit is the government version of the schoolyard trick of offering the bet: "heads, I win, tails, you lose." Obviously, had Maria engaged in espionage or intelligence work in the United States, the government would charged her with those crimes (heads, the government wins). Because the government was unable—after asserting, failing, and trying to prove such activities—it now asserts that Maria's sentence should still be particularly severe because having *not* been involved in such clear espionage activities, she must have been a "spotter," and her lack of criminal activity is just evidence of her sophistication and tradecraft (tails, you lose).

Worse still, the government disclosed its intention to designate Anderson as an expert to testify at sentencing in this matter a two days before sentencing memoranda were due and *eight* days before the hearing, with a holiday weekend in between. The government didn't attach a copy of Anderson's declaration. To the contrary, on April 17, 2019 at 7:31pm, all the defense got was

notice from the government that it may call some expert to talk about tangential topics and hypothetical other cases at sentencing rather than this one.

> If the government decides to call Mr. Anderson to the stand, the government anticipates that he will testify about the intelligence goals, priorities, tradecraft, and activities of the Russian Federation, as well as the interplay among the various Russian government components that are involved in intelligence and political influence operations. The government anticipates that Mr. Anderson will testify as to how the Russian Federation benefits from receiving information like that provided by Ms. Butina during the conspiracy underlying her guilty plea.

* * *

> The government anticipates that Mr. Anderson's expert opinions will be based on his review of: open source materials, such as media reports and interviews; public filings in this case; discussions with the case agents; and evidence collected throughout the investigation that has been produced in discovery. We anticipate his opinions also will be based on his vast experience in investigating and prosecuting counterintelligence cases.

> The government believes that Mr. Anderson's testimony will assist the Court evaluating the defendant's actions in context. The government believes that such testimony would be appropriate to assist the Court in evaluating the factors to be considered under 18 U.S.C. § 3553(a), such as the nature and characteristics of the offense and the need for the sentence imposed to: (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (2) afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A) & (B).

(*See* Govt's Apr. 17, 2019 Expert Notice, attached as Exhibit A.)

On more than one occasion Maria, through her counsel, requested the government to disclose the identities of all government expert witnesses to be called whether at trial or at sentencing. These requests (*see, e.g.*, Doc. 40-1 at ¶ 6) asked the government to provide a complete written summary of testimony to be presented by any government expert witness, including a good faith summary on what opinions are expected to be the subject testimony, the bases and reasons for those opinions, and the qualifications of the expert. Maria also requested all *Jencks* and *Giglio* material. (*Id.* at ¶¶ 7 and 9.)

Although such requests came in the context of Fed.R.Crim.P. 16, which generally does not apply during the sentencing phase of a case, due process still requires a defendant to have adequate notice of the evidence to be offered against her by the government. *See, e.g., United States Bowman*, 926 F.2d 380 (4th Cir. 1991). The Supreme Court has made clear that a defendant has a right not to be sentenced on the basis of "misinformation of a constitutional magnitude." *United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v. Beaulieu*, 893 F.2d 1177 (10th Cir. 1990). This "right is protected by the requirement that the defendant be given adequate notice of and an opportunity to rebut or explain information that is used against him" at sentencing. *United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir. 1990). If the government fails to provide sufficient, timely, or adequate notice, it runs the risk of preclusion concerning the proferred evidence. Similarly, "[i]f a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies. If a party fails to comply with a Rule 26.2 order to produce a witness's statement, the court must not consider that witness's testimony." Fed.R.Crim.P. 32(i)(2).

The government's summary of anticipated testimony is thin, late, and hardly adequate. There is no good faith summary of the subject testimony. Indeed, the actual declaration and noticed testimony in the summary are completely different on their face. Moreover, the summary of anticipated expert testimony in the government's notice is so broadly worded that the government could easily have noted its intention to call an expert for sentencing shortly after Maria pleaded guilty, or at least some other date far enough in advance to permit Maria to engage, designate, or at least consult with her own expert. Instead, knowing that Maria is desperate to go home to her family and that her counsel would be loathe to prolong Maria's incarceration any longer, the government made this disclosure at the 11th hour to prevent any form of meaningful rebuttal. This is definitional sandbagging. There are no underlying materials, source documents, witness

statements. Even still, the proposed opinions and conclusions themselves are nothing more than further speculation and supposition, which are not appropriate sentencing considerations.

