UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,     .
                             .
          Plaintiff,         .   CR No. 18-0218 (TSC)
                             .
     v.                      .
                             .
MARIIA BUTINA, a/k/a         .   Washington, D.C.
MARIA BUTINA,                .   Friday, April 26, 2019
                             .   10:07 a.m.
          Defendant.         .
. . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          ERIK M. KENERSON, AUSA
                             THOMAS N. SAUNDERS, AUSA
                             U.S. Attorney's Office
                             National Security Section
                             555 Fourth Street, NW
                             Washington, DC 20530

                             WILLIAM MACKIE, ESQ.
                             U.S. Department of Justice
                             National Security Division
                             950 Pennsylvania Avenue, NW
                             RFK Building, Suite 7700
                             Washington, DC 20530

For the Defendant:           ROBERT N. DRISCOLL, ESQ.
                             ALFRED D. CARRY, ESQ.
                             McGlinchey Stafford, PLLC
                             1275 Pennsylvania Avenue, NW
                             Suite 420
                             Washington, DC 20004

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue, NW
                             Washington, DC 20001

1              P R O C E E D I N G S

2          THE DEPUTY CLERK:  Your Honor, we have Criminal Action

3    18-218, United States of America versus Mariia Butina.  We have

4    Mr. Erik Kenerson, Mr. Thomas Saunders, and Mr. William Mackie

5    representing the government.  We have Mr. Alfred Carry and

6    Mr. Robert Driscoll representing Ms. Butina, who is present,

7    and we also have Ms. Crystal Lustig representing Probation.

8          THE COURT:  Good morning, everyone.

9      Good morning, Ms. Butina.

10      We're here for the sentencing of Ms. Butina, who has

11    pleaded guilty to conspiracy to act as an agent of a foreign

12    government in violation of Title 18, Sections 371 and 951 of

13    the United States Code.

14      I know that there's some materials here that have been

15    filed under seal, and there may be representations that you

16    want to make to me under seal.  If you do, we're going to try

17    and approach the bench.  I really don't want to have to clear

18    the courtroom.  I don't plan on discussing any sealed matters,

19    but if you need to, we can take it at the bench and seal the

20    transcript.

21      So let me tell you what I've received and reviewed in

22    advance of this hearing.  I have received and reviewed the

23    presentence report and the sentencing recommendation from the

24    Probation Department, and also the following documents that have

25    been submitted by counsel in advance of the hearing: a copy of

1    the plea agreement signed by Ms. Butina, along with the

2    Statement of Offense.

3        And I'll say at this point that the government noted in

4    its sentencing memorandum a factual mistake in the Statement

5    of Offense.  I'll say that that factual mistake does not affect

6    my consideration of the sentencing factors or my sentence, but

7    is there any objection to that correction, Mr. Driscoll?

8            MR. DRISCOLL:  There's not, Your Honor.

9            THE COURT:  All right.

10       So, Government, I'd like you to file a revised Statement

11   of Offense after the hearing.  Thank you.

12       I've also received and reviewed a sentencing memorandum

13   from the government, with exhibits that are redacted on the

14   public docket.  Included in these exhibits is a declaration from

15   Robert Anderson, Jr., a former FBI agent.  I have reviewed the

16   unredacted exhibits which were filed under seal.

17       Now, there was a missing exhibit, Exhibit 8, that was

18   referenced in the Government's sentencing memorandum that I

19   didn't receive.  I requested a copy and received a copy last

20   night.  Mr. Driscoll, have you had a chance to look at that?

21           MR. DRISCOLL:  We have, Your Honor.

22           THE COURT:  All right.  Do you have any objection to

23   the exhibit and to having the government file it after this

24   hearing?

25           MR. DRISCOLL:  We do not, Your Honor.

1          THE COURT:  That's going to be under seal.  Correct?

2          MR. KENERSON:  I believe it was filed under seal last

3     night, Your Honor.

4          THE COURT:  Yes.  I'm going to grant the motion for

5     leave to file under seal.

6          MR. KENERSON:  Thank you.

7          THE COURT:  And just file a redacted version for the

8     public docket after this hearing.

9          Okay.  I've received a supplemental memorandum in aid of

10    sentencing and a motion for downward departure, which is under

11    seal.  I've received a sentencing memorandum from Defendant with

12    exhibits, and these exhibits include 24 character letters and

13    three certificates.

14         These include a certificate of completion, Women Empowering

15    Women; a certificate, Community Service Participation in

16    Knitting Projects; and Certificate of Participation in a Life

17    Skills Class.  All but four of the letters that I've received

18    include affidavits of accuracy of translation and the original

19    Russian letter.  Obviously, I haven't reviewed the original

20    Russian letters, but I've reviewed the translated versions.

21         I've also reviewed the pleadings related to the defense's

22    motion to exclude and strike the declaration of Robert Anderson,

23    Jr.  I consider those part of the sentencing hearing record.

24    I did deny the defense motion to strike the declaration.

25         Now, Counsel, have I missed anything that has been

1    submitted for my review?

2            MR. KENERSON:  Not from the government, Your Honor.

3            THE COURT:  All right.  Mr. Kenerson, are you going to

4    be speaking for the government today?

5            MR. KENERSON:  Yes, Your Honor.

6            THE COURT:  All right.

7        Mr. Driscoll, have I missed anything?

8            MR. DRISCOLL:  You have not, Your Honor.

9            THE COURT:  Okay, good.

10        Now, Ms. Butina, you may recall that at your plea hearing,

11    the plea hearing proceeded in three steps.  The first was to

12    make sure that you were competent to take the plea, the second

13    was to make sure that you were knowingly taking the plea and

14    aware of the rights that you were giving up, and the third step

15    was to make sure that your plea was entered into voluntarily.

16        Today's sentencing is going to proceed in four steps.

17    The first step is for me to determine whether you've reviewed

18    the presentence report and whether there are any outstanding

19    objections to the presentence report, and, if so, I have to

20    resolve those objections.

21        The second step is for me to determine what sentencing

22    guidelines and sentencing range, if any, apply to your case.

23        The third step is to hear from the government, from your

24    lawyer, and from you, if you wish to be heard, about sentencing

25    in this case.