## IV. **CONCLUSION**

Maria has a constitutional right to reliable sentencing procedures and adequate notice. Federal Rules of Criminal Procedure and due process require it, and the government has not fulfilled this requirement in this case. For all of these reasons and those that the undersigned may present during a hearing on this matter, Defendant Maria Butina respectfully requests that the court exclude and strike the opinion and declaration of the government's proposed expert Robert Anderson, Jr.

Dated: April 21, 2019                              Respectfully submitted,


/s/Robert N. Driscoll
Robert N. Driscoll (DC Bar No. 486451)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 403-3870
rdriscoll@mcglinchey.com


/s/Alfred D. Carry
Alfred D. Carry (DC Bar No. 1011877)
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004
Phone: (202) 802-9999
Fax: (202) 330-5897
acarry@mcglinchey.com

*Counsel for Defendant Maria Butina*

| **From:** | Kenerson, Erik (USADC) <Erik.Kenerson@usdoj.gov> |
| **Sent:** | Wednesday, April 17, 2019 7:31 PM |
| **To:** | Driscoll, Robert; Carry, Alfred |
| **Cc:** | Saunders, Thomas (USADC); Zimmerman, Jolie (USADC); Mackie, Will (NSD) (JMD) |
| **Subject:** | Sentencing Notice |
| **Attachments:** | CDL BA Release 022919.docx; EAD-Anderson-bio (1).pdf; Robert Anderson Bio May 2018.docx; Robert Anderson navigant bio.docx; BIO.docx; Anderson Notice.pdf |

Bob, Alfred:

Please see attached and let us know if you have any questions.

Erik



U.S. Department of Justice

Jessie K. Liu
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

April 17, 2019

BY EMAIL
Robert Driscoll, Esq.
McGlinchey Stafford, LLP
1275 Pennsylvania Avenue N.W.
Suite 420
Washington, D.C. 20004

Re: United States v. Mariia Butina, Case No. 18-218 (TSC)

Dear Mr. Driscoll:

As I indicated in our phone call last week, the government may call Robert Anderson, Jr., to testify as an expert witness at sentencing in this matter. Mr. Anderson served as the Assistant Director of the Federal Bureau of Investigation (FBI)'s Counterintelligence Division; Executive Assistant Director of the FBI's Criminal, Cyber, and Response and Services Branch; and Special Agent in Charge of the Intelligence Division of the FBI's Washington Field Office.  In total, he served for 21 years as a Special Agent with the FBI.  Mr. Anderson retired at the end of 2016 and is currently the Chief Executive Officer of Cyber Defense Labs in Dallas, Texas. He has testified as an expert witness in two civil litigation depositions. His testimony in those matters concerned cyber security and intrusions by nation-state actors. Several of Mr. Anderson's bios are attached.

If the government decides to call Mr. Anderson to the stand, the government anticipates that he will testify about the intelligence goals, priorities, tradecraft, and activities of the Russian Federation, as well as the interplay among the various Russian government components that are involved in intelligence and political influence operations. The government anticipates that Mr. Anderson will testify as to how the Russian Federation benefits from receiving information like that provided by Ms. Butina during the conspiracy underlying her guilty plea.

The government anticipates attaching a declaration by Mr. Anderson to its sentencing materials.  Regardless of whether the government calls Mr. Anderson affirmatively as a witness at the sentencing hearing, it plans to make him available at that hearing, should you or the Court have any questions for him based on his declaration.

The government anticipates that Mr. Anderson's expert opinions will be based on his review of: open source materials, such as media reports and interviews; public filings in this case; discussions with the case agents; and evidence collected throughout the investigation that has been produced in discovery. We anticipate his opinions also will be based on his vast experience in investigating and prosecuting counterintelligence cases.

The government believes that Mr. Anderson's testimony will assist the Court evaluating the defendant's actions in context. The government believes that such testimony would be appropriate to assist the Court in evaluating the factors to be considered under 18 U.S.C. § 3553(a), such as the nature and characteristics of the offense and the need for the sentence imposed to: (1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (2) afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A) & (B).

Please let us know if you have any questions.

Sincerely,

Jessie K. Liu
United States Attorney

By:     __/s/_____
          Erik Kenerson
          Thomas N. Saunders
          Jolie F. Zimmerman
          Assistant U.S. Attorneys





## Robert Anderson Jr.
## Executive Assistant Director
## Criminal, Cyber, Response and Services Branch
## Federal Bureau of Investigation



Robert Anderson Jr. was appointed Executive Assistant Director (EAD) of the Criminal, Cyber, Response and Services Branch in March 2014. In this position, he oversees all FBI criminal and cyber investigations worldwide, international operations, critical incident response, and victim assistance.