1    The last step requires me to fashion a just and fair

2    sentence in light of the factors set forth in 18 U.S.C. § 3553(a),

3    a statute you'll hear a lot about.  You've already heard about

4    it some at your plea, and I'm sure your lawyer has explained to

5    you what that is.

6    At the end of the hearing, I'll also deal with the joint

7    motion for order of judicial removal that the parties have

8    submitted.

9    Okay.  So with regard to the presentence report, the final

10   presentence report and sentencing recommendation were filed in

11   this case on April 16, 2019.

12   Mr. Kenerson, does the government have any objection to

13   any of the factual determinations set forth in the presentence

14   report?

15   MR. KENERSON:  No, Your Honor.

16   THE COURT:  Now, are you expecting an evidentiary

17   hearing?  Do you have any witnesses present in the courtroom?

18   MR. KENERSON:  Your Honor, we do have a witness present.

19   THE COURT:  Is that Mr. Anderson?

20   MR. KENERSON:  Yes.  It's Mr. Anderson.  I was going

21   to say we intend to make him available to the Court if the

22   Court wants to inquire or if the defense wants to inquire.

23   THE COURT:  Okay.  Here's how I'm going to handle

24   it.  Obviously, we've all read the Anderson Declaration.  If,

25   Mr. Driscoll, you wish to present argument beyond any argument

1  you've put in your motion to strike regarding the Anderson

2  Declaration, I'll hear you.  If you wish to question

3  Mr. Anderson, you may also do so.  Obviously, you know, not

4  open-ended, but you also may do that.  That's up to you, and

5  you can let me know at the appropriate time.

6           MR. DRISCOLL:  Thank you, Your Honor.

7           THE COURT:  Okay.  Now, Ms. Butina, I'd like to

8  ask you some questions.  Are you fully satisfied with your

9  attorneys, Mr. Driscoll and Mr. Carry, in this case?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you feel that you've had enough time

12  to talk to them about the Probation Department's presentence

13  report and the papers that the government filed in connection

14  with the sentencing?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Now, Mr. Driscoll, have you and Ms. Butina

17  read and discussed the presentence report?

18          MR. DRISCOLL:  We have.

19          THE COURT:  Are there any disputed issues of fact?

20  That is, does Ms. Butina have any objection to any of the

21  factual statements set forth in the presentence report?  And

22  this does not include paragraph 71, which is the determination

23  of whether there's a sufficient analogous guideline.  I'll

24  address that later.

25          MR. DRISCOLL:  We raised minor issues, but it's fine

1    the way it --

2         THE COURT:  Okay.  I'll just deal with the factual

3    objections I'm aware of, and I can tell you that they don't

4    really affect my conclusion on the appropriate sentence here.

5         Page 3 regarding aliases.  Mr. Kenerson, do you have any

6    objection to striking the aliases as requested by the defense?

7         MR. KENERSON:  No, Your Honor.

8         THE COURT:  All right.  Those aliases will be

9    stricken.  Paragraph 62, the defense objection is overruled.

10   Ms. Butina is represented by retained counsel.  This will not

11   affect the Court's decision about whether to impose or whether

12   she's able to pay a fine in this case.  All right.

13        Paragraph 73, the government's memorandum.  Page 12 at

14   footnote 6 makes reference to the defendant's objection to

15   paragraph 73.  However, this objection is not in the final

16   presentence report, and the defendant does not raise this

17   submission in her memorandum.

18        The Court's understanding is that Ms. Butina objects

19   to paragraph 73 because it is incomplete, because the plea

20   agreement also states that the parties agreed, for allocution

21   purposes, that a sentence within the estimated guideline range

22   of zero to six months' imprisonment would be reasonable in light

23   of all the sentencing factors under § 3553(a).

24        To begin with, the presentence report does not, as a matter

25   of course, regurgitate all the language in the plea agreement.

1   Nonetheless, paragraph 5 of the plea agreement contains the

2   language, "if the Court finds that a guideline range applies."

3   So this objection, even if it were preserved by the defense, is

4   overruled.

5       Paragraph 87, this objection is overruled.  There's nothing

6   about the factual accuracy of the language that is contested, and

7   the Court will make its own determination about the defendant's

8   ability to pay a fine.

9       Okay.  Are there any further objections that I haven't

10  covered, Mr. Driscoll?

11          MR. DRISCOLL:  Not from the defense, Your Honor.

12          THE COURT:  Mr. Kenerson?

13          MR. KENERSON:  No, Your Honor.

14          THE COURT:  All right.  Having ruled on the

15  objections, I will accept the factual recitations in the

16  presentence report regarding the circumstances of the offense,

17  and, therefore, the facts as stated in the presentence report

18  will be my findings of fact for the purposes of this sentencing.

19      The next issue is the determination of the guidelines,

20  which is far more complicated in this case than in any other

21  that I usually have before me.  The presentence report lays out

22  the Probation Office's calculation of the advisory guidelines

23  that apply in this case.  The calculation was done using the

24  2018 guidelines manual and is as follows:

25      The Probation Office's position is that, since there is no

1    analogous guideline, an advisory guideline range could not be

2    determined for Ms. Butina's offense.  The parties agree that

3    pursuant to U.S. Sentencing Guidelines §2X1.1, the guideline

4    range for a violation of 18 U.S.C. § 371 follows the underlying

5    substantive offense, which in this case is 18 U.S.C. § 951.

6        The parties further agree that the U.S. Sentencing

7    Guidelines do not specify an applicable guideline for a

8    violation of 18 U.S.C. § 951.

9        Pursuant to U.S. Sentencing Guidelines §2X5.1, where the

10   guidelines do not expressly specify an applicable guideline, the

11   Court should, and I quote, "apply the most analogous guideline.

12   If there is not a sufficient analogous guideline, the provisions

13   of 18 U.S.C. § 3553 shall control except that any guidelines and

14   policy statements that can be applied meaningfully in the

15   absence of a Chapter 2 offense guideline shall remain applicable."

16       So the government argues that there is no sufficiently

17   analogous guideline for the underlying substantive offense and

18   that the provisions of 18 U.S.C. § 3553 should control.