Mr. Anderson most recently served as Assistant Director of the Counterintelligence Division beginning in August 2012; prior to that, he was the division's Deputy Assistant Director for operations.

Mr. Anderson joined the FBI in 1995 and reported to the Washington Field Office (WFO), where he worked narcotics and violent crime cases. He then served on the Hostage Rescue Team and completed deployments to more than 20 countries and war zones.

After becoming a supervisor in the Counterintelligence Division in 2001, Mr. Anderson coordinated several major People's Republic of China espionage cases involving the Department of Energy's (DOE) nuclear weapons laboratories, including the investigation of Los Alamos National Laboratory scientist Wen Ho Lee. Mr. Anderson also managed the program that placed FBI Special Agents in DOE labs.

As Unit Chief, he oversaw the management of nuclear proliferation and espionage cases, including the investigation of export broker Philip Cheng. This investigation led to multiple cases being opened and the arrests of 16 people for dual-use technology transfers.

Mr. Anderson returned to WFO in 2004, first as supervisor of its global foreign counterintelligence squad and later as supervisor of one of its espionage squads. In 2007, Mr. Anderson was promoted to Assistant Special Agent in Charge of the Counterespionage Branch at WFO. In this role, he oversaw the indictment and arrest of multiple defendants for espionage and related offenses, including an investigation that resulted in one of the first arrests, prosecutions, and incarcerations of a U.S. citizen committing espionage on behalf of China.

Mr. Anderson returned to Headquarters in 2008 to serve as Chief of the Counterespionage Section. During the next year, he led the investigation into espionage by former CIA agent Harold James Nicholson and his son, Nathan, which resulted in Nicholson's re-arrest and prosecution of both father and son for espionage. Mr. Anderson was also detailed for three months in 2009 as the Acting Special Agent in Charge of the Albuquerque Division.

In May 2010, Mr. Anderson was appointed Special Agent in Charge of the Intelligence Division at WFO, where he led the collection, coordination, and production and dissemination of intelligence information from WFO to the rest of the FBI and its U.S. Intelligence Community partners.

Before joining the FBI, Mr. Anderson was a Delaware State Trooper for nearly nine years. He served in the uniform patrol division, the criminal investigative unit, and the aviation section. Mr. Anderson, who is a pilot and a paramedic, was named the Delaware State Police Trooper of the Year in 1990—the force's highest honor—for attempting to rescue individuals who were trapped in a burning home in 1989.



# Robert Anderson, Jr.
Principal



**Areas of Focus:**

- Cyber, with specific focus on pro-active and reactive breach response.
- Enterprise risk management and critical infrastructure protection.
- Insider Threat and Proprietary Trade Secret Theft.
- Strategic advice on risk management.
- Counterterrorism.
- Hostage Rescue.

Mr. Robert (Bob) Anderson, is a part of The Chertoff Group's global Strategic Advisory Services, which is comprised of the firm's Business Strategy and Security Services practice areas. Bob joined the FBI in 1995, and was a Delaware State trooper for nearly nine years previously, where he served in the Uniform Patrol Division, the Criminal Investigative Unit, and the Aviation Section. Mr. Anderson is a pilot and a paramedic. In 1990, he was named the Delaware State Police Trooper of the Year—the force's highest honor—for attempting to rescue individuals who were trapped in a burning home.

Bob has a proven record of senior leadership in both private and federal government settings.  In 2013, FBI Director James B. Comey named Robert Anderson, Jr. as the Executive Assistant Director of the FBI's Criminal, Cyber, Response, and Services Branch. In this role, he was responsible for all criminal and cyber investigations, international operations, critical incident response, victim assistance, and roughly 20,000 personnel worldwide. Prior to that, Bob was the Assistant Director of the FBI's Counterintelligence Division, in charge of all national security investigations with an intelligence nexus. He also served in the FBI's Hostage Rescue Team for many years.

Upon retirement from the FBI in 2015, Bob became a Managing Director of a global legal technology solutions practice and was an Information Security Segment lead. In this role, Bob collaborated with clients to tackle their most critical security issues to safeguard against adversity and ensure that risks are managed rigorously. As a former FBI national security executive, his unique expertise in industry-leading cyber security threats and incident response strategies are instrumental in helping clients manage and protect their businesses.