19       Before I go any further, Ms. Butina, have you discussed

20   this disagreement -- it's very complicated -- having to do with

21   our sentencing guidelines --

22            THE DEFENDANT:  Yes.  We did discuss it.

23            THE COURT:  Okay.  Do you understand the dispute?

24   Do you understand your lawyer's position?

25            THE DEFENDANT:  Yes.

1          THE COURT:  Okay.  The defense argues that §2B1.1

2    is the most analogous and can be applied meaningfully for

3    sentencing in this case.  The defense also points the Court to

4    U.S. sentencing guidelines §2J1.4.

5          The Court finds that there is not a sufficiently analogous

6    guideline, and therefore the provisions of 18 U.S.C. § 3553

7    shall control.  Neither the government nor the defense counsel

8    has presented this Court with any binding authority on this

9    question; that is authority from the D.C. Circuit or the Supreme

10   Court, and this Court has been unable to find any either.

11         The majority of the courts that have dealt with this

12   issue have determined that § 951 does not have a sufficiently

13   analogous guideline, and I will cite to the cases the government

14   provided to the Court:

15         *United States v. Soueid*, No. 11-CR-494, Document 59,

16   from the Eastern District of Virginia; *United States v. Chun*,

17   No. 16-CR-618, from the Southern District of New York; *United*

18   *States v. Alvarez*, No. 05-CR-20943, from the Southern District

19   of Florida; *United States v. Buryakov*, No. 15-CR-73, from the

20   Southern District of New York; and *United States v. Duran*,

21   No. 07-CR-20999, from the Southern District of Florida.

22         The defense urges the Court to follow the decision in

23   *United States v. Dumeisi*, 2006 Westlaw 2990436, from the

24   Northern District of Illinois.  The defense characterizes this

25   decision as the leading case for the proposition that U.S.

Sentencing Guidelines §2B1.1 is the most analogous action for a violation of § 951.

However, the Court is unaware of any other cases that have held as such, and the Court finds that there is no reasoning provided in the *Dumeisi* decision that would cause this court to disregard the other cases that I've cited and that the government cited.

The Court also finds that an elements-based approach does not advance the defendant's position.  The offenses that the defense argues are analogous do not require any additional act in addition to the deceptive statement or withholding of information.  In contrast, § 951 has an action element.  Moreover, apart from an elements-based approach, §2B1.1 is primarily for theft and embezzlement offenses.

While §2B1.1 is used for false statements in violation of 18 U.S.C. § 1001, the Court agrees with the government that the gravamen of a 951 violation is the acting as an agent of a foreign government without first notifying the Attorney General. It is of no moment that the acts themselves may have been legal. And I use the word "may."  I'm making no finding that they were or were not.

Now, having determined the applicable guidelines, the next step is for me to consider departures.  The presentence report does not include any departure grounds.  The government has filed, under seal, a §5K1.1 motion for a downward departure.

1    The Court will grant that motion.  The defense does not request

2    any other departures in its sentencing memorandum, and Probation

3    does not recommend any, which the defense did not object to.

4        Now, § 3553 requires me to consider a variety of factors,

5    including the applicable penal statutes.  So let me take a

6    moment to describe the applicable statutory penalties for this

7    offense.  The statutory maximum here is five years of

8    imprisonment.  If a term of imprisonment is imposed, the

9    statutes provide that Ms. Butina faces a supervised release

10   range following imprisonment of not more than three years.

11       In a case of a deportable alien who will likely be deported

12   after imprisonment, the Court should ordinarily not impose a

13   term of supervised release unless required by statute.  That's

14   from §5D1.1.  The Court is aware of no statute that would

15   require it to impose a term of supervised release in this case.

16       The statute of conviction sets a maximum fine of up to

17   $250,000, and a special assessment of $100 per count is mandatory

18   under 18 U.S.C. § 3013.  The statutory restitution provision is

19   inapplicable here because there is no identified victim.

20       Counsel, have I stated accurately the statutory framework

21   under which we're operating in this case?  Mr. Kenerson?

22           MR. KENERSON:  Yes, Your Honor.

23           THE COURT:  Mr. Driscoll?

24           MR. DRISCOLL:  Yes, Your Honor.

25           THE COURT:  Okay.  Now, before I discuss the other

1    sentencing factors that will bear on my final decision, I will

2    at this point notify the parties of the particular sentence the

3    Probation Office has recommended.

4         The Probation Office has recommended 12 months and one

5    day of incarceration.  Probation does not recommend supervised

6    release, probation, or a fine.  The recommendation of the

7    Probation Office is not based on any facts or circumstances

8    that have not already been revealed to the parties in the

9    presentence report.

10        Now, at this point I'd like to give the parties the

11   opportunity to address the sentencing guideline range and any

12   other factors that bear on my consideration of a fair and just

13   sentence under § 3553(a).

14        Mr. Kenerson, does the government wish to speak about the

15   application of the factors?

16             MR. KENERSON:  Yes.  Thank you, Your Honor.

17        So reading through both of the parties' submissions in

18   this case --

19             THE COURT:  I'm going to ask you to get closer to the

20   microphone.

21             MR. KENERSON:  Understood.  So reading through both

22   of the parties' submissions in this case, Your Honor, there

23   is a picture, I think, that emerges of a young woman who is

24   simultaneously talented and caring, but who is also savvy and

25   determined.  And despite the differing tone in the parties'

pleadings, this is not a case of contested evidence; it's a case of contested interpretation of that evidence.  The government is not contesting Ms. Butina's love for her family or her desire for education or that she bought American toothpaste for the Russian Official.

But the defense, similarly, is not contesting that Ms. Butina was here trying to establish a back channel of communication with Russia.  It does not contest that before she was a student, she was able to get meetings with the Russian ambassador, and that at that meeting she promised to send him contact information for a prominent American and the name of an advisor to a presidential candidate who would come to Moscow -- that's in Exhibit No. 5 -- or that she was drafting notes that talked about how to exert influence over U.S. foreign policy, or noting how downplaying the Kremlin hand will help the Russians exert the speediest and most effective influence in the decision-making apparatus of the U.S. establishment.  That's in Exhibits 6 and 7.

The defense is not contesting that the defendant wrote notes to the Russian Ministry of Foreign Affairs explaining the Russian Official's ability to come to the United States to meet with presidential candidates, and that they actually planned and hoped to do so on more than one occasion when the Russian Official was here.