Having been directly involved in investigating and prosecuting some of the most famous spies in U.S. history, Bob is an expert in investigating theft of proprietary information and trade secrets. He has been retained as an expert witness in several ongoing litigations.  Bob has run high-profile international investigations in partnership with several Fortune 50 companies, the U.S. Departments of Defense, Justice, Energy, and Treasury, the U.S. Intelligence Community, and other federal agencies.

# NAVIGANT

## Robert Anderson
**Managing Director**

bob.anderson@navigant.com
Washington, DC
Direct: 202.481.7306

### Professional Summary

Robert (Bob) Anderson is a Managing Director in the Global Legal Technology Services with Navigant.  He leads the Information Security sub-practice.  Bob has an extremely impressive background addressing a wide array of cyber-security matters.  He joins Navigant from the FBI where he most recently served as the Executive Assistant Director of the Criminal, Cyber, Response and Services branch.

### Areas of Expertise

- **Global Program Management**: Managed staff and federal international programs in 84 countries; Developed informational infrastructure that enhanced communication, operational efficiency, and resource exchange throughout the international intelligence and cyber community.

- **Budget Management**: Managed operating budgets in excess of $600M; Ranked and prioritized program needs and controlled costs to ensure adequate funding throughout a designated fiscal cycle.

- **Change Management**: Evolved performance and culture by creating an environment that emphasized leadership development, training, and personal/team accountability with full intelligence integration; Clarified department missions/goals; Formulated strategies to improve cross-agency communication and resource sharing.

- **Strategic Development**: Formulated and communicated strategic plans in partnership and collaboration with senior officials in the United States Intelligence Community (USIC), Foreign Intelligence officials, military leaders, private corporations, White House staff, senior Congressional House and Senate Leaders, the Director of National Intelligence, and the Office of the President of the United States.

- **Investigations Management**: Oversaw, advised, and directed strategic initiatives/operations for high-profile international investigations in partnership with Fortune 50 companies, Department of Defense, Department of Justice, the USIC, Department of Energy, Department of Treasury, and other federal agencies.

  - **Types of cases include**: Espionage, economic espionage, corporate espionage, counterproliferation, fraud, counterterrorism, hostage negotiations and rescues, cyber and criminal cases resulting in numerous felony convictions. (Details upon request)

- **Regulatory Compliance**: Directed and ensured adherence and compliance to federal regulations involving public safety, personnel safety and work conditions, financial reporting, continuing education, training, investigations, law enforcement operations, and certification requirements of FBI personnel, including sworn law enforcement officers and professional support staff.

# NAVIGANT

## Robert Anderson
**Managing Director**

### Work History

| | |
|---|---|
| Navigant Consulting, Inc. | 2016 – Present |
| Federal Bureau of Investigation | 1995 – 2016 |
| Delaware State Police | 1987 – 1995 |

### Certifications, Memberships and Awards

Licensed Pilot – Private, Commercial, Instrument, Helicopter

Certified Flight Instructor for single engine and multi-engine aircraft land

Nationally Registered Paramedic

Presidential Rank Award, 2012 - Meritorious Rank to the Senior Executive in the United States Government, highest award for leadership in the U.S. Government.

Senior Intelligence Officer, 2010 – One of only 10 recipients in the U.S. Intelligence Community

Certified Intelligence Officer, 2007

National Intelligence Meritorious Citation, National Intelligence Community, 2004

FBI Hostage Rescue Team Assaulter 1997-2001

Delaware State Police Trooper of the Year, 1990

### Education

| | |
|---|---|
| Master in Public Administration | Wilmington University |
| Bachelor of Science | Wilmington University |
| Associate of Arts: Criminal Justice | Widener University |

*Confidential and Proprietary*
[1st line for document-specific information]
[2nd line for document-specific information]

Page 2

# CYBER DEFENSE LABS

*Experts Delivering Expert Services*

Contact: Jim Campbell, 972-989-4892, jcampbell@cyberdefenselabs.com



### CYBER DEFENSE LABS NAMES LEADING CYBER SECURITY EXPERT
### ROBERT ANDERSON, JR. AS NEW CEO

RICHARDSON, TX, March 4, 2019

Cyber Defense Labs (CDL), a full lifecycle information security service provider helping companies manage, detect and respond to today's cyber risks, announced Robert Anderson, Jr. as Chief Executive Officer, effective immediately.  Anderson brings strong executive leadership and exceptional knowledge in cybersecurity, counterintelligence and economic espionage to help guide CDL as it continues to provide customized solutions to help companies protect against today's advanced threats and adversaries.