It's not contesting that she sought the Russian governmental

1    feedback on someone she thought would be a Secretary of State

2    candidate, believing that the Russian opinion would be taken

3    into account in the United States.

4         So while it is certainly true that the defendant was an

5    American University student and was a devoted daughter and

6    sister -- and is a devoted daughter and sister -- she was

7    simultaneously, in her own words, as quoted in the government's

8    memorandum, executing a plan to establish unofficial contact

9    based on common views and a system of conservative values with

10   key politically minded organizations within the United States

11   including the executive level of Political Party 1.  And as she

12   admitted in her Statement of Offense, she did this for the

13   benefit of the Russian Federation.

14        As the Court weighs the 3553(a) factors, it shouldn't lose

15   sight of that last fact.  The information that the defendant put

16   back to Russia through the back channel that she was trying to

17   establish was of extreme importance to the Russian Federation,

18   as I think the Court saw in former Assistant Director Anderson's

19   declaration, and Russia targets the United States for malign,

20   intrusive intelligence operations.

21        That the defendant did not know the exact final use

22   to which this information would be put and that it was not

23   classified, did not involve dead drops or spy tradecraft, does

24   not diminish the potential harm that the defendant caused to

25   the United States.

1    The declaration of former Assistant Director Anderson,

2    of course, we believe speaks for itself, but it's important

3    to note how valuable the information is that she sent back,

4    information that had we received similar information in reverse,

5    the Assistant Director for Counterintelligence would want to

6    know that information.  Her back channel of communication had

7    serious harms -- serious potential to harm the U.S. political

8    process as well as foreign policy interests and national

9    security.

10    Of course, the Court has to analyze not only the

11    seriousness of the offense but the defendant's role within that

12    offense, and we'd ask the Court to look not just at Assistant

13    Director Anderson's declaration but also at the defendant's

14    conduct as laid out in the Statement of Offense and the

15    exhibits, based on her knowledge and intentions.

16    We submit that that conduct, with her knowledge and her

17    intent, was undoubtedly serious.  This is, I think, where we

18    fundamentally but respectfully disagree with defense's position

19    here.  This is not a registration offense.  This is a case

20    where the defendant acted in the United States as the agent of

21    a foreign government, and as she admitted in the Statement of

22    Offense, that she did so for the benefit of Russia.

23    As her words make clear, she was not solely an

24    international relations student.  Prior to her enrollment at

25    American, and prior to the fact when her student visa was even

granted, she was organizing political trips for the Gun Rights

Organization senior leadership, among other things on that trip,

but it certainly had a political component, and sending

information about the political importance of the Gun Rights

Organization members back to Moscow.

She was specifically worried about her initiative being

seized by someone else in the Russian government after that,

and that's just one example of operational-type discussions

amongst a lot of others that she had with the Russian Official.

When the defendant wrote about presidential candidates, she

did not solely copy Wikipedia.  For example, in Exhibit 4, she

highlighted having met the candidate's advisors in the matters

of international affairs and also highlighted having another

such meeting planned.

She used the U.S.-Russia Friendship Dinners to learn

American influencers' reactions to her pitch on U.S.-Russia

relations, and she was able to adjust her pitch accordingly.

She asked advice on the Russian government's readiness to meet

with people, and the Russian Official wanted to make sure that

her contacts did not forget her after the election.

She provided names of potential Secretary of State

appointees, organized a large delegation to the National Prayer

Breakfast with the express goal of starting this back channel of

communication, and she was again worried about someone in the

Russian government seizing the initiative afterwards when she

failed to meet with the President as she was promised.  It's her words and her intent as stated throughout that matters here, and there's no doubt that she was not simply a grad student.

The Court, of course, has a copy of the Diplomacy Project. The defense spends a lot of time talking about that in their submission.  But when read in the context of Exhibits 6 and 7, talking about how to best exert influence over U.S. policy, and in the context of her note to the Russian Ministry of Foreign Affairs on getting Russian Official to the meetings to meet presidential candidates, and going so far afterwards as to suggest gifts to give these candidates to suggest at the start of this back channel of diplomacy, in the context of statements regarding laying the groundwork for the past five years with the Political Party 1 leadership and asking whether the government was ready to meet advisors and attempting to meet the President in 2017, it's clear that while the defendant was a student and before she enrolled, she was actively spending a significant amount of time trying to build this back channel of communication between the United States and Russia.

So the Court should not lose sight of these actions which occurred both prior to and concurrently with her attendance at American and throughout multiple visa applications.  She knew -- as we laid out in the Statement of Offense, and she agreed, she knew that some of the information was going to the Russian government writ large, and she knew that the Russian Official

was a conduit to the Russian government writ large.  This is
not simply a case about whether defendant could have legally
done everything she had done had she registered.

As we note in the government's memo, we obviously do not
know what would have happened had she notified the Attorney
General at any particular step in the process, or prior to her
application for her F-1 visa, or prior to her application to
American or to any other university.  Maybe those visas would
have been granted, but maybe they wouldn't.

That's the whole point, is that the defendant's actions
deprived the United States of the ability to make that choice.
They deprived American University of the ability to decide
whether to admit her at all or whether to keep her on as a
student if she had filed something during her time there.  And
it deprived many individuals within the United States of the
ability to decide for themselves whether and on what terms to
meet with her.

And her conduct, I think, really shows how easily it
can be for a foreign government to target Americans in the
United States.  Her failure to register also gave the Russian
government plausible deniability that she was acting on their
behalf, which I'm sure the Court has seen they've attempted to
use numerous times since this case was brought.

So, for these reasons, we respectfully disagree with the
defense position that this is simply a failure-to-notify case

1    analogous to not filing a tax return or failing to register for

2    military service.

3        But the government also recognizes, I think as we laid out

4    in our memorandum, that this case is not espionage, which of

5    course prescribes a much higher guideline range than what the

6    government has requested here.  The defendant should get credit

7    for her acceptance of responsibility, she should get credit for

8    having done so and agreed to cooperate in a case as high-profile

9    as this one, and the Court should give her credit for those

10   things.