Rod Jones Chairman CDL www.cyberdefenselabs.com

"We welcome Bob Anderson to Texas – this is perfect timing in bringing world class leadership and expertise to our organization. At this critical time when effective security is the number one concern for organizations Bob's leadership and the team of experts he is assembling will enable us to offer highly effective client centric services and a unique partnership that our clients will value"

 "Honored and excited about the possibilities." said Robert Anderson. "helping clients combat cybercrime in the modern-day world is what CDL is all about."

Recently, Anderson served as a Principal within The Chertoff Group's Strategic Advisory Services practice, collaborating with clients to tackle their most critical security issues.  He previously served as Managing Director for Navigant's Global Information Security practice where he helped rapidly grow the firm's investigative and incident response services offering.

Anderson is a former national security executive, serving 20+ years with the Federal Bureau of Investigation (FBI).  During this time, Anderson served in several senior level positions, ultimately rising to become executive assistant director of the FBI's Criminal, Cyber, Response

# CYBER DEFENSE LABS

*Experts Delivering Expert Services*

and Services Branch where he oversaw all FBI criminal and cyber investigations worldwide, international operations, critical incident response, and victim assistance. Anderson has directed strategic initiatives and operations for high-profile international investigations in partnership with several Fortune 50 companies, along with U.S. Departments of Defense, Justice, Energy, and Treasury, the U.S. Intelligence Community, and other federal agencies.

Having been directly involved in investigating and prosecuting some of the most famous spies in U.S. history as part of his law enforcement career, Anderson is an expert in cybercrimes, counterintelligence, economic espionage, theft of proprietary information and trade secrets, and critical incident management. He has been retained as an expert witness in several ongoing litigations.

In 2012, Anderson was awarded the Meritorious Presidential Rank Award by President Barack Obama, the government's highest award for leadership.

In his career, Anderson served on the FBI's Hostage Rescue Team and completed deployments to more than 20 countries and three war zones. Before joining the FBI, Anderson was a Delaware State Trooper for nine years in the uniform patrol division, criminal investigative unit, and aviation section. He received the Medal of Valor and Trooper of the Year Award in 1990 for his efforts to save a family trapped inside a burning residence. The Trooper of the Year Award is the highest award presented by the state police and the State of Delaware. Anderson is a licensed pilot and a nationally registered paramedic.

Bob Anderson is the Chief Executive Officer of Cyber Defense Labs in Dallas Texas.  A full-service information security company specializing in "experts delivering expert services". Bob recently left his position as a Principal in The Chertoff Group's global Strategic Advisory Services where he collaborated with clients to tackle their most critical security issues to safeguard against adversity and ensure that risks were managed rigorously.

As a former national security executive and former Executive Assistant Director with the FBI, Bob was in charge of over 24 thousand agents, analyst and support employees, his unique expertise in industry-leading cyber security threats and incident response strategies are instrumental in helping clients manage and protect their businesses.

Having been directly involved in investigating and prosecuting some of the most famous spies in U.S. history, Anderson is an expert in counterintelligence, theft of proprietary/trade secrets, criminal and cyber investigations. He has been retained as an expert witness in several ongoing class action litigations globally.

Bob and his team perform criminal and cyber investigations worldwide, conducting forensic analyses to determine how an incident occurred, assess whether there is evidence of

information compromise, and identify affected individuals through data mining.

Bob served as a Special Agent with the FBI for over 21 years, Bob is a recognized expert in cybersecurity, incidence response, cyber hacking, counterintelligence, and economic espionage. He has directed strategic initiatives and operations for high-profile international investigations in partnership with several Fortune 50 companies, the U.S. Departments of Defense, Justice, Energy, and Treasury, the U.S. Intelligence Community, and other federal agencies.

In 2012, Bob was awarded the Meritorious Presidential Rank Award by President Barack Obama, presented to government senior executives as the government's highest award for leadership.

Early in his career, Bob served on the FBI's Hostage Rescue Team and completed deployments to more than 20 countries and three war zones. Before joining the FBI, Bob was a Delaware State Trooper for nearly nine years, serving in the uniform patrol division, criminal investigative unit, and aviation section. He received the Medal of Valor and the Trooper of the Year Award in 1990 for his efforts to save a family trapped inside a burning residence. The Trooper of the Year Award is the highest award presented by the state police and the State of Delaware. Bob is

a licensed commercial pilot and a nationally registered paramedic.