11       We also recognize, as I think we did in the written

12   submission, the lack of need for specific deterrence, and we

13   acknowledge her substantial assistance, which the Court has

14   noted, granted the government's motion.  So the Court should

15   take, obviously, all that into account, and the government did

16   as well in coming to its sentencing recommendation to the Court.

17       And we're happy to answer any questions the Court may have

18   at the bench about that substantial assistance, but unless the

19   Court has any other questions for the government -- sure.

20           THE COURT:  Let me inquire of Mr. Driscoll first if he

21   would like to question Mr. Anderson.  If he does not, then -- if

22   he does, then you may approach again and address any issues

23   raised in that questioning.  Mr. Driscoll?

24           MR. DRISCOLL:  I'm happy to leave the record as it is.

25           THE COURT:  All right.  And again, as I said, I have

1    reviewed your objections and your responses to the declaration

2    in your motion to strike and have taken those into consideration.

3         All right.  Thank you, Mr. Kenerson.

4         MR. KENERSON:  Thank you.

5         THE COURT:  All right.  Mr. Driscoll or Mr. Carry,

6    would defense counsel like to speak on Ms. Butina's behalf?

7         MR. DRISCOLL:  Your Honor, assuming that the guideline

8    calculation lack of -- you're not going to apply 2B1.1 is firm,

9    we won't argue that.  We'll just note our objection for the

10   record, and we'll just move on to the allocution with Mr. Carry.

11        THE COURT:  Yes.  You may approach for the allocution,

12   and your objection is noted for the record.

13        MR. DRISCOLL:  Thank you.

14        THE COURT:  Mr. Carry.

15        MR. CARRY:  Thank you, Judge.

16    I have a few prepared remarks.

17        THE COURT:  That's fine.  I'll just ask that you

18   speak -- when we read, we tend to speed up, and for the sake

19   of my court reporter, if you could slow down a bit.  Thank you.

20        MR. CARRY:  Sure.  So, for the past nine months, I've

21   gotten to know Mariia well.  It's been impossible to speak with

22   her without sensing some regret.  She never wished to break any

23   law.  She never wished to lie.  She never lied, and she never

24   acted maliciously.  Even so, she knows she violated an important

25   statute, and for this she's being sentenced.

1      Before I tell the story of the actions Mariia took that

2 has led to this moment, I'd like to first begin by addressing

3 what's on everyone's mind.  The case against Mariia is certainly

4 timely.  America is looking for enemies wherever we can find

5 them.  We feel wronged, and we should feel wronged, about the

6 attacks on our democracy perpetrated by those who wish to

7 cause us harm.  Our laws exist for a reason: so we can have a

8 government free from undue influence.

9      But here's the fact I wish to stress to the Court.

10 Mariia is not a spy.  She's not intelligence.  She's never

11 been employed by the Russian government.  She knows of no

12 secret codes, safe houses, illegals.  She has never engaged

13 in covert activity, and she has never lied to our government.

14      I mention all this because, while many of us may be

15 skeptical and untrusting, and I understand that feeling,

16 the point is that Mariia is not a proxy for the Russian

17 government.  She's not a proxy for the Russian 13 who were

18 indicted and remain at large.

19      Even so, Mariia did commit a serious crime for which she

20 has deep remorse.  The reason she's here today is because she

21 failed to notify our government before agreeing to act as an

22 agent of a Russian official.

23      Agent of a Russian official.  I appreciate how that

24 sounds.  It's easy to let your mind wander and draw conclusions.

25 But, of course, there are many agents of foreign governments

acting lawfully in the United States.  The difference between those agents and Mariia is that they notified our government in advance, while Mariia did not.  So when our government calls Mariia an agent, they are not calling her an intelligence agent. They are not calling her a secret agent.

In truth, nothing about Mariia has been secret.  She's answered every single question posed to her by our federal government, and she's been answering these questions before she was even arrested.  As we put in our memo, Mariia voluntarily produced thousands of pages of documents and voluntarily appeared before this same body, a Senate intel committee, answering all of its questions for a voluntary deposition for an eight-hour time period.

When the FBI carried out a search warrant, she gave the agents all of her electronics and passwords.  She had nothing to hide.  And when the FBI seized her computer and phone devices again with her arrest, they requested her passwords once more, and she had not changed them.

So what happened?  Well, a lot of things have been said, and Mariia has explained everything.  But her crime really comes down to this, and it's very simple.  During Mariia's time in the United States, and unbeknownst to her, she was committing a felony, conspiracy to violate § 951.

While in this country, she maintained close contact with her family and friends from Russia.  One of them was Aleksandr

Torshin, an official who used to work at the Russian Central
Bank.  They discussed vacations and their daily lives, but
Mariia also took advice from him and did things for him.  I
don't mean to trivialize or rehash all the details which you
have available to you, but the context for these things is
somewhat important.

So, for example, she bought clothes for his grandchildren.
She was also invited to a presidential campaign announcement,
and she described the event to him because he asked about it.
Mariia complied by translating a Wikipedia page she copy-pasted
into a Twitter direct message.  This is how they communicated
back and forth, and it was all unsecured.

Before starting school, Mariia made these business cards
that listed her as a special assistant to Torshin.  The title
was made up.  While traveling on a trip with him to the U.S. for
an NRA event, there was a point when the host asked: One hotel
room or two?  This made her uncomfortable.  She wanted to be
appreciated for her intellect, not her gender.  So she asked
Torshin for permission to make the card and phony title, to keep
anyone from mistaking her relationship with him for a romantic
one ever again, and he said okay.

Once in school, Mariia met her share of discrimination
on the American University campus, especially after the 2016
election.  This didn't deter her, though.  She grew to love the
United States.  You know, she tells a story.  One of the first

stories she told me was that when she got here, she went to a grocery store, and she felt like it looked like a museum.

THE COURT:  Mr. Carry, you just said she met her share of discrimination on the American University campus. What are you referring to?

MR. CARRY:  So there were moments when she was in classes and there were people who read an article that came out that portrayed her in a bad light, and they presumed that she was here for bad reasons.  As you see in one of the character letters that was provided, she points out that if they knew her, had they got to meet her, they would see that she's kind and generous, and she's not shady or shadowy.  And it was hard for her to make friends, and so the friends she did have there were few and far between.

But in any event, like a sponge, she wanted to learn as much as she could about this country, and she admired our work ethic and ideals.  And she knew this country to be good and just.  In fact, she wished to live here.  But she also loved her home, her family.  She wanted a foot in both worlds.

So she thought perhaps she could work for a think tank; perhaps she could start a foundation or be the go-to consultant for anything American or Russian.  These are the kinds of things that she had in mind as a potential career.  Graduation was inevitable, so she continued to share her political thoughts and ideas with her American contacts and Torshin, although not under

1    orders or for money.

2          When the government tells this story, they stress

3    words and phrases like "agenda" and "Russian interests" and

4    "unofficial transmitter of communications."  They're in the

5    Statement of Offense.  And we don't walk them back, but I

6    believe the government has highlighted these words to make her

7    actions appear more nefarious than they were.

8          Her agenda was better relations between Russia and the

9    United States.  The Russian interests she was pursuing was all

10   the same.  And as an unofficial transmitter of communications,

11   this means that she had conversations with like-minded people

12   at Friendship Dinners and other civic society events about how

13   to improve relations.

14         These Friendship Dinners weren't a bad thing.  It's not

15   like they were plotting behind the scenes about how to infect

16   the American government with a Manchurian candidate.  No.

17   They were cultural exchanges, attended mostly by artists, movie

18   directors, philanthropists, and political wonks.  They talked

19   about world history and U.S.-Russian affairs.  They talked about

20   peace.  And Mariia shared her thoughts and ideas with them as

21   they did with her.

22         The Friendship Dinners were publicized and out in the

23   open, and they were organized with her help by an American

24   philanthropist who she met and has long been interested in

25   restoring the relations with the U.S. and Russia as a legacy to

his father, which was an equal interest of Mariia's.

THE COURT:  You're referring to Mr. O'Neill.

MR. CARRY:  I'm referring to U.S. Person No. 2.

THE COURT:  All right.

MR. CARRY:  Mariia never stole any documents, bribed any officials, funneled money to the NRA, or lied to any investigators.  And she just can't see how anyone would think she's a spotter.

I'll also note that some have cast doubt on the seriousness of a gun rights group in a country that doesn't allow such rights. I don't normally like to inject myself into argument, but I'll remind those same people that there was a time in this country when women did not have the right to vote, and I didn't have the right to marry.  Rights advocacy is a bedrock principle of being American.  Her gun advocacy wasn't a pretext, it was sincere, and the written testimonials from the wrongly convicted people she helped as part of her work should show that.

I also take issue with how the government has characterized some of her time in the U.S., as though she was only interested in her diplomacy activities versus school.  Mariia came to the United States for school, and she was a straight-A student at AU.  And I mean a near 4.0.  She held two internships, did work-study for professors, studied at the library every day, participated in class, took her coursework seriously, did all of her exams, and graduated with high marks.

When Mariia was arrested, it had been stated that she was using her education as a cover for nefarious or clandestine ends.  This is not true.  Mariia's main interest in coming to the United States was to pursue graduate work, but as an admirer of both this country and her home, she hoped for a better relationship between the two nations.  For this reason, and for this reason alone, Mariia pursued peace-building by organizing dinners between Americans and Russians who wanted better relations.

In the end, Mariia didn't notify our government in advance of her activities, although she would have committed no crime if she had.  Regardless, Mariia has confessed to her crime.  She recognizes that her good ends were sought using unlawful means. She admits that her activities triggered a duty to notify the Attorney General and that she failed to provide that notice. For this, she is remorseful.

This remorse, which I know many Americans will be suspicious of, is not merely because she is currently in jail where she has spent most -- some of her time in solitary confinement.  No.  Mariia is filled with regret because she has accidentally harmed a country that she loved and admired, a country where she saw a future for herself, a country where she was moving to South Dakota to begin an American life.

These hopes have obviously been undone by her own actions. But Mariia understands why this is so, and her contrition is

1    honest, like everything else about her.

2        Judge, like you, I used to be a public defender.  I loved

3    the work and continue to help when I can because I can appreciate,

4    in the words of Bryan Stevenson, that each of us is more than

5    the worst thing we've ever done.  In my eight years practicing

6    law, I have met no one, and I've never said this before, but no

7    one more emblematic of that belief than Mariia.

8        She has learned a valuable lesson.  Given the high-

9    profile nature of this case, she has felt the depths of shame

10   and humiliation.  She has felt the weight of being called a

11   felon -- which now she is -- a foreign agent, and to some in the

12   news, a spy.  These are brands that she will bear for the rest

13   of her days, and she knows what they will mean for her future.

14       She has languished in solitary confinement.  Other than

15   brief trips for transport, Mariia has gone outside only once.

16   She has served a sobering night in Central Cell Block, weeks

17   in the D.C. jail, and months in the Alexandria Detention Center.

18   She has been justly punished.

19       Finally, I appreciate the sometimes higher range sentences

20   for § 951 that the government points out for offenders, but this

21   case is distinguishable.  Mariia stole no sensitive information.

22   She did no covert activity.  She never lied to our government.

23   There are no multiple counts here.  She cooperated immensely.

24       All of Mariia's many good qualities as well, which are

25   reflected in the many character letters you have seen, should

1   not be overshadowed by her aberrant act.  So I ask that you

2   impose a sentence of time served.

3       Unless you have any other questions for me with respect

4   to the factors, I believe that Mariia would like to now speak.

5           THE COURT:  Thank you, Mr. Carry.

6       Ms. Butina?

7           THE DEFENDANT:  Thank you very much for this

8   opportunity to speak in front of you.

9       Dear Judge, I came to the U.S. like many others, to better

10  my life.  For me, that meant getting an academic degree, and I

11  had no doubt that the best way to do that was here.  I wanted

12  a future career in the international policy.  At the same time,

13  I wished to mend relations while improving my own resume.  So

14  I sought to build bridges between my motherland and the country

15  I grew to love.  It was for these actions and my own ignorance

16  that I deeply sorry and hope to be shown mercy.  Never did I

17  wish to hurt anyone.

18      My parents discovered my arrest on the morning news they

19  watch in their rural house in a Siberian village.  I love them

20  dearly, but it harmed them morally and financially.  They are

21  suffering from all of that.  I destroyed my own life as well.

22  I came to the U.S. not under any orders but with hope, and now

23  nothing remains but penitence.

24      If I had known to register as a foreign agent, I would

25  have done so without delay.  I never lied or held any secrets.

I never injured someone or committed other crimes.  I just didn't register because I didn't know to.  Ignorance of law, however, is not an excuse, in the U.S. or in Russia.  And so I humbly request forgiveness.

The United States has always been kind to me, and while it has never been my intent to harm the American people, I did just that by not notifying your government of my actions in advance. I deeply regret this crime not merely because it has scarred me, my beloved friends and my cherished family, but, ironically, it has harmed my attempts to improve the relationships between the two countries.

For all the international scandal my arrest has caused, I feel ashamed and embarrassed.  My parents taught me the virtue of higher education, how to live life lawfully, and how to be good and kind to others.  I have three degrees, but now I'm a convicted felon with no job, no money, and no freedom.

My reputation is ruined both here in the United States and abroad.  And while I know that I'm not this evil person who has been depicted in the media, I am responsible for these consequences.  My personal ambitions and thinking, my choices, put me in this situation, and I'm sorry for all the alarm my behavior has become the reason for.

Just an apology will never be enough for my mistakes, dear Judge, because instead of building peace, I created discord. I cannot change the past, though I've surely tried.  I have

helped the U.S. government in any way they have requested,
even before my arrest, by aiding the U.S. Senate Intelligence
Committee last spring, by aiding FBI agents, and recently by
aiding the U.S. Attorney's Office.  I still hold the whisper
in my heart to one day return to this country, but I know this
wish is only a dream.

Dear Judge Chutkan, over the last nine months, I've learned
humility.  I've met and shared stories with some remarkable
other women, each flawed and struggling in their own way, but
still good in their own way.  As a Christian, God has carried
me through so much and gave me so much.  My attorneys fighting
for me were not getting paid.

My family and the few friends who generously talked
to me during days or nights while on breaks on my solitary
confinement, I've seen those who have never had visitors or any
money, even for a 30-seconds phone call.  I've seen others who
have waited along with me in the visitation room, and their
visitors has never come.  I'm so grateful for what I have, dear
judge.

I've also kept a quote on my windowsill from my cell that
says, "When you go through deep waters, I'll be with you."  God
has carried me through this uneasy but deserved experience.  It
is my penance.  Now I beg for mercy, for the chance to go home
and restart my life.  Please accept my apologies and allow me to
begin again.  Thank you.

1          THE COURT:  Thank you, Ms. Butina.

2          Sentencing is the most difficult part of this job.

3     After considering the departures and hearing statements made

4     by counsel and Ms. Butina, statements which I believe were

5     sincerely made, on both sides, I must now consider the relevant

6     factors set out by Congress in 18 U.S.C. § 3553(a) and ensure

7     that I impose a sentence sufficient but not greater than

8     necessary to comply with the purposes of sentencing.

9          These purposes include the need for the sentence imposed to

10    reflect the seriousness of the offense, to promote respect for

11    the law, and to provide just punishment for the offense.  The

12    sentence should also deter criminal conduct, protect the public

13    from future crimes by the defendant, and promote rehabilitation.

14         I must consider in each case the nature and circumstances

15    of the offense, the history and characteristics of the defendant,

16    the types of sentences available, and the need to avoid

17    unwarranted sentence disparities among defendants with similar

18    records who have been found guilty of similar conduct.  I've

19    considered all of these factors in deciding what the appropriate

20    sentence is in this case, and I will discuss some of them now.

21         With regard to the nature of the offense, as Mr. Anderson,

22    who is the former Assistant Director of the FBI's

23    Counterintelligence Division, noted in his declaration,

24    the United States is Russia's primary target for malign and

25    intrusive intelligence operations.

In targeting the United States, and I quote, "Russia works to obtain not only classified material or trade secrets, but also to collect any information that could, by itself or in conjunction with other efforts, assist the Russian government in increasing its geopolitical power or undermining and harming that of the United States."

Contrary to defense counsel assertions in its sentencing memorandum, this was no mere failure to provide the U.S. government with required information.  While it is certainly true that Ms. Butina was not engaged in any espionage activity, and while I certainly agree that she was a legitimate and hard-working student at the same time as she was engaging efforts, she was not simply seeking to learn about the U.S. political system.

She was seeking to collect information about individuals and organizations that could be helpful to the Russian government, and she was doing this under the direction of a Russian official for the benefit of the Russian government at a time when the Russian government was acting to interfere and affect the United States' political and electoral process.

Her activities organizing Gun Rights Organization visits to Russia, U.S.-Russia Friendship Dinners, were all used to establish back-channel lines of communication to advance Russian interests.  The conduct was sophisticated, and penetrated deep into political organizations.  Ms. Butina was likely able to

establish the contacts she did precisely because she did not reveal herself to be an agent of a foreign government.

This case is not simply about failing to notify the Attorney General.  Yes, it may be true that had Ms. Butina alerted the Attorney General, her conduct might have been legal. But it is because she did not register that her conduct was so dangerous and her crime a threat to our country's democratic institutions.

One of the things that Ms. Butina should have learned during her studies in this country is that she was able to participate in our political system and make connections because this is a country where our constitution protects individuals' freedoms to associate, gather, and exchange ideas, free from governmental interference.

But this is also a country where the rule of law means something, and our laws require her to declare her true business in this country, which was to gather information and develop relationships that could be used to Russia's advantage.  This was no simple misunderstanding by an overeager foreign student. There can be no doubt, as Mr. Anderson noted in his declaration, that the offense that Ms. Butina has pled to is serious and jeopardized this country's national security.

Turning to Ms. Butina's characteristics as an offender. It is apparent to this court, from hearing from Ms. Butina, from hearing from Mr. Carry, Mr. Driscoll, over the last nine

1    months, and from reading all of the letters submitted on your

2    behalf, Ms. Butina, that you are an intelligent, personable,

3    kind, and hard-working person who is a devoted daughter, sister,

4    granddaughter, and who impressed people wherever she went.

5        It is also clear to this court that you were a legitimate

6    and engaged student at American University and that you -- you

7    know, in a language that is not your own, you managed to graduate

8    with a 3.91 grade point average, and that is to your credit.

9        I also accept and understand that you have acknowledged

10   your wrongdoing and have fully accepted responsibility for it.

11   You have provided the government with substantial assistance and

12   cooperation, resulting in their filing of a downward departure

13   letter.  You are well educated, you have no prior convictions,

14   you don't have a prior history of criminal activity, and I will

15   tell you that I have no doubt that you will not have any further

16   criminal activity in your future.

17       I do also understand that on completion of your sentence,

18   should I sign the order of removal, you may be immediately

19   subject to removal.  You have a strong support network, which is

20   evidenced by the many letters that the Court has received from

21   your family, your friends, your former professors, your support

22   network, priests, your former colleagues -- one former colleague

23   at American University, and others.

24       No doubt you have suffered greatly because of the national

25   attention that this case has received, including some salacious

details that were proven to be incorrect.  And in the era
of Google, those will be difficult to overcome.  So I take
those factors into consideration, and I take your absolute --
what I take to be your absolute sincerity and remorse into
consideration.

Ms. Butina faces a maximum sentence of five years of
imprisonment.  She has been held for a little over nine months.
Her counsel asks for her to be sentenced to time served, and
she and the government have agreed to an order of removal, which
will hopefully prevent her from spending additional prison time
beyond her sentence awaiting deportation proceedings.

The government, after moving for a downward departure,
asks for a sentence of 18 months of incarceration, which will
mean that, with the time she has already been held, she would
serve an additional nine months less any potential institutional
good-time credit.

In addition to the nature and circumstances of the offense
and history and characteristics of Ms. Butina, I also have to
consider the purposes of sentencing, among other factors, and
one of the specific factors in 3553(a) is the need to avoid
unwarranted sentence disparity.

However, because there is not a sufficiently analogous
sentencing guideline in this case, the Court was unable to
find reliable national or D.C. Circuit statistics for mean and
median sentences, and neither the government nor the defense has

provided any.  What is clear, however, is that sentences for

violation of 18 U.S.C. § 951 and conspiracies to commit that

offense vary greatly.  The Court's sentence is in line with a

number of cases that the Court has reviewed.

If you could stand.

(Defendant complies.)

Having considered all of these factors, this court believes

that a penalty of 18 months is sufficient but not greater than

necessary to reflect the seriousness of the instant offense,

to promote deterrence, to protect the public from future crimes

that may be committed, and to avoid unwarranted disparities

among defendants convicted of similar crimes.

Therefore, based on my consideration of all the 3553(a)

factors, I will now state the sentence to be imposed.

It is the judgment of this court that you, Mariia Butina,

are hereby committed to the custody of the Bureau of Prisons for

a term of 18 months on Count 1.  You are further ordered to pay

a special assessment of $100.  The Court finds that you do not

have the ability to pay a fine and therefore waives imposition

of a fine in this case.

The special assessment is immediately payable to the Clerk

of the Court for the U.S. District Court for the District of

Columbia.  Within 30 days of any change of address, you shall

notify the Clerk of the Court of the change until such time as

the financial obligation is paid in full.

1    The Probation Office shall release the presentence

2    investigation report to all appropriate agencies in order to

3    execute the sentence of the Court.  Treatment agencies shall

4    return the presentence report to the Probation Office upon the

5    defendant's completion or termination from treatment.  The

6    Probation Office shall release the presentence investigation

7    report and/or judgment and commitment order to the Bureau of

8    Immigration and Customs Enforcement to facilitate any

9    deportation proceedings.

10    Pursuant to 18 U.S.C. § 3742, Ms. Butina, you have a right

11    to appeal the sentence imposed by the Court if the period of

12    imprisonment is longer than the statutory maximum or the

13    sentence departs upward from the applicable sentencing guideline

14    range.  If you choose to appeal, you must file any appeal within

15    14 days after the Court enters judgment.

16    As defined in 28 U.S.C. § 2255, you also have the right to

17    challenge the conviction entered or sentence imposed if new and

18    currently unavailable information becomes available to you, or

19    on a claim that you received ineffective assistance of counsel

20    in entering a plea of guilty to the offense of conviction or in

21    connection with sentencing.  If you are unable to afford the

22    cost of an appeal, you may request permission from the court to

23    file an appeal without cost to you.

24    Pursuant to D.C. Circuit opinion in *United States v.*

25    *Hunter*, 809 F.3d 677, are there any objections to the sentence

1    imposed that are not already noted on the record?  Mr. Kenerson?

2         MR. KENERSON:  No, Your Honor.

3         THE COURT:  Mr. Driscoll?

4         MR. DRISCOLL:  Other than noted, no.

5         THE COURT:  All right.  As set forth in the plea

6    agreement, the government pledged to move to dismiss the

7    remaining count of the indictment against Ms. Butina.

8       Does the government wish to do so now?

9         MR. KENERSON:  Yes, Your Honor.  We move to dismiss

10   the remaining count.

11        THE COURT:  The motion is granted.  The Court will

12   grant the Joint Motion for Order of Judicial Removal, which is

13   ECF No. 92.  As a point of clarification, the last sentence of

14   the proposed order that was submitted to me read:  "Wherefore,

15   it is hereby ordered, pursuant to Section 238(c) of INA, 8 U.S.C.

16   § 1228(c), that the defendant is ordered removed from the United

17   States to the Russian Federation promptly upon her sentencing."

18      To be clear, "upon her sentencing" means upon the

19   completion of the sentence just imposed.  The Court has changed

20   the language to read "promptly upon the completion of her

21   sentence."  Is there any objection to this not already stated,

22   Mr. Kenerson?

23        MR. KENERSON:  No, Your Honor.

24        THE COURT:  Mr. Driscoll?

25        MR. DRISCOLL:  No, Your Honor.

1          THE COURT:  All right.  Is there anything else

2   we should address today?   All right.

3       Ms. Butina, your counsel was correct when he quoted

4   Bryan Stevenson in that you are -- and I tell this to

5   defendants frequently -- that you are not the worst thing you

6   have ever done.  You are a young woman; you are smart; you are

7   hard-working; you have a future ahead of you.  I wish you the

8   best luck.

9       (Proceedings adjourned at 11:09 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*   *   *   *   *   *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE